1      A      The only thing that changed between all the

2  versions is the membership interest on Exhibit A and the

3  signature pages.

4      Q      There was no changes to section 6.10 --

5      A      No changes to 6 --

6      Q      Hold on.  Hold on.  Let me finish.

7             There was no changes to section 6.10 or

8  section 2.3, correct?

9      A      That's correct.

10     Q      And you agree that you're bound by the one you

11 signed that had those identical provisions in there,

12 right?

13     A      I agree.

14     Q      Yet, we've spent money on this side of the

15 table, your side's spent money on forgery experts and

16 fighting about this forgery thing for a good chunk of

17 this case, haven't we?

18     A      We have.

19     Q      And, yet, you're telling this panel that you

20 admit that you're bound to this agreement?

21     A      I'm bound to the one I signed and I never said

22 otherwise.  Well --

23     Q      You answered the question.

24     A      No.  I signed an agreement and I admit that I

25 signed it.  I'm not sure that agreement was fully

1088

1  executed because one of the partners didn't sign it, so

2  I think I -- there was a caveat there.

3           MR. LOWENSTEIN:  Can I borrow your Elmo?

4           MR. WALTERS:  Sure.  Can I borrow your AV

5  people over there to pull up exhibits?

6           MR. LOWENSTEIN:  Anytime you want, Randy.

7           MR. WALTERS:  Thank you.  You heard me

8  say I respected you yesterday, didn't you?

9           MR. LOWENSTEIN:  Don't change that.

10           MR. SHAMOUN:  Guys.

11           CHAIRMAN ALDOUS:  Father time has spoken.

12  Please move on.

13     Q    This is Exhibit 254 that was the e-mail from

14  Mr. DeWolf to Xu Hang that we talked about earlier that

15  the panel ordered produced.  Do you recall that?

16     A    Yes, I do.

17     Q    That's dated June 2nd, 2015?

18     A    Right.

19     Q    And that was your lawyer and IRE's lawyer and

20  Ascendant's lawyer sending a list of interrogatories to

21  Xu Hang that were answered by both Xu Hang and Wu Lili,

22  right?

23     A    I believe so, yes.

24     Q    And those were answered -- I think we saw Wu

25  Lili's letter was answered two days later.  Do you

1089

1    recall that?

2         A    Yeah.  I believe it was 4th, yes.

3         Q    And do you recall that there were a number of

4    discovery requests that came from our clients to you and

5    the other AVIC entities in this case?

6         A    When?

7         Q    Throughout this case we asked a series of

8    requests for documents and interrogatories.  Do you

9    recall that?

10        A    Yes.

11        Q    And were you aware that the panel ordered in

12   Order No. 18 that those be produced within ten days of

13   May 29th, 2015?

14        A    And what was to be produced?

15        Q    Well, there was a number of documents.  Did

16   you ever look at those and see what documents were

17   requested?

18        A    Show them to me.

19        Q    Well, I don't have the time to go through all

20   of them.

21        A    Yeah, I don't recall what the documents were.

22        Q    And do you know that -- whether -- in addition

23   to the interrogatories that Mr. DeWolf wanted an answer

24   to, whether the requests that we sent that the panel

25   ordered be responded to, do you know if those were ever

1   sent to Xu Hang and, as a friend or honorable man,

2   you-all asked him to produce that information?

3        A    I don't know if that --

4        Q    You just got the answers to the questions

5   you-all wanted answered, correct?  You don't know?

6        A    I don't know what -- say the question again,

7   please.

8        Q    I'm just wondering that when we asked for it

9   and the panel ordered it whether that request was

10  respected and it went to Xu Hang to be responded to or

11  only the ones that Mr. DeWolf wanted answered?

12       A    It was my understanding that Ascendant and the

13  other nonsignatories were not participating and I think

14  there were some things requested that were not produced

15  because of their nonparticipation, yes.

16       Q    So the participation they did do was the

17  president of IRE provided a certified letter two days

18  after Mr. DeWolf's request, right?

19       A    Correct.

20       Q    And that was presented to the panel?

21       A    Correct.

22       Q    Xu Hang sent an e-mail, who is the vice

23  president of IRE and a board member of Ascendant, he

24  sent a response to Mr. DeWolf's requests, right?

25       A    Yes, I think he did.

1091

1    Q    And then at your request, Xu Hang, the vice

2    president of IRE and the board member of Ascendant, he

3    appeared for a deposition to ask -- answer your

4    questions, didn't he?

5    A    Yes, he did it, at my request.

6    Q    And all of that was presented to the panel?

7    A    Yes.

8    Q    Are you aware of the first time we asked to

9    take Xu Hang's deposition?  Do you know what date that

10   was?

11   A    January maybe.

12   Q    And the first time you made that request to

13   him was sometime after Ms. Bramer's report, right?

14   A    Yes.

15   Q    You never reached out to him before that as an

16   honorable man, as you described him, to see if he would

17   appear for a deposition before that, did you?

18   A    I did it in response to Ms. Bramer's report.

19   Q    My question is, did you ever ask before that

20   date?

21   A    No, I never asked him before that, no.

22   Q    Do you know where the money's coming from to

23   pay Mr. DeWolf's firm and Mr. Walters' firm?

24   A    It's coming from --

25           THE WITNESS:  Is that privileged?

1092

1 Mr. Chairman, is that --

2          CHAIRMAN ALDOUS:  Don't you, yourself,

3 concern yourself with what is privileged or not.  That's

4 why those lawyers sit over there.  If they want to raise

5 an objection, they have a right to.

6          THE WITNESS:  Okay.

7          CHAIRMAN ALDOUS:  And I suggest that you

8 rely on their --

9     A    Mr. DeWolf and Mr. Walters' firm are being

10 paid by all of the Defendants in this case, is that

11 right, Defendants or Respondents, is that -- all of them

12 are paying their share, their -- whatever the cost is.

13     Q    Do you know who wrote the check to pay their

14 firms?

15     A    Ascendant writes the check and then the other

16 parties reimburse Ascendant up to about some point in

17 time.  Now the checks come directly from all the various

18 entities, and I can't tell you when that -- I don't

19 remember the exact time that began, but each entity pays

20 its portion of the bill.

21     Q    Thank you.

22     A    Does that answer your question?

23          MR. LOWENSTEIN:  No further questions.

24          CHAIRMAN ALDOUS:  Any other questions by

25 the Claimants?

1093

1      MS. PERRY:  Yes, Your Honor.

2      CHAIRMAN ALDOUS:  Oh, I'm sorry.  I

3  didn't see you.

4                    EXAMINATION

5  BY MS. PERRY:

6      Q    Mr. Thompson, I'm Deborah Perry.  I represent

7  The Nolan Group, who we've talked about today.  You

8  testified previously that while Patrick didn't codevelop

9  the Pyco project, I'm using your words there, he did

10  introduce you to the turbine manufacturer and did some

11  additional work, correct?

12      A    He -- yes, he introduced me to the turbine

13  manufacturer and I believe either he or I together

14  introduced senior management of Pyco to the turbine

15  manufacturer.

16      Q    And --

17      A    And he was in the room when [someone coughing]

18  [unintelligible] negotiated representing the turbine

19  manufacturer.

20      Q    Thank you, Mr. Thompson.

21           And do you recall who the turbine

22  manufacturer was on that deal?

23      A    A company called HD.

24      Q    And I think the panel's heard a little bit

25  about HD during this arbitration.  HD is an AVIC

1094

1    company, isn't it?

2         A    It is.

3         Q    And, Mr. Thompson, you certainly agree that to

4    have a successful wind farm you have to have turbines,

5    right; prerequisite?

6         A    I don't know how you'd do it without it.

7         Q    And when you left Ascendant, I think you

8    testified that you left about a month ago, did you relay

9    responsibilities for determining legal strategy for

10   Ascendant to another AVIC officer?

11        A    No.

12        Q    So do you know who's making the decisions for

13   Ascendant now that you've resigned?

14        A    I don't know.

15        Q    How did you notify Ascendant that you were

16   resigning?

17        A    I sent a resignation letter.

18        Q    Who did you send that to?

19        A    To Mr. Xu, who's my -- who's the board

20   chairman.

21        Q    And was there anyone else that was cc'd on

22   that?

23        A    Actually, I -- it was an e-mail, and I sent

24   it to Mr. Xu and asked him to forward it to the other

25   board members.

1095

1    Q    Have you produced that e-mail?

2    A    No.

3    Q    If we wanted it, do you still --

4    A    Yeah, I still -- yeah, sure do.  It was a

5    letter -- it was a letter attached to an e-mail -- or

6    a file that was attached to an e-mail.

7    Q    And Mr. Lowenstein asked you some questions

8    regarding who's paying the legal bills for Ascendant,

9    and you talked about each different Respondent paying a

10   portion of those bills.  Is there some type of written

11   agreement that sets that out?

12   A    There's a reimbursement agreement that says

13   Ascendant will pay and then they get reimbursed, and

14   then there's a -- but now those bills are coming

15   directly to the law firms.

16   Q    When you say the bills are coming directly to

17   the law firms, what do you mean by that?

18   A    There's a monthly invoice that goes to each of

19   the -- their clients and then the clients pay directly.

20   Q    And who do you understand the clients are for

21   Mr. Walters and Mr. DeWolf?

22   A    CATIC TED -- I'm sorry, AVIC TED, AVIC IRE,

23   Ascendant and me.

24   Q    And do you have a copy of that I think you

25   characterize it as a reimbursement agreement.  Do you

1096

1    have a copy of that, Mr. Thompson?

2        A    I do.

3        Q    Did you execute it?

4        A    I did.

5        Q    Do you recall when that agreement was executed

6    by you?

7        A    No, I don't.  I don't recall.

8        Q    Do you know if it was 2014 versus 2015?

9        A    It was 2015.

10       Q    Thank you, Mr. Thompson.

11                CHAIRMAN ALDOUS:  Mr. Denney, do you have

12   any questions?

13                MR. DENNEY:  Yes, sir, I do.

14                CHAIRMAN ALDOUS:  Okay.  Oh, I'm sorry.

15   I did not see you slip in there.  Y'all are moving

16   around too fast for me.

17                MS. MCKAY:  Go ahead.

18                CHAIRMAN ALDOUS:  No, no, no.  You go

19   ahead.  You're Ms. McKay?

20                MS. MCKAY:  I am.  I represent Jan Family

21   Interests.

22                CHAIRMAN ALDOUS:  You go next.  So you

23   sit back down.

24                MR. DENNEY:  I did.  I wasn't trying to

25   get anybody; I just couldn't see.

1   EXAMINATION

2   BY MS. MCKAY:

3       Q    Mr. Thompson, in your deposition you made a

4   statement that you would never have agreed to enter into

5   a partnership with The Nolan Group.  Do you recall that

6   statement?

7       A    Yeah, I do recall that.

8       Q    And why is it that you would never have

9   entered into a partnership with The Nolan Group?

10      A    Like I said earlier, I don't know that I

11  wouldn't.  I was never given the opportunity.  I signed

12  one agreement and I didn't sign the second agreement.

13  All I know is I didn't sign it.  I'm not -- I can't say

14  if I would or I wouldn't.  I was never given a choice.

15      Q    So your testimony is that somebody forged your

16  signature on that document?

17      A    That's always been my testimony.

18      Q    And do you have a theory as to who forged your

19  signature?

20      A    Don't know.

21      Q    Do you have theory as to why somebody would

22  forge your signature?

23      A    I don't know.

24      Q    Do you have a theory as to how your signature

25  was forged?

1098

1       A     No.

2       Q     And I think Mr. Lowenstein asked you a little

3   while ago about the amount of time and money that's been

4   put into this issue of a forgery.  You would agree that

5   a lot of time and money's been put into this?

6       A     Yeah.  A lot.

7       Q     But you've testified today, contrary to your

8   deposition testimony, that you do know who The Nolan

9   Group is?

10      A     I do not know who the individual members of

11  Nolan Group are.

12      Q     But you know who The Nolan Group is?

13      A     I know what The Nolan Group is.  I don't know

14  who the individual members of The Nolan Group are.

15      Q     And you agree that you were willing to be paid

16  by The Nolan Group for many years?

17      A     I believe I was paid by Soaring Wind and I

18  believe The Nolan Group had responsibility for the

19  administrative functions, including payroll for Tang

20  Energy and Soaring Wind and all the other businesses.

21  And so I believe that I was being paid by Soaring Wind.

22  My offer letter said, "Would you come to work for

23  Soaring Wind?"  I believe I was working for Soaring

24  Wind.

25      Q     Thank you.  So your paystubs that may say The

1    Nolan Group beginning in 1997, that doesn't change the

2    fact of whether or not you would enter into a

3    partnership with The Nolan Group?

4         A    I wasn't asked to.  I wasn't given that

5    choice.

6         Q    So the issue was whether you were asked or

7    not, not the fact that you were -- you were or weren't

8    in a partnership with The Nolan Group?

9         A    The issue is I never signed an agreement that

10   The Nolan Group was a party to.

11        Q    Yesterday you talked about the tape-recordings

12   between you and Mr. Jenevein.

13        A    Uh-huh.

14        Q    And I think that towards the end of the day

15   you referred to it as you were just BSing with your

16   friend?

17        A    Yeah.

18        Q    You were commiserating?

19        A    Exactly.

20        Q    And those statements that you made on the

21   tape, those were not true statements?

22        A    No.  And I put it in an e-mail that they

23   were inaccurate.

24        Q    So when you made the statement --

25             MS. MCKAY:  And for the panel's benefit,

1100

1    this was Exhibit 201, Claimants' Exhibit 201, which is

2    the transcript of the taped conversations.

3                    CHAIRMAN ALDOUS:  What page?  If it's

4    there.

5                    MS. MCKAY:  It's page 58 through 60.

6                    CHAIRMAN ALDOUS:  Thank you.

7       Q    During the first exchange on the clip we

8    played yesterday, Mr. Thompson, you made a comment that

9    the actions taken by AVIC moving money from Hong Kong to

10   other entities, you made a statement that you believe

11   that was fraud.  Do you recall that statement?

12      A    Yeah.  And that's inaccurate.  AVIC never --

13   AVIC never moved money to Ascendant from Hong Kong.

14      Q    But you don't disagree that you made that

15   statement to Mr. Jenevein during the time that you were

16   being taped?

17      A    I may have, yeah.  90 percent of what we

18   talked about was the blade business in those

19   conversations.

20      Q    Let me read your statement that was recorded.

21      A    Okay.

22      Q    "Another AVIC company had money in Hong Kong,

23   which was in dollars they wanted to get out of Hong

24   Kong, and they moved it over to me.  They're always, you

25   know, robbing Peter to pay Paul.  But I always said, as

1   long as Paul gets paid, I don't care what happens."

2        A    I did say that.

3        Q    So when you made that statement to

4   Mr. Jenevein, you were being untruthful?

5        A    It was BS, yes.

6        Q    And then later on when you made the statement

7   to Mr. Jenevein --

8             MS. MCKAY:  And this is on page 55 of the

9   transcript.

10             CHAIRMAN ALDOUS:  Thank you.

11        Q    -- that they were cooking the books, and you

12   go on to say, "You know what's happened is that they

13   took the money since Pricewaterhouse auditor says, 'Oh,

14   yeah, there's 10 million in the bank in that company.'

15   Okay, we'll push it aside and then wire the money over

16   to another entity."

17             You don't believe that that was actually

18   happening?

19        A    No, I don't believe it was.  I think that's

20   more BS.

21        Q    So your position, then, is that the entire

22   time you were commiserating with your friend, it was

23   just all BS?

24        A    Not all of it.  Just -- I was -- there was a

25   lot of statements I made I shouldn't have said, and I

1    have no idea what goes on in China.  I was Ascendant's

2    president.  I only saw what happened with Ascendant.  I

3    have no idea what happens in China or Cambodia or

4    anywhere else.

5              I only saw what happened in Ascendant.

6    Ascendant was audited by Pricewaterhouse; so was AVIC

7    IRE.  I have no evidence that anything inappropriate was

8    going on, and I shouldn't have said that and I'm sorry.

9              MS. MCKAY:  Pass.

10             CHAIRMAN ALDOUS:  Thank you, Ms. McKay.

11             Mr. Denney, I'm going to let you go next.

12             MR. DENNEY:  Anybody else that wants . .

13    .

14             CHAIRMAN ALDOUS:  Wait a minute.  Let me

15    check.  Anybody else have any other questions before we

16    allow Mr. Denney to go?

17             MR. DENNEY:  Thank you, Mr. Chairman.

18    Like I said, I'm not standing up to come to get you; I

19    just can't see you.

20                    EXAMINATION

21    BY MR. DENNEY:

22       Q    So have a couple of questions for you, Mr.

23    Thompson.  My name's David Denney.  I represent Mike

24    Carter.  We haven't met yet, so I wanted to introduce

25    myself.

1103

1          You had a conversation moments ago, I

2   think, with Ms. Perry about an agreement that you signed

3   with regard to who was going to pay your lawyers' fees

4   and that kind of thing, right?

5      A    Yes.

6      Q    And that -- is that --

7      A    The agreement on who paid my lawyers' fees is

8   in my employment agreement.  I believe that Ascendant

9   indemnifies me and Ascendant is paying my legal fees,

10  yes, sir.  And that's been provided.

11     Q    Okay.  Great.  Right.  So when you received

12  document requests from the Claimants, you received a

13  request for contracts for indemnification and legal

14  fees.

15     A    Yeah, and I provided that.

16     Q    And that's the document -- that's the only

17  document that you provided; is that correct?

18     A    Yeah.  When that request came out, that was

19  the only document.

20     Q    And that's a fully-executed agreement, right?

21     A    Which one?

22     Q    Your employment agreement.

23     A    Yeah, sure.  And it was provided when you

24  asked.  It was provided.

25     Q    I understand.  That's -- but that's the only

1104

1  document that you provided in response to that written

2  discovery from December/November?

3      A    Yeah.  From November, yeah.  I provided it.

4  I'm certain of it.

5      Q    I'm not disputing that you did.

6      A    Okay.

7      Q    And that indemnification agreement is the

8  agreement by which you say that the parties have agreed

9  to split the payment of your fees in ratio?

10     A    No.  That's a separate agreement.

11     Q    Do you know if that agreement has been

12 produced?

13     A    No.  It was afterward.  It was after the

14 request.

15     Q    It was.  It was executed after the discovery

16 request?

17     A    Yes, I believe so.

18     Q    Do you think all the parties have signed that

19 agreement?

20     A    Well, it's a reimbursement agreement is all it

21 is.  It just says that Ascendant will pay it and

22 Ascendant gets reimbursed.  That's all it is.

23     Q    Understood.  So I only have a couple of more

24 questions for you.

25             So you spoke a lot yesterday about these

1  recordings and how they made you feel.  It isn't your

2  contention in this case, is it, that the recordings of

3  you were made illegally, is it?

4      A    No.

5            MR. JENEVEIN:  Jackie, can we put up

6  exhibit -- I forgot the number.

7            MS. ARGUIJO:  349.

8            MR. DENNEY:  349.

9      Q    It's the e-mail that you sent, I believe, to

10  Patrick Jenevein where you said "I can't confirm the

11  things that you put into your e-mail" that now we know

12  came from the recording because you have a conflict?

13            MR. DEWOLF:  That's not the e-mail you

14  have up.

15            CHAIRMAN ALDOUS:  It's actually

16  Claimants' Exhibit 349.  Is that the one you wanted,

17  Mr. Denney?

18            MR. DENNEY:  Yes, sir.

19      Q    Right.  So you see that there, right?

20      A    I see that I sent that in response to an

21  e-mail and I realize that he's -- was intending to drag

22  me into this, and I asked him as a friend not to pursue

23  it any further.

24      Q    Okay.  So right there in the very beginning in

25  that first sentence, "As a partner in Soaring Wind

1   Energy," how did you believe at that time, on April 16th

2   of 2014, that you were a partner in Soaring Wind Energy?

3       A    I understood that Soaring Wind hadn't been

4   dissolved and I had a small, small interest in it.

5       Q    You told the panel yesterday that Mr. Carter

6   presented you with two naked pages, two signature pages,

7   with no agreement attached, right?

8       A    Correct.

9       Q    And that you did not sign those pages?

10      A    Correct.

11      Q    That was your testimony?

12      A    That's correct.

13      Q    When those documents were presented to you --

14   allegedly presented to you with no other attachment, did

15   you ask a question, anything like "Hey, I already signed

16   something.  Is this agreement being amended?

17      A    That was the first -- that was the first

18   agreement.  Control number at the bottom of that one is

19   version 10, and Mr. Carter gave me the signature pages

20   and said, "The CATIC guys are coming later today and you

21   need to sign this."  And I said, "I'm not signing

22   anything I haven't read."

23               And, sure enough, the CATIC guys came,

24   Mr. Carter signed it and Mr. Leo signed it.  They

25   initialed every page and they exchanged documents, did

1107

1    it again.  And then Sherman asked me if I was going to

2    sign it and I said, "I haven't read it yet."  And that

3    was on June 5th of 2008.

4        Q    But then you had an opportunity to read it;

5    did you not?

6        A    I read it on June 6th of 2008 and was

7    disappointed to find out I was promised 15 percent of

8    the Class B shares and I was given less than 10.  And I

9    was promised to vest in two years and it had it vesting

10   in 5, and I was pretty upset.

11       Q    Did that change from the first agreement?

12       A    That was the first agreement I saw.  I

13   never -- I didn't see it until after the signature pages

14   were presented to me.  And I did not sign version 10.  I

15   did not sign it.

16       Q    But, again, in 2014 you still believed you

17   were a partner?

18       A    I signed version 11 that was -- that had a

19   company called Tersus as a party to it, and I know that

20   because I asked Mr. Carter who Tersus was.  I know

21   Tersus was a party to it.  That's the only one I signed.

22       Q    All right.  Thanks very much.

23       A    Thank you.

24            MR. DENNEY:  Pass the witness.

25            CHAIRMAN ALDOUS:  Thank you, Mr. Denney.

1108

1    And, by the way, I was just joshing with you earlier

2    when I said that I want the record to reflect that I

3    didn't mean that you always go last.

4                    Any further questions from the

5    Respondents?

6                    MR. WALTERS:  A few.

7                    CHAIRMAN ALDOUS:  Go ahead.

8                         EXAMINATION

9    BY MR. WALTERS:

10        Q    In the recorded statement, we heard the voice

11   portion of this, and you see what you told Mr. Jenevein.

12   And this is at the very end of the February one.  You

13   say -- you told him you couldn't prove it.  You see

14   that?

15        A    Yeah.

16        Q    When he was asking you about from top up to

17   top down and money being pushed from one entity to

18   another.  See that?

19        A    Yes.

20        Q    And then it says, "I mean, I knew it from

21   you."  Were you talking about what he was telling you

22   about HT Blade?

23        A    Yes.

24        Q    Now, I want to talk to you about Claimants'

25   Exhibit 1000 that they just introduced today and this

1109

1   offer to release you or let you go.  Did they offer to

2   completely let you out of the case if you would sign

3   this affidavit?

4        A    No.

5        Q    And, in fact, not personally liable for

6   damages outside of the United States.  Do you see that?

7        A    That's correct.

8        Q    Did you hear Ms. Bramer testify yesterday

9   about over 450 something million dollars she is

10  accounting for for this 300-megawatt project in the

11  U.S.?

12       A    I did.

13       Q    And did you see our response, Mr. DeWolf's

14  response, to that saying, "If you will completely let

15  him go, we'll sign that affidavit because it's true.  He

16  doesn't know anything about this stuff"?  Do you

17  remember that?

18       A    I do remember that.

19       Q    And they did not agree to that, did they?

20       A    They did not agree.

21       Q    Who owns Cirrus Wind 1?

22       A    A company called A-Tech.

23       Q    You were asked about these court or panel

24  orders.  Do you have any documents in your possession

25  regarding any of these projects from around the world or

1110

1  a 300-megawatt project in the U.S.?

2       A    No.

3       Q    Do you know of any documents that exist

4  regarding those projects?

5       A    I do not.

6       Q    The $50,000 you were paid as a bonus, who paid

7  that bonus.  What checking account did that come from?

8       A    That came out of Ascendant Renewable Energy's

9  account.  It was following the completion of the Cirrus

10 Wind 1 farm -- Cirrus Wind 1 wind farm just a few days

11 after it was completed.

12      Q    And as to the payment of attorneys' fees in

13 this case, you said all of the Respondents are paying me

14 and Mr. DeWolf.  Did you mean AVIC USA when you meant --

15      A    No.  I mean -- I thought I clarified that.  It

16 was my understanding is that AVIC TED and AVIC

17 International Renewable Energy, or you call IRE,

18 Ascendant and I are all four of your clients.

19      Q    But all these other parties --

20      A    No.  No.  They're all -- they're represented

21 separately.

22              MR. WALTERS:  That's all I have.

23              CHAIRMAN ALDOUS:  Mr. McNeil?

24              MR. MCNEIL:  He stole my question.  I

25 have no questions.

1111

1     CHAIRMAN ALDOUS:  All right.  Let me make

2  the rounds now.  Mr. Jenevein?

3     MR. JENEVEIN:  I'm fine, Your Honor.

4     CHAIRMAN ALDOUS:  Ms. McKay?  Ms. Perry?

5     MS. PERRY:  I'm fine.

6     CHAIRMAN ALDOUS:  Mr. Denney?

7     Anybody on the panel have any questions

8  to my left?  To my right?  Judge Marshall.

9                  EXAMINATION

10  BY JUDGE MARSHALL:

11     Q    Mr. Thompson, I'd like to go back to the

12  exhibit that is right behind you with section 2.3 in it.

13  See that exhibit?

14     A    I do.

15     Q    Could you please tell me what the business is

16  as defined in section 2.3, as you read it?

17     A    It's the worldwide marketing of wind energy

18  equipment and services and materials related to wind

19  energy including, but not limited to, marketing wind

20  turbines, generator blades and wind turbine generators

21  and developing wind farms.

22     Q    And you contacted Mr. Carter for clarification

23  of that language?

24     A    Yes.

25     Q    What part of that did you not understand was

1112

1    the business of Soaring Wind?

2        A    As a practical matter, Soaring Wind only sold

3    wind turbines.  That was all they did.  I was told by my

4    boss, Mike Carter, not to do anything else but sell wind

5    turbines.

6            So, as a practical matter, I was directed

7    by him if I got a wind turbine opportunity -- or wind

8    farm development opportunity, I was directed by

9    Mr. Carter to forward it to Patrick to see if he wanted

10   to do it through Tang Energy.

11       Q    Let me try it again.  You have said that you

12   signed Soaring Wind agreement version 11, right?

13       A    The version I signed control number 11 at the

14   bottom, but there are two versions with 11 at the

15   bottom.

16       Q    But both of those versions contain section

17   2.3; is that correct?

18       A    They do, yes, sir.

19       Q    Identical, correct?

20       A    Yes, sir.

21       Q    If you signed it, why did you need any

22   clarification from Mr. Carter or from anybody?

23       A    I was asking for relief from that provision,

24   and he gave it to me.

25       Q    Did he have the authority to carve it out

1113

1    without anybody else agreeing to that?

2        A    He was -- yes.  He was my boss and he directed

3    me only to sell wind turbines.  I saw him as the

4    authority, yes.  I mean, I didn't know why Mr. Jenevein

5    could engage in the wind business outside of Soaring

6    Wind and I couldn't.  I saw him doing it.  I knew it was

7    going on before I left Soaring Wind and I was asking for

8    relief.

9                CHAIRMAN ALDOUS:  Is that it, Judge?

10               JUDGE MARSHALL:  That's it.  Thank you.

11               CHAIRMAN ALDOUS:  Mr. Byrne or

12   Mr. Capshaw?  Mr. Shamoun.

13               MR. SHAMOUN:  I can't help myself.

14               THE WITNESS:  This on our time?

15               CHAIRMAN ALDOUS:  No.  This is on the

16   panel's time.

17                         EXAMINATION

18   BY MR. SHAMOUN:

19       Q    Do you see that chart behind you that starts

20   with Aviation Industry Corporation of China, AVIC?  See

21   that?

22       A    This one up here?  Yes.

23       Q    Is -- to your knowledge, I'm only asking based

24   on your knowledge.  To your knowledge, is that chart in

25   correct form with regards to AVIC on top and then AVIC

1114

1    IHC and then the subsidiaries underneath?  To your

2    knowledge, is that correct?

3         A    No.  I think there's some in between, and I'm

4    not -- one of the things I was asked to produce was an

5    org chart, and I've never seen a complete -- I think

6    there's 200 companies on it, so I don't know that you

7    could make a complete org chart.  I know there are some

8    in between.

9         Q    But you heard testimony and, to your

10   knowledge, is the control group the correct -- the

11   holding company of it all, is that really the control

12   group?

13        A    I don't know.

14        Q    You don't know?

15        A    I don't know what goes on in China.  I have no

16   idea.  After it leaves Ascendant, I have no idea how it

17   works.

18        Q    All right.  So you don't have any knowledge of

19   who controls who and --

20        A    I really don't.  I've never met anyone from

21   CATIC TED.  I've never met anyone from CAIGA.  I only

22   interface with my board.

23              CHAIRMAN ALDOUS:  I have a couple of

24   questions.

25                        EXAMINATION

1    BY CHAIRMAN ALDOUS:

2        Q    Mr. Thompson, you testified that Ascendant

3    made $20,500 in 2011, $5,700 in 2012 and 117,000 in

4    2013?

5        A    Lost 117 in 2013.

6        Q    Lost.  Thank you.

7        A    And lost 306 in '14.

8        Q    The losses that you're -- or the gains that

9    you're talking about, is that specifically with respect

10   to the tax return that was filed by Ascendant?

11       A    Yes, it is.

12       Q    Was it the -- did Ascendant try to distribute

13   all earnings prior to filing that tax return?

14       A    No.  In 2011 there weren't any distributions.

15   AVIC's never -- AVIC IRE has never taken distributions

16   out of Ascendant.

17       Q    That brings me to my next question.  There was

18   an e-mail where there was a discussion about, you

19   know, congratulating you on the Cirrus 1 raising the

20   turbine -- 17 turbines or what have you.  Wasn't that a

21   big thing for Ascendant?

22       A    Yeah.  Because Ascendant was doing development

23   activity and primarily getting the interconnection to

24   the wind farm.  So my job from about the middle of --

25   or, really, the whole project was to get that wind farm

1116

1    interconnected.

2              And if you don't do it by the end of

3    2012, which you saw the December 25th e-mail, you

4    don't -- you're not eligible for that grant, the cash

5    grant.  So that Cirrus Wind 1 -- which I didn't work for

6    Cirrus Wind 1, I worked for Ascendant and I just did

7    development stuff.  If I didn't complete that

8    interconnection by the end of '12, they didn't get the

9    grant, and it was a lot of money.

10        Q    Well, was Ascendant a member of Cirrus Wind 1?

11        A    No.  Ascendant sold -- Ascendant set up Cirrus

12   Wind 1 and then sold it to -- sold it.

13        Q    So Ascendant was a member of Cirrus Wind 1 at

14   one time?

15        A    In 2011 it was a member and we sold it in

16   December of 2011.  I resigned as the president of Cirrus

17   Wind 1.

18        Q    All right.  So the answer to my question is

19   yes?

20        A    Yes.  I'm sorry.

21        Q    That's all right.  And then Cirrus Wind 1

22   was -- when Ascendant sold its interest in Cirrus Wind

23   1, who did it sell it to?

24        A    A company called Cirrus Wind Energy, Inc.,

25   which is a Delaware corporation.  And that is actually

1   the entity owned by A-Tech.

2       Q    So when Cirrus Wind Energy 1 sold -- or

3   purchased Ascendant's interest in Cirrus Wind 1, where

4   did that money go?

5       A    Say that again, please.

6       Q    Well, when Cirrus Wind Energy purchased

7   Ascendant's interest in Cirrus Wind 1, where did that

8   money go?

9       A    It went to Ascendant.  It -- yes, it went to

10  Ascendant.  And then that's what -- that money is what I

11  used to do the development work.

12      Q    How much was the payment from Cirrus Wind

13  Energy for Ascendant's interest in Cirrus Wind 1?  And I

14  realize --

15      A    It was $4.5 million.

16      Q    There was a reference --

17           CHAIRMAN ALDOUS:  And is it all right if

18  I ask for Exhibit -- Claimants' Exhibit 326 to be

19  brought up?  If you -- would you go to the very top

20  e-mail?

21      Q    And before we get to this, Mr. Thompson, you

22  did say that Cirrus Wind Energy, Inc., which is a

23  Delaware corporation, is the owner of A-Tech?

24      A    No, sir.  It's the other way around.

25      Q    A-Tech owns Cirrus Wind Energy?

1118

1    A    That's correct.

2    Q    And is A-Tech a corporation?

3    A    It is.

4    Q    Well, this is kind of connected.  So

5  Claimants' Exhibit 326 says Subject:  Sany Proposal.  Do

6  you see that?

7    A    Yeah.

8    Q    What is Sany?

9    A    Sany's another turbine equipment manufacturer.

10  They're a wind turbine manufacturer in China.  This is

11  probably an e-mail chain and it was related to it, but

12  they were not involved in the Cirrus project.

13    Q    And this was my question:  The Sany proposal

14  as in the subject line didn't have anything to do with

15  your bonus that year?

16    A    No.  It was probably just an e-mail chain.

17  That happened a lot was -- it'd be these wild chains to

18  nowhere.

19    Q    Do you know what company owns -- if any, owns

20  or controls A-Tech?

21    A    It's somehow connected to China Rare Earth,

22  and it's not an AVIC affiliated company.  A-Tech is

23  separate and apart from AVIC.  So AVIC -- to my

24  knowledge, AVIC IRE and no other AVIC affiliated company

25  owns any of Cirrus, to my knowledge.

1119

1    Q    All right.  And with respect to the
2    reimbursement agreement and the -- and your previous
3    employment agreement, I just want to confirm, you have
4    not individually had to pay any attorneys' fees yourself
5    for the action that has been brought either for or
6    against you; is that accurate?
7    A    I have not at this point.
8    Q    All right.  Thank you.
9         MR. SHAMOUN:  I have a question.
10        CHAIRMAN ALDOUS:  Go ahead, Mr. Toles.
11                   EXAMINATION
12   BY MR. TOLES:
13   Q    During your tenure at Ascendant, how many
14   board meetings do you recall taking place?
15   A    One.  In January of '13.
16   Q    Did you attend that meeting?
17   A    I did.
18        MR. TOLES:  That's all I have.
19                 FURTHER EXAMINATION
20   BY MR. SHAMOUN:
21   Q    Mr. Thompson, you just told the chairman that
22   the -- to your knowledge, the owner of the entity that
23   purchased Cirrus Wind 1's membership interest is not an
24   affiliate of AVIC.  Did I hear you right?
25   A    Yes, sir.

1120

```
 1        Q     When you refer to AVIC, are you referring to
 2   AVIC International Holding?
 3        A     I'm referring to all of AVIC.  AVIC --
 4        Q     Whoa, whoa.  I don't know what that means.
 5   You're referring to all of AVIC.  Can you help me out
 6   there?
 7        A     I'll use an analogy.
 8        Q     What does that mean, "all of AVIC"?
 9        A     When I say all -- when I say AVIC, I mean,
10   it's like we're saying GE.  There's hundreds of
11   subsidiaries.  When you say GE, it's all GE.  So AVIC is
12   all of AVIC.
13        Q     I gotcha.
14        A     The 200 AVIC companies.
15        Q     So when you say it's not an affiliate of AVIC,
16   what do you mean by the word affiliate?
17        A     A-Tech is a separate company that has no
18   connection to any of the AVIC family of companies.  It's
19   a separate company.
20        Q     So when I look on that chart, is it fair for
21   us as the panel to conclude that all of those entities
22   are affiliated with each other?
23        A     They're -- I understand there's a couple
24   hundred of AVIC affiliated companies.
25        Q     I'm talking about the ones on the chart.
```

1121

1   Would it be fair for us as a panel to conclude that they

2   all are affiliated with each other?

3       A    Yes, it would be fair.

4       Q    And when you worked for Ascendant, did you

5   have the mind-set to believe that Ascendant was

6   affiliated with AVIC IRE?

7       A    Yes, sir.

8       Q    And IRE was affiliated with AVIC USA?

9       A    No, sir.

10      Q    Was AVIC affiliated, in your mind, with AVIC

11  TED?

12      A    No, sir.  I never -- I only interacted with

13  AVIC IRE.  I never had any interaction with these -- I

14  don't know how they're connected.  I don't know CAIGA, I

15  don't know any -- I've never seen an org chart.  I don't

16  know how it connects.

17      Q    Well, then how can you say that the owner

18  of -- or the purchaser of Cirrus Wind's membership

19  interest is not affiliated with AVIC, then?  How do

20  you --

21      A    To my knowledge, it's not.  It's a separate

22  company somehow affiliated with China Rare Earth, and

23  that's all I know.  They bought a hundred percent

24  membership interest in 2011, and it could have changed

25  since then.

1122

1    Q    I just want to know the basis of your -- you

2    said it's not affiliated.  Is the answer you really

3    don't know if it's affiliated with AVIC?

4    A    To my knowledge, it's not an AVIC company,

5    yes, sir.

6    Q    And what's the basis of your knowledge --

7    A    When --

8    Q    -- that this China Energy, whatever it is,

9    company's not affiliated with AVIC?  That's all I'm

10   asking.  Are you just guessing?

11   A    No.  I -- they represented to me that they

12   were a separate company.  So, as far as I know, A-Tech,

13   which is the company that I sold Cirrus Wind 1 to, was

14   not in any way, shape or form connected to AVIC.  They

15   were -- they were different companies.  I'm sorry if I'm

16   being confusing.

17   Q    I just want -- when you say it's not

18   affiliated, it's based on what somebody told you?

19   A    I'm talking about they're not in the AVIC

20   family of companies, and I don't know the legal way to,

21   you know, to . . .

22             CHAIRMAN ALDOUS:  Thank you,

23   Mr. Thompson.  We're going to take a ten-minute break.

24             JUDGE MARSHALL:  I just have one

25   question.

1123

1            FURTHER EXAMINATION

2    BY JUDGE MARSHALL:

3        Q    So based upon what you represent about A-Tech

4    not being affiliated with AVIC, okay, then Cirrus Wind 1

5    at the bottom that chart, we can just put an X through

6    and this panel doesn't need to consider that?

7        A    Yes, sir.  Because it was sold in 2011 and

8    Ascendant didn't own it after that.

9        Q    Thank you very much.

10              THE WITNESS:  Yes, sir.

11              CHAIRMAN ALDOUS:  All right.  So --

12              MR. JENEVEIN:  Mr. Chairman, I have two

13   or three minutes, before or after the break.

14              CHAIRMAN ALDOUS:  With him?

15              MR. JENEVEIN:  Yes, sir.

16              CHAIRMAN ALDOUS:  Well, then let's take

17   it now.

18              MR. JENEVEIN:  My questions or the break?

19              CHAIRMAN ALDOUS:  Go ahead.  Now.  I

20   meant your questions.

21              MR. JENEVEIN:  Thank you.

22              FURTHER EXAMINATION

23   BY MR. JENEVEIN:

24       Q    Mr. Thompson, it makes common sense, doesn't

25   it, for Soaring Wind to generate demand for wind farm

1124

1  equipment if it's marketing wind farm equipment, right?

2       A    It makes sense for Soaring Wind to generate --

3       Q    Let me ask it more simply.  More demand for

4  the wind farm equipment that Soaring Wind was marketing

5  is better, right?

6       A    Yes.

7       Q    And usually you would agree that wind farm

8  development projects are done through SPVs, or special

9  purpose vehicles?

10      A    Yes, I would agree.

11      Q    And it wouldn't be appropriate for an SPV to

12 be named for Soaring Wind or affiliated with Soaring

13 Wind if a majority of the partners of Soaring Wind

14 hadn't agreed to that, right?

15      A    Wouldn't be appropriate for something to be

16 named Soaring Wind?

17      Q    Right.

18      A    Yeah.

19      Q    Because you've given a lot of testimony about

20 all these projects that Patrick Jenevein was doing for

21 Tang and not for Soaring Wind.

22      A    Yes, sir.

23      Q    And, in fact, you added the phrase "for Tang"

24 to that e-mail you quoted from Mike Carter, who said

25 "If you have a wind project development, give it to

1    Patrick to see if he's interested," right?

2         A    Yes.

3         Q    That didn't actually say "for Tang"; you added

4    --

5         A    No, I interpreted it to be for Tang.

6         Q    Okay.  That's what I want to get to.  Have you

7    ever seen an e-mail in all the hundreds that you've

8    seen about these other projects that was written by

9    Patrick Jenevein to anybody after June 1st of 2008

10   saying "This wind development project, we want to do

11   through Tang and not through Soaring Wind"?  Have you

12   ever seen one that expressly distances itself from

13   Soaring Wind?

14        A     Not that it mentions Soaring Wind, but I've

15   seen e-mails on Gallop Power, on Soaring Wind Direct,

16   on project in Katz Field with Kinder Morgan.  I've seen

17   a lot of projects that Tang was engaged in without

18   Soaring Wind.

19        Q     And on any of those projects, did a majority

20   of the Soaring Wind partners ever say "This entity is

21   committed to that project"?

22        A     No.

23        Q     But you do know that those projects -- well,

24   would you agree with this statement, and maybe we can

25   leave it here:  The only projects that Patrick

1126

1    participated in, or companies that he's affiliated with

2    participated in, after June 1st of 2008 that made money

3    were presented to Soaring Wind first?  That's true,

4    isn't it?

5         A    I don't think that's true, no.

6         Q    Can you name one project that was not

7    presented to Soaring Wind on which Patrick Jenevein or

8    Tang Energy or any affiliate made money after June 1st,

9    2008?  Just one.

10        A    I believe the Gallop Power project made money

11   and I believe the Corpus project made money.

12        Q    Thank you.  Any others?

13        A    I'm not aware.  I know there were -- they were

14   engaged in other projects, but that's the only ones that

15   made money.

16        Q    We're good.  We agree that Gallop Power and

17   Corpus were the only two projects that Tang Energy

18   engaged in that made money outside of Soaring Wind.

19   That's your position?

20        A    That's my position, yes.

21             MR. JENEVEIN:  Pass the witness.

22             CHAIRMAN ALDOUS:  All right.  Now we can

23   take a ten-minute break.

24             MR. DEWOLF:  Is this witness excused?

25             CHAIRMAN ALDOUS:  Yes.  But --

1127

1       MR. SHAMOUN:  Who's next?

2       CHAIRMAN ALDOUS:  -- if you need to make

3   an agreement --

4       MR. WALTERS:  Next is --

5       CHAIRMAN ALDOUS:  Wait a minute.

6       MR. WALTERS:  -- a gentleman by the name

7   of Charles Johnson.

8       CHAIRMAN ALDOUS:  If you do need to make

9   an agreement he needs to leave or something, just let me

10  know.

11      MR. DEWOLF:  I will.

12     (A break was taken from 10:39 a.m. to 10:59 a.m.)

13      CHAIRMAN ALDOUS:  Call your next witness.

14      MR. WALTERS:  We'll call a Mr. Charles

15  Johnson.

16    (Oath administered to witness by Chairman Aldous.)

17      CHAIRMAN ALDOUS:  State your name.

18      THE WITNESS:  Charles Johnson.

19      CHAIRMAN ALDOUS:  Thank you, sir.  You

20  may proceed.

21          CHARLES JOHNSON,

22  having been first duly sworn, testified as follows:

23              EXAMINATION

24  BY MR. WALTERS:

25     Q    Mr. Johnson, you and I -- I have called you

1128

1    one time on the phone.  Do you remember that?

2         A    Yes.

3         Q    And that was about a two-minute conversation

4    and you told me to talk to your attorney?

5         A    Yes.

6         Q    And your attorney's here with you, Mr. Grimes?

7         A    Yes.

8         Q    And I met with you this morning for about 15,

9    20 minutes?

10        A    Yes.

11        Q    And Mr. Grimes was there?

12        A    Yes.

13        Q    Have you and I discussed this case at any

14   other time?

15        A    No.

16        Q    I want -- a little bit of background for the

17   panel.  How old a man are you?

18        A    64.

19        Q    Where do you live?

20        A    Dallas, Texas.

21        Q    Tell us about your education.

22        A    I have a master's in business and a bachelor's

23   in electrical engineering.

24        Q    Mr. Johnson, have you begun, started, sold

25   companies in your experience?

1    A    Yes, sir.

2    Q    Tell the panel a little bit about that.

3    A    I've started four venture capital early-stage

4  companies beginning in, you know, 1980s.  I've been

5  involved with building those companies and selling those

6  companies.

7    Q    What do you do now?

8    A    I manage corporate jet airplanes.

9    Q    Let me show you, Mr. Johnson, just to be

10  demonstrative, it's -- do you see this letter dated

11  January 4th, 2010 to you?

12    A    Yes.

13    Q    Were you employed as the Manager of Business

14  Development for Tang Energy Group at one point?

15    A    Yes.

16    Q    And was that on or about that time frame in

17  2010?

18    A    Yes.

19    Q    And, Mr. Johnson, have you known Patrick

20  Jenevein for a period of time?

21    A    Yes.

22    Q    For about how long have you known

23  Mr. Jenevein?

24    A    Since 2008.

25    Q    And you said you're a pilot.  Have you given

1    flight instructions to Mr. Jenevein?

2          A     Yes, I did.

3          Q     What is your rating as a pilot, Mr. Johnson?

4          A     I'm an air transport pilot rated pilot.

5          Q     What does that mean?

6          A     That's the highest rating given by the FAA for

7    piloting airplanes.

8          Q     I want to show you a statement that we talked

9    about in this case that was recorded between Patrick

10   Jenevein and Paul Thompson on April 11th, 2014, and

11   you're mentioned in this statement.  You see Patrick,

12   Mr. Jenevein, asked Mr. Thompson "Have you seen Charles

13   in a while," and he says, "Huh-uh."  And Mr. Jenevein

14   says, "He's a head case."  Do you see that?

15         A     Yes, I do.

16         Q     "What happened to him?"  "I don't know."  "Is

17   he still flying?"  And he says -- Mr. Jenevein says, "I

18   hope not.  I think his family has a history of

19   Alzheimer's and he should not be flying.  I was in a

20   simulator with him."  Do you see that?

21         A     Yes, I do.

22         Q     Is any of that true?

23         A     No.

24         Q     Has Mr. Jenevein, Patrick Jenevein, ever been

25   in a simulator with you?

1131

1    A    I have observed Patrick flying a simulator but

2   he has never witnessed me flying a simulator.

3    Q    And when he says that you've got a family

4   history of Alzheimer's, is there any truth to that?

5    A    No.

6             MR. WALTERS:  Can you pull up the video,

7   please?

8    Q    I want to show you a portion of a video real

9   quick, Mr. Johnson, and ask you about it.

10             (Video playing.)

11    Q    Mr. Johnson, that testimony that we just saw

12   under oath that there was no dispute between you,

13   Patrick Jenevein, The Nolan Group, Tang Energy, is that

14   true or untrue?

15    A    Not true.

16             MR. WALTERS:  Can you play -- keep going

17   with the clip, please?

18             (Video playing.)

19    Q    Mr. Johnson, were you sued by Tang Energy

20   Group?

21    A    Yes.

22    Q    And I want to ask you about that.  When you

23   left work for Tang Energy Group, did you have a dispute

24   with Mr. Jenevein over compensation?

25    A    Yes, I did.

1132

1    Q    Tell the panel, just briefly, what that was.

2    A    I felt like he owed me compensation for a

3    project that we developed in Corpus Christi.

4    Q    Is that the project we've referred to as

5    Harbor Wind or people have referred to as Harbor Wind?

6    A    Yes.

7    Q    And then did you send correspondence to

8    Mr. Jenevein basically saying that "I feel like you owe

9    me some more money"?

10   A    My lawyer did, yes.

11   Q    And what was the response from Patrick when he

12   got that letter?  I'm just talking about the letter

13   itself.

14   A    My understanding there were a couple of

15   conversations with my lawyer and then Patrick filed

16   suit.

17   Q    And then did you file a counterclaim?

18   A    Yes.

19   Q    I want to ask you, Mr. Johnson, as the Manager

20   of Business Development for Tang Energy Group, are you

21   familiar with the Flatwater project?

22   A    Yes.

23   Q    That's the one in Nebraska?

24   A    Yes.

25   Q    And how was Tang Energy Group involved in

1133

1    Flatwater?

2         A    My understanding was Tang had started a

3    company called Gallop Power and Gallop Power was

4    developing that project.

5         Q    The Flatwater project in Nebraska, did that

6    have anything to do with Soaring Wind or the Soaring

7    Wind agreement?

8         A    Not that I'm aware of.

9         Q    And let me ask you about that, Mr. Johnson.

10   You were employed by Tang Energy Group.  Did you know

11   about Soaring Wind?

12        A    Yes.

13        Q    Had you heard of Soaring Wind?

14        A    Yes.

15        Q    What was your understanding between the

16   different -- the difference between Tang Energy Group

17   and Soaring Wind, as far as what business they were

18   doing?

19        A    My understanding was Soaring Wind was

20   primarily selling Chinese wind turbines.

21        Q    And what about Tang Energy Group?

22        A    Had a lot of different interests in the wind

23   energy area.

24        Q    Let me go to Corpus Christi next.  The Corpus

25   Christi project, the Harbor Wind, were you involved in

1134

1    that project?

2         A    Yes.

3         Q    On behalf of Tang Energy Group?  Or Tang

4    Windpower Energy Consulting?

5         A    Yes.

6         Q    Did that have anything to do with Soaring

7    Wind?

8         A    No.

9         Q    Did Patrick Jenevein ever tell you that the

10   Corpus Christi project or the Nebraska project had

11   anything to do with Soaring Wind?

12        A    No.

13        Q    In fact, did Patrick ever tell you anything

14   opposite of that?

15        A    We were involved with a couple of projects

16   that Patrick told me Gallop Power would be assuming the

17   responsibility for.

18        Q    What projects are those?

19        A    There was one in -- for Kinder Morgan close to

20   Abilene and another project in San Angelo with Johnson &

21   Johnson.

22        Q    What did Patrick Jenevein tell you as to

23   whether or not those should or should not be part of

24   Soaring Wind?  What did he tell you?

25        A    He told me that Gallop Power would be assuming

1    responsibility for any of those projects.

2        Q    Ever mention Soaring Wind in regard to owning,

3    having anything to do with those projects?

4        A    Basically said that Gallop Power would be

5    assuming the responsibility for those projects.

6        Q    Let me ask you about Paul Thompson, my client.

7    Have you ever met Paul Thompson?

8        A    Yes.

9        Q    In the time that you were -- and, by the way,

10   how long were you with Tang Energy Group, approximately?

11       A    From early 2009 -- or, excuse me, yes, early

12   2009 till mid-'11, I believe, so . . .

13       Q    In the entire time that you worked there, did

14   Patrick Jenevein ever tell you that the Corpus Christi

15   project or the Flatwater wind project should have been

16   part of Soaring Wind as opposed to his other companies?

17       A    No.

18       Q    During the entire time that you worked there,

19   did he ever once complain to you about Paul Thompson

20   working anywhere else?

21       A    No.

22       Q    In fact, what did he say to you about Paul

23   Thompson?

24       A    He would encourage me from time to time to

25   talk to Paul about wind energy-related issues that I had

1136

1    questions about.

2        Q    And did you do that?

3        A    Yes.

4        Q    Did he tell you at any time why Paul Thompson

5    was no longer with Soaring Wind?

6        A    He told me that his relationship had been

7    terminated.

8        Q    Did he tell you why?

9        A    Because of lack of results, lack of sales from

10   Soaring Wind and financial issues.

11                MR. WALTERS:  Mr. Johnson, I'll pass the

12   witness.

13                CHAIRMAN ALDOUS:  Mr. McNeil?

14                MR. MCNEIL:  No questions.

15                CHAIRMAN ALDOUS:  Mr. Jenevein?

16                        EXAMINATION

17   BY MR. JENEVEIN:

18       Q    Mr. Johnson, if Patrick Jenevein had told you

19   some project was a Soaring Wind project, that would have

20   been a lie, wouldn't it?  I shouldn't ask such a general

21   question.

22                Are you aware of any project that Patrick

23   Jenevein worked on after June 1st, 2008 where the

24   members of Soaring Wind had stamped their approval and

25   ponied up for that project?  Can you name one?

1   A    Not that I recall.

2   Q    Okay.  So it would have been a lie for him to

3  say that a project was a Soaring Wind project if, in

4  fact, it was not?

5   A    I don't believe that's the case.

6   Q    Well, that's why I asked you the question I

7  just asked you.  You're telling the panel you're not

8  aware of a single project where the members of Soaring

9  Wind had said, "We're ready to do that project," right?

10   A    You asked if they put up any money toward a

11  project, and I answered no.

12   Q    Oh, okay.  Fair enough.

13       Short of putting money up, then, are you

14  aware of any project where the members of Soaring Wind

15  had voted "Let's do that project"?

16   A    Patrick encouraged me to pursue projects as

17  part of Soaring Wind, and that's what I did.

18   Q    But did you understand my question?  I'm

19  really trying to ask a very specific one about whether

20  the partners of Soaring Wind or the members of Soaring

21  Wind had ever formally approved a project so that we

22  could call that a Soaring Wind project.  Did that ever

23  happen, Mr. Johnson?

24   A    It seems to me you're putting words that don't

25  fit together.  I mean, I pursued projects for Soaring

1  Wind.

2      Q    I don't mean to offend you, sir, and I'm sure

3  that it sounds like you -- well, whether or not you want

4  to answer this question, I'm going to ask you to answer

5  it, please.

6              Is there any project at any time since

7  the beginning of time that you're aware of that you can

8  tell this panel the members of Soaring Wind voted to

9  approve that project; yes or no, sir?

10     A    I'm not aware of any vote taking place.

11     Q    So if the members don't vote to say "This is

12  now a Soaring Wind project," Patrick would have had to

13  lie to say to anyone "That is a Soaring Wind project";

14  isn't that fair?  He couldn't do it.

15     A    I don't know how to answer that question.

16     Q    Okay.  You mentioned Gallop Power and I don't

17  want to misquote you.  I think you told the panel that

18  Patrick had told you that Gallop was assuming

19  responsibility for this project or that project.  Was

20  that your phrase?

21     A    Yes.

22     Q    Does that mean paying the bills?

23     A    If there were any bills.

24     Q    Well, do you recall that Gallop Power did pay

25  money to acquire an interest in the Flatwater project?

1139

1      A     My recollection was yes, they did.

2      Q     And, similarly, Tang Energy Windpower

3  Consulting paid money or expended resources to complete

4  the Corpus Christi Harbor Winds project; is that right?

5      A     Yes.

6      Q     You're not offering -- well, are you offering

7  this panel any testimony about whether those two

8  projects were presented to Soaring Wind?  Are you

9  offering testimony one way or the other?

10     A     I'm not.

11     Q     So if the panel has seen conclusive evidence

12  that those two projects were offered to Soaring Wind in

13  writing in June of 2010, you are certainly not here to

14  dispute that?

15     A     That's correct.

16     Q     And you're not here to say the Soaring Wind

17  agreement says anything it doesn't say, right?  You're

18  not here to provide interpretation as to the meaning of

19  the Soaring Wind agreement?

20     A     I'm not.

21     Q     You're not a signatory to that agreement?

22     A     I'm not.

23     Q     You're not here to tell the panel anything

24  that AVIC International Renewable Energy or any other

25  AVIC entity did or did not do, right?

1140

1   A    That's correct.

2   Q    You're not here to tell the panel that AVIC

3   has a different rate of return that they require on wind

4   farm investments other than 15 percent?  You're not here

5   to comment on that?

6   A    No, I'm not.

7   Q    Would you -- do you know enough about wind

8   farms to give us an opinion as to whether -- how long

9   wind farms last?  I'm not trying to make you

10  uncomfortable, sir.  I'm not trying to make you an

11  expert in something; I'm just curious if you have an

12  opinion.

13  A    Could you ask that again, please?

14  Q    Do you have an opinion about how long wind

15  farms last once they're developed?

16  A    Sure, I have an opinion.

17  Q    What's your opinion?

18  A    20, 30 years.

19  Q    And, lastly, you mentioned, I think, a Kinder

20  Morgan project.  Remember that?

21  A    Yes, sir.

22  Q    And a Johnson & Johnson project.  Was that the

23  one in Abilene?

24  A    San Angelo.

25  Q    Thank you, San Angelo.  Are you aware of

1  whether either one of those projects made money for Tang

2  Energy or any Tang affiliate?

3      A    I have no knowledge that they were even

4  completed, so . . .

5              MR. JENEVEIN:  I don't have any other

6  questions.

7              CHAIRMAN ALDOUS:  Ms. Perry?

8              MS. PERRY:  Yes.

9                    EXAMINATION

10  BY MS. PERRY:

11      Q    Mr. Johnson, my name's Deborah Perry.  I

12  represent The Nolan Group.  I believe I heard you say

13  that you were with Tang from early 2009 to mid-2011.  Is

14  that correct?

15      A    I believe that's correct.

16      Q    And I believe you also testified that Patrick

17  Jenevein encouraged you to pursue projects as part of

18  Soaring Wind; is that correct?

19      A    Yes.

20      Q    So during the time that you were there, from

21  early 2009 to mid-2011, Mr. Jenevein encouraged you to

22  pursue projects through Soaring Wind, correct?

23      A    Yes.

24      Q    And you're aware that it's typical to set up

25  special purpose vehicles to do wind farm projects,

1142

1    aren't you?

2         A    I am.

3              MS. PERRY:  That's all the questions I

4    have.

5              CHAIRMAN ALDOUS:  Thank you.  Ms. McKay,

6    or Mr. Bracy?

7              MR. BRACY:  No questions.

8              CHAIRMAN ALDOUS:  Mr. Denney?

9              MR. DENNEY:  No, sir.

10             CHAIRMAN ALDOUS:  Mr. Lowenstein?

11             MR. LOWENSTEIN:  No, sir.

12             CHAIRMAN ALDOUS:  Yes.  Did I leave

13   anybody out?  Yes.  Go ahead.

14                  FURTHER EXAMINATION

15   BY MR. WALTERS:

16        Q    Mr. Johnson, what projects did Patrick tell

17   you to pursue on behalf of Soaring Wind?

18        A    A Johnson & Johnson project in San Angelo and

19   a project with Kinder Morgan outside of Abilene.

20        Q    Did he ever tell you to pursue wind farm

21   development at the Gallop Power or the Corpus Christi on

22   behalf of Soaring Wind?

23        A    No.

24        Q    Did he tell you to pursue wind farm

25   development on behalf of Soaring Wind when you were with

1143

1    Tang Energy?

2        A    No.

3        Q    I want to show you what's Thompson Trial

4    Exhibit 234.  And, just briefly, the two other projects

5    that you talked about, the Kinder Morgan and the

6    Abilene --

7        A    San Angelo was Johnson & Johnson.

8        Q    Yeah, I'm sorry.  What were those

9    specifically?

10       A    Those are wind projects.

11       Q    And what were you trying to do for those

12   projects?

13       A    Trying to develop a way to move the project

14   forward in order to sell wind turbines to those

15   projects.

16       Q    Wind turbine equipment, true?

17       A    Yes.

18       Q    And that's what your understanding of Soaring

19   Wind was, in the business of wind turbine equipment,

20   true?

21       A    Yes, sir.

22       Q    But wind farm development was something that

23   you did not have anything to do with other than the

24   Corpus Christi and the Nebraska project, true?

25       A    That's true.

1144

1    Q    And those projects, were those done on behalf

2    of Soaring Wind or did Patrick ever tell you that they

3    were going to be somehow involved with Soaring Wind or

4    turned over to Soaring Wind?

5    A    He never said that.

6    Q    There's been talk about a company called MFG,

7    Molded Fiber Glass.  We've seen it in some reliance

8    damages or something in this case.  Let me show you

9    this, if I could.

10                CHAIRMAN ALDOUS:  What is "this"?

11                MR. WALTERS:  This is Thompson Trial

12   Exhibit 234.

13   Q    And this is a e-mail in 2010, in which you

14   are carbon copied.  Who is Carl LaFrance?

15   A    He's an officer with MFG.

16   Q    And it talks here to Patrick, "I have the

17   pleasure of forwarding the attached letter proposing

18   that MFG and Tang Energy begin discussions."  Do you see

19   that?

20   A    Yes.

21   Q    And then the second page is written to

22   Mr. Jenevein, president and CEO of Tang Energy, and

23   talks about Tang Energy.  Do you see that?

24   A    Yes.

25   Q    Did the MFG business proposal, whatever, did

1145

1    that have anything to do with Soaring Wind, to your

2    knowledge?

3         A    No.

4         Q    Did Mr. Jenevein ever tell you it had anything

5    to do for Soaring Wind, that it was being pursued on

6    behalf of Soaring Wind?

7         A    No.

8         Q    And, in fact, Mr. Johnson, isn't it true

9    Mr. Jenevein told you the opposite, that Gallop Power,

10   number one, or Nebraska and Harbor -- Tang Wind Energy

11   Consulting for Corpus Christi were the entities that

12   were going to be doing those two projects, true?

13        A    That's true.

14        Q    Outside of Soaring Wind, true?

15        A    Also true.

16             MR. WALTERS:  Pass the witness.

17             CHAIRMAN ALDOUS:  Mr. Jenevein?

18                   FURTHER EXAMINATION

19   BY MR. JENEVEIN:

20        Q    On the MFG transaction, do you know what

21   happened to those negotiations?  Do you know what

22   parties signed a Letter of Intent regarding MFG?

23        A    Yes.

24        Q    Tell the panel who signed the Letter of

25   Intent.

1146

1       A     I believe it was, you know, AVIC and MFG.

2       Q     AVIC.  So AVIC was a part of those

3   discussions?

4       A     Yes.

5                 MR. JENEVEIN:  Pass the witness.

6                 CHAIRMAN ALDOUS:  Any questions to my

7   left?  Go ahead, Mr. Toles.

8                           EXAMINATION

9   BY MR. TOLES:

10      Q     What AVIC entity signed the document, the one

11  just referenced; if you know?

12      A     It was AVIC industry that was managing the

13  blade company HT Blade, and I believe it was AVIC Heavy

14  Machinery at that time.

15                MR. TOLES:  That's all I have.  Thanks.

16                CHAIRMAN ALDOUS:  Anything to my right?

17                          EXAMINATION

18  BY CHAIRMAN ALDOUS:

19      Q     I have a question, Mr. Johnson.  You indicated

20  that the Johnson & Johnson and the Kinder Morgan

21  projects, I'm using that loosely, were -- you were

22  trying to get them up off the ground so that you could

23  sell turbines?

24      A     Yes.

25      Q     Could you characterize or just describe for us

1147

1   what you mean by trying to get them up off the ground?

2       A    Those were both what we consider

3   behind-the-meter projects.  These were corporate

4   customers that would be buying their own wind project to

5   provide electricity.  And so we would be discussing the

6   benefits of wind power to those two entities in order to

7   develop those -- the interest by those corporate clients

8   to buy wind turbines and install them to generate power

9   for their own needs.

10      Q    And in that type of arrangement where you have

11  a behind-the-meter-type client and they say, "You know

12  what, I'd like to move forward with that, with your wind

13  suggestion," what typically, then, would you do for

14  whomever you were working for to complete that?

15      A    We would try to arrange a turbine vendor to

16  supply them the wind turbine and help in whatever

17  negotiations to, you know, make sure that the wind

18  turbine met the requirements and met the right price

19  point and encouraged the project along to make sure it

20  was done correctly.

21      Q    Those behind-the-meter-type clients, would

22  they already have the place on the ground where they

23  were going to put these turbines and all the leases and

24  all that wrapped up?

25      A    Yes, sir.

1148

1    Q    So that wasn't something that was part of what

2   you had to do?

3    A    No.  Normally those projects would have their

4   own land that would -- they'd be using for installing

5   wind turbines.

6    Q    So, from your standpoint, in terms of

7   discussing the Johnson & Johnson and Kinder Morgan would

8   be, first, convince them that wind power was good,

9   right?

10   A    Yes.

11   Q    And then, secondly, if wind power was good and

12  then your turbines that you would sell them would be

13  good for them?

14   A    Yes, sir.

15   Q    And that was the extent of what you would do?

16   A    You'd really need to prove up that the wind

17  power would be sufficient to power their needs and, you

18  know, there was some scientific studies to prove that

19  the wind was going to be powerful enough.  So we'd be

20  involved in those type of discussions as well.

21   Q    When you would do that, would you sometimes

22  consult with other engineers and things to kind of get

23  the feasibility studies going?

24   A    Yes, sir.

25   Q    And, typically, for those behind-the-meter

1  clients like Johnson & Johnson and Kinder Morgan, had

2  they gone beyond the steps -- I mean, did they already

3  own an interest in a wind farm or have a -- did they

4  have turbines already or, I mean, how was it?  Where

5  were they in the process, I guess, is a better way to

6  say it?

7      A    Well, Kinder Morgan had already participated

8  in other wind projects close by was my understanding, so

9  it's -- you know, they were fairly sophisticated with

10  knowledge of wind already.

11              In the case of Johnson & Johnson, they

12  had already done a wind study, installed a MET tower to

13  prove up the wind resource.  So they were fairly far

14  along in the understanding of wind, and so we were just

15  helping that project complete additional research

16  required and potentially acquire turbines.

17              CHAIRMAN ALDOUS:  Thank you, Mr. Johnson.

18  Appreciate it.

19              Mr. Shamoun now has a question.

20                   EXAMINATION

21  BY MR. SHAMOUN:

22      Q    Mr. Johnson, what do you do now, what line of

23  work?

24      A    I manage corporate jet airplanes.  I have

25  clients that have the resources and need to own their

1   own airplane, and I help them find airplanes.  And once

2   they buy them, I help maintain them and provide pilots

3   that fly those airplanes.

4       Q    In the line of work that you do, does it have

5   or have you had anything to do with the Aviation

6   Industry of China?

7       A    No, sir.

8       Q    In no form or no fashion?

9       A    No, sir.

10      Q    Thank you.

11           CHAIRMAN ALDOUS:  Thank you, sir.  You

12   may step down.  He can be released?  You're free to go,

13   and your lawyer, too.

14           MR. WALTERS:  Ready for the next one?

15           CHAIRMAN ALDOUS:  Yes, sir.

16           Could you tell us your name, please?

17           THE WITNESS:  My name is Richard

18   Saunders.

19      (Oath administered to witness by Chairman Aldous.)

20                    RICHARD SAUNDERS,

21   having been first duly sworn, testified as follows:

22                    EXAMINATION

23   BY MR. WALTERS:

24      Q    Mr. Saunders, how are you employed?

25      A    I work for a company called E.ON Climate &

1    Renewables.  I'm a wind project developer.

2        Q    And how long have you been in the business of

3    wind, Mr. Saunders?

4        A    Wind, about 14 years.  Renewable, 24 years.

5        Q    And where do you live at this time?

6        A    Austin, Texas.

7        Q    Mr. Saunders, as it pertains to the Flatwater

8    wind project, were you involved in that project?

9        A    Yes, sir.

10       Q    How were you involved?

11       A    I was the development -- Vice President of

12   Development for Gallop Power, so I was actually the

13   person who found the Flatwater project through some

14   contacts, actually, Stoel Rives, the law firm, and I was

15   the one who pursued that acquisition for Gallop Power.

16       Q    And let me ask you, before Gallop Power was

17   formed -- and do you understand Gallop Power was formed

18   with Patrick Jenevein and Tang Energy Group?

19       A    That's correct.

20       Q    And before Gallop Power was formed, did you

21   have a company that was involved in that Flatwater;

22   finding it --

23       A    No.  The Flatwater project was found after we

24   had formed Gallop Power.

25       Q    A company called Colt, what is Colt?

1     A     So when we formed Gallop Power with Patrick,

2     we had a group of three individuals; Stephen Wiley, Don

3     Dison and myself, who formed an independent company.

4     That company was the minority owner of Gallop.

5               The concept was that Tang and Patrick had

6     cash that would be an equity provider to a company.  Our

7     goal would be to invest that money in projects itself.

8     Our goal, financial goal, was that after certain hurdles

9     had been met for the returns on that money, then we

10    would start sharing in the profits.

11    Q     As far as the Flatwater wind project in

12    Nebraska is concerned, when you dealt with Patrick

13    Jenevein, is he your main contact for all of that?

14    A     In what way?

15    Q     Well, did you deal with Patrick Jenevein?

16    A     Yes, we dealt -- on the internal, we dealt

17    with Patrick Jenevein, that's correct.

18    Q     At any time did Patrick Jenevein tell you that

19    the Flatwater wind project was being pursued, developed,

20    created on behalf of an entity called Soaring Wind?

21    A     No.

22    Q     As it applies to the Gallop, is it a joint

23    venture, is it -- how would I describe it?

24    A     I think it was an LLC.  So basically we owned

25    a certain portion of the company itself, a minority

1    portion of it.

2         Q    And for that project, before you started

3    Gallop Power, did Patrick tell you where his funds were

4    coming from for Gallop Power?

5         A    Yes.  He met with us.  So one of our partners,

6    Stephen Wiley, had met Patrick through some efforts that

7    we had at GreenHunter Energy, and he had basically said

8    that he had money, capital, an excess of capital that he

9    wanted to invest both from Tang and especially what he

10   promoted as one of the sources was HT Blade and their

11   ownership.  They had a percentage of HT Blade.

12              And he also had some private money that

13   he could place.  And his concept was you guys know the

14   business, we have the money, we'd like to place it and

15   have a professional do it.

16        Q    Ever mention an entity called Soaring Wind?

17        A    I don't remember any discussion of Soaring

18   Wind at that time.

19        Q    Did he ever mention any company called AVIC,

20   or AVIC [pronunciation]?

21        A    At that time I don't remember it.  I think we

22   focused on the -- what was of greatest interest to us

23   was HT Blade.  And when you start doing the research, we

24   found it was the second biggest blade manufacturer in

25   China at the time.  It had a lot of what we would have

1154

1    termed assets.  And if somebody owned a portion of it,

2    it seemed to represent value.

3        Q    Do you recall him saying that he got funding

4    or expected to get funding from any source other than

5    his family or his dividends from HT Blade?

6        A    No, I don't remember.

7        Q    Let me talk to you about the Corpus Christi

8    project.  Do you know what I'm talking about?

9        A    Yes.  The small project in the Port of Corpus

10   Christi that Tibor had developed.

11       Q    Let me go back to one thing I forgot.

12            Is there a biomass project up -- that's

13   got the name Gallop in it also?

14       A    Yeah.  There was a project we bought.  So

15   early in the process a project, a biomass project up in

16   Greenville, Maine had come on the auction.  It was

17   something we had looked at at GreenHunter Energy.  We

18   were going to buy it for about 16, $18 million.

19            The owner was somebody that we knew from

20   other ventures and deals, and basically it was a fund

21   trying to get rid of the project.  They were willing to

22   sell it at a discount.  It was about 10 million.  So we

23   found that after we had started Gallop Power itself.

24   Purchased it.

25            It was a loan from Tang Energy to Gallop

1  Power, and part of that concept was the loan allowed us

2  to go after USDA, so government-backed financing for the

3  project itself, as long as it was a direct loan to us.

4           So Gallop Power itself owned Gallop Power

5  Greenville.

6      Q    And about the biomass project, did that have

7  anything to do with wind energy?

8      A    No.

9      Q    The Gallop Power Greenville project, was there

10 some issue with tax credits with the U.S. Department of

11 Agriculture?

12     A    USDA, no.  Because the tax credits associated

13 with it are the production tax credit, which is a

14 federal credit, and has nothing to do with USDA.  USDA

15 was the loan guaranty.

16     Q    What did Patrick Jenevein do as far as those

17 tax credits are concerned with Gallop Power Greenville?

18     A    I've actually never seen what he did with it.

19 I have no knowledge.

20     Q    Was there something about the tax credits that

21 it should have been done in one company versus another?

22     A    Well, the answer is production tax credits can

23 only be used by the entity that produced them, whoever

24 owned that entity during that tax year.  And during that

25 time period it was owned by Gallop Power.

1156

```
 1      Q    Not Gallop Power --

 2      A    Gallop Power Greenville was wholly owned by

 3 Gallop Power in my recollection.

 4      Q    The Corpus Christi project, who found that

 5 project?

 6      A    In what manner?  The original developer was

 7 somebody named Tibor Hegedus.  I never pronounce his

 8 last name correctly but it's H-e-g-e-d-u-s.  And if

 9 you're meaning when it was brought to our attention, it

10 was brought to my attention directly by Darren Van't

11 Hof.  He's the head of renewable energy at US Bank.  And

12 US Bank was someone we were talking about tax equity for

13 Flatwater.

14      Q    And did you take -- did you present that

15 project or bring that project to Patrick Jenevein's

16 attention?

17      A    Yes.  After we -- we called Tibor, got the

18 information and then, yes, we presented as a Gallop

19 Power project, yes.

20      Q    And did it stay a Gallop Power project?

21      A    As long as we were there, yes.  As long as the

22 team was there, yes.

23      Q    And what happened eventually with the team on

24 the Corpus Christi project?

25      A    As I understand it from Tibor, that it was
```

1157

1    transferred somehow to other entities.  The project

2    itself is operational.  I still have contact with Tibor

3    and also with the Port of Corpus Christi.

4         Q    And as far as the Corpus Christi project is

5    concerned, was Soaring Wind ever mentioned --

6         A    No.

7         Q    -- to your knowledge?

8         A    No.

9         Q    Did Patrick Jenevein, when you presented or

10   went to him with the Corpus Christi deal, did he ever

11   mention "Oh, that sounds great.  I'm going to be doing

12   this or pursuing this on behalf of a company called

13   Soaring Wind"?

14        A    No.

15        Q    To this day, has that ever come up, Soaring

16   Wind for the Corpus Christi project or the Nebraska

17   project, in your dealings with Patrick Jenevein?

18        A    No.  They were Gallop Power projects.

19                  MR. WALTERS:  I'll pass the witness.

20                  CHAIRMAN ALDOUS:  Mr. McNeil?

21                  MR. MCNEIL:  No questions.

22                  CHAIRMAN ALDOUS:  Mr. Jenevein?

23                       EXAMINATION

24   BY MR. JENEVEIN:

25        Q    Mr. Saunders, did you have any say in what

1158

1    happened to Tang's interest in Gallop Power?

2         A    In what way?

3         Q    Well, the Gallop Power was 80 percent Tang and

4    20 percent Colt; is that right?

5         A    I think it was either 80/20 or 70/30.

6         Q    I'm not going to quarrel with you on --

7         A    Yeah, I can't remember.

8         Q    But the controlling interest was owned by

9    Tang?

10        A    Yes, sir.

11        Q    And you guys -- was your company called Colt?

12        A    Colt Power was the three of us.

13        Q    Colt Power had no say in whether or not Tang

14   assigned its interest to Soaring Wind or any other

15   entity, right?

16        A    No.  No, we had no control over Tang.

17        Q    Okay.  That wasn't something that concerned

18   you?

19        A    You know, I was concerned about Gallop Power

20   and the value created in Gallop Power.  To me, Tang was

21   a -- what they did on their half to me is meaningless.

22        Q    I understand.  And you're not here to tell

23   this panel that Tang did not offer its interest in

24   Gallop Power to Soaring Wind, are you?

25        A    I couldn't say.

1159

1    Q    Not something you know about?

2    A    I wouldn't know about it, no, sir.

3    Q    Same with respect to Corpus Christi.  You're

4  not here to tell this panel that Tang did not offer its

5  interest in Tang Energy Windpower Consulting, which I

6  think was a hundred percent, to Soaring Wind, are you?

7    A    I can't say what was offered by them.  I

8  can't.

9    Q    You said you're a wind farm developer?

10   A    Yes, sir.

11   Q    Would you agree with me that a wind farm is

12  likely to last about 30 years?

13   A    It will last anywhere from 20 to 30 years is

14  the leases.

15   Q    You don't dispute that you have indicated in

16  the past in writing that wind farms can go on for 30

17  plus years?

18   A    In fact, I tell my landowners that just assume

19  they will continue for beyond 30.

20   Q    You came up from Austin?

21   A    Yes, sir.

22   Q    Are you being paid for your time?

23   A    No.

24   Q    You just felt compelled to come up?

25   A    Got a subpoena.

1160

1     Q      You got a subpoena from the arbitration panel?

2     A      Yeah.  So I just assumed I had to do.

3     Q      Did Patrick remove you from the board of

4  Gallop Power?

5     A      After we resigned, I believe, but yes.

6     Q      And is it fair to say that you were not in

7  agreement to sell the Flatwater project when it was

8  sold?

9     A      I don't believe that'd be accurate.  I was

10  in -- I believe that to -- for the project to survive I

11  did not believe that Tang at that time had the financial

12  resources to allow that project to move forward and meet

13  its deadlines.

14     Q      So, for the project to survive, Tang would

15  have had to contemplate a different source of financing?

16     A      Originally what we were told is that we were

17  going to get the money through bonds that Patrick was

18  going to have, and that was the number one course, and

19  that failed.

20     Q      I'm sorry?

21     A      That failed.  And so he basically said he

22  didn't have the recourse.  So when you look at that, the

23  answer is, there's a value in the project that was

24  bought for, you know, roughly, $10 million and you had

25  to save it somehow.

1161

 1      Q     And did the sale accomplish saving the value

 2   of the project?

 3      A     Project's built and operational, so, to me,

 4   that's saving the project.

 5      Q     And that's another thing.  You said you were

 6   in continuing contact on the Corpus Christi project?

 7      A     I still talk to the people at Port of Corpus

 8   Christi and I talk to Tibor off and on.

 9      Q     And so that project's still rocking along?

10      A     Project, from what I know, is -- as of last

11   year was good, and the Port of Corpus Christi views it

12   as a success.

13      Q     You're not here to tell this panel any reason

14   why anyone ever declined to participate in the Corpus

15   project, right?  That's not your purpose?

16      A     I guess not.

17      Q     Same with Flatwater?

18      A     Flatwater.

19      Q     Lastly, you said that government -- that you

20   were seeking government backing for the Greenville

21   biomass plant?

22      A     Yeah.

23      Q     Here's my question:  For the government to

24   back a renewable project with government money, isn't it

25   true the government wanted to see a commitment to wind,

1   solar, biomass, all of those?

2       A      Yeah.   The -- there is loan guaranties for all

3   of those.   This was specific to the biomass through the

4   USDA, and the local USD chapter of that.

5       Q      Well, and I think we're probably saying the

6   same thing, Mr. Saunders, and I just want to be clear.

7   I wouldn't quarrel with you if we were suggesting that

8   wind power is one thing and biomass is another.   But the

9   United States government, before it backs a renewable

10  company, wants to see both of those things, right?

11      A      That's a tough question.   So --

12      Q      I'm not trying to --

13      A      I'm trying to -- they -- the government is

14  willing to back any of the renewable energy.   It could

15  be biomass, whether biogas, biomass, solar, wind.   Even

16  hydro projects can receive loan guaranties from the --

17  and the company itself doesn't have to have a diversity.

18  It can be a single entity that's only in wind, only in

19  biomass.

20      Q      And have you gotten government backing on

21  projects that are committed to just one form of

22  renewable energy?

23      A      Yes.

24      Q      Can you give me an example?

25      A      It was through GreenHunter Energy.   We got a

1163

1  commitment at the local level, which never came to

2  fruition, for a biomass project.

3      Q    And it was just biomass?

4      A    It was only biomass.

5      Q    But are you telling the panel, do you have any

6  impression one way or the other, that the government

7  would be more interested or less interested or equally

8  interested in backing projects that had a diversity of

9  those representatives; do you know?  Please don't

10  speculate.  I'm asking if you know.

11      A    The question is -- diversity doesn't come into

12  play because the application is for a single project at

13  a given time.  I haven't seen a portfolio of projects

14  apply for a loan application.  In my experience it's

15  been a single project.

16      Q    Are you familiar with the Department of

17  Energy's, is it, FinCo program?

18      A    I am not as familiar with that one, no, sir.

19      Q    All right.

20              MR. JENEVEIN:  I don't have any further

21  questions.

22              CHAIRMAN ALDOUS:  Anyone else on the

23  Claimants' side?  Mr. Lowenstein?

24                      EXAMINATION

25  BY MR. LOWENSTEIN:

1    Q    Mr. Saunders, I think I heard you say that the

2    only -- the companies that can get a tax credit for a

3    renewable energy or wind power project has to be the

4    owner of the project?

5    A    The production tax credit, the federal

6    production tax credit is the owner of the project itself

7    during that time period that it's produced.  It's not

8    transferable.

9    Q    And so the -- a logistics coordinator or a

10   turbine supplier, that could not apply and get that

11   production tax credit, correct?

12   A    To the best of my knowledge.

13   Q    It's got to be the owner?

14   A    The owner.

15            MR. LOWENSTEIN:  Pass the witness.

16            CHAIRMAN ALDOUS:  Any further questions?

17            MR. WALTERS:  I do.

18            CHAIRMAN ALDOUS:  Mr. Walters.

19                 FURTHER EXAMINATION

20   BY MR. WALTERS:

21   Q    In all of your dealings with Patrick Jenevein,

22   did he ever complain to you at any time about Paul

23   Thompson?

24   A    No.

25   Q    Did he ever allege to you in any way Paul

1165

1  Thompson was out competing against his company, Tang

2  Energy Group, in any way?

3      A    No.

4      Q    In fact, as it relates to your dealings on

5  behalf of Colt and Gallop Power, I want you to turn

6  around and look at this.  Do you see this business

7  purpose that's listed there?

8      A    Okay.

9      Q    I'm going to tell you that that's from a

10  Soaring Wind agreement that's been put into evidence in

11  this case.  Would you have done business with Patrick

12  Jenevein had you known about a company called Soaring

13  Wind with that business purpose?

14      A    I think the only thing that would bother me

15  that I would want to understand more fully is developing

16  wind farms.  Is that something that would have been in

17  the United States and would have been a competitive

18  process.

19      Q    If it would have been in the United States,

20  would you have done business with a company that was

21  developing wind farms in the United States?

22      A    I would have double-checked what he's trying

23  to do and where it was.  But if what he was trying to do

24  is set up two companies to do the same thing, yeah, we'd

25  be reticent in moving forward.

1166

1    Q    Did he ever tell you he had another business,
2  another entity, that was in the business of developing
3  wind farms?

4    A    In the United States?

5    Q    Yes, sir.

6    A    No.

7    Q    Did he ever tell you -- you mentioned these
8  bonds as it applied to the Flatwater wind project that
9  Mr. Jenevein was trying to get to keep it going, right?

10   A    Yes.

11   Q    Did he ever tell you that he couldn't keep it
12 going because he couldn't get money from some AVIC
13 entity?

14   A    No.

15           MR. WALTERS:  That's all I have.

16           CHAIRMAN ALDOUS:  Any further questions?

17           MS. PERRY:  Mr. Chairman, I have a
18 question, if you don't mind.

19           CHAIRMAN ALDOUS:  Oh, I'm sorry, Ms.
20 Perry.  You need to raise your hand.

21           MS. PERRY:  Yes, I do.  I'm hidden behind
22 this, aren't I?

23           CHAIRMAN ALDOUS:  I apologize.

24           MS. PERRY:  Oh, no.  That's fine.

25                    EXAMINATION

1167

1   BY MS. PERRY:

2       Q    Mr. Saunders, you're aware that it's typical

3   to set up special purpose vehicles for different wind

4   farm projects, right?

5       A    That's correct.

6       Q    So it wouldn't surprise you if Mr. Jenevein

7   had formed multiple special purpose vehicles, would it?

8       A    No.  Outside of the fact that every project I

9   know has one single purpose entity that owns it.  That's

10  more for the tax equity point of view, so it's

11  clear-cut.

12      Q    Thank you.

13           CHAIRMAN ALDOUS:  All right, sir, we

14  thank you for your time.  I don't think the panel has

15  any questions and appreciate you coming up all this way.

16           THE WITNESS:  Thank you very much.

17           CHAIRMAN ALDOUS:  Make sure you have your

18  radiator topped off on the way home.

19           THE WITNESS:  It's cooler down there,

20  hopefully.

21           CHAIRMAN ALDOUS:  So do you have another

22  witness there?

23           MR. WALTERS:  I think we're going to let

24  these guys call the next witness.  I don't have

25  another --

1168

1    CHAIRMAN ALDOUS:  And by "these guys,"

2  you're referring to Mr. McNeil and Mr. Bayles?

3    MR. WALTERS:  I am.

4    MR. SHAMOUN:  So you rest?

5    MR. WALTERS:  No, no, we do not rest.

6  They had -- in the order of witnesses, I think that they

7  were going to call a witness next.

8    CHAIRMAN ALDOUS:  That's fine.  Who is it

9  you're going to call?

10    MR. MCNEIL:  Mr. Zhang Xuming, who is

11  here, also know as Sherman Zhang.

12    CHAIRMAN ALDOUS:  We've got about ten

13  minutes before lunch.  Let's go ahead and call him and

14  get started, if you don't mind.

15    MR. MCNEIL:  Very good.  And, as a

16  housekeeping matter, Mr. Zhang is going to do the best

17  he can.  He speaks English but, or course, because of

18  the nature of the proceedings wants to be precise, so we

19  have requested an interpreter.

20    So just for the benefit I'm going to ask

21  Mr. Zhang to sit with the interpreter.  I'm going to ask

22  him questions in English, he's going to answer in

23  English, but he'll only talk to the interpreter if

24  there's something that requires the intervention of the

25  interpretation, if that's all right with the panel.

1    MR. SHAMOUN:  As long as we know what

2  he's asking the interpreter.

3    MR. MCNEIL:  Well, that's correct.  Or I

4  mean, she will -- she can interpret whatever he's asking

5  her.  That's the procedure that we used at the

6  deposition and it seemed to be fine.

7    CHAIRMAN ALDOUS:  And with regard to the

8  Claimants, do you have any question to this particular

9  interpreter?

10    MR. JENEVEIN:  No, sir.

11    CHAIRMAN ALDOUS:  It's my understanding

12  that I'll have to swear in both the witness and the

13  interpreter.

14    MR. MCNEIL:  Yes, I believe so.  And also

15  represent to the panel the interpreter was retained here

16  in Texas through our associated law firm, so I've never

17  met her before.  My client's never met her before.

18    CHAIRMAN ALDOUS:  I'm not asking you to

19  vouch.

20    MR. MCNEIL:  Okay.  Thank you.

21    CHAIRMAN ALDOUS:  So, if you would, come

22  on up, ma'am, and, just for the record, could you state

23  your name?

24    THE INTERPRETER:  Jennifer Fan Jing

25  Greene.

1170

1  (Oath administered to interpreter by Chairman Aldous.)

2           CHAIRMAN ALDOUS:  Could you state your

3  name, please?

4           THE WITNESS:  It's Xuming Zhang.  Sherman

5  Zhang.  The same.

6  (Oath administered to witness by Chairman Aldous.)

7           CHAIRMAN ALDOUS:  Thank you.  So you

8  heard the explanation by Mr. McNeil.  If you do need an

9  interpretation of anything, be sure and ask, and then we

10  can get an interpretation of what's going on between you

11  two.

12           THE WITNESS:  Yes.

13           CHAIRMAN ALDOUS:  Thank you.  You may

14  proceed.

15               XUMING "SHERMAN" ZHANG,

16  having been first duly sworn, testified as follows:

17                  EXAMINATION

18  BY MR. MCNEIL:

19    Q   Mr. Zhang, just prior to this -- or your being

20  sworn right now I identified you as Zhang Xuming,

21  spelled X-u-m-i-n-g, but you're commonly known by your

22  anglicized name of Sherman; is that correct?

23    A   Yes.

24    Q   And do you -- are you the president of any

25  company?

1171

```
 1      A    Yes.

 2      Q    What companies?

 3      A    I'm the president of AVIC USA, Inc.

 4      Q    And how long have you been the president of

 5   AVIC USA, Inc.

 6      A    It's about ten years.

 7      Q    And before you were the president of AVIC USA,

 8   Inc., did you hold any other positions as an officer of

 9   AVIC USA?

10      A    You mean --

11      Q    Just prior to the presidency.

12      A    Oh.  I was EVP of AVIC USA, Inc. for three

13   years, something.

14      Q    And so at some point in time you became the

15   president?

16      A    Yes.

17      Q    How did that come about?

18      A    In year 2005, the former CEO or the president

19   of AVIC USA retired and -- back to China, and I took

20   over the position as president of the company.

21      Q    And who recommended you to be president?

22      A    Its former president.

23      Q    Does AVIC USA have a board of directors?

24      A    Yes.

25      Q    Do you report to the board?
```

1172

1    A    Yes.

2    Q    What was the business of -- in 2005, when you

3    became the president, what was the business of AVIC USA?

4    A    At that time the business mainly is some

5    investment, like property investment real estate, and

6    also trading.

7    Q    And how long had AVIC USA been in -- strike

8    that.

9         What is AVIC USA?  Where is it formed?

10    A    It's formed in California, in 1987, I think.

11    Q    And, now, let's cut to the chase.  At some

12    point in time did you decide that it might be a good

13    idea to consider getting into the wind energy business

14    in some form?

15    A    Yes.

16    Q    When was that?

17    A    That's about in year 2007.

18    Q    As president of AVIC at that time, what were

19    your duties?  Other than the normal administrative

20    duties, did you have any job that you understood was

21    your responsibility at AVIC USA?

22    A    Yes, I do.

23    Q    What was that?

24    A    It's, you know, the -- I'm in charge of the --

25    you know, the manager of the company in all aspects,

1173

1  which include finance, you know, set up the business

2  budget and also the strategy planning, had to report to

3  the board.   And also I will, you know, manage our

4  reinvestment because some of our business has a partner,

5  local partner.

6      Q     And were you being directed by anybody else at

7  AVIC or were these duties your responsibilities?

8      A     For the day-to-day operation?

9      Q     Yes.

10     A     It is my duty and my responsibility.

11     Q     Were you responsible for finding projects or

12  suitable investments for the company?

13     A     Yes, I do.

14     Q     And when you decided to pursue or at least

15  investigate the wind energy business, what did you do?

16     A     You know, in year 2007, as I mentioned, and I

17  got chance, you know, to contact Sempra Energy Company.

18  It's based in San Diego.

19     Q     What does Sempra Energy do?

20     A     You know, they have a project in Mexico side.

21  It's around the boundary to California.

22     Q     Is this prior to your meeting Patrick

23  Jenevein?

24     A     It's before I meet Patrick.

25     Q     As a result of your contact with Sempra

1174

1  Energy, what did you do then?

2      A    The CEO of Sempra just send A-team, I believe

3  its A-team, you know, to China with me to sell the

4  equipment.

5      Q    Was that in calendar year 2007?

6      A    Yes.

7      Q    Was that before you met Patrick Jenevein?

8      A    It's before.

9      Q    And what happened as a result of -- or strike

10  that.

11           What happened during your trip to China?

12      A    I accompany the team from Sempra Energy and to

13  China.  We visited manufacturers, which include wind

14  turbine and blades.

15      Q    Did you make any business decisions as a

16  result of that trip to China?

17      A    Actually, you know, the business with Sempra

18  is they need to do a lot of [unintelligible], but in my

19  mind I think it's a good business opportunity for me.

20      Q    What would be a good business opportunity for

21  you?

22      A    Because I see the demand in United States for

23  the equipment for wind farm that year, it's quite

24  strong.  And, also, I also see the supply, I mean, the

25  equipments has capability in China.

1    Q    Did you get into contact with any suppliers in

2  China as a result of your idea?

3    A    Yes.  You know, actually I talk to

4  [unintelligible] for the factory we visited and I just

5  want to get their capability information from them.

6    Q    What did you learn from the information that

7  you got from the factory in China?

8    A    The factories are very happy to see, you know,

9  the demand from overseas, especially from America.

10   Q    How did you meet Patrick Jenevein?

11   A    During the visit, HT Blade is one of our

12  target company, and in the discussion with general

13  manager and also include other executive member of the

14  company.  And they introduce Patrick to me, actually.

15  They said it's a joint venture, they have partner named

16  Patrick based in Dallas.

17            CHAIRMAN ALDOUS:  I'm sorry.  I

18  apologize.  I didn't hear -- you said -- I just didn't

19  understand what he said, I'm sorry.

20   Q    Could you restate your answer?

21            MR. MCNEIL:  And I apologize to this

22  portion of the panel for having my back to you.

23            CHAIRMAN ALDOUS:  You just said, "I was

24  introduced to him by . . ."

25            THE WITNESS:  By the general manager of

1176

1    HT Blade factory.

2              CHAIRMAN ALDOUS:  Okay.  I'm sorry.

3         Q    And when you say introduced, were you

4    personally introduced or were you given contact

5    information?

6         A    I think I got contact information.  Also the

7    telephone number or something.

8         Q    How did you first make contact with Patrick

9    Jenevein?

10        A    I think it's by phone call.

11        Q    What was your -- well, did that phone call

12   lead to anything?

13        A    Yes.  After, you know, the phone call, I

14   introduce who I am and also very likely I looking for

15   meet him face to face and, you know, sometime somewhere

16   in America.

17        Q    Was a meeting with Patrick Jenevein arranged

18   in America?

19        A    Yes.

20        Q    When?

21        A    It's around the end of November or October.  I

22   cannot remember exactly.  It's in Los Angeles.

23        Q    Of calendar year 2007?

24        A    2007, yes.

25        Q    Was anyone with Patrick Jenevein when you met

1177

1    him?

2         A    Mike Carter.

3         Q    Where did you two meet -- or you three meet, I

4    should say?

5         A    In a lobby of hotel in Los Angeles.

6         Q    And what did you talk about during that

7    meeting?

8         A    In that meeting, you know, because restaurant,

9    we just -- I give, you know, introduction about my idea,

10   my idea is sourcing solution, just sourcing in China and

11   provide a solution to American market.

12        Q    So when you say sourcing solution, for the

13   benefit of the panel, does that mean providing a source

14   for equipment that you wanted to bring to the United

15   States?

16        A    Yes.

17        Q    Did you tell Patrick Jenevein and Mike Carter

18   that that was your idea?

19        A    Yes.  That's my idea.

20        Q    And what did they respond?

21        A    Because strong meeting and, you know, they

22   think it's a good idea, actually.

23             CHAIRMAN ALDOUS:  If we're at a good

24   breaking point, why don't we break for lunch.

25             MR. MCNEIL:  Perfect breaking point.

1178

1          CHAIRMAN ALDOUS:  Thank you.  We will

2    break for 45 minutes.

3    (A lunch break was taken from 12:02 p.m. to 12:53 p.m.)

4          CHAIRMAN ALDOUS:  All right.  Mr. McNeil,

5    sorry to have interrupted you for the lunch, but you now

6    have the floor.

7          MR. MCNEIL:  Thank you very much, and it

8    was no problem at all.

9    Q    Before we move on to the Memorandum of

10   Understanding, behind you the Claimants have prepared

11   these boards.  These are called demonstrative evidence.

12   It's not really evidence; it's just things that they

13   have on the wall here.  And you see your picture on the

14   second item right there?

15   A    I do.

16   Q    They list you in five categories.  Do you see

17   that?  AVIC USA president, and I think you testified you

18   are the president of AVIC USA; yes?

19   A    Yes.

20   Q    And then it says AVIC TED contact.  Do you

21   know where that came from?

22   A    Probably it's one time for the convenience.

23   Q    Where?

24   A    In MOU.

25   Q    Or was it the Chicago agreement?

 1       A     Chicago.  Yeah, I think in Chicago.

 2       Q     And then the third one says Cirrus spokesman.

 3  Do you know why you were designated a Cirrus spokesman?

 4       A     No.

 5       Q     Have you ever called yourself the Cirrus

 6  spokesman?

 7       A     No, I don't think so.

 8       Q     And then it says AVIC IHC direct report.  Do

 9  you see that?  Do you know where that came from?

10       A     IH, no, I don't know.

11       Q     And then, finally, the last one says AVIC

12  senior executive.  Do you see that?

13       A     Yes.

14       Q     Are you -- if AVIC is a reference to the

15  parent company, are you an AVIC senior executive?

16       A     No.  I hope.

17       Q     I understand.  Are you a senior executive of

18  any company in the AVIC family of companies other than

19  AVIC USA?

20       A     No.

21       Q     Now, behind you you have another chart that

22  was prepared, and in connection with that chart I'm also

23  showing you --

24             MR. MCNEIL:  And, by the way, for the

25  benefit of the panel we gave you what we call hot docs

1180

1  or the things that you'd be referring to the most in the

2  binders at the very beginning of the arbitration.  And

3  this document is in there.  It's listed as AVIC USA 268,

4  if you'd like to, for your ease, refer to a direct copy.

5  But in the meantime I will see if I can get this one

6  somehow -- it doesn't want to get any smaller than that

7  on here, but . . .

8       Q     Mr. Zhang, prior to this arbitration, you had

9  a chance to review this document; did you not?  The one

10  that I'm showing on the -- what we've called as an Elmo.

11  You see right in front of you?

12      A     Yes, I do.

13      Q     And did you have a chance to review this and

14  make sure that -- well, is this accurate?  Is this an

15  accurate depiction of those companies?

16      A     I believe so.

17      Q     How many companies does AVIC have in total?

18  Do you have any idea?

19      A     You mean the AVIC industry?

20      Q     Company-wide.  Yeah, the whole company.

21      A     Many, many.

22      Q     More than a hundred, right?

23      A     Probably.

24      Q     Now, you saw the board that was prepared by

25  the Claimants here behind you?

1181

1       A     Yes, I do.

2       Q     Based on your knowledge and the amount of time

3   you've been the president of AVIC USA and all of your

4   knowledge, which chart is more accurate; the one behind

5   you or the one that's on the Elmo?

6       A     The one in front of me now.

7       Q     Now, let me get back to what I was going to do

8   before lunch, which was the MOU.  You've seen this

9   document throughout the course of this arbitration,

10  haven't you?

11                  CHAIRMAN ALDOUS:  Would you mind just

12  referring to it by exhibit number?

13                  MR. MCNEIL:  Yes.  It's Exhibit No. --

14                  MR. BAYLES:  It's Claimants' No. 1 and

15  it's --

16                  CHAIRMAN ALDOUS:  That's fine.

17                  MR. BAYLES:  -- AVIC USA's No. 130 in the

18  binder.

19                  MR. MCNEIL:  And I appreciate that, and I

20  apologize if at any time I omit an exhibit number, but

21  Mr. Bayles will help me with that.

22                  CHAIRMAN ALDOUS:  I'll help Mr. Bayles

23  with that.

24                  MR. MCNEIL:  Okay.  Thank you.

25      Q     You've seen this document before, haven't you?

1182

1    A    Yes.

2    Q    And you were testifying before lunch that at

3  some point in time you met Patrick Jenevein and you also

4  met Mike Carter and there was a meeting in Los Angeles.

5  You recall that?

6    A    Yes, I do.

7    Q    When was that?  That was in -- you know it's

8  in calendar year 2007, but can you pinpoint that a

9  little bit more specifically?

10   A    Yes.  It's close to the end of year, year

11  2007.

12   Q    Do you remember when this Memorandum of

13  Understanding was signed?

14   A    It was signed in January, yeah, 2008.

15   Q    Late January?

16   A    Late, yes.

17   Q    Were there discussions between you and Patrick

18  Jenevein between the last meeting or discussions in 2007

19  and 2008 with Patrick Jenevein?

20   A    Yeah, we had, you know, quite often telephone

21  communication and also I just ask him, you know, to

22  prepare for something because I know this team coming

23  from China is coming to the States.

24   Q    Very good.  Was Mr. -- and, by the way, page 2

25  of the exhibit shows an individual named Liu Rongchun.

1183

1    Do you see that?

2        A    Yes, I do.

3        Q    Was Mr. Liu one of the members of the team

4    that was coming to the States?

5        A    Yes.  He's the team leader.

6        Q    Did you tell Patrick Jenevein he was coming to

7    the States?

8        A    Yeah.  I told Patrick, you know, team is

9    coming.  I introduce, you know, all the -- each of the

10   team member to Patrick also before they come.

11       Q    Did you arrange for them to meet here in

12   Dallas?

13       A    Yes, I do.

14       Q    Did a meeting take place here in Dallas?

15       A    Yeah, I think so.

16       Q    Was this document signed in Dallas?

17       A    Yes, I think it's in Dallas.

18       Q    Did you and Patrick Jenevein have an

19   understanding as to who prepared the document that would

20   be potentially signed as a Memorandum of Understanding?

21       A    It's Patrick prepare.

22       Q    And did you see a draft of this agreement

23   before it was signed?

24       A    Yes, I do.

25       Q    Did you make any changes to that draft?

1184

```
 1       A     No, I don't think so.

 2       Q     You'll see that it has Liu Rongchun signing as

 3   vice president.  Do you see that?

 4       A     Yes, I do.

 5       Q     Is he the vice president -- strike that.

 6             Does he have any role within CATIC USA or

 7   AVIC USA?

 8       A     He's one of the director of the board of AVIC

 9   USA, Inc. at that time.

10       Q     Did you tell Mr. Liu that you were exploring

11   wind project -- wind machinery sales and service in the

12   United States?

13       A     Yes, I do.

14       Q     Did you tell him about your prior contact with

15   Patrick Jenevein?

16       A     Yes.  Even before I meet Patrick.

17       Q     Did you present those issues to the board or

18   did the board direct you to engage in those types of

19   investigations on wind turbine and blade sales in the

20   United States?

21       A     Actually, it's my line, you know, to penetrate

22   this market and to invest in this business.  But I have

23   to, you know, think all aspects and report to the board

24   and get support from the board.

25       Q     Did they support you?
```

1185

1    A    Yes, they do.

2    Q    So when you came to Los Angeles and -- strike

3    that.

4              Before you came to Los Angeles, did you

5    identify for Patrick Jenevein what Mr. Liu's role was

6    inside of AVIC USA?

7    A    Yeah.  He's the director of the board.

8    Q    But did you tell Patrick Jenevein that?

9    A    I think so.

10   Q    Did you also tell him that he was a vice

11   president of CATIC, which is identified in the

12   agreement?

13   A    Yes, I do.

14   Q    So did you tell him in which capacity Mr. Liu

15   should sign this agreement?

16   A    He's the director of the USA, Inc., you

17   know -- I mean the CATIC USA, Inc. at that time.

18   Q    Well, why was he on the agreement; any idea?

19   A    Firstly, you know, I think it's a

20   [unintelligible], you know, because I think it's a

21   culture reason.  You know, people think, you know, he's

22   a VP, you know, and so they respect, but, actually, you

23   know, he's also the director of the company, of AVIC

24   USA, Inc.

25   Q    You said it was a cultural reason.  What did

1186

1    you mean by that?  Is it a issue of respect?

2        A    It's respect, I think, yeah.

3        Q    And did you note when the agreement was shown

4    to you the highlighted portion on the top of this

5    agreement where it says "This is not a binding

6    document"?  Do you see that?

7        A    Yes.

8        Q    Was it your understanding that it was a

9    binding document or a nonbinding document?

10       A    Nonbinding.

11       Q    So it was a nonbinding document.  What was the

12   purpose of this document?

13       A    This document just show, you know, we -- the

14   common ground and were helpful for the discussion

15   regarding the -- you know, the corporation.

16       Q    And it says on the second page down here, do

17   you see it says, where my finger is, I hope, "Tang will

18   employ attorneys to draft the Articles of Incorporation,

19   bylaws and necessary documents to finalize the

20   Memorandum of Understanding"?  Do you see that?

21       A    Yes.

22       Q    Was it your understanding that Tang would

23   employ the attorneys to do all the documentation to

24   finalize the MOU?

25       A    Yes.  Patrick, you know, has more knowledge,

1187

1    you know.

2        Q    Was that his suggestion that he do it?

3        A    He suggest, yeah.

4        Q    And it also says it's intended to be finalized

5    on or before February 28, 2008.  It wasn't finished by

6    February 28, 2008, was it?

7        A    No.

8        Q    At some point in time, though, you

9    understood -- or at some -- strike that.

10                There were additional negotiations

11   between you and Patrick Jenevein between February of

12   2008 and the signing of the Soaring Wind agreement; is

13   that fair to say?

14       A    Yes, that's true.

15       Q    Did any of those negotiations involve

16   Mr. Keith Young?

17       A    No, I don't think so.

18       Q    Did any of those negotiations involve Paul

19   Thompson?

20       A    No.

21       Q    Did any of those negotiations involve Dr. Jan?

22       A    No.

23       Q    Did any of those negotiations involve Mitch

24   Carter?

25       A    Most of time it's -- Carter, no.

1188

1     Q    I want to make sure I didn't leave anybody

2  out.

3            So when -- during that period of time,

4  from -- did you understand in the very beginning that

5  you were going to have multiple parties as partners in

6  the Soaring Wind agreement?

7     A    No.  Actually at the beginning, I think it's

8  like a joint venture between AVIC USA, Inc. and Tang

9  Energy.  Very beginning, yes.

10    Q    And a joint venture to do what?

11    A    Marketing and sales.  And also after sales,

12  service for the wind turbine, you know, machine.

13    Q    After sales, service, you mean to fix them if

14  they're broken or something like that?

15    A    Just, you know, guarantee the machine after

16  installation where it work perfectly, you know, they

17  need to regular service, actually.

18    Q    Did you know that Patrick Jenevein was in the

19  wind business or wind power business in some fashion

20  when you started discussions with him?

21    A    Yes, I know.

22    Q    Did you have any objection to him if he was

23  doing -- well, strike that.

24            Do you know -- did he tell you exactly

25  what he was doing?

1189

1      A      He's doing -- you know, I know there is a

2    project, you know, he's part of at Sinovel to sell the

3    machine to project, and most of his business is blades,

4    I think.  HT blades.

5      Q      Did Soaring Wind earn any money from anything

6    during its existence that you're aware of that did not

7    relate to the sale of some sort of wind machinery or

8    equipment?

9      A      Again, what's the question?

10     Q      The question is, Soaring Wind made a little

11   bit of money over the years; yes?

12     A      Yes.  I think about two projects.

13     Q      When you say projects --

14     A      Sale -- for each, I think, two deal he sells

15   one turbine.

16     Q      So my question was, did Soaring Wind ever earn

17   any money from anything other than the sale of wind

18   turbines?

19     A      No.

20     Q      Did you and Patrick Jenevein ever discuss that

21   the operation or the development of wind farms would be

22   part of the business of Soaring Wind?

23     A      No, I don't think so.

24     Q      In all of your discussions with Patrick

25   Jenevein between 2007 and up to the signing of the

1190

1    Soaring Wind agreement in 2008, did you have any

2    discussions during that period of time regarding wind

3    farm development being the business of Soaring Wind?

4        A    No.

5             MR. SHAMOUN:  Will you do me a favor?  He

6    can probably understand your English as fast as you can

7    spit it out.  Would you slow down with me?

8             MR. MCNEIL:  Yes, I will.

9             THE WITNESS:  Yeah, thank you.

10            MR. MCNEIL:  You got to slow down that

11   thing you got there.

12            MR. SHAMOUN:  He's understanding you.

13   You're quick, but I can't --

14            MR. MCNEIL:  I apologize and I accept the

15   admonition and just -- and say it again if I get too

16   fast.  I'm just trying to keep track of the time --

17            MR. SHAMOUN:  She's dying over there.

18            MR. MCNEIL:  I understand.

19       Q    So was it your understanding that Soaring Wind

20   retained counsel at some point in time to prepare the

21   operating agreement?

22       A    Yes, I do.

23       Q    Did you have any understanding -- or strike

24   that.

25            Were you ever invited to have a

1191

1    discussion with Soaring Wind's counsel regarding the

2    drafting of the Soaring Wind agreement?

3         A    No.

4         Q    Did you ever -- was Soaring Wind's counsel

5    identified to you before the agreement was given to you?

6    Let me ask a better question.

7              Did you know who was representing Soaring

8    Wind in the preparation of this agreement?

9         A    It's Patrick.

10        Q    You knew that Patrick was doing it?

11        A    Yes.

12        Q    Did he ever tell you who the lawyer was that

13   was preparing the agreement?

14        A    No, I don't think so.

15        Q    Did he ever tell you who the law firm was?

16        A    No.

17        Q    Did he ever invite you to talk to the lawyer

18   in order to provide your input into the agreement?

19        A    No.

20        Q    Did you ever discuss with any lawyer the

21   purposes of Soaring Wind before you signed the

22   agreement?

23        A    Maybe again.

24        Q    Did you ever talk to any lawyer about the

25   purpose of the Soaring Wind, LLC before you signed the

1192

1    agreement?

2         A    You mean the purpose?

3         Q    Yes.

4         A    No.

5         Q    When you signed it, what did you understand

6    the purpose to be?

7         A    My understanding purpose is, you know,

8    concentrate in marketing and sales, and also after sale,

9    service.

10        Q    Did you -- you read the agreement; yes?

11        A    I read, yeah.

12        Q    And that was still your understanding after

13   you read it?

14        A    Exactly.

15        Q    Is it fair to say that English is your second

16   language?

17        A    True's true.

18        Q    When the -- before you signed the agreement,

19   did you have any discussion with any of the Claimants

20   here regarding the arbitration provision that's in the

21   Soaring Wind agreement?

22        A    No.

23        Q    Now, let me see if I can do this quickly.

24   And, if it's too much, then I will break it down, but

25   did Patrick Jenevein ever complain to you prior to the

1193

1    time he -- well, strike that.

2            You know that at sometime in 2014 Patrick

3    Jenevein came to Los Angeles to meet you; yes?

4        A    Yes.  In, yeah, March, I think.

5        Q    Before that meeting, when was the last time

6    you talked to Patrick Jenevein about the Soaring Wind or

7    its business?

8        A    I think since end of year 2010 we have, you

9    know, some frequent communication.  Even hardly remember

10   what's the last meeting.

11       Q    Did you see him in calendar years 2011 or 2012

12   or 2013?

13       A    I cannot recall, but I think year 2013, 2012,

14   no.  No meeting.

15       Q    And did you have any Management Committee

16   meetings on a quarterly basis for Soaring Wind?

17       A    No.

18       Q    At any time?

19       A    In the past year 2011, 2012, no.

20       Q    At any point in time until the meeting in Los

21   Angeles, which we'll get to shortly.  At any point in

22   time up until then, did Patrick Jenevein complain to you

23   that AVIC -- strike that, that any of the AVIC companies

24   were competing with him in any way?

25       A    No.

1194

1     Q     Did he complain to you about any of Paul
2  Thompson's conduct in any way?

3     A     No.

4     Q     Did he complain to you about anything before
5  the meeting in 2014 regarding AVIC's conduct or Paul
6  Thompson's conduct?

7     A     No.

8     Q     Let's turn to that meeting in 2014.  How did
9  that meeting take place?  How did it come about?

10    A     I think it's last year, about March, and he
11 give me a call and he said he's coming to Los Angeles to
12 meet me.

13    Q     Well, at that point did you consider Patrick
14 Jenevein to be a friend of yours?

15    A     Yes, I do.

16    Q     As well as a partner in Soaring Wind; is that
17 fair to say?

18    A     Exactly.

19    Q     When he came to Los Angeles, did you make any
20 special arrangements for him?

21    A     Special arrangement?

22    Q     Yeah.

23    A     Actually, yes.  I pay, you know, to see, you
24 know, old friend.  You know, long time, no see.  And I
25 definitely want to do something for him.

1195

1    Q    What did you do for him?

2    A    I offer and I go to the airport.

3    Q    You personally picked him up from the airport?

4    A    Yes.

5    Q    And then what?

6    A    Then I cannot find him at beginning.  I just

7    try to find him because I just park in there and I call

8    him finally.  I say, "Where are you?"

9    Q    And what did he say?

10   A    And he's just, you know, standing behind my

11   car not that far, actually.

12   Q    Did you notice anything unusual about

13   Mr. Jenevein at that point?

14   A    I was a little shocked.

15   Q    What shocked you?

16   A    Because it's not Patrick Jenevein I knew

17   before, actually.

18   Q    What was different?

19   A    The big different is, you know, he has big

20   beard and also very -- the color is very strange.

21   Q    So did you pick him up?

22   A    Yes, I do.

23   Q    Did you say anything to him about his strange

24   appearance?

25   A    Yeah, I'm so happy to see him.

1196

1    Q    You didn't say anything to him about his

2  strange experience?

3    A    I -- you know, no.  Actually, no.

4    Q    Did you start a conversation in the car?

5    A    Yes, I do.

6    Q    What's the first thing that Patrick Jenevein

7  told you?

8    A    The first thing something sad.  He said he

9  sold his house and moved to apartment and a lot of

10 pressure, you know, from his partner investors, a lot of

11 pressure and complaints.  Yeah, that's -- he told me.

12   Q    Did he say anything to you -- well, during

13 that conversation, did he say anything to you regarding

14 any disputes with any AVIC company?

15   A    Yes.  I know so the dispute, you know, of HT.

16   Q    Did he identify any other AVIC company that he

17 had a dispute with other than HT?

18   A    Mainly it's HT.

19   Q    Let me set that aside for a minute and just

20 ask you a couple of other questions.  When you became

21 the president of AVIC USA, did you have a chance to

22 review its finances?

23   A    Whose finances?

24   Q    Finances of AVIC USA.

25   A    Sure.

1197

1      Q     Did it have adequate funds to conduct its

2   business?

3      A     Yeah, we have funds.

4      Q     Have you ever been asked at AVIC USA to take

5   money out of AVIC USA and to put it into some other AVIC

6   USA entity?

7      A     From AVIC USA to AVIC USA?

8      Q     AVIC USA to any other AVIC company.

9      A     No.

10     Q     AVIC USA makes investments, doesn't it?

11     A     Yes.

12     Q     And it makes investments in its own name?

13     A     Yes.

14     Q     And it owns some properties and some

15   investments that you've already talked about?

16     A     Yes.

17     Q     Are all of those investments made in the name

18   of AVIC USA?

19     A     Yes.

20     Q     And so AVIC -- and is AVIC USA a partner with

21   other joint ventures or LLC members or corporations?

22     A     Yes.  With other partners.

23     Q     But are all of the assets of AVIC USA owned in

24   its own name?

25     A     Yes.

1198

 1    Q    And are you in charge of all of those

 2  entities?

 3    A    Yes.

 4    Q    Are you -- is anybody at AVIC USA more

 5  familiar with AVIC USA's business than you?

 6    A    I think no one.  I'm the one.

 7    Q    Did any AVIC entity transfer money out of your

 8  bank account without your authority?

 9    A    No.

10    Q    Who is the signature -- strike that.

11         Who is the signatory of the AVIC USA

12  corporate account?  Who signs on the corporate account?

13    A    Usually is me and sometimes CFO.

14    Q    And who does the CFO report to?

15    A    CFO report to me.

16    Q    Does AVIC USA have a regular lawyer?

17    A    Yes, we do.

18    Q    Who's the regular lawyer?

19    A    One is Paul Ma and also you are one of our

20  lawyers.

21    Q    How long have you known me?

22    A    Ten years, something.  Ten years, I think.

23    Q    Did anybody direct you to have to hire me to

24  represent your interests in this case?

25    A    No.  It's me.

1199

1     Q     Did anyone have to get -- did you have to get

2     approval to hire me or to hire Mr. Ma to represent the

3     interests of AVIC USA in this case?

4     A     No.  That's my decision.

5     Q     And does AVIC USA have an accountant?  A CPA.

6     A     Oh, CPA.  Yes, we have.

7     Q     And who selected the CPA for AVIC USA?

8     A     It's jointly me and the CFO recommend.  I make

9     decision.

10    Q     And do you file tax returns?

11    A     Yes.  Every year.

12    Q     Is AVIC USA in good standing in California as

13    a corporation?

14    A     Yes.

15    Q     Have you -- who's appointed the corporate

16    officers in AVIC USA?

17    A     It's appointment by the board of AVIC USA.

18    Q     Upon your recommendation?

19    A     Yes.

20    Q     Has the board ever told you that you had to

21    hire somebody at AVIC USA who you did not want to hire?

22    A     No.

23    Q     Does anybody other than AVIC employees work on

24    the premises of AVIC USA?

25    A     No.

1200

1    Q    Are there any other AVIC entities that do

2    business out of your office in California?

3    A    No.

4    Q    We've heard a lot about and have seen your

5    picture on things for AVIC USA.  Can you tell us, do you

6    belong to any other organizations other than AVIC USA,

7    either business organizations or otherwise?

8    A    You mean --

9    Q    I'm sorry, let me ask you a better question.

10            Do you consider yourself a businessman,

11   sir?

12   A    Yes.

13   Q    Do you belong to any business organizations

14   other than private organizations like -- or business --

15   let me ask that again.

16            Do you belong to any organizations like

17   Chamber of Commerce --

18   A    Oh, okay.

19   Q    -- or things like that?

20   A    I'm -- yes, I do.

21   Q    Can you identify for the panel what

22   organization you belong to?

23   A    I'm the president of CEC.  It's China

24   Enterprise Council in Southern California.

25   Q    Is China Enterprise Council known very well in

1201

1  Southern California?

2      A    Yes.   Pretty well known, especially in the

3  recent years.

4      Q    Does it have any regular contacts with any

5  government officials in Los Angeles?

6      A    Yes, we do.

7      Q    Do you have regular meetings with the mayor's

8  office in Los Angeles?

9      A    In the past year, actually, we establish a

10  very regular meeting schedule with, you know, the

11  mayor's office who's in charge of economic development

12  of Los Angeles.  And also we have a very good meeting

13  with World Trade Center at LAEDC, you know, on this --

14      Q    The LAEDC, is that the Los Angeles Economic

15  Development Council?

16      A    Yeah, right.  Yeah.

17      Q    And who owns the shares of AVIC USA?

18      A    It's hundred percent owned by the AVIC

19  International Holding.

20      Q    Does AVIC International Holdings share any

21  officers with AVIC USA?

22      A    I don't think so.

23      Q    Does AVIC International Holdings share any

24  directors with AVIC USA?

25      A    No.

1202

1    Q    Now, did you ever have any discussions with

2    Paul Thompson regarding the formation of Ascendant?

3    A    No.

4    Q    Did you ever have any discussions with Xu Hang

5    regarding the formation of Ascendant?

6    A    No.

7    Q    Did you ever have any conversations with Liu

8    Rongchun regarding the formation of Ascendant?

9    A    No.

10   Q    Did you ever have any understanding that AVIC

11   USA would participate in any manner with Ascendant USA?

12   A    No.

13   Q    Excuse me.  Strike that.  With Ascendant?

14   A    No.  No.  Ascendant, no.

15   Q    Does AVIC USA own any portion of Ascendant?

16   A    Ownership?

17   Q    Yes.  Does AVIC --

18   A    No.

19   Q    -- USA own any part of Ascendant?

20   A    No.

21   Q    Did you ever receive any money at AVIC USA

22   from Ascendant?

23   A    No.

24   Q    Have you ever paid any money to Ascendant?

25   A    No.

1203

1      Q      Have you ever participated in the management

2  of Ascendant?

3      A      No.

4      Q      Have you ever been an officer or a director of

5  Ascendant?

6      A      No.

7      Q      Prior to the signing of the Soaring Wind

8  agreement did you meet Keith Young?

9      A      No.

10              MR. MCNEIL:  The panel, I'd like to --

11  Mr. Jenevein, have you discussed what I asked a few

12  minutes ago?

13              MR. JENEVEIN:  I have not.

14              MR. MCNEIL:  I was going to offer a

15  stipulation, and the stipulation was going to be that --

16  the stipulation that we've not met Keith Young before

17  the signing of the agreement and that may alleviate the

18  need to call Mr. Young as a witness, and I'm directing

19  this at Mr. Lowenstein.

20              MR. LOWENSTEIN:  So the question is, did

21  Mr. Young ever meet Sherman before he signed the Soaring

22  Wind agreement?

23              MR. MCNEIL:  Exactly.

24              MR. LOWENSTEIN:  I'd stipulate to that.

25              MR. MCNEIL:  Okay.  Thank you very much.

1204

1    That'll save us a good few minutes.

2         Q    Prior to the signing of the Soaring Wind

3    agreement, had you met Mitchell Carter?

4         A    Yes, I do.

5         Q    And who introduced you to Mitchell Carter?

6         A    It's Patrick.

7         Q    Did Patrick tell you that Mitchell Carter was

8    part of his team at Tang Energy?

9         A    I cannot exact remember.  I think, yeah, the

10   same company or . . .

11        Q    And prior to the signing of the Soaring Wind

12   agreement did you make any representations to Mitchell

13   Carter regarding what Soaring Wind would do or what AVIC

14   USA would do other than put money in?

15        A    Yes.  We had a discussion about that.

16        Q    And what did you tell him?

17        A    Actually, it was very clear in the first

18   meeting in California in Los Angeles.  It's concentrate

19   in the marketing, sales and service.  It's, you know --

20   it's like sourcing solution company.

21        Q    When did you first meet Dr. Jan?

22        A    Dr. Jan, I think, is 2007, late of 2007, I

23   think.

24        Q    Did you ever say anything -- strike that.

25             Did you ever make any representations to

1205

1     Dr. Jan regarding any participation in Soaring Wind by

2     AVIC companies other than AVIC USA?

3         A     Only -- AVIC USA is the partner.

4         Q     Do you have any authority to make any

5     representations to anybody regarding what other

6     companies will do in the AVIC family?

7         A     No.

8         Q     Who selected your partners in the Soaring

9     Wind, LLC?

10        A     It's I selected.

11        Q     Who selected?  You selected Mr. Young?  No.

12    I'm asking who selected them, who asked them to invest

13    in the company?

14        A     Ask Soaring Wind?  No, no.  Ask Patrick?

15        Q     No.  Who -- you have Keith Young, Mitchell

16    Carter, Paul Thompson --

17        A     Just -- I just know Patrick, actually.

18        Q     So my question is, do you know how they came

19    to know about Soaring Wind and invest in it?

20        A     I don't know.  I think it's Patrick introduce.

21        Q     Did Patrick ever tell you to meet with any of

22    them and convince them to invest in Soaring Wind?

23        A     No.

24        Q     Who's paying the attorneys' fees for AVIC USA

25    in this case?

1206

```
 1        A     It's AVIC USA, Inc.

 2        Q     Have you collected any money from any other

 3   AVIC entity to pay our fees?

 4        A     No.

 5        Q     Have the fees been very expensive?

 6        A     Yeah.  I think so.

 7        Q     And where do you get that money from?

 8        A     It's from my daily operation investment, yeah.

 9   And it's very expensive, I know.

10        Q     Do you have any agreement with any third

11   parties to pay the expenses that AVIC USA is paying in

12   this case?

13        A     It's only we pay my lawyers.  I pay for my

14   lawyer.

15        Q     Is there -- but -- and you have no other

16   agreements with anybody else that they will pay the fees

17   for you?

18        A     No, no, no.

19        Q     This is going to be an odd question but I'm

20   going to ask anyway.  Have you ever met a fellow named

21   Cedric Chao?

22        A     No.  Yesterday or -- I cannot remember.  Last

23   two days I saw the picture here.

24        Q     But you've never met him?

25        A     No.
```

1207

1     Q    And you heard some reference somewhere that

2  he's the lead trial counsel in this case.  Do you recall

3  that?

4     A    Yeah.  It's very interesting to learn here.

5     Q    In your opinion, who's the lead trial counsel

6  for the Respondents, at least for AVIC USA?

7     A    That's the team leading by you are here.

8     Q    Did you select the name Soaring Wind?

9     A    No.

10     Q    How did you hear that name for the first time?

11     A    That's, you know, actually just have a joint

12  venture to do the business and also, I think, it's

13  Patrick gave the name.

14     Q    I'm going to show you -- I don't want to spend

15  a lot of time on it because I think most of it is --

16  when the Soaring Wind agreement was entered into, did

17  you believe that the Soaring Wind agreement included

18  whatever the terms of the Memorandum of Understanding

19  were?  Let me ask a better question.  I'm sorry.

20          When you signed the Memorandum of

21  Understanding, that was a sort of a -- as a temporary

22  agreement --

23     A    Yes.

24     Q    -- and a nonbinding agreement; is that fair to

25  say?

1208

 1    A    Yeah.

 2    Q    And eventually you had more negotiations and

 3  more discussions and you got into the Soaring Wind

 4  agreement --

 5    A    Yes.

 6    Q    -- and AVIC USA put in $350,000 and received

 7  50 percent of the interest.  Do you remember that?

 8    A    Yes.

 9    Q    Who determined the $350,000 contribution into

10  AVIC USA?

11    A    It's me.

12    Q    And who determined that you wanted 50 percent?

13    A    It's me.

14    Q    And did you tell Patrick that?

15    A    Yes.

16    Q    Is that why there's a difference in the terms

17  between the MOU and the Soaring Wind agreement?

18    A    Yes.  That's the business model that I want.

19    Q    And, with respect to the other Claimants, did

20  you ever have any objection to them joining the Soaring

21  Wind agreement or did you leave that to Patrick?

22    A    You mean other --

23    Q    The other Claimants who are here.

24    A    Oh.  I leave to Patrick.

25    Q    And so if it was okay with Patrick, it was

1209

1     okay with you; is that fair to say?

2          A     Exactly.

3          Q     What I'd like to do is turn to Exhibit 3,

4     which is the Preliminary Agreement or the Chicago

5     agreement.  They've been called both.  I think I asked

6     you this question, but I want to make sure I did again.

7     Is Xu Hang, is he an officer of AVIC USA?

8          A     No.

9          Q     Is he a director of AVIC USA?

10         A     No.

11         Q     Has he ever been an officer or a director of

12    AVIC USA?

13         A     No.

14         Q     Has he ever been authorized to bind AVIC USA

15    to anything?

16         A     To bind?

17         Q     To bind.  To get them committed to a contract.

18         A     No, no.

19         Q     Have you ever authorized him yourself to enter

20    into any contracts on behalf of AVIC USA?

21         A     No.

22         Q     Do you know who prepared the preliminary

23    agreement?

24         A     As far as I know, I think it's Xu Hang.

25         Q     Prior to the signing of the Chicago agreement,

1210

1    did you have any discussions with Patrick where he said

2    things like "We're going to enter into the Chicago

3    agreement and we're going to do this for the benefit of

4    Soaring Wind"?

5        A    Yes, we discuss about that and I think for the

6    details, what's the question?

7        Q    The question is, did you ever do anything

8    -- strike that.

9             Did you understand that the Chicago

10   agreement was for the benefit of Soaring Wind?

11       A    No.

12       Q    Did Patrick ever tell you it was for the

13   benefit of Soaring Wind?

14       A    No.

15       Q    Did he ever say to you that whatever we do in

16   the Chicago agreement is going to help Soaring Wind?

17       A    Not mention this.

18       Q    Did any of the Claimants ever tell you that

19   the -- well, strike that.

20             In connection with this agreement, did

21   you know of the entity called CATIC TED?

22       A    I know, yeah.

23       Q    I asked you -- well, let me just go through

24   the list as quickly as I can.  Is AVIC USA a member of

25   CATIC TED, an owner of CATIC TED?

1211

```
 1     A    No.

 2     Q    Does CATIC TED own AVIC USA?

 3     A    No.

 4     Q    And are there any common officers or directors

 5  between CATIC TED and AVIC USA?

 6     A    No.

 7     Q    When Mr. Xu Hang prepared this agreement, did

 8  he ask you if he could use you as a contact person in

 9  the United States?

10     A    Yes.  You know, but, actually, at beginning we

11  don't talk about that.  I see I'm list as a contact

12  person.

13     Q    Did you have any objection to that?

14     A    No.

15     Q    And where does Xu Hang reside?

16     A    Reside?

17     Q    Where does he live?

18     A    At that time?

19     Q    Yes.

20     A    In Beijing, I think.

21     Q    So was it unusual if you wanted to list

22  yourself as a contact person in the United States?

23  Never mind.  I'll withdraw the question.

24            Take a look at the other contact folks

25  here.  You see on the Tang side of things it's saying
```

1212

1    that the contact person is Mr. Mike Carter.  Do you see

2    that?

3         A    Yes.

4         Q    Did you have any input as to whether or not

5    Mike Carter would be a contact person on behalf of the

6    Tang side of the contract?

7         A    Yes, I see that.

8         Q    Any problem with that?

9         A    No.

10        Q    Wasn't it easier since everybody was in

11   contact with each other?

12        A    Yeah.  It's more convenience for the

13   communication, I think, yeah.

14        Q    Now, when the Preliminary Agreement was

15   signed, did you authorize anybody to sign that and bind

16   AVIC USA to anything?

17        A    No.

18        Q    If the contract said something like AVIC USA

19   is bound to invest money into this contract, would you

20   have objected to it?

21        A    Definitely I would object.

22        Q    And what about if it was to invest in wind

23   farms?

24        A    No.  Wind farm development is not my business.

25        Q    And how can you say that with such

1213

1    definiteness?  Did you think about wind farm business?

2        A    Because at beginning I already understand very

3    clearly, you know, do the marketing, sales, service is a

4    nice investment but the development of wind farm, you

5    know, is huge investment.  It's need a lot of resources

6    and I don't think we have -- our team, I don't think we

7    have this capability.

8        Q    And when you agreed to a joint investment of

9    $700,000, was it your understanding that 700,000 was an

10   adequate amount of money for a marketing company that

11   would be marketing wind turbines in the United States?

12       A    Yes.  That's a marketing and service company.

13       Q    And if this was a wind farm development

14   company, is it your understanding you'd need a lot more

15   money to do something like that?

16       A    Yes.

17       Q    Was there any discussion with anybody that

18   there'd be a lot more money put into Soaring Wind for --

19   in the future for wind farm development?

20       A    No.

21            (Witness speaking to interpreter.)

22            THE INTERPRETER:  He was telling me if he

23   understands, he will not use my service.

24            MR. MCNEIL:  I'm sorry, he said what?

25            THE INTERPRETER:  He said, you know, if

1214

1    he understands everything, he will prefer say it.

2                    THE WITNESS:  I just feel sorry, you

3    know.

4                    THE INTERPRETER:  He will not use my

5    service if he understand.

6                    MR. MCNEIL:  It's nothing personal, I

7    think, is what he's saying.

8        Q    Did you -- you've been here for the whole

9    arbitration and the question is, did you hear Professor

10   Jacobson's testimony regarding what are called the

11   Bridas factors on the wall, B-r-i-d-a-s?

12       A    Yes.  I see it first time.

13       Q    I think we've established some of this, but

14   let me just get through it very quickly.  Please take a

15   look at that board.  You see -- and there's some general

16   language, Mr. Zhang.  And with respect to the number 1

17   item up there that says AVIC and subs have common stock

18   ownership, we've already -- I've asked you the question

19   but I want to go through the factors for the clarity of

20   the record.

21                    On number 1, does AVIC, the parent

22   company, and AVIC USA have common stock ownership?

23       A    No.

24       Q    As to number 2, it says AVIC and subs share

25   directors or officers.  Do AVIC and AVIC USA share

1215

1   directors or officers?

2        A    No.

3        Q    As to number 3, AVIC and subsidiaries, in this

4   case, does AVIC and AVIC USA have common business

5   departments?

6        A    No.

7        Q    Who does the accounting for AVIC USA?

8        A    Accounting -- I have a CPA and also we have

9   CFO.

10       Q    Anything done in China in that regard?

11       A    No.

12       Q    Then it says AVIC and its subs, we'll say in

13  this case, AVIC and AVIC USA, file consolidated

14  financials.  Do you know if AVIC and AVIC USA file

15  consolidated financials?  That's number 4.

16            MR. SHAMOUN:  Malcolm, when you refer to

17  AVIC, are you talking about AVIC International Holdings?

18       A    Yes.  That's why I --

19            MR. MCNEIL:  No.  I believe -- this isn't

20  my exhibit, but I'll ask Mr. Jenevein.  When you're

21  talking about AVIC up here, you're talking about the

22  parent company of AVIC; are you not?  Or are you saying

23  any AVIC entity?

24            MR. JENEVEIN:  I think the Fifth Circuit

25  is concerned about the structure as a whole.

1216

1   　　　　　MR. MCNEIL:  Okay.  Well, I don't mind

2   framing my questions either way, Mr. Shamoun, just for

3   the benefit --

4   　　　　　MR. SHAMOUN:  I just want the record to

5   be clear when I read it.

6   　　　　　MR. MCNEIL:  And I want you to, too, so .

7   . .

8   　　A   No, we don't -- no, I don't think so, no.

9   Number 4 is no.

10  　　Q   Well -- and with respect to the first

11  entities, do you believe that AVIC USA has the same

12  stock ownership as any -- well, let me come back -- let

13  me finish the list and then we'll make the record clear.

14  　　　　　MR. MCNEIL:  I appreciate that.

15  　　Q   With respect to -- it says number 5, AVIC

16  finances subsidiaries.  Does any other AVIC entity

17  finance AVIC USA?

18  　　A   No.

19  　　Q   In fact, is one of the main businesses of AVIC

20  USA hotel ownership at the present time?  Is one of the

21  main businesses of AVIC USA hotel ownership?

22  　　A   Yes.

23  　　Q   And we saw an article -- there was an article,

24  an incorrect article, that was presented saying you paid

25  $15 billion, with a B, for a hotel.  Was that a

1217

1    correct -- was that correct?

2        A    15 billion?

3        Q    Yes.

4        A    No.

5        Q    And we also saw another one that was

6    contradicting the first one, and the second one that

7    contradicted the first one said, I think, 13 million.

8    Does that sound more like what's correct in terms of the

9    hotel you paid for?

10        A    13 million is reasonable, yeah.

11        Q    You bought a hotel for, roughly, that amount

12    of money?

13        A    Yeah, yeah.  The first one.

14        Q    Did you refinance any property in order to get

15    that money?

16        A    Yeah, definite.

17        Q    Did you borrow money from any other AVIC

18    entity in order to finance that purchase?

19        A    Most of the monies are from the New York, you

20    know, finance market and from the banks, yeah.  Also

21    some third-party, you know, finance resources.

22        Q    So you're not relying on any AVIC company to

23    give you money in order for AVIC USA to survive?

24        A    The finance market is huge.  You know, we can

25    just select.

1218

1    Q    Good.  So that -- well, that brings us to --

2    number 6 it says, AVIC causes the incorporation of the

3    subs.  Does AVIC -- has AVIC USA incorporated other

4    entities or formed other entities for its business

5    deals?

6    A    You mean --

7    Q    AVIC USA.

8    A    Yeah, we do.

9    Q    Well, you bought a hotel.

10   A    We do -- yeah, we do invest money for, you

11   know, the different business.

12   Q    But were you directed to do that by some other

13   AVIC entity or did you do that because it's a good

14   business practice?

15   A    No.  It's -- no.  I make decision.

16   Q    And then it says subs operate with grossly

17   inadequate capital.  Have you ever acted with not enough

18   money?

19   A    So far, so good.

20   Q    And number 8, AVIC often pays salaries and

21   expenses of sub.  Have you ever paid the salaries or

22   expenses of other AVIC companies?

23   A    No.

24   Q    Has AVIC ever paid the salaries or expenses of

25   anybody in your company?

1219

1    A    No.

2    Q    Subs receive no business from other sources.

3  I'm not quite sure what that means in the context of

4  AVIC USA, but the business -- you do business -- strike

5  that.

6              The hotels and other business that you

7  do, that's not with other subsidiaries of any AVIC

8  company, is it?

9    A    No.

10   Q    Number -- let's see.  AVIC uses subs' property

11  as its own.  Does any AVIC entity treat AVIC USA

12  property as its own property?

13   A    That's AVIC USA's property.

14   Q    Does any -- and, as far as you know, does

15  anybody else use your property?

16   A    No, no, no.

17   Q    And number 11, the daily operations of AVIC

18  and subs are not kept separate.  Do you have an

19  office -- does AVIC USA have an office in China?

20   A    No.

21   Q    Where does -- where do the AVIC companies

22  reside?

23   A    You mean AVIC?  The top?

24   Q    Yes.

25   A    It's in Beijing, I think.

1220

1      Q     And then it says number 12, subs do not

2   consistently observe corporate formalities.  Do you know

3   what's meant by the phrase "corporate formalities"?

4              (Witness speaking to interpreter.)

5      Q     Number 12.

6              (Witness and interpreter speaking.)

7      Q     Let me ask a better question.

8              (Witness and interpreter speaking.)

9      Q     Let me withdraw the question.

10             MR. SHAMOUN:  Wait a minute.  I want that

11   on the record.

12             MR. MCNEIL:  I'm sorry.  Go ahead.

13             MR. SHAMOUN:  I want that exchange on the

14   record.

15             MR. MCNEIL:  Can you please explain your

16   explanation, I think.

17             MR. SHAMOUN:  I want that conversation --

18             MR. MCNEIL:  I understand.  That's fine.

19   Go ahead.

20             THE INTERPRETER:  Oh.  I was -- me?  This

21   is -- this question for the interpreter?

22             MR. MCNEIL:  Yeah.  Ms. Shamoun would

23   like to know what the witness asked you, I believe.

24             THE INTERPRETER:  The witness asked me to

25   translate this.  Number --

1221

```
 1                    THE WITNESS:  12.

 2                    THE INTERPRETER:  Yes.  No. 12, which I

 3   did.

 4              (Witness speaks to interpreter.)

 5                    THE WITNESS:  One more time.

 6      A    (Through interpreter) Please translate one

 7   more time.

 8              (Interpreter speaking to witness.)

 9                    MR. SHAMOUN:  Can I get what she just

10   said to him on the record?

11                    THE WITNESS:  Let me -- let me explain.

12                    MR. SHAMOUN:  No, no, no.

13                    MR. MCNEIL:  No.  Why don't you say what

14   you --

15                    CHAIRMAN ALDOUS:  Ma'am, would you repeat

16   in English what you asked him in Chinese?

17                    THE INTERPRETER:  I didn't --

18                    CHAIRMAN ALDOUS:  What you just read --

19                    THE INTERPRETER:  I did not ask him in --

20                    CHAIRMAN ALDOUS:  I'm sorry.  What you

21   just read from the Board, please repeat it in English

22   what you just said to him in Mandarin, I guess.

23                    THE INTERPRETER:  In Mandarin?

24                    CHAIRMAN ALDOUS:  Well, whatever you use.

25                    THE INTERPRETER:  Okay.  What I said
```

1222

1   is -- what I -- the way I translated was the AVIC subs

2   do not normally obey the corporate formalities.

3                    CHAIRMAN ALDOUS:  It appeared or it

4   sounded as though your reading of that particular line

5   was longer in your language than ours.  But that's what

6   you read -- you did to him -- said to him?

7                    THE INTERPRETER:  Correct.  I was -- the

8   interpreter was struggling with that particular sentence

9   because --

10                   CHAIRMAN ALDOUS:  So one of the things

11  about interpretation is that you not give your own

12  interpretation of the matter that you're reading because

13  that changes the nature of what you're reading.

14                   So if you cannot translate it directly

15  from the way it is written or what is directly asked,

16  then I say that you inform us that you can't do that and

17  then attempt it in a different way.

18                   THE INTERPRETER:  Yes.

19                   CHAIRMAN ALDOUS:  Okay?

20                   THE INTERPRETER:  I will definitely do

21  that.

22                   CHAIRMAN ALDOUS:  Because it has to be

23  exact.

24                   THE INTERPRETER:  Yes.  I apologize --

25  to -- that's what was -- my following statement was

1223

1    going to come out was the interpreter was struggling

2    with the meaning of that sentence and maybe, you know,

3    that's what follow up, but I didn't get a chance to say

4    that.

5                    And another thing I want to say is I did

6    not add my words into that but that's my understanding

7    of that sentence.  However, the Chinese interpretation

8    is twice as long than English.

9                    CHAIRMAN ALDOUS:  If you're capable of

10   reading it exactly as though it is in Chinese, then you

11   can do it.  If you cannot do it, then you need to let us

12   know before you do it.

13                   But, with that said, Mr. McNeil's

14   withdrawing the question, so let's move on to a

15   different --

16                   MR. MCNEIL:  Sure.  Let me just ask a

17   couple of simple questions.

18        Q    Do you hold regular meetings at AVIC USA?

19        A    Yes, we do.

20        Q    Do you hold corporate meetings at AVIC USA?

21        A    Yes.  Every year, yeah.

22        Q    Do you know what minutes are?

23        A    Sure.

24        Q    Do you keep minutes of those meetings?

25        A    Yes, we do.

1224

1     Q     Have you ever entered into any loan agreements

2    at AVIC USA that are not documented with loan papers?

3     A     You mean finance?

4     Q     Yes.

5     A     All the finance is a lot of documents.

6     Q     Do you approve them internally at your

7    meetings?

8     A     Yes.  Have to sign.

9     Q     13, it says subdirectors act in the interest

10   of the parent.  Do you act in the interest -- well, do

11   you act in the interest of AVIC International Holdings?

12    A     No, no.  I am the president of AVIC USA, Inc.

13    Q     Right.  And you make those decisions?

14    A     Yes.

15    Q     And you report those decisions to the board;

16   yes?

17    A     Yeah, I make decision.

18    Q     And you do that on your own?

19    A     Yes.

20    Q     And it says AVIC pays or guarantees debts of

21   subs.  Do you know any circumstances where AVIC -- any

22   of the other AVIC companies have guaranteed the debts of

23   any of the subs?  And, actually, let me strike that

24   question.

25                    Do you know of any circumstances where

1225

1    AVIC has guaranteed the debts of AVIC USA?

2         A    No.

3         Q    And it says AVIC does not deal with subs at

4    arm's length.  Does AVIC do anything to interfere with

5    your operation of AVIC USA?

6         A    No.

7         Q    Have they ever restricted you in any way?

8         A    No.

9         Q    Have they ever instructed you not to do

10   something that you wanted to do which was a good

11   business decision?

12        A    I make decision myself.

13        Q    As to number 16, do you believe that anything

14   that you are doing with AVIC USA violates Chinese law?

15        A    Chinese law?

16        Q    Yeah.  Do you think anything that you're doing

17   at AVIC USA violates Chinese law?

18        A    No, I don't think so.

19        Q    On number 17 it says state funds AVIC, AVIC

20   funds subs.  We've already talked about that, I think.

21   Your testimony is that AVIC USA is not funded by AVIC;

22   isn't that right?

23        A    The shareholders of AVIC International

24   Holding.

25        Q    But do you fund yourself internally or does

1226

1    other money come from other AVIC entities?

2         A    It's from AVIC International Holding.

3         Q    And it says AVIC -- well, I don't think I can

4    answer number 19 with you.  Number 20, no evidence --

5    okay.  No evidence subs can initiate litigation without

6    AVIC.  You know that in this case AVIC USA has a

7    cross-complaint, a cross-claim against the Claimants.

8    You're aware of that; yes?

9         A    Yeah, I do.

10        Q    Did you have to get approval for that

11   cross-claim from anybody before you filed that

12   cross-claim?

13        A    No.  I make decision.

14        Q    And, finally, as to 21, you are holding and

15   using the property of AVIC USA for the benefit of AVIC

16   USA; is that correct?  The property of AVIC USA, it

17   belongs to AVIC USA; is that right?

18        A    Yes.  Yes.

19        Q    And you're using it for the benefit of AVIC

20   USA's business?

21        A    Yeah.  Sure.

22        Q    Do you have any idea why you're here in this

23   litigation?

24        A    Why I'm here?

25        Q    Yes.

1227

```
 1      A     I think as president of AVIC USA, Inc.  It's

 2   wrongfully sued by Patrick and Tang Energy.

 3      Q     And --

 4      A     And Patrick knows, you know, AVIC USA do

 5   nothing wrong.  And he has dispute with his investment

 6   in China HT.  He just want to use this, you know,

 7   agreement with AVIC USA as the [unintelligible] to

 8   settle his dispute in China.  I think that's my

 9   understanding.

10      Q     What was your state of mind when Patrick

11   took -- how many recordings did -- strike that.

12            When the recording was made in March of

13   2014, did you know that it was being recorded?

14      A     No.

15      Q     And you heard the recording; yes?

16      A     Yeah.

17      Q     And that recording took place in a restaurant

18   in Fullerton in a hotel; yes?

19      A     Yes.

20      Q     And that's --

21      A     In the bottom of my hotel.

22      Q     And was that conversation confidential, as far

23   as you were concerned?

24      A     Yeah, definite.  Just the two of us.

25      Q     Exactly.  And you thought it was just between
```

1228

1    the two of you, didn't you?

2        A    Yes.

3        Q    And what was your state of mind during that

4    conversation?

5        A    Just a conversation, you know, between

6    friends.  And also, you know, just to tell what happened

7    and for me just want help my friend.

8        Q    So your state of mind is you were trying to

9    help him in any way you --

10       A    Try to help my friend.

11       Q    Do you consider him a friend now?

12       A    No.

13       Q    Do you know how many times Mr. Jenevein

14   secretly recorded your private conversations?

15       A    I think it's two times.

16       Q    And the second time was in Pomona?

17       A    Yeah.  In my office.

18       Q    What was the purpose of that meeting?

19       A    Which meeting?

20       Q    The purpose of the meeting in Pomona.

21       A    The meeting is, you know, discuss, you know,

22   the possibility to solve the problem or settle the

23   problem.  I think that's one of the topic.

24       Q    Did Patrick tell you that he'd be recording

25   that meeting also?

1229

1      A    No.

2      Q    Did you file a criminal complaint against

3  Patrick for the filing -- or the recording of the

4  statements under California law?

5      A    I do.

6      Q    Are they still pending?

7      A    Yes.

8      Q    Thank you.

9           MR. MCNEIL:  I'll pass the witness.

10          MR. SHAMOUN:  Thank you.

11          CHAIRMAN ALDOUS:  Does Mr. Thompson's

12  team have any questions?

13          MR. WALTERS:  No.

14          CHAIRMAN ALDOUS:  On the Claimants' side,

15  Mr. Jenevein, do you have some questions?

16          MR. JENEVEIN:  I do, Your Honor.

17          MR. DEWOLF:  Mr. Shamoun, can I get the

18  time?

19          MR. SHAMOUN:  Y'all are at 11 hours and

20  10 minutes, and you guys are at 11 hours and 20 minutes.

21          MR. DEWOLF:  Thank you.

22                    EXAMINATION

23  BY MR. JENEVEIN:

24      Q    Mr. Zhang, I'll try to be brief because I know

25  that the panel will have access to your entire

1230

1    deposition.  There are only a couple of things I want to

2    make sure we're clear on.

3                    This company, your company, is one

4    hundred percent owned by this company?

5        A    Yes.

6        Q    This company, AVIC HQ, owns a controlling

7    interest in IHC?

8        A    The control -- you mean the control ownership?

9        Q    A controlling interest.  It owns most of IHC?

10       A    Yeah, by percentage.  I don't know exactly how

11   much.  And also have different definition.  I think it's

12   the majority shareholder.

13       Q    You said the Chicago agreement had nothing to

14   do with the Soaring Wind agreement, right?

15       A    No.

16       Q    Well, just to be clear, no, it didn't have

17   anything to do with Soaring Wind?

18       A    Nothing to do with Soaring Wind.

19       Q    But you were there?

20       A    I was there.

21       Q    And you were named on the face of the Chicago

22   agreement?

23       A    Yes.

24       Q    As a contact person?

25       A    Yes.

1231

1    Q    Even though you were not employed or in any

2 way affiliated with CATIC TED?

3    A    No affiliate.

4    Q    So I'm correct?

5    A    Correct.

6    Q    In your deposition didn't you tell me you

7 thought that that ceremony showed that Soaring Wind had

8 good influence in China because of the attendance of the

9 Deputy Minister of Commerce?

10   A    Yes.  If deputy minister is coming to visit

11 Chicago.

12   Q    Well, but in particular what you said in your

13 deposition was that was -- that that showed that Soaring

14 Wind had good influence.  Remember that?

15   A    Soaring Wind has influence, I cannot recall

16 this.

17            MR. JENEVEIN:  Members of the panel, I

18 don't want to take the time to impeach him.  It's at

19 page 144 of his deposition, which you'll have whenever

20 you're ready.

21   Q    You said Patrick Jenevein secretly recorded

22 you twice, and the second one you said was when he came

23 to your office on June 12th, 2014, correct?

24   A    Yes.

25   Q    On what basis did you tell this panel and on

1232

1 what basis did you tell the Pomona Police Department,

2 what factual basis, sir, did you base the allegation

3 that Patrick Jenevein had made that recording?

4     A    He's in the meeting and another gentleman, so

5 I think it's -- he record.

6     Q    Was the other gentleman in the meeting with

7 Patrick Tony Stewart?

8     A    I know gentleman.  I forgot his name.

9          MR. JENEVEIN:  Tony, can you stand up?

10    A    Oh, yes.  Yes.

11    Q    Is the gentleman in the back the other man who

12 was there?

13    A    Yes.

14    Q    Did you file a criminal complaint against

15 Mr. Stewart?

16    A    No.  Patrick only.

17    Q    Also Paul Ming Ma was in that meeting,

18 correct?

19    A    Yes.

20    Q    Did you file a criminal complaint against

21 Mr. Ma?

22    A    No.

23    Q    So you only filed a criminal complaint against

24 one of the three other people who were in that meeting?

25    A    Exactly.

1233

1    Q    So what is your evidence that Patrick Jenevein

2    caused that conversation to be recorded?

3    A    Because he did the first record in Fullerton.

4    He's the one, I believe, he record.

5    Q    I understand you.  You accused him in a

6    criminal complaint of recording the June 12th

7    conversation because you understood that he had recorded

8    you on March 22nd?

9    A    The first is in the Fullerton hotel.

10   Q    Right.  Because he recorded you at the

11   Fullerton Hotel, you assumed he had recorded you in the

12   meeting in Pomona?

13   A    Yes.

14   Q    And you say you did not hear the announcement

15   that the conference call service made that the call was

16   being recorded; is that right?

17   A    I don't think -- I cannot recollect clearly

18   this conference call because Patrick dial one number,

19   but I don't remember he dialed a code.  That's why I say

20   it's not conference call.  No, no, no.  It's not a

21   multi-station conference call.  It's only two places.

22   Some people in Dallas in one office and one group in my

23   office.

24   Q    So there were other people that were

25   participating in the same discussion who weren't even in

1234

1   Pomona, right?

2        A    No.

3        Q    No, there weren't?  I'm correct?

4        A    Yeah.

5        Q    Other members of Soaring Wind participated in

6   the call and, as far as you know, they were from Texas

7   at the time?

8        A    I think maybe somewhere.  I'm not sure.

9        Q    And you don't have any reason to believe one

10  way or the other that they did or did not initiate the

11  recording?

12       A    I don't know.

13       Q    You just threw out a criminal complaint and

14  your lawyer has harped on it for nine months in this

15  arbitration with no evidence whatsoever that a crime was

16  committed?

17       A    I think it's Patrick did.

18            CHAIRMAN ALDOUS:  I think we understand.

19  The confusion you're going to get into there is if

20  you're trying to get him to define what a criminal

21  violation is or isn't.

22            MR. JENEVEIN:  Oh, I'm not going to do

23  that.

24       Q    Are you aware, Mr. Zhang, that the Pomona

25  Police Department has reported that they find no

1235

1    evidence that a crime was committed?

2        A    I've talked to them recently as to my lawyer

3    is handling this.  I still insist it's criminal action.

4        Q    By the way, you mentioned your lawyer.  Your

5    lawyer who helped you file that complaint is with

6    Mr. McNeil's firm, right?

7        A    Yes.

8        Q    And I think you just told the panel that you

9    felt like that conversation you had with Patrick

10   Jenevein was confidential; is that right?

11       A    Yes.

12       Q    And you have heard the tape?

13       A    Yes.

14       Q    And on the tape, you would agree with me that

15   you can hear other conversations going on in the

16   background?

17       A    Hardly to hear.  I only hear the bing bong,

18   you know the dishes and the fork and knife and, you

19   know, in part of the record.

20       Q    Well, let's do it this way:  Can you agree

21   with me that if the recording from your conversation

22   with Patrick perceived or recorded audibly surrounding

23   conversations, if that's true, would you agree with me,

24   sir, that those other people at those other tables could

25   also have overheard you?

1236

1     A    I don't think so.

2     Q    You just said a moment ago that you made the

3  decision to file the counterclaim in this case; is that

4  right?  Did I hear you say to your lawyer that you

5  decided to file the counterclaim?

6     A    Right.  Yes.

7     Q    Who did you decide to file a counterclaim

8  against?

9     A    Against Tang Energy and Tang Energy Group.

10    Q    Anybody else?

11    A    And others also.

12    Q    Others also.  Do you know who?

13    A    Yeah.  Who sue us.  I mean, it's Patrick

14  Jenevein and the Tang Energy.

15    Q    So your counterclaim is against Patrick

16  Jenevein and Tang Energy?  Or is it against the other

17  Claimants, too?  I'm just asking.

18    A    Yeah, include others.

19    Q    So it's against all the other Claimants;

20  Mr. Young, Mr. Carter?

21    A    Yes.

22    Q    It's against The Nolan Group?

23    A    Yes.

24    Q    And it's against Patrick Jenevein, too?

25    A    Yeah, Patrick is on there.

1237

1    Q    That's the decision that you made?

2    A    Yes.

3    Q    And what is the nature of the counterclaim?

4    What's the claim?

5    A    The counterclaim is --

6         MR. MCNEIL:  I would object to the extent

7    that this invades attorney-client privilege.

8    Q    Let me be very clear.  I don't want that --

9         CHAIRMAN ALDOUS:  The objection's

10   overruled for that question.

11   Q    Mr. Zhang, what is the counterclaim that you

12   have asserted against all those people you just

13   mentioned?

14   A    Generally speaking, you know, the counterclaim

15   is, you know, the damage, you know.  And my lawyer know

16   the detail of the process.  And for me, it's damage to

17   AVIC USA, Inc.

18   Q    And what is the damage to AVIC USA, Inc.?

19   A    My aspects for me.

20   Q    I'm sorry?

21   A    The damage is my aspects actually happen

22   already.  First off, we were sued wrongly and also, you

23   know, have to facing this litigation and spend a lot of

24   money and energy, and also I believe it's wrong suing.

25   Q    Is it your understanding, sir -- and I don't

1238

1   want to talk about your conversations with lawyers, but

2   is it your understanding that the damage caused to AVIC

3   USA is that you've had to pay for attorneys' fees?

4        A     Beyond that.

5        Q     And what is it beyond attorneys' fees?

6        A     As I said, you know, affect, you know, my

7   personally and affect my daily work.  And also we have

8   to -- you know, people talking about this case, and

9   that's the -- you know, like news, you know, to the

10  public and, you know, I just feel the pressure.

11       Q     And I don't want to minimize how it's affected

12  you personally.  I'm not questioning that, but what I

13  really want to understand is, what is it that you

14  contend Patrick Jenevein and Keith Young and Mike Carter

15  did that justifies a counterclaim against them?  What

16  did they do?

17       A     They justify the wrong lawsuit and even

18  include Soaring Wind.  And AVIC USA, Inc. is a 50

19  percent shareholder of Soaring Wind.  I even don't

20  understand.  You know, it's like I'm suing myself.  And

21  who approved this?  Who approved to hire Patrick

22  Jenevein's brother as my counsel?  And all this I cannot

23  find answer.  I totally, you know, cannot understand why

24  this can happen.

25       Q     Is it -- and I don't -- I want to make sure

1239

1    I'm understanding you.  Is it fair to say that you're

2    suing these gentlemen because they are suing you and

3    because they are suing Soaring Wind, or they're suing on

4    behalf of Soaring Wind?

5         A    Right.

6         Q    I think you told the panel two things.  One,

7    you told them you had the chance to review the

8    Memorandum of Understanding, right, before it got

9    signed?

10        A    Which one is -- the first one?

11             MR. JENEVEIN:  Exhibit 001.

12        Q    Right.  The first one.  The one that Mr. Liu

13   signed.

14        A    Oh, okay.

15        Q    I think you said you reviewed Exhibit 001 and

16   decided not to make any changes; is that right?

17        A    Right.

18        Q    And that agreement says that AVIC USA/CATIC

19   USA will own 44.5 percent of Soaring Wind; is that

20   right?

21        A    It's there.

22        Q    But then you told the panel that it was also

23   you who insisted that -- on the Soaring Wind agreement

24   it would be 50 percent?

25        A    Right.

1240

1    Q    So why did you change your mind?

2    A    Actually, you know, for me, this MOU is

3    nonbinding agreement.  It's show, you know, the common

4    interest and understanding, you know, we are going to

5    moving forward.  But for details of the, you know,

6    corporation, it takes time, you know, to negotiate for

7    all the details.

8            That's just a MOU to show, you know, that

9    both side has the interest to continue to working

10   together and to figure out what will be the final.  So I

11   don't care that much about the, you know, words to use,

12   but I just pay very attention to the word "not binding."

13   Q    I think I just want to talk about two areas,

14   two more areas.  Did you -- have you listened to the

15   Paul Thompson tape-recorded conversations?

16   A    You mean yesterday or . . .

17   Q    Ever.  Are you aware from any source of what

18   Paul Thompson said in the conversations that Patrick

19   recorded with him?

20   A    Very clear I cannot remember when.  I just be

21   told that it's Paul Thompson being recorded.

22   Q    Are you aware specifically that he said

23   "Having something in writing means nothing to the people

24   at AVIC"?  Are you aware that he said something to that

25   effect?

1241

1     A    Yesterday, I -- yeah, probably.

2     Q    Did you hear that?

3     A    Yeah.  Probably, yes.

4     Q    Do you think that's true or false?

5     A    False.

6     Q    Having something in writing means quite a lot

7 to the people at AVIC; is that what you're saying?

8     A    Again?

9     Q    Well, let me -- is it important to the people

10 at AVIC what's in writing or not?

11     A    It's important.

12     Q    It's important?

13     A    Uh-huh.

14     Q    So when you saw section 2.3, it was important

15 to you because it was in writing and you were about to

16 sign it?

17     A    Yes.  Agree.

18     Q    And it's -- and it said "in developing wind

19 farms" when you signed it.  And I think the last part I

20 want to make sure is clear, I think you told the panel

21 there is no way Soaring Wind could develop wind farms if

22 there wasn't money coming from somewhere else; is that

23 right?

24     A    Actually, I have different understanding about

25 this description.  For me, it's marketing of wind energy

1242

1    equipment, service and the material related to wind

2    energy.  So for me, that's -- the key is marketing,

3    service.  You know, that's not develop wind farms.

4        Q    But when you agreed to all the terms of the

5    Memorandum of Understanding that you negotiated with

6    Patrick, you will agree with me that wind farm

7    development was absolutely a part of the deal?

8        A    No, I don't think so.

9        Q    Do you see Exhibit 001 on your screen?

10       A    Yes, I see there, but I don't think so.  My

11   understanding to this is marketing and sales.

12                   MR. JENEVEIN:  I'm done.

13                   MR. SHAMOUN:  Pass?

14                   MR. JENEVEIN:  No.  I was the first.

15                   MS. PERRY:  I'm going to ask some

16   questions.

17                   CHAIRMAN ALDOUS:  Do you pass the

18   witness?

19                   MR. JENEVEIN:  Yes.  I'm sorry.

20                   CHAIRMAN ALDOUS:  Let's see.  Ms. Perry,

21   do you have any questions?

22                   MS. PERRY:  I do.  I think I'm going to

23   need that karaoke mic from Malcolm.

24                            EXAMINATION

25   BY MS. PERRY:

1243

1    Q    Mr. Zhang, I represent The Nolan Group and I
2    think you testified on direct and you just testified
3    again that in your opinion Soaring Wind was not in the
4    business of developing wind farms.  Is that correct?
5    A    Soaring Wind is not, you know, engage in the
6    wind farm development.  It's sales and marketing
7    company.
8    Q    And you held that opinion when we took -- when
9    your deposition was taken earlier this year, correct?
10    A    Yeah.  I think I see in my mind, that's
11    company, you know, marketing and sales, service.
12             MS. PERRY:  Please play clip 29077.  This
13    is from Sherman Zhang's deposition.
14             (Video deposition playing.)
15    Q    So it would be correct to say that
16    Mr. Jenevein did send to you multiple wind farm
17    development projects, correct?
18    A    Yes.
19    Q    In fact, in 2010 Tang sent you a nondisclosure
20    agreement in connection with Gallop Power.  Do you
21    recall that?
22             MS. PERRY:  Could you put up AVIC 164?
23    Q    And, if you --
24    A    Yes.
25    Q    You recall getting that nondisclosure

1244

1  agreement?

2      A    Yes.

3      Q    Do you recall signing it?

4      A    Yes, I do.

5      Q    And so you were told about the Gallop Power

6  project, which is Flatwater, and signed an NDA in

7  connection with that, correct?

8      A    Yes.

9      Q    And you were also told about the Corpus

10 Christi, the Harbor Wind project, correct?

11     A    There's another one?

12     Q    Yes.

13     A    In this --

14     Q    It's not referenced in here.

15          MS. PERRY:  You can take that down,

16 Jackie.

17     Q    In addition to this project that we just

18 talked about, you were -- Patrick also gave you

19 information about the Corpus Christi Harbor Wind

20 project, correct?

21     A    You show me?  I cannot remember exactly.

22     Q    I don't know that I can show you, Mr. Zhang --

23 actually, I can.

24          MS. PERRY:  Clip 29008.

25     Q    We'll see if this refreshes your recollection.

1245

1           (Video deposition playing.)

2      Q    But Patrick Jenevein did talk to you about

3  multiple wind farm development projects, correct?

4      A    Yes.

5      Q    I know, just as an aside, you mentioned that

6  when you saw Patrick in December that he had a beard.

7  You recall that testimony?

8      A    (Witness nods affirmatively).

9      Q    Do you recall that he told you that he'd been

10 skiing and so he'd grown a beard so his face wouldn't be

11 so cold?  Do you recall that?

12     A    No.

13          MS. PERRY:  I'll just inform the panel

14 when you read the transcript, I think that it reflects

15 that.

16     Q    Here in Texas it gets a lot colder than

17 California.

18          Let's talk a little bit about the MOU.

19          MS. PERRY:  Jackie, can you put up

20 Claimants' 1, please?  And if we go to the second page

21 on the MOU and just zoom in on the signatures.

22     Q    Actually, you mentioned that Liu Rongchun,

23 who --

24          MS. PERRY:  Brent, can you put up the key

25 player board for me?

1246

1    Q    . . . that Liu Rongchun is a director of AVIC

2    USA; is that correct?

3    A    Is a director of AVIC USA, Inc., 2008, yes.

4    Q    In 2008.  Who are the current directors of

5    AVIC USA?

6    A    We have several.  About five.

7    Q    Can you name them, please?

8    A    Today?

9    Q    Yes.

10   A    Liu Jun, Pan Lin Wu, myself, Zhang Chuan Jun

11   and Dong Hai.

12   Q    And have the directors changed between --

13   obviously, at least Liu Rongchun is no longer a director

14   of AVIC USA, but have the others directors changed over

15   the course between 2008 and now?

16   A    Yes.  Yes.  Some change, yes.

17   Q    Was Bian Tao ever a director of AVIC USA?

18   A    No.

19   Q    And in 2008 Liu Rongchun was also the vice

20   president of big CATIC, right?

21   A    2009?

22   Q    Liu Rongchun was the vice president of -- I'm

23   sorry, was it CATIC -- of CATIC?

24   A    Uh-huh.  Which year?  Which year?

25   Q    Oh, which year, I'm sorry.  2008.  2008.

1247

1    A    Yes.  Vice president, yeah.

2    Q    And he's -- so he's the one that signed, and

3  we can see here it says CATIC on the signature line, not

4  CATIC USA, right?

5    A    Right.

6         MS. PERRY:  And, Jackie, if we go back to

7  the first page of that MOU, and go to the fourth

8  paragraph from the bottom.

9    Q    The last line there says, "CATIC offices and

10 employees in China will be available for support, as

11 needed."  Do you see that, Mr. Zhang?

12   A    Yeah, I see that.

13   Q    And you've already testified that CATIC USA

14 doesn't have any employees or offices in China, right?

15   A    No.

16   Q    So that's correct?

17   A    Correct.

18   Q    So if there were other CATIC employees or

19 offices that were going to provide support from China,

20 those would not be employees of CATIC USA?

21   A    You mean the officers in China, they are not

22 officers in AVIC USA.

23   Q    I mean offices.  Offices, not officers.  So

24 like physical offices and employees.

25   A    We have no office -- AVIC USA has no office in

1248

1    China.

2        Q    Would it be fair to say that at the time that

3    AVIC USA entered into the Soaring Wind agreement, no one

4    at AVIC USA had any expertise in wind farm finance?

5        A    AVIC USA by itself internally, no.

6        Q    We've had discussions about the Chicago

7    agreement today.  You were at the signing ceremony for

8    the Chicago agreement, right?

9        A    Right.

10       Q    And Bian Tao signed the Chicago agreement,

11   correct?

12       A    Right.

13       Q    And we've already heard that he was never a

14   director of AVIC USA, correct?

15       A    No, he's not.

16       Q    And when Bian Tao signed the Chicago

17   agreement, he was with CATIC TED, correct?

18       A    I think he sign on behalf of Ascendant, on

19   behalf of Tang or something.  I think the name of the

20   company's there.

21       Q    CATIC TED?

22            MS. PERRY:  Can you call up Claimants'

23   Exhibit 3 and go to the signature page?

24       Q    So does that refresh your recollection Bian

25   Tao was signing on behalf of CATIC TED?

1249

1    A    Yes.

2    Q    And, for the benefit of the panel, when we

3 look back at our flowchart here, CATIC TED is now AVIC

4 TED; is that right?

5    A    AVIC TED.  I think so.

6    Q    And when the Chicago agreement was signed,

7 CATIC USA, which is the same now as AVIC USA, did not

8 have $300 million, did it?

9    A    We don't have.

10    Q    And you would know that, wouldn't you, because

11 you're the president of AVIC USA?

12    A    I know exactly.

13    Q    And then when you were there for the signing

14 of the Chicago agreement, you were there as a

15 representative of Soaring Wind, weren't you?

16    A    I think they name me as a contact person, I

17 think.

18    Q    So you would agree that one of your capacities

19 that you were there, you were there as a representative

20 of Soaring Wind?

21    A    That's hardly to say or not.  I'm the contact

22 person for -- I think for Tang Energy, and Tang Energy

23 is a party for this agreement, and I just, you know,

24 know Patrick so well, I need to communicate easier for

25 Tang Energy, I think, also.

1250

1          MS. PERRY:  Could you please play clip

2     29012?

3              (Video deposition playing.)

4     Q    So it was a good opportunity for Soaring Wind,

5     correct?

6     A    It's a good opportunity, I think, for Tang,

7     sure.  And because of marketing and sales when it comes

8     to Soaring Wind, Soaring Wind benefit from this.

9     Q    And in connection with that Cirrus -- you've

10    mentioned Cirrus Aircraft, and I know the panel's aware

11    that after the execution of the Chicago agreement, some

12    of the folks that were there traveled to Duluth,

13    Minnesota to tour the Cirrus Aircraft facility, right?

14    A    Right.

15    Q    And Bian Tao with CATIC TED was at that

16    meeting, too, correct?

17    A    Right.

18    Q    And the purpose of the visit was that Patrick

19    Jenevein had told you that Cirrus was interested in

20    manufacturing blades, correct?

21    A    Right.

22    Q    And there was a good opportunity to make

23    airfoil blades for wind turbines?

24    A    Yes.

25    Q    And you're aware that CAIGA, which is on the

1251

1    chart up there, acquired Cirrus, correct?

2        A    Okay.

3        Q    You're aware that CAIGA acquired Cirrus

4    Aircraft, aren't you?

5        A    Yeah.  Yes, I do.

6        Q    And I believe that you said that you had heard

7    that it was at least -- that CAIGA paid at least -- paid

8    over $100 million for Cirrus Aircraft; is that correct?

9        A    Yes.

10       Q    And Bian Tao is with CAIGA, isn't he?

11       A    Bian Tao is -- that time is TED, I think.

12    Talking about TED?  I don't know.  I misunderstand what

13    you mean is CAIGA.

14       Q    Is he an officer or employee of CAIGA; Bian

15    Tao?

16       A    No, I don't know.

17       Q    You don't know.  And I think that you said

18    when we were talking about the current directors of AVIC

19    USA that Pan -- Pan Lin?

20       A    Pan Lin Wu.

21       Q    . . . Pan Lin Wu is a current director; is

22    that right?

23       A    Yes.

24       Q    I know we talked about, Mr. Zhang, when you

25    started working for AVIC USA, but before you started

1252

1 working for AVIC USA did you work for any other AVIC

2 entities?

3      A    Before I move to America in year 2002 as a VP.

4 Before that I work in joint venture at a

5 [unintelligible] company for eight years.

6      Q    So a joint venture with an AVIC company or

7 with --

8      A    A joint venture with Israeli company, and

9 Chinese partner is CATIC Beijing.

10     Q    So I think I got that right, a joint venture

11 with an Israeli company and you were working for CATIC

12 Beijing?

13     A    No.  I working for the joint venture.

14     Q    The joint venture.  The partners in the joint

15 venture were an Israeli company and CATIC Beijing; is

16 that correct?

17     A    Right.

18     Q    And you worked for that joint venture for

19 eight years before you came to the U.S.?

20     A    From day one to day Z.

21     Q    From what?

22     A    From beginning to the -- before I move to

23 America, we sold this business to Fortune 500 in

24 America, a big company.

25     Q    Have you ever worked for any other

1253

1    companies -- any other AVIC companies or companies in

2    which AVIC was a partner or a joint venturer?

3         A    [unintelligible] involve with them.  I don't

4    see -- oh, in Shenzhen, 1980s is joint venture with

5    McCall Company.

6         Q    So did that involve AVIC?

7         A    No.  It's Beijing.  It's some other company.

8         Q    But it'd be fair to say that for, I guess,

9    over -- for over 20 years you've either worked for an

10   AVIC entity or in a joint venture with an AVIC entity,

11   correct?

12        A    I don't know how to define this.  If you

13   say -- it's 8 years in joint venture and 14 years in

14   America.

15             MS. PERRY:  I'll pass the witness.

16             CHAIRMAN ALDOUS:  Thank you, Ms. Perry.

17             MR. WALTERS:  Do you have any questions,

18   Mr. Lowenstein?  Do you want to order last on the menu?

19             MR. LOWENSTEIN:  Yes.  I'd like to go

20   last this time, Your Honor.

21             MR. BRACY:  Thank you.

22                      EXAMINATION

23   BY MR. BRACY:

24        Q    Mr. Zhang, my name is Matt Bracy.  I represent

25   Jan Family Interests.  Just a quick couple of questions

1254

1    because we don't have very much time.

2              When you say -- when you're talking about

3    the organization of AVIC and all the companies and you

4    say tier one, what do you mean by tier one?

5    A    Tier one is -- that's the concept like, you

6    know, we working or, you know, talking, discussion with

7    GE or Boeing company, you know.  People say it's

8    important company, call that tier one.  Like supplier,

9    tier one supplier, tier two.  I think it's a very

10   general concept.

11   Q    In the organization chart of AVIC that's

12   behind you, does tier one mean like a level below AVIC

13   China and then AVIC IHC and then do those refer to tiers

14   when you speak of them?

15   A    I think it's hardly to say in that way.

16   Q    You don't see it that way?

17   A    Here it's how important the third party

18   recognize them.  I think that's even more important.

19   Q    Okay.  Thank you.  And then if you say

20   brother-sister company, what do you mean by that?

21   A    That's very -- you know, in China, you know,

22   like we say [unintelligible], you know.  And

23   brother-sister means they are very closer or know each

24   other well, you know.  That's that mean.

25   Q    So earlier in your examination by Mr. McNeil

1255

1   you were asked if AVIC had ever directed you to do

2   something that you didn't want to do, and I believe you

3   said, "No."  And he was speaking of if they told you to

4   do something with property of AVIC USA or with the

5   finances, he said, "Did they ever tell you to do

6   something you didn't want to do?"  Do you remember that?

7         A    Actually, that how situation start with HT

8   Blade.  You know, Patrick told me a lot of sad story

9   about HT.

10        Q    I was actually speaking of when your attorney

11  was asking you the question a few minutes ago.  Do you

12  remember that?  I'm not talking about Patrick; I'm

13  talking about Mr. McNeil.

14        A    Oh.  You just talking about when I talk to

15  Patrick, that's how --

16        Q    I'm sorry.  If I said that, I misspoke.  I

17  meant when Mr. McNeil was asking the question earlier.

18        A    No.  It's -- you know, business is business.

19  Sometimes, you know, some people introduce on business,

20  it's not good opportunity I don't think, I will, you

21  know, just pass it even though have some, you know,

22  discussion or even, you know, fighting, you know.  But

23  business is business.

24        Q    Has anyone at AVIC IHC or AVIC Aviation

25  Industry Corporation of China ever told you to do

1256

1    something with the assets of AVIC USA that you did not

2    want to do?

3        A    No.

4        Q    So when you were speaking to Patrick Jenevein

5    and you were being recorded and you said, "For the

6    others we like to invest some business, but the meantime

7    we have to invest something our brother-sister company,

8    you know, in the tier one, we don't want to," were you

9    telling the truth?

10       A    That's why I just say full around the

11   conversation, the whole story is Patrick complain his

12   partner in this and there.  I just follow.  I just

13   replied, you know, to comfort him.  That's definitely

14   the situation.  He come on this and that, I say, "Oh,

15   yeah, they do this and do that."  That's not -- it's

16   follow the conversation with Patrick.

17       Q    So it was not true?

18       A    What's not true?

19       Q    What you said was not true?

20       A    Again, I must be very careful.  I mean, what's

21   not true?

22       Q    The quote I just gave you, you said in a

23   conversation with Patrick.

24       A    Oh, that's not true.  That's -- no.  If . . .

25              MR. BRACY:  I'll pass the witness.

1257

1      CHAIRMAN ALDOUS:  Mr. Denney, do you have

2  any questions?

3      MR. DENNEY:  Yes.  Just a few.  Thank

4  you.

5                  EXAMINATION

6  BY MR. DENNEY:

7      Q   Mr. Zhang, good afternoon.  My name's David

8  Denney.  I represent Mike Carter.  I'm going to ask you

9  a few general questions, then I think we'll get to a few

10  more specific questions.

11      A   Sure.

12      Q   My first question is, does the state-owned

13  entity, the Aviation Industry of China; that is, AVIC

14  HQ, offer any goods and services that include propellers

15  for wind powered electricity generators?  Does that

16  company offer those goods?

17      A   That's a long question.  Can you make it a

18  little shorter?

19      Q   Does AVIC HQ sell or market propellers for

20  wind powered electricity generators?

21      A   You mean the AVIC headquarter, top AVIC?

22      Q   Yes.

23      A   I don't think so.

24      Q   Does it offer goods and services related to

25  cotton pickers?

1258

1    A    Cotton what?

2    Q    A machine that picks cotton.

3    A    Pick cotton.  You mean the headquarter?

4    Q    Yes.

5    A    I don't think so.

6    Q    And the same question with regard to turbine

7    engines?

8    A    No.

9    Q    Does AVIC International USA offer goods and

10   services related to any of those propellers for wind

11   powered electricity generators?

12   A    AVIC USA, no.  For wind power business, I just

13   put everything and discuss -- you know, I concentrate in

14   the marketing and sales to Soaring Wind and rely on

15   Patrick in America.  And my help is to, you know, help

16   sourcing in China.  And I accompanied Mike, Paul to pay

17   several visit to China to each of the supplier of

18   machine blades, and why I say it's opportunity is good

19   for everyone, Tang develop the wind farm --

20        MR. JENEVEIN:  Mr. Chairman, I think he

21   misunderstood the question.  Can we have the question

22   again?  I'm just trying to save time.

23        CHAIRMAN ALDOUS:  Yeah, I was kind of

24   lost anyway.  Why don't we take a ten-minute break.

25        (A break was taken from 2:34 p.m. to 2:53 p.m.)

1259

1        CHAIRMAN ALDOUS:  All right.  Mr. Bracy,

2  I think -- no.  Mr. Denney, you're on the clock.

3        MR. DENNEY:  Thank you, Mr. Chairman.

4      Q    As a housekeeping matter, Ms. Perry asked me

5  if I would ask you again to name the five directors of

6  AVIC USA.

7      A    Today?

8      Q    Yes.

9      A    Liu Jun, myself, Pan Lin Wu, Zhang Chuan Jun,

10  Dong Hai.

11        MR. JENEVEIN:  Can we get spellings?  Can

12  we please get spellings?  Spell those, please?

13      A    English?

14      Q    It looks like the translator has written them

15  down maybe.

16        THE INTERPRETER:  Liu Jun, L-i-u, J-u-n.

17  Pan Lin Wu, P-a-n, L-i-n, W-u.  Zhang Chuan Jun,

18  Z-h-a-n-g, C-h-u-a-n, J-u-n.  Dong Hai, D-o-n-g, H-a-i.

19        MR. DENNEY:  Thank you very much.

20      Q    So before the break I asked you three sort of

21  strange things about whether AVIC HQ did business in

22  three, weird, random business types, right?  And you

23  told me that AVIC HQ did not do business in those areas?

24      A    Yes.  My understanding is that they go out to

25  sell or something.  I don't understand you say

1260

1    investment or . . .

2         Q    Well, so that's my question, is does AVIC --

3    did AVIC HQ do business offering goods and services in

4    the propeller industry, the propeller for wind powered

5    electricity generators --

6         A    You mean doing businesses including

7    investment?

8         Q    No.  Only itself as a corporation.

9         A    To do the sales?

10        Q    Correct.

11        A    Has the people go outside promotion and sales?

12        Q    Right.

13        A    No.

14        Q    And it uses subsidiaries for that?  For

15   example, if it had Cirrus Aircraft --

16        A    No, I don't know.  I don't know.  If you

17   say -- I have no idea about how to do that.  I have no

18   idea.

19        Q    So if AVIC HQ is in the turbine engine

20   business, would it have a subsidiary for that?  Do you

21   know of an AVIC subsidiary that does business in the

22   turbine engine arena?

23        A    As investment or sales?  I have to be very --

24   I don't -- I don't know.

25        Q    Sure.  Let's look at it either way.  Does AVIC

1261

1   HQ have a subsidiary in any tier that offers goods and

2   services related to turbine engines?

3        A    I have no idea.  I just know HT, you know,

4   blades.

5        Q    And that would be propellers for wind powered

6   electricity generators, right?

7        A    Yeah.  Blades is for the wind turbine machine

8   to generate the power.

9        Q    Right.  Okay.  And that's a subsidiary on the

10  chart well below AVIC HQ?

11       A    Which chart?

12       Q    On the chart behind you.  Oh, it's not even on

13  the chart.  That's fine.

14       A    You have to -- I don't know.  I don't know the

15  question.  Sorry.

16       Q    No, that's okay.  I forgot it wasn't on the

17  chart.

18            MR. DENNEY:  Can you bring up Exhibit 361

19  for me, please?

20       Q    That's you.  Do you recognize yourself?

21       A    Yeah.

22       Q    Can you tell me --

23       A    It's much younger.

24       Q    Yeah.  A few months, right?  So that's your

25  deposition.  Can you tell the panel to what you are

1262

1    pointing?

2         A    I pointing pin.  Yeah, it's a logo.

3         Q    A lapel pin?

4         A    Yes.

5         Q    And can you describe that pin for the panel or

6    can you tell the panel what that pin is?

7         A    That pin is gift I got from my friend, I

8    think, more than ten years ago.

9         Q    Can you -- let's see.

10                  MR. DENNEY:  Can you bring up S5 for me?

11        Q    You had a discussion with Mr. Jenevein, did

12   you not, at your deposition about your lapel pin?  Does

13   that refresh your recollection about that conversation?

14        A    Yes.

15        Q    And you testified that it's used by lots of

16   companies?

17        A    Oh.  This kind of pin, different color,

18   different material.  Just like GE or Boeing, you know,

19   people like collect that, and I given by my friend and

20   it's a golden one.

21        Q    And does that have any meaning?

22        A    No.  That's a logo.

23        Q    It's a logo?

24        A    That's just a pin, a logo.

25        Q    But --

1263

1    A    It's not real gold.  It's gold-plated.

2    Q    Does it signify rank of any kind?

3    A    No, I don't think so.

4    Q    Are you aware that on -- in November of 2014

5  during the -- while this case has been pending, that

6  AVIC HQ filed a trademark application with the United

7  States Patent and Trademark Office for the logo on your

8  pin to achieve trademark protection to register that

9  logo for about 158 classes of goods and services in the

10  United States?  Did you know anything about that?

11    A    I have no idea.

12            MR. DENNEY:  If I may approach the

13  witness?

14            CHAIRMAN ALDOUS:  You may.

15            MR. DENNEY:  I'm handing him what have

16  just been marked as Claimants' Exhibits 1002 and 1003.

17            CHAIRMAN ALDOUS:  Do you have copies for

18  the other side?

19            MR. DENNEY:  I do.  Mr. Chairman, these

20  are certified copies of the trademark applications filed

21  by AVIC HQ.

22            CHAIRMAN ALDOUS:  Please provide them to

23  the opposing party.  Do you have any for Mr. DeWolf

24  and --

25            MR. DENNEY:  I gave Malcolm four, I'm

1264

1    sorry.

2                    CHAIRMAN ALDOUS:  All right.  Thank you.

3         Q    Have you ever seen those public documents

4    before, Mr. Zhang?

5         A    This one?

6         Q    Yes.  Have you ever seen those public

7    documents before?

8         A    That's the first time.

9         Q    Now, I'm going to hand you these copies

10   because I didn't highlight the pretty ones.  I

11   highlighted the Xeroxes.

12                   MR. DENNEY:  Claimants would move -- or

13   at least Carter would move for admission of these

14   documents into evidence.

15                   CHAIRMAN ALDOUS:  Any response?

16                   MR. WALTERS:  Guess I probably ought to

17   look at it.

18                   MR. MCNEIL:  Yeah.  Well, I think my

19   preliminary response is I'm not quite sure what the

20   relevance is, so I'll make a Rule 34 objection.

21                   CHAIRMAN ALDOUS:  Mr. Walters?

22                   MR. WALTERS:  This is not on an exhibit

23   list and it hasn't, so if you'd just give me one second

24   to thumb through.

25                   CHAIRMAN ALDOUS:  I'm giving it to you.

1265

1          MR. WALTERS:  Thank you.

2          CHAIRMAN ALDOUS:  Just say, "One second,

3  please."

4          MR. SHAMOUN:  Time's up.

5          MR. WALTERS:  I have no objection to

6  whatever's in that document.

7          CHAIRMAN ALDOUS:  Mr. McNeil, typically

8  we would just simply say we would allow him to use it

9  for cross-examination but not admit it into evidence.

10  But because this is an arbitration, we'll probably allow

11  him to admit it into evidence and use it in

12  cross-examination and the panel will only consider it

13  for the purpose and to the extent that we believe it

14  should be used.

15          MR. MCNEIL:  Understood.  And I'm --

16  understood.  So I guess you're overruling my objection?

17          CHAIRMAN ALDOUS:  That would be the

18  correct sentiment.  And let me just say, since it's --

19  and it's been represented as a certified copy.  As a

20  result, there's no real foundational issue.  So you can

21  use it --

22          MR. BAYLES:  Can I inquire one question

23  about the exhibits?

24          CHAIRMAN ALDOUS:  Yeah.  But remember the

25  rule.

1266

1      MR. BAYLES:  Never mind.

2      CHAIRMAN ALDOUS:  No, no.  I'm talking

3  about the rule of one lawyer versus --

4      MR. DENNEY:  Mr. Bayles, is your question

5  about some of it looks like it's from a website?  Okay.

6  Because I can address that.

7      CHAIRMAN ALDOUS:  Go ahead.

8   Q    Mr. Zhang, it'll be easier to flip through the

9  copy.  So if you'll take the one that has the rocket

10  ship or the airplane on the back page, that's Exhibit

11  1002.  If you'll flip to the fourth page of that

12  document with me.  Well, okay, tell you what, let's

13  start on the second page.  Filing date, do you see that,

14  November 21, 2014?  That was during the pendency of this

15  case; was it not?

16   A    I see the date.

17   Q    Can you look down -- oh, I'm sorry.

18      MR. DENNEY:  Can you put up my TM1,

19  please, for the panel?  This is the web printoff of

20  the -- what we have certified copies of, just so guys

21  can follow along.  And if you'll skip down to the bottom

22  of the entire document.

23      MR. SHAMOUN:  How do I know what AVIC is

24  on there?

25      MR. DENNEY:  Well, we're about to look at

1267

1    that, Mr. Shamoun, right here.

2        Q    Owner of the mark at the bottom says Aviation

3    Industry Corporation of China, correct, Mr. Zhang?

4        A    It's right there.

5        Q    And is that address the street address

6    headquarters of Aviation Industry Corporation of China?

7        A    I believe so.

8        Q    128 Jianguo Road in Beijing?

9        A    Personally I don't know, but I think right in

10   there, it's written there.

11       Q    Well, when you see Aviation Industry

12   Corporation of China, that means AVIC HQ to you, right?

13       A    Aviation Corporation of China?

14       Q    That means AVIC HQ to you, right?

15       A    To me, it's Aviation -- that's name there.  I

16   don't know what you mean.

17       Q    Well, we've been referring to the top box on

18   the organizational chart as AVIC HQ in this proceeding.

19       A    Oh, okay.  If you define already.

20       Q    Well, I don't want to confuse you.

21       A    No.  Okay.

22       Q    So when we see Aviation Industry Corporation

23   of China, we mean HQ?

24       A    Okay.

25       Q    You don't have any reason to dispute that

1268

1    that's not who the owner of this mark is?

2        A    I have no idea.

3        Q    Now, if you'll flip with me to the second page

4    under Goods or Services.  Now, unless I missed a

5    semicolon here, there are 158 of these goods and

6    services listed, but I'll draw your attention to two of

7    them that have been highlighted; electric motors and gas

8    turbine engines not for land vehicles.  That was one of

9    the questions I asked you before, about is AVIC HQ in

10   the business of dealing with those goods.  And the

11   second one is propellers for wind powered electricity

12   generators.  Do you see that?

13       A    It's written there.

14       Q    And that's what I highlighted for you there.

15       A    Uh-huh.

16       Q    And my question is, Mr. Zhang, is, is it

17   correct that these goods and services are marketed and

18   sold through subsidiary entities and not AVIC HQ?

19       A    I have to say this again, I have no idea about

20   HQ, you know.  They are doing business in this way,

21   that -- I have no idea.

22       Q    Does it seem to you that this list of goods

23   and services is all AVIC -- that it's all AVIC?

24       A    No, no.  I have no idea about that.

25       Q    Well, okay.  Can you look at this list and

1  tell me if just -- that's -- if it's all AVIC or if

2  those are goods and services done by other companies?

3  You can pick one at random, if you'd like.

4              MR. MCNEIL:  I'd like to insert an

5  objection at this time.  Number one, they have to lay

6  some foundation with this witness, of course, that he's

7  even seen it before or understands what a trademark

8  filing is.

9              The second one is I have a understanding

10  of trademark law and I'm noting that these say on them

11  that these are Section 1(b) applications which are

12  Intent-to-Use applications.  And if he has no idea

13  what's going on at AVIC, it ends up being irrelevant and

14  a waste of everyone's time.

15              And the third objection is that these are

16  dated July 10, 2015 and are well beyond any time frame

17  that is relevant to the arbitration.

18              CHAIRMAN ALDOUS:  Well, I'm going to

19  sustain the objection for the purpose of the witness

20  saying that he's not familiar with what's going on.  But

21  I think the point that you're making has been made with

22  regard to the logo that was on his lapel pin during his

23  deposition and the fact that AVIC HQ has now filed a

24  trademark application for that particular logo.

25              MR. DENNEY:  In the interest of time, I

1270

1    will take that and I will sit down.

2                    CHAIRMAN ALDOUS:  Thank you.

3                    Do you have any questions,

4    Mr. Lowenstein?

5                    MR. LOWENSTEIN:  I do.  It'll be brief.

6                    CHAIRMAN ALDOUS:  And I hope that I

7    didn't misstate anything for the panel's purposes, but

8    go ahead.

9                    MR. LOWENSTEIN:  Mr. Shamoun, if you

10   can't hear me, I'll pick up the microphone, but I really

11   hate those things.

12                   MR. SHAMOUN:  Come on.

13                   MR. LOWENSTEIN:  I'm going behind the

14   witness but not going to stand next to him.

15                   THE WITNESS:  It's really no problem for

16   me.

17                            EXAMINATION

18   BY MR. LOWENSTEIN:

19      Q    You testified -- I'm going to butcher your

20   name.  Mr. Zhang, did I get that right?

21      A    Sherman.

22      Q    Sherman.  You testified, Sherman, that you, as

23   the president of AVIC USA, gets to decide what business

24   AVIC USA goes into, correct?

25      A    Right.

1271

1    Q    You understand that AVIC IRE is in the

2    renewable energy business, don't you?

3    A    Yeah.

4    Q    And AVIC IRE has been developing wind farms?

5    A    Yeah.  In these days, seems like they are.  I

6    don't know.  I don't know detail.

7    Q    So that's a sister company that's been set up

8    to do renewable energy, isn't it?

9    A    What's you mean sister?

10   Q    Well, I mean a company that's jointly owned in

11   the AVIC chain.  Forget sister company.

12            AVIC IRE was set up to do renewable

13   energy, wasn't it?

14   A    Yes.

15   Q    Is it your testimony to this panel under oath

16   that if you decided to sell off your hotels in AVIC USA,

17   that you could go spend that money on wind farm projects

18   in AVIC USA?

19   A    Yes.  If I have a plan to do that.

20   Q    No.  I'm asking you if it's your testimony

21   under oath to this panel that you could go sell off the

22   hotels of AVIC USA today and go start developing wind

23   farms in direct competition with this entity?

24   A    Oh.  That's a big question.  I sell my hotel

25   today.  Why I sell my hotel today?

1272

1    Q    That's what I'm asking.  I'm asking if you

2    could use the capital of AVIC USA to compete with

3    another AVIC entity?

4    A    I don't understand.  I mean, you're talking

5    about I sell the hotel to invest with wind farm?

6    Q    Well, that's a good point.  You don't have the

7    capital today to invest -- or you didn't have it at any

8    point to invest in wind farms, correct?

9    A    Because invest with wind farm is not my

10   business plan at all.

11   Q    I understand that.  You testified to this

12   panel that you had the ability to go do whatever you

13   thought was in the best business interest of AVIC USA?

14   A    Right.  If it's a good business opportunity.

15   Q    And if a good business opportunity to get into

16   a wind farm came up today or at any point since AVIC

17   IRE's been around, you're saying it would be okay for

18   you to go compete with AVIC IRE and do your own wind

19   farm development in USA?  That's your testimony?

20   A    I think maybe I answer in this way, if it's

21   good enough, I'm not sure.  If I have business

22   opportunity, no matter is what, I believe that's a good

23   business, good return, I will try my best to finance

24   my -- you know, finance the capital to do it.

25   Q    You're free to compete is your answer?

1273

1    A    Compete if it's a good market, compete is

2  there, but I always like less competition business.

3    Q    We looked at that memorandum -- I'm sorry,

4  what's been called the Chicago agreement where you're

5  identified as the contact person.

6    A    Yes.

7    Q    And in there that was a document that was

8  signed by AVIC TED, correct?

9    A    Yes.

10   Q    And at the time you were with AVIC USA?

11   A    I was president of AVIC.  I was as a contact

12  person there.

13   Q    Right.  And Mr. McNeil started to ask you a

14  question and then stopped, and I'd like the answer.  He

15  says, "Was it unusual for the vice president of CATIC

16  TED to identify the president of AVIC USA as a contact

17  person in a document like that?"  Would that be unusual?

18   A    It's kind of -- you know, you are talking

19  about unusual, but I will say it's once -- I think it's

20  the first time.

21             MR. LOWENSTEIN:  That's all I have.

22             CHAIRMAN ALDOUS:  Mr. McNeil?

23                  FURTHER EXAMINATION

24  BY MR. MCNEIL:

25   Q    Just a couple of quick questions.  Was there

1274

1    anything in the -- were there any discussions prior to

2    the signing of the MOU -- I'm just looking for the

3    microphone because I don't want to be admonished by

4    Mr. Shamoun.

5                    Is there anything -- were there any

6    discussions prior to the signing of the MOU regarding

7    Soaring Wind getting into the biomass business?

8         A    No, I don't think so.

9         Q    Was there any discussions regarding getting

10   into the aircraft business?

11        A    No.

12        Q    Was there any discussion about Soaring Wind

13   entering into any business other than marketing wind

14   blades and turbines?

15        A    No.  Concentrate in sales and marketing.

16        Q    Now, during the questioning, I'm not sure, I

17   think it was Mr. Jenevein who was asking you about the

18   cross-claim and you were trying to identify the terms or

19   what cross-claims have been filed in this case.

20                    Has it -- have you been clarified

21   regarding -- is it true that the only cross-claims in

22   this case are directed at this time against Tang?

23        A    Yeah.  I think so, yeah.  Tang.

24        Q    Tang/Tang [pronunciation].  I'm sorry.

25        A    Yeah, T-a-n-g.

1275

1    Q    And, finally, you were shown an exhibit by

2  Ms. Perry, which was an e-mail from Shulei Wang.  Do

3  you recall that?  She showed you the e-mail of Shulei

4  Wang passing an NDA agreement to you via e-mail.  Do

5  you recall that?

6    A    Oh, just now show me this?

7    Q    Yes.

8    A    Okay.  I remember that.

9    Q    Shulei Wang worked for Tang; isn't that right?

10    A    Yes.

11    Q    And that was reflected in the e-mail address

12  on that e-mail; yes?

13    A    Right.

14    Q    Did you understand that Shulei Wang was

15  presenting something to you in connection with Soaring

16  Wind?

17    A    She's Tang's -- I never heard she's working

18  for Soaring Wind.  She Tang's staff, I think.

19    Q    And when things are passed along to you by

20  Tang, did you believe them to be inside of Soaring Wind?

21    A    No.  It's Tang Energy's.

22         MR. MCNEIL:  No further questions.  Thank

23  you, sir.

24         CHAIRMAN ALDOUS:  Mr. Jenevein?

25         MR. JENEVEIN:  Can I see 261, Jackie?

1276

1                         FURTHER EXAMINATION

2    BY MR. JENEVEIN:

3         Q    Mr. Zhang, we can agree, can't we, that the

4    only affiliation you have with Patrick Jenevein or Tang

5    Energy is through Soaring Wind?

6         A    Yeah.  That's the joint venture, yeah.

7         Q    And you're not an interest holder in Tang?

8         A    Patrick is, you know --

9         Q    Just a real simple question.  You don't own

10   any interest in Tang Energy?

11        A    Oh.  No, no, I don't own.

12        Q    So this Exhibit 216 that's on your screen is

13   another e-mail.  Does that one also -- does it pertain

14   to Flatwater?  You see Flatwater right there?

15        A    Yeah.

16        Q    And you see the reference to the 9-megawatt

17   project?

18        A    Yes.

19        Q    That's the Corpus Christi project, right?

20        A    Yes, right there.

21        Q    So on June 21st, 2010 you got an e-mail from

22   Tang transmitting information on both Corpus Christi and

23   Flatwater?

24        A    Yeah, I think so.

25        Q    And you're telling the panel that didn't have

1277

1   something to do with Soaring Wind?

2       A    That's wind develop project.  I think it's

3   Tang's project.

4       Q    It was just Patrick Jenevein -- Tang was going

5   to do that project?

6       A    Yeah.

7       Q    They just wanted your permission?

8       A    No.  We are going to the sales and marketing.

9   I think that's what we are going to do.

10               MR. JENEVEIN:  Okay.

11               CHAIRMAN ALDOUS:  Any other questions

12   from the remainder of the Claimants?

13               Anything further, Mr. McNeil?

14               MR. MCNEIL:  Nothing further.  Thank you.

15               CHAIRMAN ALDOUS:  Any questions from the

16   arbitrators to my left?  Any questions from the

17   arbitrators to my right?

18               MR. SHAMOUN:  I have one question.

19               CHAIRMAN ALDOUS:  Mr. Shamoun has a

20   question.

21                       EXAMINATION

22   BY MR. SHAMOUN:

23       Q    I want to make sure I heard you correctly.  I

24   believe you said that AVIC USA's sole shareholder is

25   AVIC IHC.  Did I hear that right?

1278

1      A    Let me repeat.  AVIC USA, the shareholder is

2  AVIC International Holding.

3      Q    Thank you.  And I assume the shareholders --

4  the shareholder determines who's on the board; is that

5  right?

6      A    Yes.  You're right, yeah.

7           MR. SHAMOUN:  Thank you.

8           CHAIRMAN ALDOUS:  I have a couple of

9  questions, if you don't mind.

10                    EXAMINATION

11  BY CHAIRMAN ALDOUS:

12      Q    When you said that AVIC USA invests for the

13  purpose of its business, whose money does AVIC USA

14  invest?

15      A    The money's from AVIC USA, Inc.

16      Q    Did AVIC USA only invest money from its own

17  operations?

18      A    Yes.  You know, I determine the projects and

19  see my capability and then do the investment, based to

20  approval by board.

21      Q    Right.  You indicated that after you initially

22  met with Patrick Jenevein in Los Angeles in 2007 that

23  you called him and told him that a team was coming from

24  Beijing to the United States.

25      A    Right.

1279

1    Q    What company was coming over -- or, I'm sorry,
2    what was the team that was coming over?

3    A    The team is coming over for other -- they have
4    other purpose, I believe so, and I would like to take
5    this chance to introduce one of the important person to
6    Patrick.

7    Q    And who was on the team; do you recall?

8    A    Who owned the team?

9    Q    Who was on the team that was coming from
10   Beijing?

11   A    There are several people, I think.  The team
12   leader is Liu Rongchun.

13   Q    The team leader is Leo?

14   A    Leo, yes.

15   Q    And who else was on the team?

16   A    I think -- I cannot exactly recall.  I think
17   Xu Hang is one of them and some other I cannot exactly
18   remember, but it's leading by Mr. Liu.

19   Q    Was that Mr. Xu, Xu Hang?

20   A    Yeah, I think.

21   Q    And they were coming over to the United States
22   for many reasons?

23   A    For many reasons, yeah.

24   Q    And one of the reasons that you mentioned it
25   to Mr. Jenevein was you wanted him to meet some

1280

1    important people?

2        A    Yeah.  I would like to take chance to let

3    Patrick meet him, introduce him to Patrick.

4        Q    Leo Rongchun?

5        A    Yes.

6        Q    When you -- do you know -- you said earlier

7    that the purpose of Soaring Wind was to sell wind

8    generation equipment and service it.

9        A    Right.

10       Q    What particular equipment are you referring

11   to?

12       A    That's important part, actually.  Wind

13   turbine, which include the blades and also the tower.

14       Q    The power?

15       A    The tower.

16       Q    Oh, the tower?

17       A    The tower, yeah.

18       Q    So the turbine to you means the engine and the

19   blades?

20       A    The turbine, yes, included the generator,

21   gearbox, blades, all this part.

22       Q    And the tower?

23       A    And the tower, yes.

24       Q    Was there a particular manufacturer of the

25   turbine blades and generator and tower that you wanted

1281

1    to promote as part of the sales efforts through Soaring

2    Wind?

3        A    Actually, we source many companies in China,

4    we visit together.  They are, you know, different

5    location.  You know, they produce different capacity of

6    the machines.  So we impress to all of them, we try to,

7    you know, just be -- they are rest in America to promote

8    their products.

9        Q    So did it matter to you what particular

10   manufacturer in China manufactured the blades, for

11   instance, that you wanted to promote through Soaring

12   Wind?

13       A    No.  It's just this business.  Any

14   resources -- actually, we visit many other companies.

15   And two machine we put successfully there.  I think it's

16   one in Utah, one in Minnesota.  Both of them is not --

17   it's like private company's machine.

18       Q    The two that you sold, do you recall who the

19   manufacturer was of the blades for the turbine?

20       A    The blades, one of them is manufactured by

21   themself, and another one, I don't think it's HT's, no.

22       Q    So for the two turbine sales that were made

23   through Soaring Wind, neither one of them used the HT

24   blade?

25       A    No.  As far as I know, no.

1282

1    Q    Do you know who China Creative Wind is?

2    A    China created?

3    Q    Creative Wind, that company.

4    A    No, I have no knowledge.

5    Q    When Cirrus 1 wind project got started in

6    2011, was -- were you with AVIC USA still manu -- I'm

7    sorry, trying to sell turbines and generators through

8    Soaring Wind?

9    A    Since I set up the company, I rely on the

10   Patrick team in America.  Actually, we just -- I myself

11   and my staff in USA, Inc. just assisted them in China.

12   If they need help, communication or visit, I accompany

13   them to go.  But America side, I hundred percent rely on

14   Patrick.

15   Q    I see.  So for whatever happened in the United

16   States, you relied on Mr. Jenevein?

17   A    Right.

18   Q    If he needed assistance in China, he would

19   come to you?

20   A    Yeah.  He ask me or let me know.

21   Q    How many employees do you have that work with

22   you at AVIC USA?

23   A    Today?

24   Q    Yes.

25   A    Today in headquarter I have on my payroll

1283

1    five.

2         Q    Five?

3         A    Yes.

4         Q    There's you, and just can you tell me what the

5    positions are that work there?

6         A    I'm the CEO and president.  I have a VP and I

7    have a CFO, and also I have like a lady in charge of

8    administrative and also assistant.

9         Q    If you -- in 2011 when the Cirrus 1 wind

10   project started going, are you aware that they purchased

11   17 turbines for that particular project; Ascendant did?

12        A    Actually, year 2011, I have no communication

13   with Patrick.  Very little, you know.  He didn't tell me

14   Cirrus or -- maybe send some e-mail.  I'm not sure, you

15   know, but I have no idea about the project because

16   American side, rely on Patrick.

17        Q    All right.  So I may not have made my question

18   clear.  Are you aware that in 2011 or 2012 Ascendant

19   caused 17 wind turbines to be purchased for the Cirrus 1

20   wind project?

21        A    I don't know.

22        Q    If Ascendant purchased those turbines without

23   the assistance of AVIC USA --

24        A    No.

25        Q    They did not?

1284

1    A    No.

2    Q    And you had no knowledge of it?

3    A    No knowledge.

4    Q    All right.  Thank you.

5              JUDGE MARSHALL:  Mr. Chairman?

6              CHAIRMAN ALDOUS:  Yes.  Judge Marshall.

7                   EXAMINATION

8  BY JUDGE MARSHALL:

9    Q    Sir, do you know who the directors -- the

10  board of directors of AVIC International Holding Company

11  are or were between 2008 and 2014?

12   A    No.  I know maybe two of them.  Other, I'm not

13  familiar, even.

14   Q    Which two?

15   A    Usually it's the CEO is board member and

16  another senior VP, but that's, generally speaking.  But

17  I have no idea who is.  You mean the headquarter of

18  International Holding?

19   Q    International Holding, uh-huh.

20   A    Yeah, I have no idea who the others.

21   Q    Could you spell their names for us, please?

22   A    Today?

23   Q    Yeah.

24   A    Today I know Wu Guangquan is a board member.

25  Wu Guangquan.  And others I have no idea.

1285

1    Q    Thank you very much.

2    A    Thank you.

3         MR. SHAMOUN:  I have one question.

4              FURTHER EXAMINATION

5  BY MR. SHAMOUN:

6    Q    The board members that are presently the board

7  members of AVIC USA, do you know where they live?

8    A    Yes.

9    Q    Where?

10   A    Most of them in Beijing.

11   Q    In Beijing?

12   A    Yeah.  Only I located in Los Angeles,

13  California.

14   Q    Have they ever come to California to attend a

15  board meeting?

16   A    Board meeting usually is held in China.

17   Q    China?

18   A    In China, yeah.  Because difficult for all

19  them come in town.  If we have something urgent, we have

20  a call conference.

21   Q    And, based on what you answered to Judge

22  Marshall's question, you don't know whether or not some

23  of the board members of AVIC USA were also members of

24  the board of AVIC IHC; am I correct?

25   A    You mean the AVIC International Holding?

1286

1     Q    Yeah.  You don't know, do you?

2     A    I know them.  They are my director, but I

3  don't think they are in that board.  That's my personal

4  -- yeah.  I have no idea.

5              MR. SHAMOUN:  That's all I have.

6              CHAIRMAN ALDOUS:  All right.  Thank you,

7  sir.  Mr. Lowenstein stood up and --

8              MR. LOWENSTEIN:  Can I follow up on Mr.

9  Shamoun's question?

10             CHAIRMAN ALDOUS:  You can.

11                  FURTHER EXAMINATION

12  BY MR. LOWENSTEIN:

13     Q    Mr. Shamoun asked you whether those gentlemen

14  were on the board of directors for IHC.  I'd like to ask

15  you if you know what involvement those individuals have

16  as employees or officers of AVIC IHC?

17     A    AVIC International Holding?

18     Q    Yes.

19     A    You mean the directors?

20     Q    So one of your directors is, help me if I get

21  this wrong, Liu Jun?

22     A    Liu Jun, yeah.

23     Q    And isn't he a executive vice president of

24  AVIC International Holding?

25     A    He's VP, yeah.

1287

1    Q    And Pan Lin Wu?

2    A    Is CFO.

3    Q    Of AVIC International Holding?

4    A    Yes.

5    Q    And somebody named Zhang and their name?  What

6    was that name, again?

7    A    Zhang Chuan Jun is in the finance department.

8    Q    He's the CFO of International Holding,

9    correct?

10   A    No.  Pan Wu.  Pan Li Wu.

11   Q    Is the C --

12   A    CFO.

13   Q    And that last person we just talked about,

14   Zhang?

15   A    Zhang Chuan Jun.

16   Q    Is in the finance department of International

17   Holding?

18   A    Finance department of Holding.

19            CHAIRMAN ALDOUS:  Thank you very much.

20   You can --

21            MR. JENEVEIN:  Mr. Chairman, I'd like to

22   call the panel's attention, I don't know if you-all can

23   see the screen, I think this is a live feed from the

24   Internet.

25            CHAIRMAN ALDOUS:  No, I'm not sure how I

1288

1    feel about a live feed from the Internet being shown.

2                    MR. JENEVEIN:  All right.  Take it off,

3    please.

4                    CHAIRMAN ALDOUS:  Simply because the way

5    we usually do this is, you know, you got an exhibit, you

6    want to offer it, you got to show it to the other side.

7                    I understand we're in the Internet age

8    and all that and I know that the panel is not limited

9    to -- from the Internet ourselves, but let's --

10                    MR. JENEVEIN:  Understood.

11                    CHAIRMAN ALDOUS:  Thank you for your

12   time, sir.  You may step down.

13                    THE WITNESS:  Thank you.  Thank you so

14   much.

15                    CHAIRMAN ALDOUS:  Who's your next

16   witness?

17                    MR. MCNEIL:  I'm going to turn it back to

18   Mr. Walters.  I think we're going to put the rest of Xu

19   Hang's testimony on.

20                    CHAIRMAN ALDOUS:  The four minutes?

21                    MR. WALTERS:  Yes.  It's not the rest.

22   It's the four minutes.  Four-and-a-half minutes.  I

23   don't know if it would go up on that big TV or not, but,

24   anyway, let's go ahead and play that.

25                    (Video deposition playing.)

1289

1         MR. WALTERS:  Stop.

2         MR. TOLES:  Do you know where you stopped

3    in the transcript?

4         MR. WALTERS:  They asked me that earlier

5    and I don't remember.  This is -- and I wish I could

6    give you the page and line on this, but it's so limited.

7         Is that on the big TV?  Let me turn this

8    around just in case anybody does want to see it.

9         (Video deposition playing.)

10        MR. WALTERS:  At this time we'd call

11   Steve DeWolf.  Steve DeWolf was -- his deposition was

12   taken in this matter by the Claimants in this case.

13        MR. SHAMOUN:  Okay.

14   (Oath administered to the witness by Chairman Aldous.)

15                    STEVE DEWOLF,

16   having been first duly sworn, testified as follows:

17                    EXAMINATION

18   BY MR. WALTERS:

19       Q    Mr. DeWolf, please tell us your full name.

20       A    Steve DeWolf.

21       Q    How long have you been in the wind energy

22   business?

23       A    13 years.

24       Q    And can you tell the panel some of the

25   projects that you have done, you or your business have

1290

1  done, in the wind energy business?

2      A    We've done 8 projects that are in commercial

3  operation, and my role was in the development of those

4  projects.  All the projects are in Texas.  They comprise

5  about 1,000 megawatts of wind energy, which is about

6  5 -- between 5 and 10 percent of the wind energy in

7  Texas.

8      Q    We saw the book you referenced the other day

9  that obviously hasn't sold very well.  Have you taught

10  wind energy law?

11      A    I did.  I taught wind energy law at the

12  University of Texas Law School.

13      Q    Have you done domestic wind energy projects?

14      A    Yes.  All of them have been in Texas.  Though,

15  I've looked at a couple of projects outside of Texas.

16                  MR. JENEVEIN:  If I might interrupt, I'm

17  sorry to do this, but do I understand that Mr. DeWolf is

18  now being called as an expert witness?  I mean, aside

19  from the fact that he's a witness of any kind?

20                  CHAIRMAN ALDOUS:  Well, why don't --

21  first of all, if he asks a specific question that

22  references that is, you know, a expert witness-type

23  question, an opinion, and he hasn't been properly

24  designated, you can object at that time.

25                  I have a whole set of issues about a

1291

1   lawyer who's acting as both a lawyer before a tribunal

2   and as a witness on disputed factual issues.  It's my

3   understanding that the rules of ethics and -- but

4   they -- it's not really supposed to happen.  But since

5   we're all lawyers, I'm going to let -- Mr. Jenevein,

6   were you going to call him by depo?

7                MR. JENEVEIN:  I did.  I have -- I am --

8   I think I've already constructively submitted his

9   deposition testimony.

10               CHAIRMAN ALDOUS:  Well, I guess that

11   would be then you waived any right to ask for his

12   recusal, I guess, as counsel in that regard.

13               MR. JENEVEIN:  I'm not asking for that.

14   My concern here is he's giving -- it sounds like he's

15   about to give expert testimony.

16               CHAIRMAN ALDOUS:  Well, you know, I don't

17   think he's going to ask expert questions.  Are you?

18               MR. WALTERS:  Well, I'm not going to ask

19   expert questions, but I will tell you this -- I'm going

20   to try not to ask expert questions but I will tell you

21   this:  We designated anybody who's called as a witness

22   in this case may give expert opinions.  They called

23   Mr. DeWolf as an expert in this case, but I'm going to

24   try to limit my questions.

25               MR. JENEVEIN:  That's just not -- I can't

1292

1    let him misrepresent that to the panel.

2                  CHAIRMAN ALDOUS:  Well, okay.  So -- just

3    so that --

4                  MR. WALTERS:  Well, I can show you that,

5    but --

6                  CHAIRMAN ALDOUS:  I don't think that's

7    specific enough to be calling for an expert witness.  So

8    I don't mind you asking him factual questions.  And if

9    you're okay with what you're doing, then I'm okay with

10   it.  And I think you waived it, so kumbaya.  Let's go.

11        Q    Mr. DeWolf, I want to show you a couple of

12   things.  This is Thompson Trial Exhibit No. 238.  What

13   is this?

14        A    AWEA does a yearly market report showing the

15   winds projects that are either in construction or have

16   been completed during that particular year.

17                  MR. JENEVEIN:  Randy, I'm sorry, what was

18   the exhibit number?  I didn't get it.

19                  MR. WALTERS:  Thompson Exhibit 238.

20                  MR. JENEVEIN:  Thank you.

21        Q    Is there anything in the yearly AWEA report

22   indicating a 300-megawatt project in the U.S. done by

23   any AVIC entity?

24        A    I've reviewed them and did not see one.

25        Q    Let me show you Exhibit No. 246.  This is part

1293

1    of Ms. Bramer's report.  Let me turn to the second page

2    of this exhibit.  Actually, it's part of this.  What is

3    Wind Energy SmartBrief?

4         A    Wind Energy SmartBrief is something that goes

5    to folks that deal with wind business.  You don't have

6    to be in AWEA.  Patrick gets one, I get one.  They just

7    send it out.

8         Q    How often do you get SmartBriefs?

9         A    I think it's during the business week and then

10   they -- holidays they take off.

11        Q    And during -- this exhibit, does it reference

12   just U.S. wind power projects?

13        A    No.  It does international projects.  It'll

14   talk about not every project in the world, but it talks

15   about various projects in overseas.

16        Q    So, for example, looking through this, that

17   was part of her exhibit, does it reference international

18   projects as well?

19        A    Yes, sir.

20        Q    And have you looked to see whether any AVIC

21   entity is listed in the SmartBriefs as owning, having

22   equity interest, completing any of these projects in

23   these countries that Ms. Bramer references?  Has that

24   been done?

25                  MR. JENEVEIN:  Can I ask if one lawyer's

1294

1   going to lead -- examine his partner, who's co-counsel,

2   can he at least not lead him?

3              MR. WALTERS:  I just asked has that been

4   done?

5              CHAIRMAN ALDOUS:  Well --

6       Q    I'll ask it.

7              CHAIRMAN ALDOUS:  -- I mean -- I bet you

8   wouldn't even have to ask him questions and he could

9   answer them, but I'm not really concerned about him

10  leading too much.  In fact, we might go faster.

11             MR. JENEVEIN:  Fair enough.

12      A    The answer to your question is I have not gone

13  back and looked at every one of the daily wind

14  SmartBriefs.  I've been receiving that for at least the

15  last ten years.  I do not recall seeing the projects of

16  which Ms. Bramer described.

17      Q    How about trade journals for AWEA?  Are there

18  trade journals in the industry?

19      A    There are various trade journals in AWEA.  One

20  is North American Windpower.

21             MR. LOWENSTEIN:  Now I need to object.  I

22  know Mr. Jenevein's busy, but, I mean, we're having a

23  witness who's being proffered allegedly not as an expert

24  but is going to now tell the panel what the substance of

25  many, many documents for over ten years that aren't in

1295

1    front of them.  So I object.  These haven't been

2    produced and there's a lack of foundation of his

3    personal knowledge and I just ask that the panel not

4    allow this.

5           CHAIRMAN ALDOUS:  Well, this is asking

6    him about stuff that's out there in the universe and

7    asking of his knowledge.  I think I can speak for

8    everybody here that I'm not sure this is very helpful to

9    the panel.  I think we got your point concerning that

10   other thing, but -- so if your point is that there's no

11   literature out there that shows these projects that

12   you're talking about, then we heard that a while ago.

13          MR. WALTERS:  Point taken.  No further

14   questions.

15                  EXAMINATION

16   BY MR. JENEVEIN:

17      Q    Mr. DeWolf, you've reviewed all these AWEA

18   annual reports?

19      A    I've reviewed the ones that are a trial

20   exhibit, yes, sir.

21      Q    Well, you produced, I thought, five or six

22   years' worth of AWEA annual reports?

23      A    Yes, sir.

24      Q    And you said just now you've reviewed them?

25      A    Yes, sir, I did.

1296

1    Q    Did you see any entry that indicated that
2  Gallop Power had anything to do with Flatwater?
3    A    I wasn't looking for that, and so the answer
4  is it may be there, it may not.  I was looking to see if
5  I saw any entry for a 300-megawatt project, and I looked
6  also for -- specifically for the Cirrus project.
7    Q    And I guess it's fair to say that you weren't
8  looking for any evidence that Tang Energy Windpower
9  Consulting had anything to do with the Harbor Winds
10 project in Corpus Christi either, did you?
11   A    Yes, sir, that's affirmative.  But -- yes,
12 sir.
13   Q    So you didn't find it?  You didn't see it?
14   A    I didn't see it, yes, sir.
15        CHAIRMAN ALDOUS:  Any of the other
16 Claimants' counsel have questions?
17        MR. BRACY:  No.
18        CHAIRMAN ALDOUS:  All right.  Thank you,
19 Mr. DeWolf.  In your capacity as a witness.
20        MR. DEWOLF:  Can I come back to my lawyer
21 hat?
22        CHAIRMAN ALDOUS:  You may.  We have an
23 Astros for that.
24        Let's see.  Do you have another witness?
25        MR. WALTERS:  I do not at this time.

1297

1      CHAIRMAN ALDOUS:  Mr. Bayles, are you
2  calling somebody?  You're moving.
3      MR. BAYLES:  No.  If it please the panel,
4  we'd like to use this opportunity to cross-examine
5  Professor Naughton at this time.
6      CHAIRMAN ALDOUS:  I see.  There was an
7  agreement about this earlier.  Is Professor Naughton
8  here?
9      MR. LOWENSTEIN:  He is.
10      CHAIRMAN ALDOUS:  I thought I saw you.
11  Come on up.
12      Professor Naughton, if you may recall, I
13  swore you in some couple of days ago.
14      THE WITNESS:  Yeah.
15      CHAIRMAN ALDOUS:  Same stuff applies.
16      THE WITNESS:  Absolutely.
17      CHAIRMAN ALDOUS:  Great.
18      Mr. Bayles, you may proceed.
19      MR. BAYLES:  Thank you.
20                   EXAMINATION
21  BY MR. BAYLES:
22      Q    Good afternoon, Professor.  When were you
23  engaged to be an expert for Mr. Young?
24      A    In -- well, I wrote my report in December
25  2014, so shortly --

1298

 1      Q      I'm sorry, that was the date of the report?

 2      A      Yes.

 3      Q      And do you remember how long before that you

 4  were engaged?

 5      A      I think the actual final engagement didn't

 6  occur until November '14.

 7      Q      And that was 2014?

 8      A      Correct.

 9      Q      And how much have you billed for your

10  services?

11      A      I made an estimate of how long it would take

12  to write that first report, and I billed for that amount

13  up front.

14      Q      And what was that amount?

15      A      I think -- I don't know precisely, but about

16  5,600.

17      Q      And you have been paid for that?

18      A      Yes.

19      Q      And are you aware of how much Professor

20  Jacobson billed in this case?

21      A      I am not.

22      Q      Did you read Mark Stokes' reports?

23      A      Yes, I did.

24      Q      Before it was served?

25      A      Not before it was served.  After it was

1299

1    served.

2        Q    Did you -- okay.  So you didn't provide any

3    input in Mr. Stokes' report before it was served?

4        A    No.

5        Q    Do you agree with everything he says in his

6    report?

7        A    Of course not.

8        Q    Is there anything in particular that you

9    thought was a really good point?

10       A    I'm sorry, you're asking me to comment on --

11       Q    I'm asking you --

12       A    -- Colonel Stokes' report?

13       Q    -- a yes or no question on if you thought

14   there was anything in Mr. Stokes' report that was a

15   really good point?

16       A    A really good point?  I thought there were

17   many, many really good points in Colonel Stokes's

18   report.

19       Q    I'm trying to -- sorry.  Are you done?

20       A    Sure.

21       Q    I'm trying to ask yes or no questions, just so

22   you know.  In some cases when you say yes, I might say,

23   "Well, okay, explain."  In some cases I may not.

24            Is there anything in there that you

25   thought was not strong?

1300

1  A  No.

2  Q  Did you provide any feedback you had on

3 Mr. Stokes' report after you reviewed his report?

4  A  No.  I met Colonel Stokes here on Saturday.

5  Q  Did you read Professor Jacobson's report

6 before it was served?

7  A  Again, I read it after it was submitted.

8  Q  And do you agree with everything he says in

9 his report?

10  A  No.

11  Q  Is there anything in his report you thought

12 was not strong?

13  A  No.

14  Q  Anything that you thought that was

15 particularly weak?

16  A  No.

17  Q  Were you aware of Professor Jacques deLisle

18 before you were engaged in this arbitration?

19  A  Yes.

20  Q  Can you describe how you're aware of him in

21 one or two sentences?

22  A  Well, I'd met him a couple of times.  He's a

23 colleague and he's a well-respected lawyer who is

24 especially well known for human rights and Taiwan

25 issues.

1301

1      Q     But you didn't attend Professor deLisle's

2   deposition, correct?

3      A     I did not.

4      Q     Have you read his report?

5      A     Yes, I have.

6      Q     Did he criticize your report in his report?

7      A     He criticizes it and also has some nice things

8   to say about it.

9      Q     But you didn't even mention his report in your

10   testimony on Monday, did you?

11      A     I do not believe I did, no.

12      Q     Have you read his deposition?

13      A     I have glanced at it.  I have not read it

14   carefully.

15      Q     Did he criticize your report in his

16   deposition?

17      A     I can't say for sure, I'm sorry.  I did not

18   read it carefully enough.

19      Q     You didn't even mention his deposition in your

20   testimony on Monday, did you?

21      A     I did not.

22      Q     Did you read the report of Mark Chadwick?

23      A     Yes, I did.

24      Q     And did he criticize your report in his

25   report?

1302

1      A      I wouldn't call it criticism.  He refers to

2  it.

3      Q      And you didn't mention his report in your

4  testimony on Monday either?

5      A      That's correct.

6      Q      Do you have an understanding of why you were

7  called as the very first witness in this case?

8      A      Yes.

9      Q      And can you express that in one or two

10  sentences?

11     A      Yes.

12     Q      Please do.

13     A      I was asked to deliver an opinion as to

14  whether AVIC acted as a single entity with its

15  subordinate units serving under its direction.

16     Q      And that's why you were called as the very

17  first witness in this case?

18     A      I think I was called as the first witness in

19  order to set the broader scene.

20     Q      And how long did you stay in the arbitration

21  on Monday?

22     A      All day.

23     Q      And did you attend this arbitration Tuesday or

24  yesterday?

25     A      No.  I was -- I needed to go back to

1303

1   California.  I had expected to go back Monday night, so

2   I came back to face cross-examination today.

3        Q    Thank you for doing that.

4             Has anyone communicated to you anything

5   that has happened in the arbitration since you left?

6        A    No.  Other than a text message saying "things

7   went fine" or something like that.

8        Q    And you haven't been provided with any of the

9   exhibits that have been discussed here?

10       A    Not in the last two days, no.

11       Q    And you have -- have you ever seen the 80-plus

12  page PowerPoint presentation that Professor Jacobson

13  presented during his testimony?

14       A    I have not seen it to this day.

15       Q    All right.  Do you have a copy of your report

16  with you?

17       A    I do.  I don't have it right in front of me

18  right now.

19       Q    That's fine.

20            MR. BAYLES:  Professor Naughton's report

21  is Exhibit 190 in the binder that the panel has.

22            CHAIRMAN ALDOUS:  When you say Exhibit

23  190, are you referring to Claimants' Exhibit 190?

24            MR. BAYLES:  No.  AVIC USA's Exhibit 190.

25            CHAIRMAN ALDOUS:  All right.

1304

1    Q    Professor, do you recall in your report

2  indicating that all AVIC entities are in a pyramid with

3  AVIC HQ at the top?

4    A    Correct.

5    Q    That alone doesn't mean that AVIC is a single

6  entity, correct?

7    A    That in itself is simply a descriptive

8  statement.

9    Q    And you're aware that AVIC USA's expert Mark

10  Chadwick said at paragraph 2.2 of his report that the

11  pyramid structure is the most common structure and gives

12  the example Citigroup?

13    A    Of course.

14    Q    And AVIC pyramid's structure is no different

15  than that of any other large Western corporation,

16  correct?

17    A    I think in its general outlines, that's a fair

18  statement.

19    Q    Looking at paragraph 10 of your report . . .

20    A    It's two-sided.

21         CHAIRMAN ALDOUS:  Thank you for being

22  green.

23    Q    All right.  This is page 4 of Exhibit 190.

24  You mention SASAC is the owner of AVIC HQ, correct?

25    A    Correct.

1305

 1     Q    And then you say the Chinese maintains control

 2   over AVIC HQ through SASAC, correct?

 3     A    Correct.

 4     Q    Now, the control SASAC exerts over AVIC HQ is

 5   no different than the control that may be exercised by

 6   any governmental owner of a corporation, correct?

 7     A    I wouldn't say there's no difference.  If

 8   you're to say that it's generally in that category, yes.

 9   But SASAC is both an ownership agency and a regulatory

10   agency.

11     Q    Am I correct that you get it right in your

12   report that SASAC owns AVIC HQ and Stokes and Jacobson

13   get it wrong by asserting that the Chinese party or the

14   Chinese government own AVIC HQ?

15     A    No.  Certainly I prefer my formulation.  I

16   think I state it more precisely and more accurately and,

17   in formal terms, the ownership of AVIC HQ is held by

18   SASAC.

19     Q    Thank you.  Also on page 10 of your report you

20   state that "The group corporations were established to

21   maintain a level of control consistent with that of the

22   former industrial ministry," correct?

23     A    Correct.

24     Q    And Mr. Chadwick highlights in his report that

25   things are much different at AVIC since it was at the

1306

1    ministry, correct?  You want me to read the previous

2    question?

3        A    Yes.  Would you, please?

4        Q    All right.  You state at page 10 "The group

5    corporations were established to maintain a level of

6    control consistent with that of the former industrial

7    ministry."

8        A    Sure.

9        Q    All right.  Mr. Chadwick points out that

10   things are much different at AVIC since it was at the

11   ministry, correct?

12       A    And I would certainly agree with

13   Mr. Chadwick's statement.  Things are much different.

14       Q    Chadwick points out that AVIC now has a wide

15   range of commercial activities on a global scale and the

16   number of operations in which there are external

17   shareholders, suggesting your reference placed in the

18   former ministry as irrelevant, correct?

19       A    If he says that that suggests that the

20   emphasis placed on it being a former ministry is

21   irrelevant, then he's greatly mistaken.  I would just

22   want emphasis -- remember that AVIC's primary mission is

23   to provide military aircraft to the People's Liberation

24   Army.

25       Q    Mr. Lowenstein -- all right.

1307

1     AVIC websites placed in evidence by

2  Claimants note there are 200 subsidiary companies and 20

3  listed companies, correct?

4     A    Right.

5     Q    Now, your claim in actual expertise and

6  research are really about SOEs operating in China and at

7  the upper levels, correct?

8     A    That's certainly been a large focus of my

9  research, yes.

10    Q    And does your expertise and research about

11 SOEs extend to how subsidiaries of Chinese SOEs operate

12 overseas?

13    A    Overseas?  I have not done specialized

14 research in that topic, but it's certainly something

15 I've followed closely over the years.

16    Q    Is it your opinion that all the AVIC

17 companies, all those 200 -- that AVIC HQ and all the 200

18 or so subsidiaries are operating as a single entity?

19    A    I think I express this quite clearly in my

20 testimony.  What I said was that AVIC HQ has the

21 mechanism and the capability to compel the subordinate

22 units to act as its agents.  And that when it chooses

23 to, it's able to do so, and I gave the reasons why I

24 thought that was the case.  Of course, it's -- it would

25 be silly to claim that such a large organization always

1308

1    acts as one unit.  That would be impossible.

2        Q    And so you would agree that just because SASAC

3    or HQ or the communist party may be able to influence a

4    decision at some point, that doesn't imply that they do?

5        A    It doesn't necessarily imply that they do, but

6    it implies that they have the capability to do so if

7    they choose.

8        Q    Now, on page 5, paragraph 13 of your report,

9    you state "AVIC HQ holds clear ownership of all its

10   immediate subsidiaries," correct?

11       A    Uh-huh.

12       Q    I'm sorry, did you answer audibly?

13       A    Yes.  I'm sorry.  Yes.

14       Q    That's correct?

15       A    That's correct.

16       Q    Every company owner wants to have clear

17   ownership of its companies, correct?

18       A    That's not necessarily true.  Control has

19   value, so, of course, people will pay for control.  But

20   in many cases people are happy to have ownership without

21   complete control.  That's why we have takeover battles

22   in the United States.

23       Q    I'm not sure you responded to my question.

24   Let me ask it again.

25       A    Sorry.

1309

1    Q    Every company owner wants to have clear
2    ownership of its companies, correct?
3    A    Every -- I'm sorry, I don't understand the
4    question.
5    Q    Well, the reason for the question is the
6    heading of paragraph 13.  "AVIC Group HQ maintains clear
7    ownership control of its immediate subsidiaries."  And
8    I'm asking, how is that unique?  Doesn't every company
9    want to have clear ownership control of its
10   subsidiaries?
11   A    I think we need to separate ownership and
12   control.  They're not identical.  Control is a positive
13   value and companies would prefer that and they pay money
14   for it, but companies don't always feel that it's in
15   their -- that it's worthwhile for them to have absolute
16   control.
17   Q    Well, that's what's confusing to me.
18   A    Well, companies have -- companies have
19   minority --
20            MR. LOWENSTEIN:  Let him ask his
21   question.
22   A    Sorry.
23   Q    That's all right.
24            Ownership control is your term.  I'm
25   trying to understand what you mean by ownership control.

1310

1    A    So clear -- the ability to exercise clear

2    control as the owner without having to share -- dilute

3    that control by sharing it with other owners.

4    Q    And, again, that's no different than Western

5    companies or any multinational company; isn't that

6    correct?

7    A    I think there is a difference, yes.  Sorry.

8    Q    And you didn't mention this in your testimony

9    Monday either, correct?

10   A    I'm sorry, I don't recall.

11   Q    After AVIC USA served its rebuttal report and

12   after the deposition of Jacques deLisle, it became

13   apparent that an economist -- that as an economist your

14   understanding of ownership control isn't really a useful

15   opinion in these proceedings, is it?

16   A    I disagree.  I certainly can see my failings

17   as a scholar of the law.  But I think economists have a

18   very sophisticated notion of control.  That means, you

19   know, residual cash flow rights and ability to dispose

20   of assets and -- exert during physical control.  I think

21   it's a useful concept.

22   Q    I'm not discontinuing the importance of your

23   profession or your expertise.  The suggestion I'm making

24   is that you didn't -- that part of your opinion wasn't

25   highlighted on Monday because of the impact of Professor

1311

1  deLisle's opinions and testimony.  And are you telling

2  me that that wasn't even discussed in your preparations

3  to testify?

4              MR. LOWENSTEIN:  I object.  Wait.  No,

5  he's an expert.  I'm sorry.  I withdraw my objection.

6              CHAIRMAN ALDOUS:  Thank you.

7       A    I'm sorry?  The --

8       Q    Let me start over.  Did you talk with any

9  attorney in this case in preparation for testifying on

10 Monday about how you might highlight the portions of

11 your report for your testimony?

12             THE WITNESS:  Should I be --

13             MR. LOWENSTEIN:  You can answer whatever

14 he wants to ask you about your preparation.

15      A    I mean, we prepared, and the main emphasis of

16 the preparation was we had very little time and we

17 should highlight the most important facts.  That --

18 ownership and control did not come up.

19      Q    Have you had a chance to review the chart with

20 the structure of Respondents that AVIC USA produced in

21 these proceedings?

22             CHAIRMAN ALDOUS:  If you can direct the

23 witness to an exhibit number.

24             MR. BAYLES:  Yeah, I'm going to put it in

25 front of him.  I think Mr. McNeil might have stolen it

1312

1    from me.

2                    CHAIRMAN ALDOUS:  The panel is shocked.

3    That was a tongue-in-cheek response, for the record.

4                    MR. BAYLES:  Mr. Jenevein, would you mind

5    bringing up 268 for us?  AVIC USA 268.

6                    MR. JENEVEIN:  AVIC 268.  Here we go.

7    Thank you.

8                    MR. BAYLES:  Thank you.

9                    THE WITNESS:  Uh-oh.

10                   CHAIRMAN ALDOUS:  No, it didn't break.

11   It just moved.

12                   THE WITNESS:  Oh, boy.  Now that one's

13   broke.

14                   MR. LOWENSTEIN:  Never mind.

15                   JUDGE MOSELEY:  That's why he's a lawyer.

16                   MR. LOWENSTEIN:  Now you can't see any of

17   it.

18                   MR. JENEVEIN:  What have you done?

19                   CHAIRMAN ALDOUS:  Wait a minute.  Let the

20   AV guy do it.

21                   MR. LOWENSTEIN:  Sorry.

22                   CHAIRMAN ALDOUS:  And I would have called

23   you a different name if I'd known your name, but since I

24   don't, I called --

25                   MR. LOWENSTEIN:  There we go.

1313

1    Q    Never mind their screen.  I'm just kidding.

2         All right.  Have you had a chance to

3    review this?

4    A    I looked at it on Monday for the first time.

5    Q    All right.  And do you understand this has

6    been offered and accepted into evidence?

7    A    Sorry?

8    Q    Do you understand this has been offered and

9    accepted into evidence?

10   A    Yes.

11   Q    AVIC HQ has ownership control, as you use the

12   term, over all the companies below it, correct?

13   A    Correct.

14   Q    Is AVIC HQ's ownership control over AVIC IRE

15   or Ascendant limited as compared to its ownership

16   control over AVIC International Holding Corporation?

17   A    So the structure of the control that AVIC

18   International Holding Corporation exerts over AVIC

19   International Holding, Ltd. listed company is, of

20   course, quite sophisticated.

21        It holds almost 34 percent indirectly

22   through AVIC International Shenzhen and 37-and-a-half

23   percent directly.  But, obviously, it's able to exercise

24   both those voting shares quite -- without any restraint,

25   and so it has a -- it has a over 70 percent share.

1314

1    Q    And is it significant that AVIC International

2    Holding, Ltd. is a listed company and that it's the

3    immediate parent of AVIC IRE?

4    A    I think it's significant in the sense that it

5    shows an attempt by AVIC International to develop in a

6    certain direction, which would be conformable to better

7    corporate governance and market discipline.  Whether

8    it's there or not is another question.

9    Q    Now, on page 3 of your report you indicate

10   "AVIC is one of a select group of national-level holding

11   companies," correct?

12   A    Correct.

13   Q    And the ownership control you discuss in your

14   report as to AVIC is no different than the ownership

15   control of the other companies in that select group

16   exert, correct?

17   A    It's I didn't say no different but similar to,

18   yes.

19   Q    And are each one of those companies in that

20   select group respectively single entities?

21   A    I think what I said clearly in my testimony

22   was that there are a number of reasons why AVIC is

23   more -- even more capable of acting as a single entity.

24   Q    I'm just wondering if your opinion and the

25   importance that you place on ownership control is just

1315

1    as important when applied to the other group in -- the

2    other companies in that select group?

3        A    Yes.

4        Q    Is it your opinion that each of the 112 top

5    tier SOEs identified in your report is respectively a

6    single company?  In other words, each of the 112

7    themselves is a single company?

8        A    I never argued that each of the 112 always

9    acts as a single entity.

10       Q    Could it be implied from your report that

11   that's your opinion?

12       A    No.

13       Q    The concept of ownership control in your

14   report is different than the term control in the

15   corporate law sense, correct?

16       A    That's probably true.  I don't know enough

17   about the corporate law sense to answer.

18       Q    And it's not unusual for the subsidiaries in

19   multinational corporations to follow strategic

20   directions sent down by the top entity in the

21   corporation, correct?

22       A    That is true.

23       Q    And it's not against Chinese law for the

24   subsidiaries of AVIC HQ to follow strategic directions

25   sent down by AVIC, correct?

1316

1    A    That is certainly true.

2    Q    And is it your contention that the CATIC

3  statement that, quote, it is directly subordinate to

4  AVIC is an admission by CATIC of any fact relevant to

5  your opinion?

6    A    It is simply an attempt to describe the nature

7  of the corporate structures.  In and of itself, that

8  certainly should not be interpreted as sufficient to

9  prove agency.

10   Q    And you haven't been here the last three days,

11  so you don't know how the parties on the Claimants' side

12  are pointing to such statements like directly

13  subordinate, do you?

14   A    Well, I did hear Mr. Zhang's testimony just

15  now.

16   Q    And you note in paragraph 17 that AVIC

17  International Holding is also a directly controlled

18  subsidiary of AVIC Group HQ, and you're using that term

19  in the same sense you use it throughout your report,

20  correct?

21   A    Yeah.

22   Q    And in paragraph 19 you state CAIGA operates

23  under the strategic guidance of HQ Group, correct?

24   A    Right.

25   Q    And an imperative expressed by AVIC to CAIGA

1317

1   which CAIGA follows is not evidence of anything, is it?

2        A     In and of itself, it would not be evidence of

3   anything.

4        Q     Sure.  So so far we've got a whole list of six

5   or seven things that in and of themselves are not

6   evidence of anything --

7        A     No, I think we only have a list of one thing

8   that's in and of itself not --

9        Q     And what's that?

10       A     Ownership.

11       Q     I don't mean to sound disrespectful, sir.  I

12   don't feel that way at all towards you.

13       A     I'm trying to answer as best I can.

14       Q     Now, the AVIC Group HQ five-year plan you

15   mention in your report at paragraph 22 is no more than

16   an expression of general policy goals in state

17   investment priorities, correct?

18       A     I've spent a lot of time studying five-year

19   plans in China, and I think they are much more important

20   than that description implies.  You need to realize that

21   a five-year plan has many different levels.  There's a

22   top -- sorry.

23            CHAIRMAN ALDOUS:  Well, you can't just

24   look at me, Mr. Bayles.  You have to ask me to do

25   something.

1318

1    MR. BAYLES:  Apparently it has great

2  force and effect if I just look at you.

3    CHAIRMAN ALDOUS:  On the witness, but it

4  doesn't do anything for me.

5    MR. BAYLES:  Well, I tell you what

6  doesn't have force and effect is to say I'm having a

7  Perry Mason moment.

8    MR. SHAMOUN:  What kind?

9    Q    Are you aware of any court decision in the

10  United States finding that all the subsidiaries of a

11  Chinese state-owned entity are alter egos?

12    A    No.

13    Q    Are you aware of any court decision in the

14  United States finding that any two subsidiaries of a

15  Chinese state-owned entities -- entity are alter egos of

16  each other?

17    A    No.  I'm not a lawyer.  I'm not familiar.

18    Q    Do you have any opinions about whether

19  anything the AVIC family of companies are doing violates

20  Chinese law?

21    A    I'm not enough of an expert on Chinese law to

22  be able to answer that.

23    Q    Professor deLisle has a line of rebuttal to

24  your report and the reports of Mr. Stokes and Professor

25  Jacobson that could basically be characterized as "Just

1319

1    because the communist parly are leaders of AVIC HQ could

2    have meddled in the business decisions of the

3    subsidiaries that are a subject of this arbitration

4    doesn't mean that they actually did so."

5              Do you conclude that AVIC HQ actually did

6    meddle on the relevant facts?

7         A    Yes, I do.

8         Q    The only facts on this issue are basically

9    derived from self-serving statements by Patrick Jenevein

10   and the recordings he made secretly of statements by his

11   friends, correct?

12        A    No, that's not correct.

13        Q    Did you review the Xu Hang testimony?

14        A    Yes, I did.

15        Q    Do you have any reason to believe that Mr. Xu

16   did not testify truthfully?

17        A    Well, I introduced into evidence statements --

18   sorry.  Yes, I do have reason to believe that.

19        Q    Did you review the Sherman Zhang testimony?

20        A    No, I was not able to.

21        Q    And -- but you were here today listening to

22   him?

23        A    Correct.

24        Q    Do you have any reason to believe that

25   Mr. Zhang has not or did not testify truthfully?

1320

1      A     I did not find it plausible.

2      Q     Okay.  Wait.  Excuse me?

3      A     I did not find it plausible.

4      Q     Do you believe that all AVIC companies are all

5    one entity?

6      A     Again, I believe that all AVIC companies have

7    the capability to act as one entity and did in their

8    relevant wind power case.

9      Q     How long have all AVIC companies been acting

10   as one entity?

11     A     Well, for about 50 years.

12     Q     Now, are you familiar with the RAND report

13   that's Exhibit C13 to Mr. Stokes' --

14     A     A little bit.

15     Q     You understand that it gives descriptions

16   showing how independent AVIC subsidiaries have been and

17   illustrates the problem of grouping all the second tier

18   holding companies into one unitary group?

19     A     Yes.

20     Q     Now, you gave a reason for the reorganization

21   of AVIC in 2008 in your report and under direct

22   examination on Monday, correct?

23     A     Yes.

24     Q     In fact, on Monday you said that after 2008

25   the company now looks like something modern, something

1321

1    that looks like the U.S. defense economy, correct?

2        A    That's its objective is to evolve in that.

3        Q    And your description of the AVIC in existence

4    now is like Boeing and Ratheon under a big contract?

5        A    No.  I said that was their objective was to

6    become like that.

7        Q    And Boeing and Ratheon have many people on

8    their boards and in their management who have civilian

9    and defense ties, don't they?

10       A    Yes.

11              MR. BAYLES:  Can I have a moment?

12              CHAIRMAN ALDOUS:  Sure.

13              MR. BAYLES:  Maybe just 60 seconds.

14       Q    Thank you, Professor.  Thank you for coming

15   back today.

16       A    Sure.

17              CHAIRMAN ALDOUS:  Do you have any --

18   Mr. Walters, do you have any questions?

19              MR. WALTERS:  Do not.

20              CHAIRMAN ALDOUS:  Any of the Claimants

21   have any questions?  Mr. Lowenstein?

22              MR. LOWENSTEIN:  I have one.

23                       EXAMINATION

24   BY MR. LOWENSTEIN:

25       Q    Mr. Naughton, you were asked if you found

1322

1    Mr. Zhang's testimony to be plausible.  No.  You were

2    asked if you had any issues with it and you said, "I

3    didn't find it plausible."  What did you mean by that?

4         A    Well, I showed in my testimony and in the

5    submitted evidence that higher levels of AVIC had given

6    direction to the entire group company, first of all, in

7    2007 to seek out wind power as a new area to development

8    -- of development, but then the head of AVIC had said

9    that all of AVIC would have to be involved in the

10   development of wind power.

11                   And then, subsequently, that only AVIC

12   Renewable Energy would have the right to develop wind

13   power.  And, therefore, it seems to be completely

14   implausible that Mr. Zhang would have independently

15   decided to develop wind power and that he had the

16   capability to compete with AVIC Renewable Energy in wind

17   power today if he felt so.

18                   MR. LOWENSTEIN:  That's all I have.

19                   CHAIRMAN ALDOUS:  Any members of the

20   panel have any questions for Professor Naughton?

21                   Thank you.

22                   THE WITNESS:  Thank you.

23                   CHAIRMAN ALDOUS:  You're now fully

24   released to return to California.

25                   THE WITNESS:  Thank you, sir.

1323

1        CHAIRMAN ALDOUS:  We're going to take a

2   ten-minute break.

3        (A break was taken from 4:14 p.m. to 4:35 p.m.)

4        CHAIRMAN ALDOUS:  Mr. Bayles, you calling

5   the next witness?

6        MR. BAYLES:  Yes.  Thank you.  We call

7   Dr. Andrew Safir to the stand.

8        CHAIRMAN ALDOUS:  Dr. Safir, step on up.

9   You can sit down.

10       (Oath administered to witness by Chairman Aldous.)

11       CHAIRMAN ALDOUS:  You may proceed,

12   Mr. Bayles.

13       MR. BAYLES:  Thank you.

14              DR. ANDREW SAFIR,

15   having been first duly sworn, testified as follows:

16              EXAMINATION

17   BY MR. BAYLES:

18       Q    Dr. Safir, would you please tell the panel

19   briefly about your background and experience that's

20   relevant to the opinions that you're now offering in

21   this case?

22       A    Sure.  I'm a doctor in economics.  In that --

23   had one for about almost 40 years.  I am the president

24   of Recon Research Corporation, which is an economic

25   advisory firm that specializes in analyzing complex

1324

1   corporate dispute efforts.

2            As far as my credentials for this sort of

3   case, my company, and myself in particular, we do a lot

4   of damage work.  We do a lot of damage analysis,

5   contract interpretation, drafting of economic terms and

6   conditions, [unintelligible] clauses, for example,

7   things like that.

8            I have been involved in a number of

9   fairly large disputes where the damage numbers, both pro

10  and con, have run into the millions.  Two or three that

11  come to mind, I was the expert witness for the State of

12  California in a very large class action case against

13  Sempra Energy El Paso Pipeline Pacific Gas & Electric

14  over the monopolization of pipeline capacity to

15  California for natural gas.  I think the damage

16  calculations there were somewhere in the 6 to 7 billion

17  range.  The case settled, providing relief for the

18  class; that is, the People of California, to about $2

19  billion.

20            More recently, I am involved as the

21  expert defense witness against the State of California

22  for Shell Energy in a $1.5 billion complaint to the

23  FERC, the Federal Energy Regulatory Commission.  I'm

24  also the expert defense witness for the U.S. government

25  in a case where a pipeline is bringing a breach of

1325

1    contract claim before the federal court of claims, and

2    that case will be adjudicated in the next few weeks.

3              So I'm used to dealing with large damage

4    issues.  I understand how damage models can and should

5    be put together and how to do that and what the

6    requirements are to do that reasonably and with economic

7    certainty in a nonspeculative fashion.

8        Q    Thank you.  Would you please tell the panel

9    briefly some of the things you did specific to this case

10   to evaluate it and prepare the two reports you issued?

11       A    Sure.  Well, in the first instance I looked

12   over the work that was done by Ms. Bramer.  I looked at

13   the available evidence in this case and the evidence

14   that she used to put together her damage analysis, and I

15   reviewed depositions in the case.

16             I reviewed materials such as the Soaring

17   Wind agreement, reviewed website materials and other

18   information from public sources and evaluated that

19   material against the claims that were made by the

20   Claimants in this case and the work that was done by

21   Ms. Bramer in calculating out her $7.6 billion damage

22   calculation.

23       Q    And you've been in attendance here at the

24   arbitration?

25       A    Yes.  I've been sitting over there in the

1326

1    corner.

2        Q    Now, as a general matter, have you identified

3    some problems with Ms. Bramer's analysis?

4        A    Yes, I have.

5        Q    And what would be the first major point you'd

6    like to discuss?

7        A    Well, I don't think it's -- from listening to

8    the discussion here will come as any surprise, but I

9    think the first problem with Ms. Bramer's analysis is

10   the phantom projects she identifies.  There simply isn't

11   enough information on the projects and the size of the

12   megawatts that she claims to use any of those numbers in

13   beginning a damage calculation.

14              So the first problem with her work is

15   that she has assumed a very large amount of activity

16   that is undertaken by AVIC which doesn't seem to comport

17   with reality.

18       Q    And is this what you're referring to as her

19   reliance on alter ego analysis as well?

20       A    Well, you know, she's -- that's an assumption

21   that she has to make to rely on alter ego analysis; and

22   if you don't rely on alter ego analysis, it changes the

23   whole tenor of the decision.  But the alter ego issue is

24   really not -- it's one that she's assumed.

25              I don't think she's made a determination

1327

1    that AVIC USA is operating as an agent of anyone else.

2    She's making that assumption, but she's not the expert

3    testifying to that issue.  She is, however, making that

4    assumption, and that's another problem when you look at

5    the analysis.  It broadens it, in my view, unnecessarily

6    from having read the terms of the Soaring Wind

7    agreement.

8         Q    And so those assumptions that she's made

9    necessarily affect the agreements of the parties that

10   she relies upon to develop her analysis, correct?

11        A    Well, I think it affects the scope of her

12   analysis.  It stretches the scope of her analysis well

13   beyond the Soaring Wind agreement, which is made between

14   two specific parties; Tang and AVIC International USA.

15   It broadens it in a way that I don't feel is

16   appropriate, but, you know, that's simply one of her

17   assumptions.

18        Q    And we talked briefly over breakfast about

19   this and I think it's something you described as a

20   cascade of assumptions?

21        A    Well, the problem with her work, aside from

22   the alter ego, is, as I say, there's -- once you make

23   this assumption that there's a phantom -- that phantom

24   projects are a reality out there, then she has a cascade

25   of assumptions that follow from that that she uses to

1328

1  apply to that to get a damage number.

2           For example, she assumes that there is a

3  certain amount of capital investment that is -- that

4  would be forthcoming if you had a project of this nature

5  or these project sizes.  Then, having determined that,

6  she assumes that there is a -- there is a rate of return

7  that can be applied to that phantom investment from

8  those phantom megawatts.

9           Then she assumes that there is a capital

10 investment amount that AVIC would acquire, which is

11 equal to a hundred percent of that total investment.

12 And then she assumes that the stream of income from this

13 investment would go out for a period of 25 years.

14          So when you make assumption on assumption

15 on assumption on assumption without any evidence, you

16 can get a very large number.  You can get any number you

17 want, and that's the problem with looking at a model

18 that is evidence deficient and attempting to come up

19 with some estimate that is available for evaluation of

20 either an arbitration panel or a court with any

21 certainty.

22          I understand there's a word for it -- or

23 there's a phrase for it in Texas, "all hat, no cattle."

24 It's simply not a credible number once you -- since it's

25 based on whole cloth.

1329

 1      Q      And how about her attempt to identify specific

 2   rate of return that would be required for AVIC

 3   International USA?

 4      A      Well, again, the -- she uses the return, I

 5   think, of around 15 percent.  I believe from her

 6   material and from her testimony, it came from, I think,

 7   one e-mail that was not an e-mail that AVIC

 8   International USA had anything to do with.

 9              It was an e-mail that went to another

10   AVIC entity, and she simply assumes that that's

11   sufficient to determine that that's the rate of return

12   that they would use as a hurdle rate.

13              In fact, if you look at AVIC USA, you've

14   heard testimony here that the concept there was more of

15   a financing arrangement for short-term financing for the

16   facilitation of the purchase of wind turbines.  It's a

17   much lower discount, it's a much lower interest rate

18   because it's essentially a rate, a loan rate, a

19   short-term loan rate that they would be willing to

20   accept as a rate of return.

21              And, in fact, there's a number of

22   e-mails that go back and forth at the AVIC USA level

23   which say 8, 8-and-a-half percent is a number that they

24   would choose.  So, again, you get an assumption that is

25   just that, it's an assumption not based upon sufficient

1330

1   amount of evidence in my view.  But, again, it's a

2   cascade of assumptions.  We're not looking at any

3   reality here; we're just looking at a series of

4   assumptions.

5       Q    The specific points that you -- these -- all

6   these specific points are detailed in your report

7   that's --

8       A    Yes.  These are in my criticism of Ms. Bramer.

9   They are in the report.

10                  MR. BAYLES:  So that's a rebuttal report,

11  the second report, and that's AVIC USA Exhibit 185.  And

12  to the extent we can, we'll try to highlight portions,

13  but hope that the panel will consider that report for

14  these specific points that Dr. Safir is making.

15                  MR. CAPSHAW:  Excuse me just a second.

16  Is that your Exhibit 269 in this book?

17                  MR. BAYLELSS:  No.  Those are -- that's

18  something else.  It's AVIC USA 185 in that book.

19                  MR. CAPSHAW:  Thank you.

20      Q    So, to summarize this overall point, have you

21  drawn any conclusions about the reasonableness or the

22  professionalism of --

23      A    Well, the estimate, the $7.6 billion estimate

24  is clearly not an economically -- what I would consider

25  to be an economically reasonable estimate.  I don't

1331

1   think anybody would consider it an economically

2   reasonable estimate, nor should it be considered that.

3                   It is simply a series of assumptions.

4   It's an exercise.  It has no support in the evidence

5   that was provided, but, worse, it ignores better

6   evidence.  You know, you should use as an analyst the

7   best evidence rule.  You should look to see what

8   evidence is available.

9                   In this instance Ms. Bramer uses a

10   website or two websites and a -- basically a resume

11   databank to come up with $7.6 billion in damages.  She

12   ignores sworn testimony that's been made not only before

13   this arbitration board but was available in deposition

14   before her.  She simply ignored it.  She said, "Well,

15   you know, that's not what I'm relying on."  Well, that's

16   not the right way to go about evaluating damages, and an

17   analyst should be held to a higher standard.

18       Q     Thank you.  Now, you were here when the

19   opening statement was put on --

20       A     Yes.

21       Q     -- by the Claimants and also when Ms. Bramer's

22   PowerPoint presentation was presented and you saw that

23   they characterized these damages as expectation damages?

24       A     Yes.

25       Q     Is that something you take issue with?

1332

1    A    Well, in part.  It's clear that a good

2    portion, in fact, the bulk of Ms. Bramer's damages,

3    could be termed an expectational damage in that she has

4    calculated out what we term a lost profits calculation.

5                    That is, she has postulated that these

6    profits would have been earned if the Soaring Wind

7    agreement had not been breached.  In the but for world

8    were the agreement held, these would be the profits, and

9    then she has contrasted that with profits that would

10   have been earned in the actual world, which she terms at

11   zero.

12                   So the difference between what would have

13   been earned in the but for world and the world in which

14   no breach occurred measured up against those that

15   actually occurred creates a loss in profits.  And most

16   economists, in fact, most damage analysts in most

17   courts, determine that to be an expectational or an

18   expectation damage calculation, the lost profits part of

19   it.

20                   However, she's added in another part of

21   it, which is incorrect, as part of her lost profits.

22   And that's a $1.5 billion mistake, even if you believe

23   all her other assumptions actually generate a damage of

24   something like 5-and-a-half or $6 million.

25   Q    And that's the Perry Mason moment I stepped in

1333

1    yesterday?

2        A    That was your attempt at a Perry Mason moment

3    the other day.

4        Q    Help me out.  Where did I go wrong in --

5        A    You didn't go wrong; you're just not an

6    economist.  The capital investment required to generate

7    the lost profits is not in itself a lost profit.  So the

8    fact that -- to generate these lost profits, AVIC

9    International USA would have had to invest a certain

10   amount of money.  You can't confuse that with the

11   expectational damage of the lost profits.

12                Ms. Bramer did that, so did the lawyers

13   who presented the opening statement.  They have to be

14   considered separately to award if you -- even if you

15   believed everything about the lost profits calculation,

16   to award the capital investment in addition to the lost

17   profits is to provide a windfall.  And most economists

18   seek to avoid that in damage calculations and it's an

19   error in calculating out the number.

20                So, in part, her damage analysis is a, in

21   theory, inappropriate calculation of expectational

22   damages, but there's a 1.5 or so billion dollar error in

23   the number even if you believe that these phantom --

24   this phantom calculation and these phantom profits would

25   have actually existed.

1334

1    Q    Now, even if Ms. Bramer's calculation was a

2  reasonable expectation lost profit damage estimate, it

3  would still be unrecoverable from an economic

4  standpoint; is that right?

5    A    Yes.  Even, again, if you believe that the $6

6  billion that remains in the calculation, this lost

7  profit calculation, was a reasonable one, in my view

8  it's not collectible under this agreement.  The

9  agreement clearly states in several spots that

10  consequential damages or indirect damages are not --

11  cannot be awarded by an arbitration panel.  It's in the

12  agreement.

13           These damages, these expectational

14  damages that she's calculated, are all indirect damages

15  from an economic standpoint.  None of them relate

16  directly to the two parties that are signed in the

17  agreement.  They don't relate to AVIC International USA

18  and its copart Tang.

19           The Soaring Wind agreement is not the

20  focus of these damages; it's the alter ego component of

21  all these damages to AVIC IRE or other areas.  So if you

22  believe them and you still want to consider them as

23  expectational damages and lost profits, I have no

24  problem with that in concept, but all those damages are

25  indirect -- to an economist, indirect and consequential

1335

1   mean the same thing.  Under this agreement, there's no

2   provision for collecting a consequential damage.

3              So even if you believed all this, once

4   you parse out the double counting or the unanticipated

5   windfall, those damages, they all are indirect, they're

6   not recoverable under the agreement, as I've read it,

7   from the economic terms that it contains.

8       Q    And there were a couple of provisions in the

9   Soaring Wind agreement that impact what you're talking

10  about?

11      A    Yeah.  I believe it's in two spots.  I

12  couldn't give you the exact cites unless you put them

13  up.

14      Q    This is AVIC USA Exhibit 21.

15              MR. SHAMOUN:  Mr. Bayles, I cannot hear

16  you.

17              MR. BAYLES:  Thank you.

18      Q    This is Exhibit 21, page 52 of the exhibit,

19  section 13.3(l)?

20      A    Yeah.

21      Q    Is that one of the --

22      A    Yes, it is.  It says there pretty -- I mean,

23  from my standpoint, the arbitrator shall have no

24  authority to award special, exemplary, punitive or

25  consequential damages.  There's another section in this

1336

1  agreement, which I suspect you'll put up, that also

2  talks about, I believe, indirect.  But, to me, it's the

3  same as consequential.

4      Q    And is that section 17.10 of the agreement?

5      A    Yes, it is.  It says, "In no event shall any

6  -- it's in bold printing.  "That any member or

7  representatives or affiliates be liable to the company

8  or to other members or representatives or affiliates for

9  any exemplary, punitive, special, indirect,

10  consequential, remote or speculative damages."

11          The damages that have been calculated by

12  Ms. Bramer, even if you believe them, are clearly

13  consequential and indirect.  They are also, in large

14  part, remote in that she's talking about a 25-year

15  agreement that's a damage that you incur today that will

16  cost you 25 years from now a certain amount of money.

17  That is, by any economic definition, a remote damage.

18  And in terms of speculative, I've been over earlier --

19      Q    Well, before you move on, as far as remote --

20  and you were here today when a couple of witnesses

21  talked about wind farms and how long they last.  I think

22  they -- some testimony about 30 years or even more than

23  30 years.  Is it still your opinion that going out 25

24  years in the report like Ms. Bramer does is remote?

25      A    Yes, it is.  Because there's a distinction

1337

1    between a physical availability to function out 35 years

2    and an economic viability out 35 years.  There's an

3    awful lot of activity intervening, a lot of things

4    intervene over a 30 or 35-year period that make it very,

5    very difficult to determine that you will actually

6    acquire a lost profit out that far.

7              Technology changes, things improve,

8    markets differ.  The -- to look at a damage out 25 years

9    is, from an economic standpoint, extremely remote.  None

10   of us really know what the future holds that far out.

11   And even with a very, very hefty discount rate, it's

12   really difficult to call that sort of damage anything

13   other than remote.

14              I'm not saying that you can't calculate a

15   remote damage or that one might not be a reasonable

16   estimate of a remote damage, but here it is definitely

17   remote.  It's certainly economically remote, and remote

18   damages are, again, ruled out within this agreement.

19   Q    I interrupted you and I think you were talking

20   about how the damages are speculative in violation of

21   this agreement?

22   A    Yeah.  I mean, certainly in my view, I think,

23   we've been over earlier, any damage calculation which is

24   based on bad evidence, in other words, not best

25   evidence, in fact, no evidence that I can see -- pardon

1338

1    me, I'll drop that, minimal evidence of any real

2    existence of these projects and then is compounded by

3    assumption after assumption to calculate out a number

4    is, in my view, a very highly speculative damage

5    calculation by any standard.

6        Q    And so based on all the things that you've

7    reviewed, what is -- even if liability is found,

8    assuming liability, as Ms. Bramer does, what is an

9    appropriate measure of damages?

10       A    You know, I wouldn't see virtually any damage

11   here from the Soaring Wind agreement.  The damages are

12   too speculative.  They are consequential.  They are

13   overcollected in that they're trying to come in with an

14   extra capital expenditure damage.  In my view there

15   really are no damages here to speak of.

16       Q    Okay.  Thank you.  Now, you do do some -- you

17   do -- you work with your staff and do some math and put

18   a model together and come up with a number in your

19   rebuttal report based on -- well, why don't you just

20   tell us briefly about that.  And, again, we won't spend

21   too much time on it, but it is found in your report in

22   the exhibit I mentioned.

23       A    Yeah.  I tried to step into Ms. Bramer's shoes

24   for a little bit to see, you know, what possibly one

25   could stretch to come up with a damage number of the

1339

1   sort that she had in mind; that is, if you have an alter

2   ego finding.

3              And where I came up was the only areas

4   where it seemed that an AVIC entity had any real nexus

5   to a wind activity was in the $50 million that was

6   supposedly spent in the United States.

7              And to that I said all right, let's

8   assume that there's a $50 million investment.  Let's

9   assume that the percentage that AVIC IRE has said at one

10  point or another it might be willing to fund for any

11  project -- now, again, they're talking about short-term

12  projects but they said, "Well, you know, we might fund

13  30 percent of it and get our money back as soon as we

14  could."  So I applied a 30 percent percentage of

15  ownership to a $50 million project, I believe.

16             I then took the rate of return that,

17  again, AVIC International USA indicated it would accept

18  as a rate of return, which, since it's a more financing

19  type short-term financing arrangement, it was about 8

20  percent.  And then I think I allowed that -- to me, I

21  almost never do a damage calculation where I would go

22  out 25 years.  To me, if you can look 5 years in the

23  future for most damages, you're running into speculation

24  if you go much beyond that.  I think I took it out 5

25  years and I came out with something -- I haven't got it

1340

1    in front of me, but I believe it was something on the

2    order of $8 million in total.

3        Q    Okay.  Thank you.

4             Now, looking for a minute at the opening

5    statement PowerPoint, the copy we were given was page 42

6    and it's the top slide on it.  This is the expectation

7    number that the Claimants are requesting.  And then on

8    the next page couple of slides later we get a

9    disgorgement request.  Those numbers look --

10       A    Yeah.  Those are -- this is Ms. Bramer's

11   second damage, which is what she termed the disgorgement

12   damage that would be due Tang from the breach of the

13   Soaring Wind agreement, and it's exactly the same amount

14   that she has for the lost profits calculation.

15       Q    Okay.  So has she done a disgorgement

16   calculation, in your opinion?

17       A    No.  This is absolutely incorrect.

18            CHAIRMAN ALDOUS:  Excuse me.  Are you

19   referring to the PowerPoint used by the lawyers or the

20   PowerPoint used by Ms. Bramer?

21            MR. BAYLES:  This is the PowerPoint used

22   by the lawyers in the opening statement.

23            CHAIRMAN ALDOUS:  Well, I was confused

24   because you were attributing it to Ms. Bramer, but I

25   didn't think that this was one of her slides.  Is that

1341

1   right?

2           MR. BAYLES:  Well, the reason I put it up

3   here is --

4           CHAIRMAN ALDOUS:  Well, I just want to

5   make sure what you're talking about because --

6           MR. BAYLES:  I believe it is -- there is

7   a slide that has the same numbers in the report.  At

8   this moment I'm not finding that.  I think the exhibit

9   fairy may have secreted it away.

10          CHAIRMAN ALDOUS:  Okay.  Well, let me

11  just -- just so that the record's clear, the slide that

12  you're referring to is a slide that was used by the

13  counsel in opening as opposed to the slide -- a slide

14  used by Ms. Bramer.  If you find that, you know, be

15  happy to use it.  So, I mean, I just -- this is for the

16  record.

17          MR. BAYLES:  That's a good point.  And I

18  will --

19      Q   Is it your understanding that -- well, tell me

20  what is your understanding of the -- Ms. Bramer's

21  opinion as far as damages -- or disgorgement and

22  expectation damages and the numbers that she puts forth

23  in her opinions?

24      A   Yeah, Mr. Bayles, I would put that slide back

25  up because there's precisely no difference between that

1342

1    slide and what Ms. Bramer testified to.  She said that

2    the disgorgement numbers were identical to her lost

3    profits numbers, that you could morph one into the

4    other.

5         Q    Just for the record, we're looking, again, at

6    page 43 of the printed version of the Claimants' opening

7    statement slides, the bottom slide.

8         A    And I realize that opening statements are not

9    evidence.  What I'm indicating to you is this is my

10   understanding that this is a correct representation of

11   Ms. Bramer's disgorgement calculation, and it's no

12   different than the amount that she's asked for in the

13   lost profits calculation, which she does have in the

14   slide from her presentation, and it is thoroughly

15   incorrect.

16              This is a lost profits calculation.  It's

17   an expectational damage.  You cannot disgorge profits

18   that have not been earned.  These are profits that no

19   one has earned, that people would like to earn or would

20   have earned had the agreement been in place.  They are

21   not profits that were earned by someone that then need

22   to be returned.

23              You cannot disgorge profits you haven't

24   earned.  That is an actual calculation; it's not a

25   forecast calculation.  You can't throw up something you

1343

1    haven't eaten.  And, as a result, this is not a

2    disgorgement calculation of any sort and you could never

3    use it as such.  In fact, there was no disgorgement

4    analysis done by Ms. Bramer in this case.

5        Q    Let's talk about reliance damages for just a

6    minute.

7        A    Sure.

8        Q    It's your understanding that the Claimants are

9    requesting an award for reliance damages?

10       A    That's my understanding, yes.

11       Q    And have you formed an opinion about that?

12       A    Yes.

13            MR. LOWENSTEIN:  I need to insert an

14   objection to that.  I don't believe this witness was

15   designated as an expert on that element of damages.

16            CHAIRMAN ALDOUS:  Overruled.

17       Q    Go ahead.

18       A    I'm sorry, what was the question?

19       Q    Give us your opinion on their claim for

20   reliance damages.

21       A    Oh.  Well, as I understand the claim for

22   reliance damages, Ms. Bramer is not supporting it and I

23   would agree with her on that because it does not pass

24   the economic smell test in any sense for two reasons.

25            The claim is for $55 million, and it is a

1344

1    claim for losses that were occurred by Tang Energy as a

2    result of the breach of this agreement, actual losses

3    that were occurred -- were incurred.

4              And I think I sat here and listened to

5    Mr. Jenevein a few days ago, in fact, at 3:10 in the

6    afternoon on August 11th when he said that all of Tang

7    Energy's operations were in support of Soaring Wind.  He

8    had signed that agreement and that was what Tang

9    Energy's activities were all focused toward.

10              If that's the case, then the best way to

11   determine whether he's lost any money is to go look at

12   his tax returns.  I did that and, in fact, I did it in

13   my report.  Over the 2009 -- if you believe that the

14   agreement was in place from 2009 through currently -- I

15   only had figures from 2009 to 2013.  But over that

16   period of time, 2009-2013, I believe Tang Energy has

17   actually earned a profit net income of over 6 or $7

18   million.  I don't have the number right in front of me.

19              So you can't claim a disgorgement damage,

20   you can't -- I'm sorry.  You can't claim a reliance

21   damage if you've lost no money.  To say "Well, I would

22   have lost -- I would have earned more but for this,"

23   that's a lost profits calculation.  That's a different

24   one.  But in reliance sense, as far as I can see, Tang

25   Energy's lost no money.

1345

1          The other reason why I think it doesn't

2   pass the economic smell test is let's assume for the

3   moment that there is a $55 million loss.  In any damage

4   calculation, the damaged party has an obligation to

5   mitigate, if at all reasonable and possible.

6          In this instance, again, I listened to

7   Mr. Jenevein where he said that he could have gotten out

8   of the Soaring Wind agreement at any time he chose, that

9   it was possible simply to leave the agreement.

10         In addition, somebody asked him how much

11   money have you actually got into that agreement, and he

12   said, "I think I contributed or Tang contributed," and

13   I'm talking about him as Tang, "Tang contributed

14   something like $55,000 to that agreement."

15         Well, if you can get out of the

16   agreement, if you can walk away from it and leave

17   $55,000 there on the table and avoid 55 million in

18   damages, you're talking about being able to mitigate $55

19   million with one-tenth of one percent of the amount.

20         For both those reasons, I don't feel that

21   the reliance -- these damages are an appropriate number.

22   Q     Thank you.

23         Now, you tabbed a page of Ms. Bramer's

24   PowerPoint presentation.  This is page 78 here at the

25   bottom.  And would you take a minute and -- I mean, I

1346

 1   think your opinions have -- on this have been generally

 2   described here in your testimony, and you also have your

 3   report, but is there something else that you would like

 4   to discuss regarding -- just looking at the chart?

 5        A    Just looking at the chart, I think we've

 6   covered it.  You'll look at the -- you know, the capital

 7   contribution here and the 25-year damage calculation,

 8   and you simply can't add the two of them together as a

 9   lost number.  And using this again as the same number

10   for disgorgement damages is simply ridiculous.

11        Q    Thanks.  Now, you've also prepared an opinion

12   as to the damages that AVIC -- or, rather, the

13   disgorgement -- the disgorgement claim of AVIC USA in

14   this matter.  Could you just briefly -- and that's a

15   separate report.

16        A    Yes, sir.

17        Q    That's --

18             MR. BAYLES:  For the panel's benefit,

19   that's the Safir initial report.  It's AVIC USA 184.

20        Q    Would you, please, describe the basis of that

21   opinion and what it is?

22        A    Sure.  That's the -- AVIC International USA

23   has a claim for breach of contract against Tang for the

24   breach of the Soaring Wind agreement.  And they have

25   claimed a disgorgement damage for that, and they're

1347

1 entitled to under breach of contract claim, as I

2 understand it.  And they asked me to calculate out what

3 that damage calculation would be.

4           Again, I applied looking at what the

5 profits were that were earned by Tang that should have

6 been the property of Soaring Wind and were not.  And in

7 my mind, listening to people, reading up on it and

8 listening to testimony here during the proceeding, all

9 of Tang's operations or in -- supposedly, in support of

10 Soaring Wind, if the agreement had been properly

11 executed, all of the revenue that would have been

12 generated by Tang Energy would have been generated

13 through Soaring Wind, all of it, according to

14 Mr. Jenevein.

15           As a result, since none of it went to

16 Soaring Wind and the agreement was breached, all of it

17 should be disgorged back to Soaring Wind as a damage

18 claim.  The best way to determine that is to take a look

19 at tax returns; certainly, the tax returns from 2009

20 through 2013.  All the monies earned by Tang over that

21 period of time that came up to the Tang Energy Group

22 should be disgorged.  What was earned should be handed

23 back.

24           In addition, I have also, in my

25 calculation, feel that the amount of money that was

1348

1    earned in 2008 by Tang, in particular, an extraordinary

2    capital gain that was earned in April, should also be

3    disgorged.

4         Q    Thank you.  Now, in making these assumptions,

5    right, this breach and --

6         A    Well, I've assumed the contract was breached.

7    I was told to assume that.  I'm not an expert on that.

8    But the disgorgement damage didn't require many

9    assumptions.  It's basically adding up the tax -- the

10   net income on the tax returns.

11        Q    What I'm getting to is, you sat through the

12   testimony and heard some discussion of the significance

13   that should be placed upon your report on these

14   disgorgement as far as what admissions it might have

15   made to what Respondents' claims -- or Respondents'

16   theory of the meaning of the business purpose or, you

17   know, any other kinds of admissions that might have been

18   made by your report in conducting this disgorgement

19   analysis?

20        A    Yes, I understand broadly that it entails

21   certain assumptions about the operation of the Soaring

22   Wind agreement.

23        Q    And are your assumptions, for purposes of this

24   report, any sort of admission as far as what

25   Respondents' conclusion of the evidence is?

1349

1        A       I'm not sure how to answer that question.

2    I've assumed that -- I've read the four corners of the

3    agreement and, for purposes of my report, I've assumed

4    that all the operations of Tang Energy, including their

5    wind farm development issues, should be included under

6    the Soaring Wind agreement.  If -- you know, if that is

7    not an admitted fact, then that would have to change the

8    numbers in my report.

9        Q       And the point is, your report does not speak

10   to evidence that is -- forms any sort of admission by

11   the Respondents but, in large respect, adopts some of

12   the assumptions of the Claimants, correct?

13       A       Yes.  It's my analysis of looking at the

14   document -- I'm not making a legal determination to

15   whether that's right or wrong as to what should be in or

16   out of that, but for purposes of my disgorgement

17   calculation, I've looked to the four corners of the

18   document as I've been able to interpret it as the

19   Soaring Wind document.

20       Q       You tabbed two more pages of Ms. Bramer's

21   PowerPoint, as I understand relates to this issue that

22   we're talking about, and the first one is page 63?

23       A       Yes.  This is just a representative that I

24   agree with her that the numbers from the net income of

25   Tang Wind Energy would equal about $25.9 million from

1350

1    2008 to 2013.  I think my disgorgement number is a

2    little higher than that because I've also included any

3    profits that might have been made in their wind power

4    consulting business.

5        Q    And then the second page that you tabbed was

6    page 65?

7        A    Yes.  This is the page that indicates, as I

8    said earlier, the absurdity of the reliance damages that

9    were put out.  There were no losses on a reliance basis.

10   If you just look from 2009 to 2013, Tang Wind Energy

11   actually made $7.6 million over that period of time.

12   They didn't lose 55 million.

13       Q    So just, in conclusion, if you were going to

14   summarize the two reports and -- how do you feel about

15   the state of the damages testimony in this case?

16       A    As I say, I don't believe Ms. Bramer's

17   testimony has validity or should be given much economic

18   weight.  I don't think that she's used the best evidence

19   available.  Best evidence is the sworn testimony that

20   the panel has heard from the participants.

21            If there -- it's also the best evidence

22   that a scouring of various publications across publicly

23   available information shows that the wind projects that

24   she is using as the basis for her consequential

25   damage/expectational damage calculation do not exist

1351

1      that we can find.

2                   And just because something doesn't exist

3      doesn't mean that you should wish it into reality.  You

4      can't do that or you shouldn't do that as a damage

5      expert.  It's the wrong thing to do and I think those

6      damages are bogus.

7                   MR. BAYLES:  Pass the witness.

8                   CHAIRMAN ALDOUS:  Mr. Walters, do you

9      have any questions?

10                  MR. WALTERS:  I do not.

11                  CHAIRMAN ALDOUS:  Mr. DeWolf?

12                  MR. DEWOLF:  No.

13                  CHAIRMAN ALDOUS:  Mr. Lowenstein going to

14     go first?

15                  MR. LOWENSTEIN:  I am.

16                  CHAIRMAN ALDOUS:  The floor is yours.

17                  MR. LOWENSTEIN:  Thank you.

18                          EXAMINATION

19     BY MR. LOWENSTEIN:

20          Q    Dr. Safir, it's appropriate for a damages

21     expert to assume liability for doing a damages opinion,

22     correct?

23          A    It can be.

24          Q    Well, if the damages expert was asked to

25     assume liability and assume alter ego in this case, it

1352

1    would be appropriate for Ms. Bramer to do that?

2        A    Yeah, I would think that she could do that.

3    You know, she would have to evaluate whether she thought

4    she could do that reasonably, but sure.

5        Q    So you're not saying there was something

6    unprofessional or anything like that with respect to her

7    assuming liability and alter ego for the purposes of

8    doing her report, are you?

9        A    Not at all.

10       Q    And let's pick up on your best evidence thing.

11   That's kind of what I want to focus with since you used

12   that term.  Would you agree with me that the best

13   evidence to use in a case would be evidence that existed

14   contemporaneous with things going on, not evidence

15   created after the lawsuit gets created?  Would you agree

16   with that?

17       A    In general, I like to look for evidence that

18   would occur prior, but recollections about, you know,

19   reality, if they're elicited during the course of a

20   litigation, is certainly reasonable to rely upon.

21       Q    Well, you identified Tang's tax returns as, I

22   think, the best evidence in that instance, right?

23       A    No.  I identified Tang's tax returns as one of

24   a number of things I was relying on for certain types of

25   damages.  You'll have to tell me which one you want.

1353

1    Q    You said tax documents were good information

2    for a damages expert to look at, right?

3    A    If you are doing a certain type of

4    calculation.

5    Q    You relied on it with respect to your opinion

6    that Tang made $7.7 million over whatever period of time

7    you looked, correct?

8    A    Yes.  For that purpose, that's a good

9    indicator to use.

10   Q    And what's better evidence, a tax document or

11   somebody's memory of what's in a tax document?

12   A    Well, typically I would like to see a tax

13   document.

14   Q    What's better, the terms under which a party

15   forms and invests in an entity or somebody's memory of

16   what happened in that entity?

17   A    If you're talking about an agreement versus

18   what somebody remembers later about an agreement, I

19   would prefer to have the agreement.

20   Q    You have not seen any of the tax documents for

21   any of the entities that have been listed that

22   Ms. Bramer talked about relating to these wind projects

23   around the world, have you?

24   A    I don't think there were any wind projects

25   around the world.  That's the whole point.  I couldn't

1354

1   see that there was any evidence of that.

2       Q    Dr. Safir, you're not saying you're an expert

3   on the existence of wind farm projects around the world,

4   are you?

5       A    I am certainly an expert researcher and I can

6   look to see if there's any evidence in the public record

7   of wind farm projects.  I can Google up with the best of

8   them to determine if there are PPAs, if there's names

9   out there, if there are press releases.  And I am very

10  well aware of public -- of large power projects.  I work

11  on them all the time, and I'm certainly aware that these

12  things do not occur in a completely nontransparent

13  fashion.  You can trace them.  You can see evidence of

14  them.  I didn't see any.

15      Q    I don't want to cut you off, but this --

16      A    Okay.  I'm done.

17      Q    -- until instructed otherwise, this is going

18  against my time.

19           Ms. Bramer was asked this.  I'm going to

20  ask you the same question.  You didn't go to New Zealand

21  to see if there was wind farms that were built in New

22  Zealand, did you?

23      A    Actually, I did.

24      Q    You went to New Zealand to look for wind

25  farms?

1355

1      A      I was in New Zealand about two months ago and

2  I did see several wind farms.

3      Q      And do you know who owned them?

4      A      No.

5      Q      Do you know who built them?

6      A      No.

7      Q      Did you go find out the title documents to see

8  who the company that built those farms are?

9      A      No.  But I was there and I did see the wind

10  farms.

11      Q      Did you see -- so they did exist?

12      A      Oh, there are wind farms in New Zealand, for

13  sure.

14      Q      Do you know what joint venture owned that wind

15  farm?

16      A      No.

17      Q      Did you go to Bulgaria?

18      A      No, didn't go to Bulgaria.

19      Q      Did you go to Romania?

20      A      Close.  No.

21      Q      You did analysis here, and let me figure out

22  if I can understand what you relied on.  You relied on,

23  I think we've seen a letter from the president of AVIC

24  IRE, Wu Lili?

25      A      Yes.  That was one of the pieces of evidence I

1356

1    looked at.

2        Q    There was an e-mail from Xu Hang responding

3    to Mr. DeWolf's letter.  You recall seeing that?

4        A    Yes.

5        Q    Xu Hang's deposition?

6        A    Yes.

7        Q    That's what you told me in your deposition you

8    relied on in determining --

9        A    No.  I think I added something else, that

10   there was a phone conversation.

11       Q    You're right.  I'm sorry.  And you interviewed

12   Xu Hang?

13       A    I did.

14       Q    You were given the opportunity as the expert

15   hired by AVIC USA and -- well, I'm sorry.  AVIC USA

16   hired you, correct?

17       A    That's correct.

18       Q    You were given the opportunity as the expert

19   for AVIC USA to interview on the telephone the vice

20   president of AVIC IRE, correct?

21       A    Yes.

22       Q    Are you aware of any other expert like

23   Ms. Bramer being given that same opportunity to

24   interview him?

25       A    I don't know.  You'll have to ask her.

1357

1    Q    And you didn't -- or you discounted in that

2    analysis the website and the public information that we

3    looked at that AVIC IRE produced?

4    A    I'm not sure I discounted them.  I gave them

5    the weight they deserved.

6    Q    And the weight they deserve was based on your

7    saying the best evidence was the information coming from

8    the individuals at AVIC IRE?

9    A    The best evidence that I saw was the

10   information that was sworn testimony in this proceeding

11   in addition to whatever evidence I could find from

12   websites and listening to evidence regarding resume

13   databanks.

14   Q    When you talked to -- you've seen that

15   Mr. DeWolf sent an e-mail to Xu Hang and in response

16   he got these letters, correct?

17   A    Yes.  I haven't seen the e-mail.  I

18   understand, but I didn't bother to read it.

19   Q    When you were asking for information from the

20   lawyers that would be helpful in performing your

21   analysis to get best evidence, did you ever tell them

22   that you needed to see the tax information or the

23   contracts, like EPC contracts or ownership documents or

24   anything else like that, relating to these projects that

25   Wu Lili and Xu Hang were talking about?

1358

1     A     Well, there weren't any projects.  That was

2   the point.

3     Q     What --

4     A     They were talking -- I'm sorry.  They were

5   talking about what they didn't do.  There were simply

6   no --

7               CHAIRMAN ALDOUS:  You answered the

8   question.

9               THE WITNESS:  I'm sorry?

10              CHAIRMAN ALDOUS:  Have you answered his

11  question?

12              THE WITNESS:  Yes.

13              CHAIRMAN ALDOUS:  Okay.

14    Q     So it's your testimony under oath that you

15  don't believe the Ralls project exists?

16    A     Those -- the Ralls project --

17    Q     That's a yes or no question, Dr. Safir.

18    A     No, it's not.  No, it's not.  That's not my

19  testimony.

20    Q     Right.  The Ralls project does exist?

21    A     Yes.

22    Q     What we don't know is who owns it, who

23  developed it, how much money went into it.  That's what

24  we don't know, correct?

25    A     No.  Well, we only don't know part of that.

1359

1    We know that AVIC IRE doesn't own it.

2        Q    Let's take a different question.  We know that

3    there was wind farms built in New Zealand, correct?

4        A    Yes.

5        Q    What we don't know is who owns them, who

6    financed them, how they were developed and how much

7    money went into them, right?

8        A    Again, I believe that what we know is that

9    AVIC IRE had no ownership of them.  The remainder, yes,

10   you're correct.

11       Q    And what I'm saying is, if you are Xu Hang or

12   Wu Lili and you're wanting to establish "We never got

13   involved in these projects, but we were involved in one

14   way, but we didn't finance them completely," right, "we

15   financed the wind turbines," wouldn't you want to see

16   the documents that supported that to say "Here it is.

17   They did a short-term finance of the wind project but

18   they didn't invest because they're not listed as an

19   owner"?  Wouldn't that be the best evidence to look at

20   to see how that project got developed?

21       A    It would be handy to have, absolutely.

22       Q    And you didn't ask for it for any of those

23   projects, did you?

24       A    No.  I didn't feel I needed it.

25       Q    You got the letter that was prompted by

1360

1    Mr. DeWolf's e-mail and, based on that letter -- and

2    let's look at that.

3                    MR. LOWENSTEIN:  Somebody help me with an

4    exhibit number.

5                    MR. JENEVEIN:  DeWolf letter?

6                    MR. LOWENSTEIN:  No.  The Wu Lili letter.

7                    CHAIRMAN ALDOUS:  Yes, he means the Wu

8    Lili letter.

9                    MR. LOWENSTEIN:  180, Jackie.  Thank you,

10   Mr. Chairman.

11                   CHAIRMAN ALDOUS:  Well, you said somebody

12   help me out with that, and I wasn't sure if you meant

13   us.

14                   MR. LOWENSTEIN:  I did not.  It was

15   directed behind me.  Nope.  170.  AVIC USA 170.

16       A    This looks like it.

17       Q    Yeah.

18       A    I can't read it.

19       Q    I can't either.  Hold on.  All right.  Let's

20   look at paragraph E on the second page as an example.

21                   So Ms. Wu says, "Regarding the project in

22   Mongolia, AVIC-E," which is a reference to AVIC IRE,

23   "has made a small payment to secure an exclusive period

24   to grant access to the data room."  Do you see that?

25       A    Yes, I do.

1361

1    Q    And no further inquiry was made to Mr. Hang or

2   Ms. Lili or anybody else to say, "Can you show me the

3   documents that back up that statement so that we can

4   show this panel"?

5    A    I think I asked "How much did you pay," and I

6   got an answer of about $10,000 or something to take a

7   look at the data room.

8    Q    You don't have the document to show the panel

9   that supports that, do you?

10   A    Well, that was a phone conversation.

11   Q    Right.  And nobody asked for that document?

12   A    I didn't need a document.  I asked them and

13   they gave me an answer.

14   Q    Let's look at paragraph H on the third page.

15   It says, "In Bulgaria, AVIC IRE provided trading and

16   logistic services to the 4.5-megawatt project."  First,

17   that definitely suggests there's a project that exists

18   in Bulgaria, right?

19   A    Yes.

20   Q    All right.  It says, "The owner is a local

21   company in Bulgaria."  Now, if there's trading and

22   logistics, do you understand what kind of contract would

23   exist to support the trading and logistics part of a

24   wind farm project?

25   A    There might be a contract, there might not.

1362

1   Because trading and logistics can also just simply mean

2   delayed invoicing, things like that, so . . .

3        Q     So did you ask --

4        A     You can have a formal contract --

5        Q     Did you ask what kind of contract existed to

6   Ms. Lili or Mr. Hang when you were looking at the

7   Bulgaria project?

8        A     No.  I didn't feel that was necessary.

9        Q     Did you ask how much money -- did you ask

10  whether -- strike that.

11              Did you ask was there something called an

12  EPC contract that went with that or any of those other

13  agreements that Mr. DeWolf listed when he wrote up

14  agreements?

15       A     No.

16       Q     Do you know if any of those agreements would

17  have established "Hi, by the way, that does show that

18  AVIC IRE did not invest in that project"?

19       A     They might.  I don't know if they would show

20  that they didn't invest, but they would -- it would show

21  some track that the contract -- that the project

22  existed, and it might give a little more information

23  precisely as to how AVIC IRE was interacting with that

24  project.

25       Q     That certainly would have been the best

1363

1    evidence, wouldn't it?

2        A    Well, there probably would have been better

3    evidence you could get than that.  I'm only -- you know,

4    when I say it's best evidence, it's best evidence that's

5    available.

6        Q    And the best evidence was the word of these

7    people, and you took their word for it and dug no

8    further, correct?

9        A    Well, I took their sworn testimony under oath

10   to do it.  And, in addition, I took responses that I got

11   when I asked them for information, sure.

12       Q    And you had Xu Hang on the phone and you never

13   said, "Can you send me the documents -- for whatever

14   IRE's involvement was in any of these projects, can you

15   send me the documents so I can actually lay my eyes on

16   them and see that what you're telling me is true"?  Did

17   you ask him for a single document?

18       A    No, I didn't.

19       Q    You criticized Ms. Bramer's -- or the

20   PowerPoint from the opening statement, and that does

21   break out the future damages of the $5 billion and it

22   has the $1.4 billion of the capital investment, correct?

23       A    Yes.  They're listed separately.

24       Q    Now, that capital investment, had it been made

25   through Soaring Wind, Soaring Wind would have that asset

1364

1    as an asset of Soaring Wind, wouldn't it?

2         A    It would probably also have a liability to

3    AVIC International USA corresponding to the amount of

4    the capital investment.  So on net, I really -- I would

5    assume it would be there.

6         Q    It's your testimony that a capital investment

7    into a company, a capital contribution is a liability?

8         A    Well, it can.  It depends on what you mean by

9    capital contribution.  As you know, the Chinese, who own

10   or who are operating AVIC IRE -- I'm sorry, AVIC USA,

11   have a different view of what a capital investment is.

12   I think we went over this again in my deposition.

13              They feel that the translation was

14   somewhat off and that they were really talking about

15   financing, not capital investment.  So it's unclear to

16   me whether it would be a loan through --

17              MR. LOWENSTEIN:  Mr. Chairman, can I ask

18   for some relief here?  I think it was a yes or no

19   question.  I don't believe the question -- the answer

20   was getting there.

21              CHAIRMAN ALDOUS:  Dr. Safir, because

22   we're on clocks here and, if you've been sitting here,

23   you're aware of the lawyers' concern over their time.

24   Please try to answer the question as best you can.  If

25   you feel like you need to explain your answer, just say,

1365

1  "I feel like I need to explain that answer."

2              THE WITNESS:  Okay.  I will do that, but

3  these people want $7.6 billion in damages, and I feel

4  that --

5              CHAIRMAN ALDOUS:  I appreciate that.

6              THE WITNESS:  -- I have to be careful in

7  my answers, sir.

8              CHAIRMAN ALDOUS:  I appreciate your

9  statement.  Please confine yourself to the question.

10             THE WITNESS:  Okay.

11     Q     Let me just ask it this way:  If that $1.4

12  billion had been invested into Soaring Wind and it had

13  gone and made acquisitions of these $1.4 billion of

14  assets, Soaring Wind would have those $1.4 billion in

15  assets, wouldn't it?

16     A     Yes.

17     Q     And it doesn't have those assets?

18     A     No, it doesn't have any assets.

19     Q     You're not a lawyer, correct?

20     A     No, sir.

21     Q     So your opinions on what is a direct or

22  indirect or speculative damage or what mitigation is,

23  those are based on your lay understanding of that, not

24  based on any legal opinion, correct?

25     A     You've asked me -- it's a compound question.

1366

1    They're not based on a lay understanding; they're based

2    on my understanding as an expert economist dealing in

3    this field for many years.  However, they are not based

4    on legal determinations.

5        Q    You'll leave that to the panel, won't you?

6        A    Of course.

7              MR. LOWENSTEIN:  All right, Jessie, I'm

8    ready for my chart.

9        Q    While he's coming over, it was your opinion

10   that Ms. Bramer's opinion was based on a waterfall of --

11       A    A cascade of assumptions.

12       Q    A cascade of assumptions.  So let's go through

13   those and see if we can work through that.  Let's start

14   with rate of return.  You said that was one of those

15   assumptions, correct?  That her opinion that a 15

16   percent rate of return, that's what she used to

17   calculate her damages?

18       A    Yes.

19       Q    And I've split -- she didn't split these up

20   into two different ones; I've done this because I want

21   to stick with your opinions.

22              You said that -- in your opinion I think

23   you said that the rate of return that AVIC USA would do

24   is 8 or 8-and-a-half percent, right?

25       A    Yeah.  Well, again, stepping into Ms. Bramer's

1    I hesitate to say fantasy world, but the phantom

2    calculation, I would put 8 for the debt rate of return,

3    which, in fact, is the actual rate of return because

4    that's -- that would be their rate of return.

5         Q    So that's your opinion.  You don't have any

6    opinion on the rate of return for an equity investment,

7    right?

8         A    For AVIC International USA, I believe their

9    equity rate of return, which is just a debt rate of

10   return, is 8 percent.

11        Q    Let's not say debt again.  I'm asking to the

12   extent they make a capital investment or something like

13   that for the owner of -- let's talk about the owner of a

14   wind farm, okay.  You have not rendered an opinion on

15   what the rate of return for the owner of a wind farm is?

16        A    No, I haven't.

17        Q    So you don't know that one.  Sorry about the

18   question mark.  That's bad.

19             She used a hundred percent because she

20   said there was no other information other than a hundred

21   percent contribution in the record, right?  You recall

22   hearing that?

23        A    I don't think she said there was no other

24   information other than a hundred percent.  She said she

25   had no information and she was going to assume a hundred

1368

1   percent.  That's a difference.

2       Q    And your opinion was this should be 30

3   percent?

4       A    Again, stepping into her arrangement, the best

5   that I had seen that AVIC International IRE was willing

6   to look at was 30.

7       Q    We're going to come back to these that we're

8   filling in here.  The cost per megawatt, she used $1.7

9   million per megawatt for the U.S. and slightly less in

10  other countries.  And you didn't really take issue with

11  that, correct?

12      A    No.  I think if you want to play with the

13  megawatts numbers, you can use the same.

14      Q    The discount rate, she used what's called the

15  weighted average cost of capital.  You didn't take any

16  issue with the way she did the discount rates, did you?

17      A    The WACC is fine.

18      Q    The lifespan -- you've heard, I guess, four

19  different witnesses now.  I guess based on Ms. Bramer's

20  research she came up with 20 to 25 years for a lifespan

21  of a wind farm project.  You heard Patrick Jenevein say

22  30 years.  You heard the gentleman today testify,

23  Mr. Johnson said 20 to 30 years and Mr. Saunders said 30

24  years.  Do you recall that?

25      A    I did.

1369

1    Q    Do you take issue with those lifespans of the

2  project?

3    A    For a physical lifespan, I got no problem

4  with -- well, I definitely have a problem with 30 plus

5  years, but 20 to 25 years is certainly reasonable for a

6  physical lifespan, not for economic values.

7    Q    So we'll give that for physical lifespan.

8          And then her general calculation for that

9  internal rate of return, you didn't take issue -- you

10 took issue with some of her inputs, but the way she

11 calculated damages, you didn't have any dispute with

12 that methodology, did you?

13   A    No, I'm not sure she used an IRR, but

14 generally her calculation of once you get all the

15 assumptions, she used a standard type of lost profits

16 calculation.

17   Q    I think you called it an expectation

18 calculation in your --

19   A    Well, lost profits is an expectation

20 calculation.

21   Q    Now, let's revisit the ones we have a dispute

22 on.  The 8 percent that you used -- and I think you

23 actually, to be fair, used 8 to 8-and-a-half percent?

24   A    Yes, that's correct.

25   Q    And so the -- that opinion, the 8 to

1370

1    8-and-a-half percent, that was based on e-mails and, I

2    think you said, internal AVIC USA e-mails?

3        A    That's correct.

4        Q    What those actually were were e-mails from

5    Mr. Carter to Sherman talking about certain potential

6    investment opportunities, and he was making the proposal

7    that we could get a 8 percent of return -- potentially

8    get an 8 percent return on those projects, right?

9        A    Yeah.

10       Q    And each of the instances that you cite in

11   your report where that was the potential rate of return,

12   AVIC USA rejected those projects?

13       A    Yes.  And I understand why they did.

14       Q    So you are not aware of any AVIC entity,

15   including AVIC USA, ever doing a deal that was limited

16   to an 8 to 8-and-a-half percent rate of return, are you?

17       A    No, I'm not.  I'm not aware of anybody doing

18   any of these deals.

19       Q    And so the only basis for this was a proposal

20   from Mr. Carter that was rejected by AVIC USA, right?

21       A    Several e-mails.  But they were basically

22   "We'd like to do a deal" and AVIC USA saying "We're not

23   interested in doing a deal."

24       Q    And do you have any evidence of any AVIC

25   entity ever getting into one of these wind energy deals

1371

1    for less than a 15 percent return?

2         A    I have no evidence of AVIC International USA

3    getting into any wind farm deal.

4         Q    Therefore, you don't have any evidence to show

5    the panel of any AVIC entity doing any kind of wind farm

6    financing at less than a 15 percent return, do you?

7         A    I have no evidence of that.  I have no

8    evidence of higher or lower.

9         Q    Now let's talk about this.  The 30 percent

10   investment that you said they would -- your testimony

11   was AVIC wouldn't want to do more than a 30 percent

12   investment in any of these deals, right?

13        A    Again, stepping into Ms. Bramer's philosophy,

14   I didn't find anything that was above 30 for anything

15   that AVIC International USA would do.

16             MR. LOWENSTEIN:  Can you pull up Exhibit

17   388, Jackie?  Can you pull up -- I'm sorry, I'm trying

18   to get -- so the panel can see who it is.  Go back to

19   the first page real quick just so we can see who these

20   e-mails are between.  No, the bottom one, I'm sorry.

21        Q    So this is an e-mail exchange between Paul

22   Thompson, Xu Hang, Tiger and others at AVIC, right?

23        A    This looks like it's from Ascendant to AVIC

24   Energy, so this is not AVIC International USA in any

25   sense.

1372

1     Q     But these are AVIC personnel having

2  communications about a project?

3     A     When you say people in the AVIC family --

4     Q     These people -- remember, we're assuming alter

5  ego for purposes of this damages analysis.

6     A     Fair enough.

7     Q     So let's go to the second page.  And in

8  here --

9              MR. LOWENSTEIN:  Highlight that first

10  sentence.

11    Q     So it says, "I mean that AVIC will pay

12  3.27 million for 82% interest.  I understand your idea.

13  However, as we made contributions to the projects on

14  construction loan, the equity, project management maybe,

15  etc., it is possible for us to negotiate with the

16  developer to ask more shares.  If we could get 82%

17  shares, AVIC's equity IRR could achieve 15% as

18  required."  Do you see that?

19    A     Yes.

20    Q     Did you consider this demand to have at least

21  82 percent and a 15 percent return in doing your

22  analysis?

23    A     I didn't consider this for my analysis.  I

24  considered when I did try and step into her shoes tried

25  to determine what AVIC International USA would do, not

1373

1    AVIC in its totality.

2        Q    And how is that stepping in Ms. Bramer's

3    shoes?  You know Ms. Bramer looked at all of the

4    activities of all these entities, right?

5        A    I understand that, but what I'm --

6        Q    But you criticize her for being

7    unprofessional, so I want to be clear here.  She was

8    doing what she was asked to do, which was to look at all

9    these entities, and in there she's got evidence that

10   says an 82 percent interest and 15 percent internal rate

11   of return, right?

12       A    Yes, she has some of that.

13       Q    But you didn't consider that when you were

14   criticizing her for being unprofessional, did you?

15       A    I considered it and didn't wish to use it.

16       Q    As far as this 30 percent, again, this came

17   from an internal e-mail between Mr. Carter and Sherman

18   where Mr. Carter was proposing an investment of 30

19   percent into a project?

20       A    That's right.

21       Q    And AVIC USA rejected that deal?

22       A    That's correct.

23       Q    You don't have any evidence of any AVIC entity

24   ever entering into a wind energy deal for less than a

25   hundred percent, do you?

1374

1    A    You can't prove a negative.  No, I have no

2  evidence that they would have invested a hundred percent

3  or that they ever would have thought about investing.

4    Q    You don't have any evidence of them capping

5  their involvement at 30 percent, do you?

6    A    That e-mail isn't evidence that 30 percent

7  was one figure that was considered.

8    Q    Proposed by Mr. Carter, rejected by AVIC USA?

9    A    Absolutely.

10   Q    I'm sorry.  Here's the rest of that statement

11 from Exhibit 338 where they say "We need to ask for at

12 least 82 percent.  The higher, the better."  Do you see

13 that?

14   A    I do.

15   Q    You commented on the $50 million expenditure.

16        MR. LOWENSTEIN:  Let's look at Exhibit

17 330, please, Jackie.  Pull up the highlighted paragraph.

18   Q    Did you testify that you assumed that AVIC

19 would have contributed 30 percent of the 50 million?  Is

20 that what you did when you were recalculating

21 Ms. Bramer's numbers and stepping into her shoes?

22   A    Yes, I believe that's the case.

23   Q    But this e-mail actually says they spent $50

24 million, doesn't it?  It says AVIC International's

25 already provided a total of 50 million.

1375

1    A    That's what this says.

2    Q    And then you chopped that down to 30 percent

3    of that amount?

4    A    Well, I don't see this is -- I never found any

5    projects that this would relate to, aside from the two

6    that have been already mentioned; Ralls and Cirrus.  So,

7    in my view, I didn't want to presume that just because

8    it says it here that there was expenditures of that

9    amount.  I couldn't find the expenditures of that

10   amount.  So 30 percent seemed, again, within the

11   confines of doing an analysis given the -- along the

12   lines of Ms. Bramer was interested in, I used 30

13   percent.

14   Q    30 percent of the 50 million that Xu Hang says

15   they spent?

16   A    It says "provided."  I don't know if that

17   means spent, but, you know, I could not find the 50

18   million.  To me, the only reason I used 50 million at

19   all was because I knew that there was at least two

20   expenditures where they had a participation.

21              In fact, they argued that they only, in

22   fact -- not argued, but the evidence there indicated

23   that they had earned something on the order of $100,000.

24   Q    Xu Hang -- you got the opportunity to talk to

25   Xu Hang on the phone?

1376

1     A     I did.

2     Q     He sent this e-mail where he says he spent

3  $50 million?

4     A     Yes.

5     Q     Did you ask him to detail for you --

6     A     He didn't say he spent --

7     Q     Hold on a second.

8           Did you ask him to detail for you how the

9  $50 million was spent?

10    A     As I indicated to you a minute ago --

11    Q     That's a yes or no question, Mr. Safir.  This

12  is on my clock.  Did you ask him --

13          CHAIRMAN ALDOUS:  Let's not argue,

14  though.

15          MR. LOWENSTEIN:  I'm sorry.

16          CHAIRMAN ALDOUS:  Let me just say yes and

17  no, yes and no, the best you can.

18    Q     Did you ask Xu Hang for a detailing of how

19  they spent that $50 million from that e-mail?

20    A     I don't believe they spent $50 million, and I

21  didn't ask, as a result, how they spent it.

22          CHAIRMAN ALDOUS:  Now, you see, right

23  there you could have just said, "No, I didn't ask him."

24          THE WITNESS:  Okay.

25          CHAIRMAN ALDOUS:  That's what we're

1377

1    talking about.

2              THE WITNESS:  Fair enough.

3       A    No, I didn't ask him.

4       Q    All right.  Let's shift to the damage claim

5    that is being made against Tang.  First of all, is it

6    your understanding that this damage claim is being

7    asserted against just Tang or all of the Claimants?

8       A    I believe it's just against Tang.

9       Q    And Tang owns -- so it's your understanding

10   that the damages you've calculated cannot be attributed

11   to any of the other Claimants?

12      A    I believe that's correct.

13      Q    And I don't want to spend too much time on

14   your damage opinion here, and others may have questions

15   on it.  The scope of your damage opinion assumes that

16   all of the money that Tang has earned since January of

17   2008 is damage attributable to the Soaring Wind claim?

18      A    Yes.

19      Q    And you understand we've got this agreement

20   that defined the scope of what the business is, right?

21   This -- 2.3, that defines the scope of the Soaring Wind

22   business?

23      A    Yes.  That's one definition of the Soaring

24   Wind agreement, within the agreement, yes.

25      Q    And you can look at all these panel members in

1378

1   their eyes and tell them that you've done a sufficient

2   analysis to determine that all of the money that Tang

3   has earned since 2008 falls within that section 2.3?

4        A    Sure.  I mean, I have his testimony from

5   Mr. Jenevein that all the money that Tang earned, all

6   the effort that Tang made since 2008 or 2009 or during

7   the signing of this agreement was directed at Soaring

8   Wind activity.

9        Q    And --

10       A    He said that, you know, August 11th at 3:10 in

11  the afternoon.

12       Q    And, just so we're clear, that includes wind

13  farm development, right?

14       A    That's correct.

15       Q    That includes wind farm consulting?

16       A    That's correct.

17       Q    That includes these biomass projects we've

18  heard about?

19       A    That includes anything that generated income

20  or loss for Tang Energy Group.

21       Q    And you believe that's a reasonable

22  interpretation of the Soaring Wind agreement?

23       A    I believe so.  I guess I do.

24       Q    Let's focus on one more thing within -- tell

25  me the number again of the damages you're seeking

1379

 1   against Tang.  25 millionish?

 2        A    I think it's 26, 27ish.

 3        Q    18 million of that is attributable to the sale

 4   of an interest in March of 2008, right?

 5        A    Yes.

 6             MR. LOWENSTEIN:  And let's look at

 7   Claimants' 922.  No, not that one.  What's the tax

 8   return?

 9             MS. ARGUIJO:  Tang tax return?  919.

10             MR. LOWENSTEIN:  That one.  Sorry.  This

11   is Claimants 919.

12        Q    And this is from Tang's tax return and this

13   references Tang's sale of shares, 1,570 shares of Tang

14   Wind Energy, LLC.  Do you see that?

15        A    I do.

16        Q    And the $18 million of your 26 million is

17   attributed to the capital gains from that sale?

18        A    Yes, that's correct.

19        Q    And that sale occurred in March 2008?

20        A    Yes.

21        Q    And the effective date on this agreement is

22   June 2008?

23        A    The stated date on the agreement is June.  I

24   believe the agreement -- people were operating as if the

25   agreement was effective earlier than that.

1380

1     Q     If the panel determines that the agreed to

2     effective date is June 2008, then we need to remove that

3     $18 million number from your damage claim, correct?

4     A     That's correct.

5     Q     The other thing was we were talking about you

6     were rendering opinions on speculative and future and

7     remote.  In an analysis like this, the discount rate

8     brings the value of that -- those future profits to the

9     present, correct?

10    A     Yes.

11    Q     And you calculate in -- and we had an

12    agreement that the weighted average cost of capital that

13    Ms. Bramer used, you didn't take issue with that?

14    A     That's correct.

15    Q     And so -- and that -- applying that, and we

16    saw those in the bar graphs from Ms. Bramer's testimony,

17    she used -- there was this much future income and she

18    used this much as part of her calculation.  Do you

19    remember that?

20    A     I do.

21    Q     And that's to bring it back to the present?

22    A     That's discounting it by whatever the rate of

23    the discount was.

24                MR. LOWENSTEIN:  I'm going to pass to

25    Mr. Jenevein, but I reserve the opportunity to mark this

1381

1    as an exhibit when it comes back to me.  I don't have a

2    sticker handy.

3                    CHAIRMAN ALDOUS:  Okay.  Since we're

4    passing the witness right now, let's go ahead and break

5    for the day.  It's almost 6:00 o'clock.  We'll start up

6    again at 9:00 o'clock in the morning.

7

8                    (Proceedings suspended at 5:56 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1382

1    STATE OF TEXAS      *

2    COUNTY OF DALLAS    *

3

4        I, Christy Fagan, CSR, CRR, RMR, TMR, RPR, CLR,

5    Certified Shorthand Reporter in and for the State of

6    Texas, hereby certify to the following:

7        That this transcript is a true record of the

8    proceedings held and the parties present, named herein

9    August 13, 2015.

10       Certified to by me on this 2nd day of September,

11   2015.

12

13

14

15

16

17

18   _____
     Christy Fagan, CSR, CRR, RMR, TMR, RPR, CLR
19   Texas CSR 5459
     Expiration:  12/31/16
20   LEGAL SOLUTIONS COURT REPORTING
     Firm Registration No. 424
21   3102 Maple Avenue
     Suite 450
22   Dallas, Texas 75201
     (866) 830-1717
23   (866) 651-4292 Fax
     www.LegalSolutionsCourtReporting.com
24

25

1383

1                    CAUSE NO. 01-14-0001-4150

2    TANG ENERGY GROUP, LTD, in      )
     its own capacity and on         )
3    behalf of SOARING WIND          )
     ENERGY, LLC, THE NOLAN GROUP,   )
4    INC., Keith P. Young,           )
     Mitchell W. Carter and JAN      )        INTERNATIONAL
5    FAMILY INTERESTS, LTD.,         )        CENTRE FOR
         Claimants,                  )        DISPUTE RESOLUTION
6                                    )
     and                             )
7                                    )
     SOARING WIND ENERGY, LLC,       )
8        Intervenor,                 )
     vs.                             )
9                                    )
     CATIC USA, INC. a.k.a. AVIC     )
10   INTERNATIONAL USA, INC.,        )
     AVIATION INDUSTRY OF CHINA,     )
11   CHINA AVIATION INDUSTRY         )
     GENERAL AIRCRAFT, CO., LTD.,    )
12   AVIC INTERNATIONAL HOLDING      )
     CORPORATION, AVIC               )
13   INTERNATIONAL RENEWABLE         )        DALLAS, TEXAS USA
     ENERGY CORP., ASCENDANT         )
14   RENEWABLE ENERGY CORP., CATIC   )
     T.E.D., LTD. a.k.a. AVIC        )
15   INTERNATIONAL, T.E.D. LTD,      )
     and Paul E. Thompson,           )
16       Respondents.                )

17

18              *   *   *   *   *   *   *   *   *   *   *

19                   ARBITRATION PROCEEDINGS

20                      AUGUST 14, 2015

21                       DAY 5 OF 5

22              *   *   *   *   *   *   *   *   *   *   *

23

24       ARBITRATION PROCEEDINGS taken in the above-styled

25   and numbered cause on August 14, 2015, from 9:12 a.m. to

1384

1    4:58 p.m., before Christy Fagan, CSR, CRR, RMR, TMR,

2    RPR, CLR in and for the State of Texas, reported by

3    computerized stenotype machine at the Hilton Anatole,

4    2201 N. Stemmons Freeway, Dallas, Texas.

5

6

7                        APPEARANCES

8    ARBITRATION PANEL:

9            Chairman Steven Aldous
             Judge Glen Ashworth
10           Judge Jeff Kaplan
             Judge John Marshall
11           Judge Mark Whittington
             Mr. Joseph Byrne
12           Mr. Richard Capshaw
             Mr. Gregory Shamoun
13           Mr. William Toles

14   FOR TANG ENERGY GROUP, LTD. and SOARING WIND ENERGY,
     LLC:
15
             Mr. Bob Jenevein
16           Mr. Brent Turman
             Vincent Lopez Serafino & Jenevein, PC
17           1601 Elm Street
             Suite 4100
18           Dallas, Texas 75201
             (214) 979-7400
19           (214) 979-7402 Fax
             bjenevein@vilolaw.com
20           bturman@vilolaw.com

21           Mr. Jim Moseley
             Gray Reed & McGraw, P.C.
22           1601 Elm Street
             Suite 4600
23           Dallas, Texas 75201
             (214) 954-4135
24           (214) 953-1332 Fax
             jmoseley@grayreed.com
25

                                                                    1385

 1              A P P E A R A N C E S (continued)

 2    FOR PAUL THOMPSON:

 3              Mr. Randall G. Walters
                Walters Balido & Crain
 4              10440 North Central Expressway
                15th Floor
 5              Dallas, Texas 75231
                (214) 749-4805
 6              (214) 760-1670 Fax
                randy.walters@wbclawfirm.com

 7

                Mr. Steven K. DeWolf
 8              DeWolf Law
                10000 North Central Expressway
 9              Suite 1405
                Dallas, Texas 75231
10              (214) 615-4170
                (214) 615-4171 Fax
11              steve@dewolflaw.com

12    FOR AVIC INTERNATIONAL USA, INC.:

13              Mr. Malcolm McNeil
                Mr. David Bayles
14              Arent Fox, LLP
                555 West Fifth Street
15              48th Floor
                Los Angeles, California 90013
16              (213) 629-7400
                (213) 629-7401 Fax
17              malcolm.mcneil@arentfox.com
                david.bayles@arentfox.com

18

                Mr. Paul Ming Ma
19              Law Offices of Paul Ming Ma
                17800 Casleton Street
20              Suite 670
                City of Industry, California 91748
21              (626) 581-4843
                mingmalaw@yahoo.com

22

23

24

25

1386

```
 1              A P P E A R A N C E S (continued)
 2    FOR KEITH P. YOUNG:
 3              Mr. Jeffrey Lowenstein
              Mr. Jesse Okiror
 4              Bell Nunnally & Martin, LLP
              3232 McKinney Avenue
 5              Suite 1400
              Dallas, Texas 75204
 6              (214) 740-1400
              (214) 740-1499 Fax
 7              jeffl@bellnunnally.com
              jesseo@bellnunnally.com
 8
      FOR THE NOLAN GROUP, INC.:
 9
              Ms. Deborah Perry
10              Munsch Hardt Kopf & Harr, PC
              3800 Lincoln Plaza
11              500 N. Akard Street
              Dallas, Texas 75201
12              (214) 855-7565
              (214) 978-5335 Fax
13              dperry@munsch.com
14              Mr. John Clement
              Clement Legal Services
15              4925 Greenville Avenue
              Dallas, Texas 75206
16
      FOR JAN FAMILY INTERESTS, LTD.:
17
              Mr. Matt Bracy
18              Ms. Brandi McKay
              Scheef & Stone, L.L.P.
19              2601 Network Blvd.
              Suite 102
20              Frisco, Texas 75034
              (214) 472-2100
21              (214) 472-2150 Fax
              matt.bracy@solidcounsel.com
22              brandi.mckay@solidcounsel.com
23
24
25
```

1387

```
 1              A P P E A R A N C E S (continued)

 2

 3    FOR MITCHELL W. CARTER:

 4            Mr. David Denney
              Ms. Ashley Ahn
 5            The Law Offices of David T. Denney, PC
              8350 North Central Expressway
 6            Suite 925
              Dallas, Texas 75206
 7            (214) 739-2900
              (214) 739-2909 Fax
 8            ashley@denneylaw.com
              david@denneylaw.com
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1388

1                    I N D E X

2                                              PAGE

3    APPEARANCES . . . . . . . . . . . . . . . . . 1384

4    DR. ANDREW SAFIR

5    Examination by Chairman Aldous  . . . . . . . . 1396

6    Examination by Mr. DeWolf . . . . . . . . . . . 1399

7    Examination by Mr. Jenevein . . . . . . . . . . 1401

8    PAUL THOMPSON

9    Examination by Mr. DeWolf . . . . . . . . . . . 1402

10   Examination by Mr. Lowenstein . . . . . . . . . 1404

11   Examination by Mr. Jenevein . . . . . . . . . . 1405

12   Examination by Mr. Shamoun  . . . . . . . . . . 1406

13   PROFESSOR JACQUES DELISLE

14   Examination by Mr. Bayles . . . . . . . . . . . 1408

15   Examination by Mr. Jenevein . . . . . . . . . . 1451

16   Examination by Mr. Lowenstein . . . . . . . . . 1469

17   Examination by Mr. Denney . . . . . . . . . . . 1474

18   Further Examination by Mr. Bayles . . . . . . . 1482

19   Examination by Judge Marshall . . . . . . . . . 1483

20   Examination by Mr. Byrne  . . . . . . . . . . . 1486

21   Examination by Mr. Shamoun  . . . . . . . . . . 1491

22   Further Examination by Judge Marshall . . . . . 1499

23   Examination by Chairman Aldous  . . . . . . . . 1500

24   Further Examination by Mr. Shamoun  . . . . . . 1505

25   Further Examination by Mr. Bayles . . . . . . . 1506

1389

1    Closing Statement by Mr. Jenevein . . . . . . . . 1531

2    Closing Statement by Mr. Bracy  . . . . . . . . . 1542

3    Closing Statement by Mr. Denney . . . . . . . . . 1543

4    Closing Statement by Ms. Perry  . . . . . . . . . 1544

5    Closing Statement by Mr. Lowenstein . . . . . . . 1545

6    Closing Statement by Mr. Walters  . . . . . . . . 1550

7    Closing Statement by Mr. McNeil . . . . . . . . . 1575

8    Rebuttal Closing Statement by Mr. Lowenstein . . 1628

9    Rebuttal Closing Statement by Mr. Denney . . . . 1629

10   Rebuttal Closing Statement by Mr. Jenevein . . . 1630

11   Closing Statement by Judge Moseley  . . . . . . . 1644

12   Court Reporter's Certificate  . . . . . . . . . .1661

13

14

15

16

17

18

19

20

21

22

23

24

25

1390

1         P R O C E E D I N G S

2         CHAIRMAN ALDOUS:  All right.  Good

3  morning, everybody.  We were at the point in time where

4  the witness had been passed to Mr. Jenevein.

5         MR. LOWENSTEIN:  Can I unpass for two

6  seconds?  Not to ask questions, just to offer an

7  exhibit.

8         CHAIRMAN ALDOUS:  You may, but --

9         MR. DEWOLF:  I've got two housekeeping

10  matters, Your Honor.

11         CHAIRMAN ALDOUS:  Mr. DeWolf, go ahead.

12         MR. DEWOLF:  First is that the panel

13  expressed some interest about reimbursement agreements

14  between Ascendant and AVIC Renewable and AVIC TED.  I

15  had Paul Thompson get those, and so we're going to offer

16  those as Exhibit 257 and, I believe, Exhibit 256.

17         CHAIRMAN ALDOUS:  I assume you've

18  provided these to the other --

19         MR. DEWOLF:  I'm just about to, yeah.

20         And then the other issue, Your Honor, is

21  I asked Mr. Jenevein just a minute ago who he was going

22  to call for rebuttal, and he wouldn't tell me.  So would

23  like to know -- you know, I understand they may not call

24  anybody, but I'd like to have some idea.

25         CHAIRMAN ALDOUS:  Well, Mr. Jenevein, are

1391

1   you aware at this time of whether or not you will?

2                    MR. JENEVEIN:  No, Your Honor.  I want to

3   see the end of their evidence.

4                    CHAIRMAN ALDOUS:  Let's wait and give him

5   a chance to evaluate with his team and the rest of the

6   Claimants' lawyers before we force him to do something.

7                    MR. DEWOLF:  All right.  Just a little

8   bit of advanced warning would be appreciated.

9                    CHAIRMAN ALDOUS:  Right.  And now do you

10  want to --

11                   MR. DEWOLF:  I do.

12                   CHAIRMAN ALDOUS:  Okay.  Why don't you

13  hand those out and then you can hand those --

14                   MR. DEWOLF:  So, Your Honor, we're

15  offering into evidence Thompson Exhibit 257, which is

16  the AVIC -- Ascendant Renewable and AVIC International

17  Renewable reimbursement agreement.  So here's nine

18  copies.

19                   CHAIRMAN ALDOUS:  Thank you.

20                   MR. DEWOLF:  And then --

21                   CHAIRMAN ALDOUS:  Then didn't you have

22  two?

23                   MR. DEWOLF:  I do.  Here's the second

24  one.  This is 256.

25                   And then we'd offer into evidence -- let

1392

1  me just count the copies.  And then we'd offer into

2  evidence Thompson Exhibit 256, which is the

3  reimbursement agreement between Ascendant Renewable and

4  AVIC TED.

5            CHAIRMAN ALDOUS:  Thank you.  All right.

6  Any objection to the admission of these exhibits?  And I

7  realize you're looking at them.

8            MR. JENEVEIN:  No.  We're happy to have

9  them.  The panel ordered them in January and I'd like

10  the rest of the -- I'd like the signed copies that Paul

11  Thompson told us were out there.

12            MR. DEWOLF:  That's all we've got are

13  these that are signed by him and not by the other side.

14            CHAIRMAN ALDOUS:  Do you know whether or

15  not there is a fully executed copy?

16            MR. DEWOLF:  There is not.  And we can

17  put Paul Thompson on the --

18            CHAIRMAN ALDOUS:  Well, we'll go ahead

19  and admit it, Thompson Exhibits 256 and 257, for

20  purposes of the panel.

21            MR. MCNEIL:  Mr. Chair, one last --

22            CHAIRMAN ALDOUS:  Yes, Mr. McNeil.

23            MR. MCNEIL:  One tiny -- yes.  You may

24  remember that during my cross-examination of Professor

25  Jacobson I brought up a fact that one of the issues --

1393

1   or one of the documents that was relied on by the other

2   side was an article that was published in the 21st

3   Century Business Herald.

4             CHAIRMAN ALDOUS:  I remember it well.

5             MR. MCNEIL:  Thank you very much.  I

6   think that Mr. Bayles -- we tried to get extra copies

7   and we couldn't get them printed out.  Opposing counsel

8   has it.

9             This is the article from The Wall Street

10  Journal showing that that site has been shut down.  I'll

11  give you -- the panel the remainder of my copies if they

12  want to circulate it.  Any objection?  No objection, I

13  think, from the other side.

14            MR. JENEVEIN:  No objection.

15            CHAIRMAN ALDOUS:  No objection.  All

16  right.  Well, you can circulate it to the panel.  As I

17  understand it, you're just offering it for our

18  consumption as opposed to our admission?

19            MR. MCNEIL:  Well, I've referenced it --

20  no, I think it's for your admission, Mr. Aldous, because

21  it's, obviously, part of what, I think, the panel needs

22  to weigh in terms of the credibility of the experts.

23            CHAIRMAN ALDOUS:  All right.  Well, do

24  you have a number for it?

25            MR. MCNEIL:  Yes.  It's written on the --

1394

1    I'm sorry, I just handed out the --

2                    MR. BAYLES:   276.

3                    CHAIRMAN ALDOUS:   All right.   Then AVIC

4    276.001 will be admitted for whatever purpose --

5                    MR. MCNEIL:   Thank you.

6                    CHAIRMAN ALDOUS:   -- to be considered.

7                    MR. JENEVEIN:   I wanted Mr. McNeil to

8    tell us who shut the paper down.

9                    MR. MCNEIL:   The article speaks for

10   itself.

11                   CHAIRMAN ALDOUS:   So, you know, we

12   recognize that it's an article from the Internet and --

13   as George Bush would say, and the Google, and we will

14   consider it for whatever purpose it is.

15                   MR. MCNEIL:   As was the underlying --

16   it's an article of an article, in essence.

17                   CHAIRMAN ALDOUS:   Right.   All right.

18                   So, Mr. Lowenstein, you indicated that

19   you had a couple of questions?

20                   MR. LOWENSTEIN:   I just want to -- no.   I

21   just want to offer Exhibit 1004, which is the board that

22   we used yesterday with Dr. Safir.

23                   CHAIRMAN ALDOUS:   All right.   Any

24   objection?   None heard.

25                   MR. DEWOLF:   No objection.

1395

1    CHAIRMAN ALDOUS:  It'll be admitted, but

2    I'm not carrying that.

3    MR. LOWENSTEIN:  Yeah.  We'll get a

4    reduced copy for the panel to consider.  It may be half

5    that size.

6    CHAIRMAN ALDOUS:  So Exhibit 1004 -- the

7    Claimants' Exhibit 1004 will be admitted.

8    Now, can -- are you ready, Mr. Jenevein?

9    MR. JENEVEIN:  I have no questions for

10   this witness.

11   CHAIRMAN ALDOUS:  No questions by

12   Mr. Jenevein.  Ms. Perry?

13   MS. PERRY:  No, Your Honor.

14   CHAIRMAN ALDOUS:  Let's see.  Who else is

15   back there?  Ms. McKay or Mr. Bracy?

16   MR. BRACY:  No.

17   CHAIRMAN ALDOUS:  And then Mr. Denney?

18   MR. DENNEY:  No, sir.

19   CHAIRMAN ALDOUS:  Am I forgetting anyone?

20   Any redirect?

21   MR. DEWOLF:  Just one second.

22   MR. BAYLES:  No redirect.

23   CHAIRMAN ALDOUS:  With being no redirect,

24   let me ask members of the panel, do you have any

25   questions for Dr. Safir?  None to my left.  To my right.

1396

1   Shockingly, I may have a couple of

2   questions.

3                              EXAMINATION

4   BY CHAIRMAN ALDOUS:

5      Q    Doctor, did you see any evidence in the

6   e-mails back and forth with respect to AVIC IRE and

7   Ascendant Renewable Energy concerning the development of

8   between 500 and 1,000 megawatts over a -- as a business

9   plan?

10     A    I can't recall seeing any of those.

11     Q    Just --

12     A    I'm not saying they're nowhere; I just don't

13  recall seeing them.

14          CHAIRMAN ALDOUS:  I'm going to ask

15  Jackie, just because I know everybody's saying Jackie,

16  if you would -- just a minute.  Let me find this real

17  quick.  It is Exhibit -- here it is.  Claimants' Exhibit

18  281.  If you would, just bubble out that top part.

19  There you go.

20     Q    I think this is an e-mail from Xu Hang to

21  Paul Thompson in 2011 talking about a business plan and

22  "I think it is better for us to secure 500-1000 megawatt

23  project, which we will leave them for next 2-3 years, I

24  would support you for this target by reserve financial

25  resources in AVIC International headquarters, to do

1397

1    that, we'd better speed up and find more potential

2    projects."

3                 There was a lot of discussion about, you

4    know, there's -- I guess one side refers to it as the

5    phantom 300 megawatts and so forth.  Did you take any

6    consideration to what their business plan might have

7    shown in coming up with your opinions?

8         A    Well, I didn't have, of course, a copy of

9    their business plan, but --

10        Q    I guess, let me ask it a little differently.

11        A    Sure.

12        Q    Would a business plan that reflects this have

13   any effect on your opinions?

14        A    Probably not.  I was looking for actual

15   projects.  You know, what you plan to do, they are

16   plans.  They look ahead but, you know, actually finding

17   the projects, bringing them to fruition, I was looking

18   more for information like that.

19        Q    Well, referring back, there was a previous

20   e-mail where Mr. Hang said that -- something to the

21   effect of they'd spent $50 million trying to develop

22   projects, and it seems to me that that number matches up

23   pretty closely with the 55 million that they claim --

24   that Claimants claim they spent.  And each, both the

25   Tang or Soaring Wind, developed two projects and, as we

1398

1    know, Ascendant had two projects and they both claim to

2    have spent about $50 million.

3           Do you know whether or not that is --

4    would be a typical amount that would be spent in trying

5    to pursue many different projects but ending up only

6    with a smaller subset of projects?

7      A    I can only give you my experience, you know,

8    as a business analyst.  That's a lot of money to spend

9    planning as opposed to actually producing, but I have no

10   other insight as to what they may have spent.

11      Q    Thank you.

12          CHAIRMAN ALDOUS:  Could you bring up

13   Exhibit -- Claimants' Exhibit 314?  Top part there.

14      Q    In Exhibit 314, it appears to be an e-mail

15   from Bo Peng, or Isaac, to Paul Thompson in December of

16   2011.  It says, "Richard confirmed to me the $6 million

17   has been transferred to A-tech HK," which I assume is

18   Hong Kong.  Mr. Cai from A-tech will fly to Hong Kong on

19   Friday to transfer this money from A-tech HK to CWEI."

20   And I think that's Cirrus Wind Energy 1.  "So we will

21   need Mr. Edwards go set up the bank account first thing

22   in the morning, then we can forward the wire transfer

23   instructions to them."

24          The question I have for you is, did you

25   see any evidence of what the actual sales price was for

1399

1   the Soaring Wind -- I'm sorry, Cirrus Wind project that

2   was sold by Ascendant or Ascendant's special project

3   vehicle to A-Tech?

4        A    I didn't see any evidence of it.  I listened

5   here and I believe Mr. Thompson said it was about 6

6   million, if I recall.

7        Q    My recollection is he said about 4-and-a-half

8   million, and so my question was, do you have any

9   knowledge that you can share with the panel as to why

10  there's a difference in the amounts of 4.5 million

11  versus 6 million as reflected in this document?

12       A    No, I wouldn't have any information on that.

13       Q    Did you do any calculations to determine what

14  the net value or benefit was, whatever it -- however you

15  might characterize it as an economist, that flowed to

16  AVIC IRE or AVIC TED as a result of the sale of either

17  the Ralls project or the Cirrus Wind 1 project?

18       A    I did not.

19       Q    Thank you, sir.  That's all I have.

20            MR. DEWOLF:  A couple of questions based

21  on your questions, if I may.

22            CHAIRMAN ALDOUS:  Sure.

23                    EXAMINATION

24  BY MR. DEWOLF:

25       Q    Sir, did you see any -- Chairman Aldous said

1400

1    that he thought that Ascendant had done two projects.

2    Was it your understanding that Ascendant only did one

3    project, which was Cirrus Wind 1?

4         A    I had thought that they only did Cirrus Wind

5    1.

6         Q    And with regard to the Ralls project, this was

7    Thompson Exhibit No. 241, do you see that this is the

8    North American Wind, it says that Sany bought the

9    project from America Seawind.  Do you see that, sir?

10        A    Yes, I do.

11             CHAIRMAN ALDOUS:  I'm sorry, what number

12   is that?

13        A    That is Thompson Trial Exhibit No. 241.

14             CHAIRMAN ALDOUS:  Thank you.

15        Q    And also to the extent it would be -- that's

16   fine.

17             MR. DEWOLF:  That's all we got, Your

18   Honor.

19             CHAIRMAN ALDOUS:  Mr. Bayles?

20             MR. BAYLES:  Nothing further.

21             CHAIRMAN ALDOUS:  Any of you folks over

22   there?  All right.

23             MR. JENEVEIN:  Mr. Chairman, one

24   question.

25             CHAIRMAN ALDOUS:  Sure.  Not of me.

1401

1    MR. JENEVEIN:  Jackie, can we bring that

2  last exhibit back up?

3                    EXAMINATION

4  BY MR. JENEVEIN:

5    Q    Dr. Safir, do you have any idea why the money

6  was -- forget about the amount of the money.

7                    MR. LOWENSTEIN:  The last one that the

8  Chairman asked about.

9                    MS. ARGUIJO:  What was the last one?

10                   CHAIRMAN ALDOUS:  341, I think.

11   Q    Regardless of the amounts, I don't want us to

12  get confused on the amounts, why do you understand money

13  would have been flowing from Cirrus or any AVIC entity

14  to A-Tech?

15   A    I have no information on that.

16   Q    It kind of seems like there's something we

17  don't know, right, because evidently the Respondents'

18  position here is that A-Tech was the buyer, right?

19   A    Yes, I believe so.

20                   MR. JENEVEIN:  That's all I have.

21                   MR. DEWOLF:  Your Honor, could we call

22  Paul Thompson just to clarify that issue?

23                   CHAIRMAN ALDOUS:  Well, first of all, why

24  don't we let this witness go.

25                   MR. DEWOLF:  Yes, Your Honor.

1402

1          CHAIRMAN ALDOUS:  Dr. Safir, thank you.

2     You may step down.

3               THE WITNESS:  Thank you.

4          CHAIRMAN ALDOUS:  And since we're on your

5     clock, you can -- and I assume you've visited with

6     Mr. McNeil about this, you can call Mr. Thompson.

7               MR. DEWOLF:  Okay, Mr. Thompson, could

8     you come up?  And, Jackie, we've never met formally, but

9     would you pull up that same exhibit number that --

10              CHAIRMAN ALDOUS:  314.

11              MR. JENEVEIN:  341.

12              CHAIRMAN ALDOUS:  No.  314.  I had it

13    backwards.  I transposed it.

14              MR. LOWENSTEIN:  314.

15              MR. DEWOLF:  Thank you, ma'am.

16                    EXAMINATION

17    BY MR. DEWOLF:

18        Q    Paul, would you explain what this e-mail

19    refers to?

20        A    Yes.  This is an e-mail that was sent on

21    December 15th that acknowledges that a down payment for

22    the purchase of the turbines from CCWE, that's China

23    Creative Wind Energy, was transferred to A-Tech.

24              I think he's got it backwards, that -- so

25    he's instructing their agent, Mr. Edwards, to set up the

1403

1  bank account because this is -- this is a down payment

2  for the turbines.  The project was purchased for -- from

3  Ascendant for $4.5 million.  This is a $6 million down

4  payment for turbines.  Those two things are not related.

5       Q    And let me clarify.  Just -- let's kind of go

6  through the chain.  You-all bought -- Ascendant bought

7  the project from Wind Tex Energy for about $3 million,

8  right?

9       A    That's correct.

10      Q    And then you, in turn, paid it -- spent -- I

11  guess, sold it to A-Tech for 4.5 million?

12      A    Correct.

13      Q    And what was that difference for?

14      A    We spent about one-and-a-half million dollars

15  on development activities; interconnections,

16  environmental studies, engineering, a whole bunch of

17  things, cost about a million-and-a-half.  We netted

18  about $25,000 over the two-year period, 2011/2012.

19      Q    And then AVIC IRE, the way they made some

20  money, is they actually facilitated the transport of the

21  turbines to the United States?

22      A    Yeah.  That was -- they call it trading and

23  logistic services.  They provided the shipping

24  transportation from China to the site, and Mr. Peng Bo

25  was responsible for the logistics.  That was his job.

1404

1      MR. DEWOLF:  That's all I've got.

2      MR. LOWENSTEIN:  I guess -- can I ask a

3  question.

4                    EXAMINATION

5  BY MR. LOWENSTEIN:

6      Q    So you said that you thought there was a

7  mistake, but both in the subject and in the first

8  sentence it says 6 million is transferred from AVIC

9  International to A-Tech, right?

10     A    Yeah.  AVIC International bought the

11  turbines -- it should -- it should say -- it may have

12  been transferred to A-Tech and then A-Tech bought -- no,

13  I'm sorry.  AVIC International bought the turbines for

14  $6 million.  That's a down payment for the turbines.

15     Q    From A-Tech?  A-Tech --

16     A    A-Tech paid $6 million.

17     Q    No.  Hold on.  A-Tech doesn't sell wind

18  turbines, does it?

19     A    A-Tech was the owner of the project.

20     Q    A-Tech doesn't sell wind turbines, does it?

21     A    A-Tech doesn't sell wind turbines.  A-Tech

22  owns the project.

23     Q    And so there's money going -- 6 million going

24  -- I mean, it says twice money from AVIC International

25  HK to A-Tech, right?

1405

1     A    Right.

2     Q    The $6 million is flowing that way and A-Tech

3  is not selling turbines to --

4     A    I think the e-mail is wrong.

5            MR. DEWOLF:  Just answer.

6            THE WITNESS:  Okay.

7     A    Yes, you're right.  That's what it says.

8            CHAIRMAN ALDOUS:  Well, if we all could

9  not talk over one another, I would appreciate it.

10    A    You're right, that's what it says.

11          MR. LOWENSTEIN:  That's all I have.

12          MR. JENEVEIN:  Real quickly, Your Honor.

13          CHAIRMAN ALDOUS:  Go ahead.

14              EXAMINATION

15  BY MR. JENEVEIN:

16     Q    This doesn't say Ascendant sent this money.

17  This is about AVIC International in Hong Kong, right?

18     A    A-Tech Hong Kong.  A-Tech is not AVIC.

19     Q    No, sir.  I'm looking at where it says

20  AVIC-Intl HK.  You see that?

21     A    Uh-huh.

22     Q    That's not Ascendant.

23     A    That's not Ascendant, no.

24     Q    Are you personally familiar with the

25  activity -- investment activities of AVIC International

1406

1    Hong Kong?

2         A    No, I'm not.

3         Q    So if there's evidence that AVIC International

4    is a coinvestor in this project, that's not something

5    that's within your knowledge?

6         A    No, it's not.

7              CHAIRMAN ALDOUS:  Any other questions

8    from the Claimants' side?  And rather than name you

9    individually, I'll just throw it out there generally.

10             Any redirect?

11             Mr. Shamoun has questions.

12                        EXAMINATION

13   BY MR. SHAMOUN:

14        Q    If you know, where are the documents that

15   relate to this transaction?

16        A    They were produced.  The documents where

17   Cirrus Wind 1 was sold, those documents were produced.

18        Q    No.  As it relates to the $6 million.

19        A    Oh.  There's a Turbine Supply Agreement where

20   the turbines were purchased for -- there's down payment,

21   $6 million.  I don't have it.  I've never seen the

22   Turbine Supply Agreement.

23        Q    My question is, do you know where the

24   documents are?

25        A    No, I don't.

1407

1    Q    Okay.

2    A    I never had --

3    Q    Just --

4    A    -- access to documents -- to those documents.

5    Q    But Ascendant was involved in this?

6    A    No.  He's just telling -- he's confirming a

7    wire transfer for the deposit of the turbines was made.

8    Q    If Ascendant wasn't involved, why -- can you

9    explain to me why your name's on there, Paul?

10   A    He was acknowledging that the down payment for

11   the turbines had been made.

12   Q    No, my question is, can you tell me why your

13   name's on there if it has nothing to do with Ascendant?

14   A    He's just sending me acknowledgment that the

15   money for the down payment had been wire transferred.

16   That $6 million -- I'm certain -- absolutely certain the

17   $6 million was a down payment for the turbines.  And I

18   want to clear up that $4.5 million is what was spent

19   to -- what Ascendant received for the sale of the

20   project, for the development asset.  I'll try better.

21   Q    Okay.  Thank you.

22            CHAIRMAN ALDOUS:  Did you -- I didn't see

23   the sale documents or I haven't seen them referred to

24   from Cirrus 1, the sale documents relating to this

25   transaction.  Are they admitted as an exhibit?

1408

1    MR. JENEVEIN:  As to the investment in
2    Cirrus Wind, Your Honor, I'm not sure.
3    CHAIRMAN ALDOUS:  All right.  Thank you,
4    Mr. Thompson.
5    Call your next witness.
6    MR. BAYLES:  Thank you, Mr. Chair.  We
7    call Professor Jacques deLisle.
8    CHAIRMAN ALDOUS:  Professor deLisle.  You
9    can take a seat.
10    THE WITNESS:  Thank you.
11    CHAIRMAN ALDOUS:  Just state your name,
12    if you would.
13    THE WITNESS:  Jacques deLisle.
14    (Oath administered to witness by Chairman Aldous.)
15    CHAIRMAN ALDOUS:  You may proceed.
16    PROFESSOR JACQUES DELISLE,
17    having been first duly sworn, testified as follows:
18    EXAMINATION
19    BY MR. BAYLES:
20    Q    Professor, would you please give us a brief
21    background as far as your qualifications and experience,
22    which should be significant to the panel for the
23    opinions you've rendered?
24    A    Sure.  The full form's in my report, but the
25    short form is I'm a professor of law and political

1409

1  science at the University of Pennsylvania.  I've been

2  doing that for about 20 years.  My specialty in teaching

3  and research is Chinese law, Chinese politics and

4  policy.

5              I teach courses in this field, including

6  Chinese law, law in the Chinese economy, law and

7  economic reform in China, China international law.  I've

8  taught Chinese politics on foreign policy as well.  I

9  write on these subjects.

10              Professor Naughton was kind enough to

11  note yesterday that he thinks that I am well known for

12  my human rights and Taiwan-related work.  I write at

13  least as much on questions of laws placed in economic

14  reform in China and on the rule of law and legal reform

15  in China.

16              I'm also a member of the National

17  Committee on U.S.-China Relations and I run the Asian

18  program for a small think tank called The Foreign Policy

19  Research Institute.  And I've participated in a number

20  of programs, U.S. government programs, Chinese programs,

21  international organization programs on law in China,

22  including the U.S. China Rule of Law Experts Dialogue,

23  which is a Track one-and-a-half meeting.

24      Q    Okay.  And where did you go to law school and

25  you did a clerkship, too?

1410

1    A    Yeah.  I went to law school and grad school in

2  political science at Harvard and I clerked for Steve

3  Breyer when he was Chief Judge of the First Circuit.

4    Q    Could you please tell us the efforts in which

5  you engaged to bring yourself up to speed specifically

6  to this case?

7    A    Also, speaking of speed, I grew up in Arizona,

8  but I have acquired some northeastern habits in the last

9  30 years.  So if I'm talking too fast, please just ask

10 me to slow down.

11            THE REPORTER:  Slow down.

12    A    It's worse when the clock is going.  Okay.

13 I'm sorry.

14            The question, what did I do for this.  So

15 I reviewed a number of documents provided primarily by

16 you and your colleagues, the three expert reports by

17 Professor Naughton, Colonel Stokes and Mr. Jacobson.  I

18 also reviewed what I think was the then current

19 statement of claim or statement of controversy from the

20 Claimants.

21            I looked at a number of materials

22 regarding Chinese law, and I saw, I think, some of the

23 supporting material that was submitted in conjunction

24 with the expert reports.  And I think I also saw an

25 affidavit from Patrick Jenevein.  I think that's all

1411

1    that I saw before preparing my report.

2        Q    And then you issued a report.

3                  MR. BAYLES:  And, for the panel's

4    benefit, that is AVIC USA 192.  And his CV is actually

5    in your binder under Claimants' Exhibit 805.

6        Q    Then you -- so you issued your report and then

7    you also gave a deposition in this case, right?

8        A    Yes.

9        Q    And did you do anything further to prepare

10   before your deposition?

11       A    Yes.  I saw many more of the exhibits that had

12   been submitted in support of the expert reports, the

13   three expert reports.  I also saw the transcripts of the

14   telephone conversations, the recorded telephone

15   conversations, and I did some additional independent

16   research.

17       Q    And after you gave your deposition in

18   preparation for your testimony today, what did you do?

19       A    I reviewed some of the things I had looked at

20   earlier.  I did a little more independent work.  I also

21   saw the rough transcripts of the testimony given by

22   Professor Naughton and Mr. Jacobson.  I also saw the --

23   what I take it are PowerPoint used by Mr. Jacobson.  And

24   I was present at the hearing yesterday, so I heard

25   Professor Naughton's cross-examination and Mr. Zhang's

1412

1  testimony.  I also had occasion to look at the

2  deposition testimony of Xu Hang.

3      Q    Thank you.  Now, going back to your report,

4  and I believe you have a copy in front of you.

5      A    Yes.

6      Q    Your report basically has a structure of two

7  main headings.  Would you just give us a rough overview

8  of how your report's structured?

9      A    Sure.  My report was structured as a response

10  to the reports from the three experts on the other side,

11  and what I take the gist of their claims to be is two

12  different theories of what is, in effect, wrong here.

13            One is that there is this large unitary

14  entity that is China that includes the party-state and

15  all the various AVIC subsidiary related entities.

16  That's one theory.

17            The other is that whatever goes on with

18  the party-state, the AVIC structure, all the subsidiary

19  and affiliated entities are unitary.

20      Q    And, since time is short and the panel has

21  your opinion in written form, can you just hit the

22  highlights of the first part?

23      A    Sure.  So in terms of the relationship between

24  the party or party-state and AVIC and AVIC entities'

25  state-owned enterprises, I think there are several

1413

1    issues I have with the other side's expert reports.

2                One is that the claims, much of what they

3    rely on, in effect, proves too much.  That is, many of

4    the features that they discuss are true of multinational

5    corporations in general.  And, by the way, I neglected

6    to mention one other thing that I had seen, which is the

7    Chadwick report.  I saw that after I prepared my report.

8                But many of these features are typical of

9    multinationals in general.  They're typical of any

10   Chinese company that has a relatively complex,

11   multilayered corporate structure, certainly Chinese

12   companies that have subsidiaries or affiliates abroad,

13   and a lot of it would be true of state-owned enterprises

14   and, therefore, pretty much any Chinese enterprise large

15   enough to figure internationally.  So if you accept

16   those kind of generic features as establishing

17   unitariness, you're taking down a whole bunch of

18   entities as being unitary.

19               Secondly, I would say that much of what

20   is pointed to as direct and detailed control by the

21   party-state is, in fact, on closer inspection, very

22   general guidance.  It's policy guidance, industrial

23   policy, as we would call it.  These are important

24   sectors for China and Chinese companies to go into.  We

25   want Chinese companies to go out and invest in the

1414

1    world.  We want efficiency and market orientation.

2    These are very general policy guidelines of the sort

3    that you would see in many countries.

4              And I think there are also references to

5    the five-year plan, which in China today is not anything

6    remotely resembling Soviet style planning.  It's a much

7    more general guidance of policy priorities and state

8    priority sectors.

9              So I think many of these things are very

10   general.  They're not the kind of specific type control

11   that I think Claimants' experts are trying to derive

12   from those.

13       Q    And that's not just Stokes' report either?

14       A    No.  I would say that is in all three of the

15   reports, as I recall.

16             Then there is a question of the content

17   of a lot of these policies or directives that one sees

18   from the party and state.  Much of that content urges or

19   requires companies to obey Chinese law, which includes

20   behaving like separate corporate entities where they are

21   so structured.  It includes obeying various regulations

22   and laws.  A lot of it is in that vein.

23             Much of it is an imperative to be more

24   like commercial enterprises, to behave in market

25   regarding commercial profit maximizing, value maximizing

1   ways.  So that content often cuts for the autonomous

2   behavior of companies independent of the party and

3   state.

4                Then to get into somewhat more specific

5   issues, much of the discussion from, I think, all of the

6   experts, but especially Professor Naughton, is about the

7   role of SASAC, which is this state entity.  It is a part

8   of the Chinese government, but it has three roles.  And

9   I think one needs to keep separate what they are.

10               One of SASAC's roles is as a regulator of

11  an important part of the economy, particularly the large

12  state-owned enterprises.  And, indeed, there are

13  empirical studies now that suggest and conclude, indeed,

14  that SASAC's principal role in dealing with state-owned

15  enterprises now is as a regulator, issuing rules that

16  say you've got to have internal control mechanisms for

17  using state capital.  If you're investing abroad above a

18  certain level, you have to meet certainly regulatory

19  requirements, that kind of thing.

20               The second function of SASAC is to act as

21  owner.  So these are state-owned enterprises, but the

22  state's ownership function is vested with SASAC, so it

23  acts as the state owner, in effect.

24               And so much of what SASAC is described as

25  doing is doing what owners do legitimately under Chinese

1416

1    law, which is owners under Chinese law are allowed to

2    select directors, to have a role in the selection of

3    management, to set general guidance and strategy for the

4    companies that they own to participate in important

5    corporate decisions.

6              Chinese company law is a bit different

7    from Angelo-American company law and, certainly,

8    American company law, in that it tends to be an owner

9    and shareholder powerful system and a relatively

10   comparatively weak board of director system.

11             There's another piece of what SASAC does

12   that is somewhat peculiar to the Chinese circumstance,

13   and that is because the history of these enterprises

14   that are directly under SASAC, and there's a hundred and

15   some that are directly under SASAC and there's a select

16   group of a few dozen, 40 some, that occupy a somewhat

17   higher status.

18             The history of these is these are big

19   enterprises that were built up with lots of state

20   investment in a prereform era, in the more communist

21   era, if you will.  And so when these were converted into

22   corporations, there was a concern that the state's

23   assets not be squandered.  And there were some big

24   scandals in the early years of reform where some of

25   these companies went out and behaved recklessly in ways

1417

1  that put what we're still seeing as the public assets at

2  risk.  So they're somewhat greater restrictions on the

3  use of enterprise assets by the higher tier entities

4  directly under SASAC, but those are fairly minor

5  limitations around the edges of a corporate reform,

6  which has said enterprises have their own assets, bear

7  their own risks and liabilities.

8            So the next point, I guess, is the

9  question of the role of the communist party, and I think

10  particularly in the Stokes and Jacobson reports,

11  although this is somewhat in the Naughton report as

12  well, there's an emphasis on the role of the communist

13  Chinese party.

14            It is true that at least at the upper

15  levels in companies under SASAC, the Chinese communist

16  party's organization department, its sort of personnel

17  department, vets and approves and has a significant role

18  in the selection of management.  But the suggestion,

19  which is in -- the argument, which is in several of the

20  reports, that this means that these are primarily

21  apparatchiks, that they are state officials or party

22  puppets, as it were, just doesn't ring true with what we

23  know about the behavior of state-owned enterprise

24  managers.

25            There are pretty extensive studies that

1418

1    show that these enterprise managers function largely in

2    response to career incentives, a chance for advancement,

3    that their prospects are affected by the degree to which

4    their companies are functioning well and are profitable,

5    and they tend to follow a career path, either within an

6    enterprise structure or at least within a sector.

7    Something which, you know, Mr. Zhang testified yesterday

8    was his career trajectory, and I think that's a fairly

9    common one.

10              So while we do have a party presence and

11   there are party committees within these companies, it's

12   nowhere near the degree of tight control and day-to-day

13   intervention that I think the other experts' reports

14   have suggested.

15       Q    Are you almost to the end describing your

16   first section --

17       A    Almost.

18       Q    -- of your report?

19       A    Got a couple of more --

20       Q    [unintelligible] before you move to the

21   second.

22       A    Okay.  Right.  The other -- then the last

23   couple of points on this.  One is that -- and some of

24   this came up with Professor Naughton yesterday.  There's

25   a bit of a structure of argument that is "can implies

1    did."

2                    It is true that the Chinese system is

3    such that if someone's sufficiently far up the chain,

4    someone sufficiently politically powerful chose to

5    intervene, they could have the impact of affecting a

6    decision, and it is possible, but can doesn't imply did.

7    That it happens sometimes doesn't provide a basis for

8    concluding that it happened here, and I disagree with

9    Professor Naughton's inference that it did happen here.

10                   And, finally, I would say that, you know,

11   returning to my first points, that if one were to take

12   the kinds of things that are persuasive and credible in

13   their reports as an account to the way China works,

14   those are mostly features that apply across the board

15   such that we would be overturning a lot of the way the

16   Chinese law and, for that matter, U.S. law runs and

17   counter Chinese companies has created entities with many

18   of these characteristics as being separate companies

19   that should be treated as such.

20       Q    And do you see Claimants' experts backing away

21   from some of the opinions that you rebutted in that

22   section through the course of these proceedings?

23       A    I think Professor Naughton put less of an

24   emphasis on the ownership and control arguments in his

25   testimony than he did in his report, as I think came out

1420

1  in my deposition.  I think that the way those terms are

2  likely used and the sources on which they're relying

3  here, they are used more of a corporate law sense.  That

4  is, ownership or hundred percent ownership, controlling

5  shareholder, things like that, rather than how

6  economists might use them.  And, even so, I don't think

7  they are ownership and control at the level of the kind

8  of tight, unitary structure that the Plaintiffs' experts

9  infer -- or Claimants' experts infer.

10     Q    Thank you.  Now, we're going to --

11     A    So the other point is that I saw relatively

12  little resemblance between Mr. Jacobson's report and his

13  testimony here.

14     Q    And we're going to go through the PowerPoint

15  slides in detail, and we've reserved some time to do

16  that, but recognizing that our time is limited, could

17  you give us a brief summary of the second section of

18  your report?

19     A    Sure.  Some of it is structurally parallel.

20  So again we've got a proves too much phenomenon.  That

21  is, if a structure of ownership like -- the board's not

22  up there.  The board that has been up there is enough to

23  establish unitariness, then you take down virtually any

24  Chinese company of any size, including any Chinese

25  company that operates significantly outside of China.

1421

1    And the same would be true of, as I understand it, many
2    multinational corporations.
3               So, you know, the organizational
4    flowchart, which is a sort of structure of ownership
5    shares here, again, if that's enough, then you're making
6    a fairly broad statement about the pervasiveness of
7    unitariness not just in this case but across a huge
8    range of companies, both Chinese and otherwise.
9               In terms of the types of examples relied
10   upon to show intervention and interference and control,
11   as with the state policies, so, too, with the discussion
12   of how higher levels of AVIC, particularly AVIC
13   headquarters, deals with its subordinates, most of these
14   are things about, you know, general policy guidance,
15   strategic guidance about the sectors that are important,
16   the kinds of behavior, the kinds of agendas one should
17   be pursuing.  It's all very broad strategic policy
18   directives, which are consistent with what Chinese law
19   allows owners to do and what Chinese law allows a
20   headquarter entity within a corporate group structure
21   like this to do.
22               And some of them are sort of
23   cheerleading.  You know, "Go forth and make that project
24   work."  It's a little old school communist style, but,
25   you know, in Chinese it'd be called jiayou, that's

1422

1   j-i-a-y-o-u.  It's sort of a cheer at a basketball game.

2   You know, go out and conquer.  A lot of it reads to me

3   like that.

4              And we do have independent information

5   about the way AVIC as a corporate group has behaved.

6   There's the RAND report that's cited by, I believe,

7   Stokes.  And this is one of a series of reports by the

8   RAND corporation that looks specifically at AVIC, and

9   the account there is that you actually have a great deal

10  of autonomy for the component units within AVIC.  That

11  AVIC headquarters exercises, at most, overall strategic

12  and financial guidance, that especially outside the

13  aviation sector of the companies have had a great deal

14  of autonomy.  And, indeed, some of the restructurings,

15  including the 2008 restructurings are addressed in part

16  to the problem of duplication, lack of coordination

17  among AVIC branches.

18              And we've certainly seen examples even

19  recently of pieces of AVIC not being exactly on the same

20  page.  I mean, the media recently, there's been a lot

21  about the Shanghai stock market debacle and the

22  government has intervened to keep up shares and has said

23  this is an important problem we need to deal with for

24  investor confidence and for economic well-being.  It's

25  been an interventionist but fairly moderate tone.  You

1423

1  have the chair of AVIC headquarters, Lin Zuoming --

2            MR. SHAMOUN:  Can I cut you off?

3  Mr. Bayles, would you ask him when we refer to AVIC,

4  which one?

5            THE WITNESS:  Oh, I'm sorry.  At this

6  point -- I'm sorry, at this point I'm referring to the

7  chair of AVIC headquarters, which is the top level

8  there.  Right, the AVIC -- the 62.52 percent entity

9  there.

10           It has been quoted as saying that this is

11  a foreign attack on China.  It's an attempt to undermine

12  the Chinese economy.  This is pretty out there and

13  hardly in step with what we've seen, even from the

14  Chinese party and state.  But we have somebody at a

15  subordinate entity in the AVIC structure, a subsidiary

16  company, that has been removed from his position and is

17  subject now to investigation by the Chinese Securities

18  Regulatory Commission for short selling, for doing

19  exactly the opposite, undermining the buying of shares.

20  Even as Lin Zuoming was saying, "We're keeping up the

21  share prices by buying," so there's -- you know, there's

22  that.

23           But the more important evidence here, I

24  think, on this is the careful studies done by RAND, and

25  it's not just one study, this is the one that's quoted,

1424

1     is one in a series of about four or five of an

2     overlapping group of some quite respected researchers in

3     this area, including one who has served as the senior

4     director for China of the National Security Council.

5     RAND does a lot of government intelligence contract

6     work, so they tend to be pretty careful.

7                   And there's other scholarship about the

8     behavior of these kinds of corporate group structures

9     that, again, points to, in companies like AVIC, a lot of

10    autonomy, indeed, sometimes excessive autonomy from the

11    viewpoint of headquarters of the component and

12    subordinate or subsidiary units.

13                  CHAIRMAN ALDOUS:  I want to encourage

14    you, Professor deLisle, to go ahead and take your time,

15    despite the time constraints, and I also want to express

16    my condolences to your law students if you teach that

17    fast.

18                  THE WITNESS:  Well, they get used to it

19    after a while.  I just hope we won't be here long enough

20    for that.

21                  CHAIRMAN ALDOUS:  Right, right.  But --

22    so that we want to make sure that we catch what you have

23    to say.  So I don't want you to feel the pressure of the

24    clock.

25                  THE WITNESS:  Thank you.  I will take

1425

1    that admonition.

2              CHAIRMAN ALDOUS:  And, besides, I don't

3    want you to pass out from lack of breathing.

4              THE WITNESS:  My brain has survived

5    without oxygen for a good long time, sir.

6              CHAIRMAN ALDOUS:  I just wanted to say

7    that because I know you feel the pressure of time, but

8    take your time.

9              THE WITNESS:  Thank you.

10        Q    Professor, your testimony reminded me, you

11   speak and read Mandarin?

12        A    I speak the Mandarin dialect of Chinese.  I

13   read Chinese.  It's a standard written language

14   regardless of your dialect.

15        Q    And some of your research is conducting that

16   language and also through travels to China?

17        A    Yes.  I go to China several times a year.

18   Much of my research, including some of what I did for

19   this, is using Chinese language original sources.

20              So where was I?  Right.  So the --

21        Q    Would you like the court reporter to read your

22   last -- to refresh your memory?

23              CHAIRMAN ALDOUS:  I didn't mean to

24   interrupt.  I apologize.

25              THE WITNESS:  That's all right.

1426

1        MR. CAPSHAW:  Page 19 of your report.

2        THE WITNESS:  On page 19, okay.  That'll

3   remind me of where I was.

4       A    Okay.  Right.  So I would say that many of the

5   phenomena that the Claimants' experts point to as

6   suspicious as indications of a great deal of control or

7   meddling strike me as not really bearing the weight

8   that's put on them.  I think in particular it was the

9   Jacobson report that I think badly mischaracterized the

10  MOU.  It's not a binding document.

11              A Memorandum of Understanding -- I mean,

12  although I realize that this memorandum and the

13  subsequent LLC agreement are American law documents, as

14  I understand it, my sense is they were probably written

15  from the perspective of Chinese companies.  And that in

16  the process of setting up a joint venture in China, you

17  very typically would said it would have an MOU, which is

18  understood as a broad intention to go forward, but it

19  has no legal significance.

20              The legal significance comes later when

21  you draft the agreement to create the venture, and then

22  in the Chinese context submit that document for approval

23  by the authorities before you can go forward.

24      Q    And as far as Liu Rongchun signing that

25  document and his relationship to the companies that

1427

1    you've heard in testimony in preparation, the

2    significance of that?

3        A    Well, I have no independent knowledge of why

4    he signed.  I heard Mr. Zhang's testimony yesterday.  My

5    understanding is that he was a director, or at least is

6    reported as being a director of AVIC USA, AVIC

7    International USA, while also being an officer of AVIC

8    International Hold -- the thing we've been referring to

9    as AVIC International.

10              It is not ideal to have somebody other

11   than the head of the relevant company sign something,

12   but there are a number of possible explanations.  Again,

13   I wasn't there.  I wasn't in his head.  What I can say

14   is that it is consistent with my experience dealing with

15   large Chinese organizations, that when you have a

16   delegation come to an event, there is a huge amount of

17   deference to the most senior member of the delegation.

18   And if the most senior member decides he wants to do

19   something, you're not going to push back as a more

20   junior member unless you think you have a compelling

21   reason.

22              Now, if you were signing a legal

23   document, such as one creating an LLC, that would be an

24   occasion where one would hope that the more junior

25   person would push back.  A nonbinding document like an

1428

1  MOU, not so much.  Even if the wrong person, in some

2  sense, signed a legally binding development, it would --

3  you know, it would certainly raise problems.

4         Chinese law is quite restrictive in that

5  it has a concept called the legally designated

6  representative person.  It's simpler in Chinese,

7  typically the CEO, who is authorized to sign and bind

8  the company.  If someone else does it, there are ways in

9  which someone else could be treated as an agent with the

10 authority to bind the company, and so one might be able

11 to cure it that way.

12    Q   Thank you.  As far as time we've budgeted, I

13 think let's move on.  Any other points in your second --

14    A   If I can take a brief look at where I was

15 here.

16         CHAIRMAN ALDOUS:  And so at this point --

17 well --

18         THE WITNESS:  I'm almost done.

19         CHAIRMAN ALDOUS:  Well, that's okay, but

20 I'm going to have to claim Chairman status and take a

21 ten-minute break.  Apologize for that.

22    (A break was taken from 9:59 a.m. to 10:21 a.m.)

23         CHAIRMAN ALDOUS:  All right.  Thank you,

24 Mr. Bayles.  You may continue.

25         MR. BAYLES:  Thank you, Mr. Chairman.

1429

1    Q    You were in the second half of your report and

2  down to, I think, the two or three last bullet points.

3    A    I think that's right.  So I think when we took

4  the break I was talking about ways in which I thought

5  that the examples that the Claimants' experts offered

6  for intrusive control or unitariness by upper levels of

7  AVIC, including AVIC headquarters, over subsidiaries

8  were not all that they were represented as being.

9            I mentioned the MOU.  We discussed that.

10  There's some other examples.  In the interest of time,

11  I'll just flag one more, which is the discussion of the

12  provision of capital.  And it is commonplace and legally

13  permissible for Chinese companies to establish

14  subsidiaries, to invest in other companies as well as to

15  have their officers and directors serve as officials as

16  officers of other companies.

17            That's a general company law principal.

18  It also applies specifically to the subset of wholly

19  state-owned companies like AVIC headquarters and it

20  applies to companies under SASAC under particular

21  regulations.

22            The other aspect of providing capital

23  that is referenced in at least some of the expert

24  reports is a discussion of some sources from Moody's and

25  Fitch, the sort of rating services.  Those don't strike

1430

1  me as providing capital or instances of providing

2  guaranties for subsidiaries' debts, which, by the way,

3  is allowed under Chinese law.  One company can issue a

4  guaranty for the liabilities of another company, but

5  those struck me as outside -- rating services outside

6  analysts handicapping the likelihood that a higher level

7  entity within AVIC would backstop a company that got in

8  trouble.  Essentially a too big to fail, too important

9  to fail, too strategically significant to fail within

10  the broader corporate strategy.  But it would be a

11  discretionary, after the fact bailout, rather than a

12  provision of capital ex ante.

13          Then I won't go into all the details of

14  this, but a chunk of this part of my report goes through

15  the aspects of Chinese law, both general laws like the

16  company law and more specific laws, like the provisions

17  of the company law that apply to wholly state-owned

18  corporations and their subsidiaries and also SASAC

19  company specific laws that set forth a variety of

20  factors such that if what the Claimants and their

21  experts say are true, we would have very serious

22  violations of company law across the board.  Really it

23  looks almost like what I would give as a very bad issue

24  slaughter exam in a course on Chinese company law.  That

25  is, there are rules about the rights of managers and

1431

1    directors, the rights of corporation vis-a-vis their

2    owners and investors, the obligations of owners and

3    investors toward the company and a whole panoply of

4    issues there, such that if we have this kind of control

5    or if we had the kind of insubstantiality of operations,

6    you know, it really would be an extreme case and the

7    kind of case that, under Chinese law, could lead to

8    sanctions up to and including criminal penalties for

9    those involved and the dissolution of the company and

10    cancellation of its business licenses.

11                    Chinese law requires that entities that

12    are licensed as corporations as legal persons have to

13    have their own management, their own assets sufficient

14    to conduct their operations, their own place of

15    business, their own structure, those kinds of things.

16        Q    And, Professor, one of the points of this is

17    that the other experts have relied on Western sources

18    for certain principles, and these key cases in

19    particular, they put the emphasis on the wrong portion

20    or even misstated the import?

21        A    I'm sorry, I'm not sure --

22        Q    Well, going back to the RAND report, which you

23    mentioned, which is -- which was discussed by Professor

24    Naughton.

25        A    Right.

1432

1    Q    Remember, I put that in front of him and asked

2    him if this report also gives descriptions of how

3    independent AVIC subsidiaries have been and illustrate a

4    problem of grouping all second tier holding companies

5    into one unitary group.

6    A    Right.  So, you know, we do have some

7    information, some studies specific to AVIC and others

8    about other companies of similar character, these group

9    companies and state-owned enterprises.  Again, the RAND

10   report goes into some detail about the degree to which

11   AVIC headquarters' role is one of strategic guidance, an

12   oversight.

13        The subsidiaries, particularly in the

14   nonaviation section, are sort of financially overseen

15   for profitability but exercise a great deal of

16   operational autonomy.  That's in this RAND report, which

17   piggybacks on earlier RAND reports on the same set of

18   issues.  And, again, the studies of Chinese state-owned

19   enterprise behavior, including these multitiered

20   structures, is full of descriptions of essentially high

21   degrees of autonomy, sometimes often higher degrees of

22   autonomy than the parents would like.  And I've given

23   you earlier some anecdotal evidence of that going on in

24   the AVIC structure recently.

25        The Claimants' experts, as I recall, also

1433

1    rely on some what are, in my mind, rather weak academic

2    sources.  There's a piece by Wan Xiao Zhu [phonetic],

3    who is a professor at Fudan, I believe.  I've seen that

4    piece, at least if I have found the right source, it is

5    an unpublished, incomplete draft that is written about

6    listed companies, which is not the case with most of the

7    AVIC entities here, and it was written before the most

8    recent round of amendments to the company law.

9                There's another that is an SJD

10   dissertation, a prize-winning dissertation, but an SJD

11   dissertation at Harvard where the focus of the

12   dissertation is on what happens to corporate governance

13   when Chinese companies go and list on foreign stock

14   exchanges.  Not exactly germane here.  The part that's

15   quoted is in a fairly boilerplate introductory chapter.

16               So I think that compared to specific

17   studies of AVIC by people like RAND, specific studies of

18   the behavior of managers at state-owned enterprises

19   directly under SASAC that have looked at the career

20   paths of particular individuals and that have been

21   published in leading law reviews strike me as a better

22   source of evidence on that issue.

23               I'd also say that Professor Naughton

24   himself has written about the success of corporate

25   restructuring in the state-owned enterprise sector in

1434

1  creating incentives for managers to behave in the

2  interest -- and directors to behave in the interest of

3  their companies, and I think he even cited in his report

4  AVIC International as being held up as a model of

5  corporate governance.

6           That's a term that means something in

7  Chinese.  It means having the characteristics that the

8  Chinese company law says are the good characteristics of

9  good corporate governance, which means owners exercising

10  their proper and limited role, officers and directors

11  exercising their autonomy, not ripping off minority

12  shareholders if it's a multi-owner company, things of

13  that ilk.

14     Q    And could you just wrap up the second part of

15  your report?

16     A    Sure.  Last couple of points.  So I've

17  discussed the general legal framework and rules for

18  companies of all types and of those specific types under

19  Chinese law.  The AVIC structure is legally also an

20  enterprise group in China.  There are a handful of these

21  large enterprise groups.  That is a distinct legal

22  structure.

23           It is clear under Chinese law that

24  membership in a group, and properly structured, is

25  called a jituan, sorry, j-i-t-u-a-n, does not in any way

1  vitiate the independent legal status of the members of

2  the group.  It's a conglomerate structure with separate

3  legal entities folded into it.  And, therefore, the

4  entities that are member companies have all the rights

5  and obligations that I've been talking about with

6  companies generally.

7            Finally, in this part, as in the other

8  part, I think the Plaintiffs' -- sorry, the Claimants'

9  experts' arguments do have some of the structure of can

10 happen, sometimes has happened, therefore either happens

11 all the time or certainly happened in events relevant

12 here.  There's also a last little bit in my report that

13 discusses what to make of some of the quotations from

14 the transcript of the recorded telephone calls.

15    Q    Thank you.  And you mentioned Jacobson

16 PowerPoint slides.  You went through them and picked

17 out, in the interest of time, I understand, a new order

18 in which you'd like to address them.  Would you just

19 explain what you want to do with that?

20    A    Yes.  So after my arrival here I received the

21 Jacobson PowerPoint slides and I received the rough

22 transcript of his testimony, and Mr. Bayles asked me to

23 look at it.  In the interest of not putting everyone to

24 sleep and not burning the entire clock, I will start

25 with what I consider to be the most important issues and

1436

1    then you can just stop me when you want to cry uncle.

2             So, I mean, there --

3        Q    First of all, and this has organized some of

4    the Bridas factors, right?

5        A    Most of it.  There are a couple of pieces to

6    this.  There's first the four hypotheticals, which

7    sounds like a Chinese communist slogan, the four

8    hypotheticals, and then there are the Bridas factors.

9        Q    So looking at the first hypothetical, then.

10       A    I think maybe the most efficient way to tackle

11   this is to say what I have to say generally about that

12   before hypotheticals, which is, you know, if you want my

13   considered views on these issues, I think they're most

14   effectively and precisely put out in my report and in

15   the parts of the deposition where I had a chance to give

16   somewhat more detailed answers.

17            As to the hypotheticals, a few things.

18   One is that, as I said in answer to each of these

19   questions, most of the goals, most of the end results

20   that these hypotheticals have the higher-ups at AVIC

21   achieving could be achieved lawfully through various

22   mechanisms.  Through the appointment of directors,

23   through participation in major company decisions,

24   through those things that are rights of owners under

25   Chinese law, which, again, are relatively expansive.

1437

1        So I was answering these questions on the

2    premise that we are talking about a situation in which

3    the proper channels were not used.  If you load in

4    enough facts and enough legal conclusions, then, sure,

5    you get to a point where what's happened is over a

6    various line.  When these things cross a line, however,

7    it seems to me that there are still two further

8    questions, and I addressed at least one of these in my

9    deposition.

10       One further question is, as I think I put

11    it somewhat fliply, one swallow does not a summer make.

12    So if you have some instances of violation, I would say

13    as I would expect it in many companies, in many

14    corporate structures, there are instances where somebody

15    transgresses.  That doesn't strike me as adding up,

16    absent more, to a pattern where a subsidiary is so

17    hollow as to be unitary with its superiors.

18       The other issue, of course, is if -- and

19    this has come up in the Bridas context, which was not

20    something I considered in preparation of my report or

21    deposition, but is whether the transgressions alleged

22    are entangled with the particular actions that are

23    claimed ground liability in the situation before us.

24       And at the deposition where these

25    hypotheticals were put to me, what was not put to me is

1438

1   the particular alleged facts about this case that were

2   underlying the hypotheticals, I've now had a chance from

3   the PowerPoint from Mr. Jacobson to see what the

4   examples are.  And I reject the suggestion that the

5   examples, at least as put in this PowerPoint, are only

6   or best interpreted as being consistent with the way the

7   hypotheticals were phrased.

8        Q    Okay.  Thank you.  So looking at the first

9   hypothetical, what's your comment in response to that?

10       A    Right.  Again, you know, I said what I said.

11  The context is in the transcript and in terms of the --

12  of my deposition.  In terms of the example, this strikes

13  me as, as I was saying earlier, one of these kind of

14  rather mundane visits by somebody saying "This is an

15  important project.  Let's see it go forward."  This

16  doesn't strike me as a good example of the kind of

17  displacement that was posed in the hypothetical or, at

18  least, it's not clearly that.

19            The second hypothetical is the Memorandum

20  of Understanding.  I've given my view on that, that this

21  is not a binding document in any way.  And there is at

22  least a contending explanation, and I've given my views

23  on what that might be, for having Liu Rongchun be the

24  signatory to this.

25            As to the third, I got to say by the time

1439

1  I got through the 80 some pages or whatever this is of

2  PowerPoint, I felt like I had spent a lot of time in

3  Cambodia.  I mean, this Cambodian loan, which strikes me

4  as a fairly small loan, at an 8 percent interest rate,

5  you know, it gets a lot of weight here.  I know nothing

6  about what happened in that transaction.  It's,

7  obviously, not something intimately bound up with the

8  wind energy questions that are at issue here.

9          And I did say in response to hypothetical

10 four, if every last employee of a company were appointed

11 not by anybody at that company but were, in fact,

12 appointed and placed by someone higher up, that would be

13 an instance of a transgression.  I will say that when I

14 was answering that question, I had in mind relatively

15 large entities.  You know, AVIC has -- the whole AVIC

16 structure, including all the subsidiaries has, I think,

17 close to half a million employees, and some of them are

18 very big.

19          I honestly don't have an opinion about

20 what happens when you're talking about picking employees

21 of a small company with, you know, single digit number

22 of employees or something.  So that's what I have to say

23 about hypotheticals.

24     Q    And then the PowerPoint went into the specific

25 Bridas factors, and do you have comment about Bridas and

1440

1   its application, just generally?

2       A    Well, I mean, I'm not holding myself out as an

3   expert on Bridas or any other particular legal standard

4   here, but, you know, I think I've been asked to respond

5   to the Jacobson PowerPoints on this.  I have -- I'm

6   familiar with the Bridas case.  It's not something I've

7   studied deeply, but from my reading of it there are ways

8   in which what went on there looks very different from

9   what we know about China and at least what I understand

10  about this case.

11              What happened in Turkmenistan looks a lot

12  more like what happened in China in 1949; that is, a

13  state action expropriating foreign investments.  China

14  did do that in 1949.  We actually settled that when we

15  normalized relations in 1979 and set up a fund to

16  compensate American companies that had been

17  expropriated.

18              Some aspects of it, the $17,000

19  capitalization of a company involved in a very big

20  project looks maybe a little bit like what happened on a

21  much smaller scale in China in the early 1980s.  There

22  was a phenomenon called briefcase companies, a company

23  that consisted of nothing but a briefcase.  And so

24  people would set it up, draw in investors and then walk

25  away with, you know, essentially zero capitalization.

1441

1   It strikes me that what went on -- or what's alleged to

2   have gone on here is a good deal more complicated.

3            The other feature in Bridas, as I

4   understand it, is that the claim is that the -- it's

5   essentially a retail, not a wholesale claim.  That is,

6   that what happened was in this particular set of

7   transactions, a company was set up and used as a sham to

8   defraud the target, and it wasn't a broad inquiry into

9   the way the company or set of companies or a bunch of

10  affiliated companies generally behaved.

11           If I understand correctly piercing the

12  corporate veil and alter ego doctrine more generally,

13  sometimes we'll look at that more wholesale question

14  about whether in general these companies are hollow

15  shams and used to perpetrate frauds, but within Bridas

16  it seemed to be focused very much on what happened in

17  that context.

18           Now, the most analogous phenomena to

19  Bridas that I see and what I know about -- or have been

20  told about what goes on here has to do with - and this

21  gets to some of Professor Naughton's comments as well -

22  is some suggestion that the restructuring -- I mean, I

23  assume if there's an analogy here, that the

24  restructurings within AVIC somehow looked like the

25  restructurings in Turkmenistan.

1442

1          And, as I understand the restructuring

2     within AVIC, and in a general way I'd certainly heard

3     about these before this case, is that what happened in

4     the middle to late 2000s, 2008/2009 or thereabouts, was

5     AVIC went through a very large restructuring driven by

6     concerns about what had happened before.

7          So we all know the story about how AVIC

8     started out as essentially a piece of the Chinese

9     government and then was set up as a company that was

10    deeply integrated with the government and then was put

11    on a more arm's length basis in the early '90s, and then

12    was split into AVIC I and AVIC II.

13         And the reports at the time were that

14    that was done to -- as what's happened in other Chinese

15    sectors, to have two state-owned companies compete with

16    one another to try to push up quality, to lower price,

17    that kind of thing, and that that was seen as

18    unsatisfactory in the defense industry.  They still

19    weren't getting what they wanted, so they merged them

20    back in 2008 or so.

21         At the same time there was an attempt to

22    separate instead of having two competing AVICs to merge

23    them back into one AVIC and take the units that do

24    military stuff and kind of park them over here and then

25    take the other units, which are commercial, and do other

1443

 1   things with them.

 2            So this is the era where they go toward

 3   creating COMAC, the company that's supposed to compete

 4   with Airbus and Boeing eventually.  It's a situation

 5   where we have the most profitable parts of at least the

 6   nondefense side of AVIC being in nonaviation sectors,

 7   including increasingly renewable energy.  It's a period

 8   when China is saying renewable energy is a place we need

 9   to go for environmental reasons and for economic

10   security reasons.

11            So there's a lot of stuff going on there.

12   If the allegation -- I don't know if it is, but if the

13   allegation is those restructurings were set up to rip

14   off a particular foreign partner, that's a long con or

15   it's a tail wagging -- a very small tail wagging a very

16   big dog.

17       Q    So you asked me to reorder the slides in the

18   interest that you wanted to address them, and so I put

19   slide number page 67, Bridas factor number 16.

20       A    Right.  Okay.  This is the claim that Chinese

21   law statutes and cases, I believe is what it says in

22   Bridas, regard AVIC as an arm of the state.  That's just

23   not true.

24            Chinese law is crystal clear that

25   enterprises, including state-owned enterprises, are

1444

 1   distinct from the state.  They do not partake of the

 2   state's sovereign immunity.  They must bear assets --

 3   bear rights and liabilities with their own assets.  They

 4   are legally distinct.  And that's, you know, full stop.

 5              The things that are cited here I don't

 6   think speak to the question of what Chinese statutes or

 7   cases say.  That Xiao Wan, I assume, is Xiao Wan Zhu or

 8   Xiao Zhu Wan.  I've already spoken to what that report

 9   looks like.  The same thing with [unintelligible].

10   That's the student dissertation I was talking about.

11              There's a quote from Paul Ma here, which

12   from the face of it and from -- if I'm remembering

13   correctly, from the surrounding text in the transcript,

14   I think this is Mr. Ma's brief recapitulation of the

15   history of AVIC's evolution that we all know and love

16   from being part of a ministry to being a company to

17   being a structure like this with some degree of

18   centralization.  I didn't read this as a statement of

19   the way things are right now.

20   Q    And the next factor you wanted to discuss was

21   Bridas factor number 1?

22   A    Number 1.  All right.

23              MR. BAYLES:  We're going to get through

24   as many of these as we can in the time that we budgeted

25   for this witness.  If others want to carry on through

1445

1  the rest of whatever factors we don't, the professor's

2  prepared to do that.

3      A    Common stock ownership.  Again, Bridas is a

4  fairly cursory case.  I don't know quite what this

5  means, but this and the next couple of factors I'll

6  discuss really go back to my earlier comment about

7  proves too much.

8              That is, if we are talking about a

9  situation of interlocking share ownership, I see no

10  evidence of that.  If we are talking about a situation

11  where a higher level entity owns all or part of a lower

12  level entity, then, yes, absolutely.  That's true of

13  AVIC, as I said in the part of what I say here that's

14  quoted.  It's true of any number of Chinese companies

15  and, I gather, true of any number of American

16  multinational, etc. companies.  You know, if this is

17  enough to be a problem for alter ego or whatever, then

18  we've all got problems.

19              What do we have next, 2?

20      Q    Anything else on factor 1?

21      A    Let's see.  I don't think so, no.

22      Q    Factor number 2?

23      A    Really, same story.  I would not characterize

24  what I know about the AVIC structure as a matter of

25  sharing directors or officers.  It's more along the

1446

1  pattern of what I said earlier, which is it is a common

2  practice in Chinese companies I take from the Chadwick

3  report and multinationals and certainly is permissible

4  under Chinese law for an owner or investor or for

5  officers and directors there to serve in a leadership

6  capacity at subsidiaries in which they invest or which

7  they own.

8      Q    And factor number 6?

9      A    Again, another kind of proves too much

10  problem.  When a parent company establishes this

11  wholly-owned subsidiary, well, yeah, that's what it

12  does.  And my understanding of the history of many of

13  these AVIC companies is that that's what happened.  That

14  somebody up the chain established companies lower down

15  the chain, either as wholly-owned subsidiaries or as

16  entities in which they held a significant ownership

17  stake.  Again, my understanding is this is pretty common

18  and certainly allowable under Chinese law.

19      Q    Factor number 13?  Slide 57.

20      A    Sorry.  There we go.  Subsidiaries' directors

21  act in the interest of the parent.  You know, the --

22  this, again, has some significant reliance on the

23  Cambodia loan.  I don't know -- you know, I don't really

24  have much of a view on that.

25              Certainly directors are obligated to act

1447

1    in the interest of their company rather than the parent.

2    Directors have responsibilities to owners who are the

3    parent and, as I've said at some length, we have a lot

4    of evidence about how entities below the top level in

5    AVIC and in similar corporate structures do act

6    autonomously and sometimes frustratingly autonomously

7    rather than the interest of the top level leadership.

8        Q    Factor number 18, starting with slide 73.

9        A    Subsidiaries have little or no autonomy.  You

10   know, obviously this is a matter that is, you know, in

11   dispute in the testimony that I've seen.  What I wanted

12   to say about this is a couple of things.  One is the

13   quotation from my deposition is in a very narrow

14   context.  It was about that third aspect of SASAC's role

15   that I talked about.

16               That is, that companies that are

17   entrusted with state-owned assets, which is certainly

18   true at top levels of these few dozen major state-owned

19   conglomerates, but I don't believe is necessarily true

20   at several levels down, but there are these restrictions

21   on putting at risk these core state assets.  And

22   that's -- my comment was in that narrow context against

23   the backdrop of the general rules, which do apply in

24   large part to AVIC and similar entities, that they do

25   have control over their own assets and business

1    decisions, as Mr. Zhang testified.

2              Again, I'm not going to sound like a

3    broken record here about the evidence we have about the

4    autonomy of subsidiaries and their operation in these

5    kinds of companies, and specifically in AVIC as

6    reflected in the RAND report and Professor Naughton's

7    own description of AVIC International as a model of

8    corporate governance and so on.

9         Q    Factor number 19, slide 77.

10        A    Concerned primarily with national interests.

11   Again, this is essentially -- I would be repeating

12   myself about the degree to which subunits pursue their

13   own particular agendas, and the autonomy evidence we

14   have on that, in terms of what is quoted here on slide

15   77, this is the kind of thing you often see with Chinese

16   companies.

17             They -- you know, the corporate group

18   engages in a long list of activities.  Those activities

19   typically are parsed out among particular business units

20   which then pursue them.  And the most -- the latter

21   underlying section really strikes me as one of those

22   general policy priority strategic guidance kind of

23   comments that I talked about earlier.

24        Q    Factor 20, slide 78.

25        A    I have no inside knowledge about how decisions

1449

1   are made about whether to litigate or not, but under

2   Chinese company law, one of the things that comes with

3   being an enterprise legal person is independent

4   authority to litigate.

5            Obviously, AVIC USA is a U.S. company.

6   I'm not an expert on U.S. company law, but my sense is

7   generally corporations have authority to litigate on

8   their own.  I believe Mr. Zhang testified that he makes

9   those decisions himself.

10   Q    I want to turn to something else briefly.  You

11   mentioned that Professor Jacobson's -- well, that

12   there's changes in his approach to things from his

13   report to when he came actually to these proceedings,

14   and I'd just like your thought on that.

15   A    Well, I mean, I read his report as a very

16   broad -- well, two pieces.  One, it was very

17   broadbrushed statements about China writ large and AVIC

18   writ large.  I thought it was, you know, rather thin on

19   specifics and I take it on point by point in my report.

20   There were pieces of his initial report that I thought

21   leaned very heavily on a few quotations from the

22   transcripts, and I address those as well.

23            But that first part, which I just

24   mentioned, that there was a big part of his report seems

25   to have disappeared by the time he came to testify.  The

1   claims about how the party-state is in everything and

2   controls everything in detail was supplanted by what

3   appears to be a march through the Bridas factors.

4       Q    Now, what was your conclusion at the end of

5   your report?  Just generally describe.

6       A    That I found the arguments and evidence and

7   conclusions offered by the Plaintiffs' experts to be

8   ultimately unpersuasive on the issue of a high degree of

9   unitariness on either of the two theories.  That is,

10  China, Inc., if you will, party-state and AVIC, or AVIC

11  as a unitary entity without differentiation of any

12  significant degree among its subsidiaries.

13            So it was a matter of fitting with what

14  we know about AVIC particularly or about these kinds of

15  companies or about Chinese business structures and legal

16  frameworks, you know, I just think in various ways those

17  reports were wrong or they were incomplete or I would

18  read some of the things that they read one way a

19  different way.

20      Q    And now that you've had the benefit of

21  preparing to be deposed, being deposed and preparing to

22  be here today --

23      A    A delightful experience on all accounts, I can

24  assure you.

25      Q    Anything else you'd like to say about your

1451

1    ultimate conclusion?

2        A    It hasn't changed my ultimate conclusion.

3    It's added some flesh on the bones, as I've had a chance

4    to see the full transcripts, to hear the testimony, but

5    it hasn't changed anything in my basic conclusions.

6                    MR. BAYLES:  Pass the witness.

7                    CHAIRMAN ALDOUS:  Do you have any

8    questions, Mr. Walters?

9                    MR. WALTERS:  We do not.

10                   CHAIRMAN ALDOUS:  Or Mr. DeWolf?

11                   MR. DEWOLF:  No, Your Honor.

12                   CHAIRMAN ALDOUS:  Who will be going first

13   for Claimants?  Mr. Jenevein, you may proceed.

14                    EXAMINATION

15   BY MR. JENEVEIN:

16       Q    Welcome to Texas, Professor.

17       A    It's good to be back.

18       Q    Do you have the impression that the Claimants'

19   experts have offered the opinion for the purposes of

20   this arbitration that every subsidiary and

21   sub-subsidiary in the AVIC family is one entity?

22       A    I think there are parts of the Stokes and

23   Jacobson opinion they get at least very close to that.

24       Q    Get close to it --

25       A    Well, I think -- I mean, I don't have the

1452

1  opinions in front of me, but I think I recall a passage

2  said something like "This degree of control exists even

3  in joint ventures."

4      Q    Well, I didn't ask you about joint ventures; I

5  specifically asked about all the subsidiary units of the

6  AVIC family.

7      A    I --

8      Q    There's not a question pending.

9      A    I don't recall them addressing every specific

10 entity within AVIC.  I infer from their general

11 comments.

12     Q    Professor, I'm going to try hard not to

13 interrupt you.  Please, let's -- just so we can save the

14 time that everybody's trying to preserve, I'll

15 appreciate it if you'll try to limit your answer to my

16 question.

17     A    Okay.

18     Q    Let me wrap up a couple of things that I think

19 we agree on.  You said there is no sovereign immunity

20 issue for this panel to worry about.

21     A    I said that in the Chinese view of state-owned

22 corporations they do not partake of the state sovereign

23 immunity, yes.

24     Q    Well, when I asked you in your deposition

25 these entities do not enjoy sovereign immunity, your

1453

1    answer was "that's correct," right?

2        A    That is correct.  That is as seen in Chinese

3    law and I believe that's how U.S. courts have generally

4    handled this as well, if we're talking commercial

5    activities.

6        Q    And that the entities in this case, all the

7    AVIC entities that are named in this arbitration, were

8    engaged in commercial activity, right?

9        A    I believe that's correct.  I believe that none

10   of the entities that would be producing defense

11   implements, which might or might not be in that

12   category, are directly involved.

13       Q    Honestly, I'm not sure I understand your

14   response.  And all I'm asking here -- and this is an --

15       A    As far as I know, yes.

16       Q    As far as you know, yes, all the entities here

17   are engaged in commercial activity, right?

18       A    Yes.  With the caveat of it depends on how you

19   read AVIC headquarters, which oversees all of these

20   things; but aside from that, yes.

21       Q    And to some extent -- I don't want to

22   mischaracterize your report, but is it fair to say that

23   your criticism -- one of your criticisms is that just

24   because the Claimants' experts say this can happen and

25   just because it does happen sometimes does not

1454

1   necessarily mean it happened in this case, right?

2        A    That is one of my opinions, yes.

3        Q    Now, that's what I want to test because

4   Professor Jacobson certainly -- I would say all the

5   Claimants' experts, it seems to me, got into the

6   specifics of this case.  Have you done that?  Have you

7   delved into the specifics of this case to determine

8   aside from what might happen what did happen here?  Have

9   you done that?

10       A    I looked at what's been available about the

11  specifics of this case and the record of this case.

12       Q    For example, can you tell the panel what

13  position Liu Rongchun held in April of 2010?

14       A    In April of 2010?  I'm not sure what position

15  he held at that point.  I know at one point he was a

16  director of AVIC International USA.  Or at least that's

17  the testimony.

18       Q    Now, you heard that testimony from Mr. Zhang

19  yesterday, right?

20       A    Yes.

21       Q    And do you know of any other time when that

22  role of Mr. Rongchun, or Liu, was ever disclosed before

23  yesterday?

24       A    I don't recall specifically.  I've seen a lot

25  of lists of who holds what office.  I don't recall him

1455

1   being listed.

2       Q    And you heard Mr. Zhang mention that Liu, who

3   we've called Leo, was a director of USA because

4   Mr. Zhang suggested that was the capacity in which he

5   signed the MOU, right?

6       A    I believe what I testified to was that I was

7   basing my analysis here today on the statement yesterday

8   that he was a director of AVIC USA, and in that role we

9   had, you know, that possible analysis that I gave what

10  might have been going on there.

11      Q    You can see this chart can't you, Professor?

12      A    Yes.

13      Q    AVIC USA is here.  And what you're telling the

14  panel is that Liu, who we have called Leo, was a

15  director of AVIC USA at one point?

16      A    That is my recollection of Mr. Zhang's

17  testimony.  I have no independent knowledge of that.

18      Q    Do you have any independent knowledge or any

19  knowledge at all of what Liu Rongchun's role was at AVIC

20  IHC ever?

21      A    I do not.

22      Q    Do you have any independent knowledge or

23  knowledge of any kind of what Liu Rongchun's role was at

24  AVIC IRE?

25      A    I believe I've been told that he held a

1456

1   position there at some point.

2        Q    But you're just not sure which one?

3        A    I'm not.  It's fairly common for people to

4   rotate through a group company.

5        Q    Do you know whether Liu Rongchun ever held a

6   position at CAIGA?

7        A    No, I don't.

8        Q    Let me ask you to make an assumption.  You do

9   know, it's not an assumption, that when the MOU was

10  signed, it was signed on behalf of CATIC by Liu?

11       A    I know it was signed by Liu Rongchun and it

12  is -- it states that CATIC is one of the parties.  And

13  his signature is in a place where one would have whoever

14  signed for CATIC.

15       Q    Can you tell the panel every -- can you name

16  every party to the MOU?

17       A    I believe it was CATIC on one side and Tang on

18  the other.

19       Q    CATIC and Tang?

20       A    Yes.

21       Q    And by CATIC, you understand that to mean AVIC

22  IHC, International Holding Corp.?

23       A    I believe it's a prior name, yeah.

24       Q    Right.  Here's what I want to ask you:  If

25  Mr. Liu Rongchun signed the MOU -- well, one question

1457

1    before I get to my assumption.

2         You've read the MOU?

3    A    Yes.

4    Q    And you realize it contains a covenant that

5    Soaring Wind will be the exclusive vehicle for CATIC in

6    the wind energy business?

7    A    It contains that statement.

8    Q    Aside for the moment from whether you think

9    it's binding or not, do you think it's right that the

10   man who signed that promise later became the chairman

11   two years later of the company set up to compete with

12   Soaring Wind?

13   A    I don't think I have a view on whether that is

14   right, depending what you mean by "right."  Is it

15   immoral?  If it were done for certain reasons, possibly.

16   Q    Well, and I'm not trying to trick you into

17   being an authority on alter ego law, but we talked about

18   it in your deposition and you've testified on Bridas

19   today.  It's fair to say that -- and I think this is how

20   you fairly described it.  There's an element of control

21   and then there's an element of injustice; is that fair?

22   A    Those are, in my understanding, factors that

23   go into alter ego and similar analysis, yeah.

24   Q    Okay.  That's the context in which I'm asking

25   my question.  We've talked a lot about control, but I

1458

1    want to focus just for a second on that other prong.

2              If that happened as I suggest, that the

3    same man who promised that Soaring Wind would be the

4    sole vehicle for CATIC's involvement in the wind energy

5    business two years later became the founding chairman of

6    the company designed to compete with that company, is

7    that injustice?

8        A    It would depend on why it happened.

9        Q    You can't look that panel in the eye right now

10   and say, "Yes, gentlemen, that would be wrong"?

11       A    I don't know why he was transferred.  If it is

12   to perpetrate a fraud on the Claimants here, then, you

13   know, that would, at least in a moral sense and possibly

14   in a legal sense, be wrong.

15             But people move from position to position

16   in state-owned enterprises for a variety of reasons.

17   It's a common career path to rotate through,

18   particularly within subsectors that have common business

19   foci.

20             MR. JENEVEIN:  Jackie, let's look at the

21   MOU for just a second.  I want to look at the first

22   paragraph.  I think that's it.

23       Q    I don't want to misquote you.  I think you

24   said that Professor Jacobson badly mischaracterized this

25   as a binding agreement; is that right?

1459

1    A    I believe he -- I don't recall exactly what I

2    said.  My view is that he, in his report, characterized

3    this as either a binding agreement or tried to merge it

4    into the Soaring Wind Enterprises, LLC agreement.

5                 MR. JENEVEIN:  Jackie, can we just

6    highlight that bottom sentence there?

7    Q    You understood -- what did you say, you had a

8    rough draft of his testimony?

9    A    I saw the rough draft of the transcript, yeah.

10   Q    So you understood that he testified that it

11   would not have been a binding agreement if the LLC had

12   not been established?  That was his rationale.

13   A    I don't recall that specifically from his

14   testimony.

15   Q    All right.  Well, then let's just look at the

16   highlighted sentence.  That's what it says, right?  That

17   it will not be a binding document and there will be no

18   damages if the LLC is not established.  I read it,

19   right?

20   A    Yeah.

21   Q    The LLC was established, right?

22   A    As -- yes, I believe it was for the Soaring

23   Wind agreement.

24   Q    That's what I'm asking.  It's not a trick

25   question.  So there's nothing in this -- there may be a

1460

1    merger clause that we can talk about, but there's

2    nothing in this document that says it's not binding once

3    the LLC is established, right?

4         A    Well, it says what it says.

5         Q    Okay.  I don't want to argue with you, but

6    that's the only place it says anything about whether

7    it's binding or not?

8         A    And what I spoke to, I'm not holding myself

9    out as an expert on American law of Memorandum of

10   Understanding; I was giving you what this document would

11   have looked like to a Chinese party, which is these are

12   the kinds of things you do as expressing an intention to

13   go forward.

14        Q    You heard Paul Thompson say this document was

15   signed in Texas, right?

16        A    I think I recall him saying that, yeah.

17        Q    So, to be blunt, why should this panel care

18   about what a Chinese party would think that meant?

19        A    I don't know whether the panel will care or

20   not.  This was in the context of my response to the

21   Jacobson report, which was not entirely clear to me, but

22   the way I read it was this was an attempt to say -- to

23   put more legal weight on this than I thought it bore

24   from the perspective that I was able to bring to it.

25   And, you know, my report speaks for itself in that

1461

1    regard.

2       Q    And I don't mean to suggest that the panel is

3    or is not compassionate; I'm saying the panel should

4    construe this contract in accordance with the law,

5    right?

6       A    I would hope and expect and believe the panel

7    would construe everything in accordance with the law.

8    I'm not here to offer opinions on legal conclusions or

9    on the credibility of facts.  I'm doing my best to

10   assess what I've got here.

11      Q    And I appreciate that, Professor.  If the

12   panel determines that this is a binding agreement, then

13   AVIC or CATIC breached this agreement by creating AVIC

14   IRE; is that right?

15      A    I don't know.  I haven't formed an opinion on

16   that.

17      Q    Well, what else would you need?  I mean, you

18   know that this agreement says that Soaring Wind is going

19   to be the only vehicle CATIC uses in the wind energy

20   business, right?

21           MR. JENEVEIN:  Can we just see that,

22   Jackie?  Do you have that call-out?  Highlight that

23   first sentence, please.

24      Q    You've already told us you've seen the

25   agreement and you've read that highlighted sentence that

1462

1  says Soaring Wind will be the exclusive vehicle for both

2  Tang and CATIC interest in the wind industry, right?

3       A    I see that sentence, yes.

4       Q    You don't -- do you think it's ambiguous?

5       A    I think it says, you know, what it says.  It

6  is a statement that this agreement has Tang and CATIC

7  saying that SW will be the exclusive agreement for

8  interest in the wind industry.

9       Q    And there's nowhere else in this agreement

10 where that duty, that covenant, is modified or limited

11 in any way, is there?

12      A    As far as I recall, no.

13      Q    So if that's it and you know that CATIC set up

14 AVIC International Renewable Energy to engage in the

15 wind energy business - this is the last time I'm going

16 to ask you this - can't you agree with me that CATIC

17 breached that agreement?

18      A    I'm having a hard time parsing a sentence

19 which says there will be no damages if it's not

20 established to read that into there will be damages if

21 it is established and then something set up to compete.

22 But I don't think anybody's interested in my American

23 law contract analysis.  I don't teach contract.

24      Q    I wouldn't be asking you if I wasn't

25 interested.  I think you're a smart guy and I want to

1463

1    hear your answer.

2        A    I appreciate that, but there are many smart

3    people who aren't in this room testifying and I'm not

4    here because I'm smart.

5        Q    Professor, I didn't ask you if there were

6    damages; I asked you if there was a breach.  Are you

7    going to answer that question?

8        A    If there is a breach by -- if these two

9    parties, which is to say CATIC and Tang, if one of those

10   two parties went and set up a separate vehicle, a

11   different vehicle to compete with Soaring Wind Energy,

12   you know, I'm not a big fan of analyzing contracts on

13   the fly, but I could see where that would raise a

14   question.  I don't know an instance that CATIC has set

15   up an entity of that sort.

16       Q    CATIC is AVIC IHC, right?

17       A    That's what it became, yeah.

18       Q    Who do you think set up AVIC International --

19       A    Fair enough.

20       Q    -- Renewable Energy?

21       A    Fair enough.  I was not focused on that at the

22   moment.

23       Q    Do you know who the officers of AVIC IHC are?

24       A    I have seen lists of some names.  I don't

25   recall them offhand.

1464

1    Q    And it's not a memory test, but are you aware

2  of whether or not any of the directors of AVIC USA are

3  also officers of AVIC IHC, International Holding Corp.,

4  or CATIC?

5    A    Whether -- I'm sorry, could you repeat that?

6    Q    Yeah.  Do you know whether or not there's any

7  overlap between the officers of AVIC International

8  Holding Corp. and AVIC USA?  By that I mean AVIC

9  International USA, Inc.

10   A    I don't recall specific if they are.  It would

11 not surprise me if they were, for the reasons I've

12 testified to.

13   Q    You testified on direct that the Chinese

14 government has been ordering some of these state-owned

15 companies to act more like normal corporations.  Is that

16 -- did I hear you --

17   A    It's among the things, yeah.

18   Q    Well, if the government is having to order

19 them to do that, isn't that an indication that they're

20 not doing it on their own?

21   A    Yeah, the reform is an ongoing process and we

22 started from a baseline of no separation to pushing them

23 very far, in many cases, down the path in that

24 direction.  I've testified about how this is not simply

25 a goal but is also something we have a lot of evidence

1465

1   of in practice.  Is it perfect or complete?  No.  Has it

2   gone a long ways down that road?  Yes.

3       Q     Well, AVIC -- you mentioned that AVIC, big

4   AVIC HQ, is currently under investigation by the China

5   Security Regulation Commission?

6       A     No, I don't think they are.  I think one of

7   the subsidiaries that is accused of short selling, of

8   dumping shares, the head of that entity and the entity

9   itself are under investigation.

10      Q     Do you know whether AVIC is being investigated

11  right now by the Central Committee for Discipline and

12  Investigation?

13      A     Every entity in China is being investigated by

14  the Central Committee for Discipline and Inspection.

15  It's the primary vehicle for the current anticorruption

16  drive.  Every entity in China is a bit of an

17  exaggeration, but any substantial entity is.

18      Q     So that's yes?

19      A     I don't know specifically that AVIC is.  I

20  would be surprised if they were not, and any entity of

21  that size and that scale and that importance if there

22  were not CCDI investigations going on.

23      Q     So did your testimony just go from yes, every

24  entity in China is being investigated or every

25  state-owned entity to no, I'd be surprised if AVIC's

1466

1    being investigated?

2         A    I would be surprised if AVIC were not being

3    investigated.  That is, the Central Discipline

4    Inspection Commission is a -- the principal

5    anticorruption body under the party.  It is

6    investigating corruption by people who are party members

7    in any number of positions in the government or in major

8    enterprises.  This is a big deal anticorruption

9    investigation.  I know of no significant institution

10   that is immune from it.

11        Q    But this AVIC sub executive who short sold

12   was -- and who was fined and investigated, that is

13   certainly not evidence that he was operating

14   independently, is it?

15        A    I don't think it's evidence whether he was

16   operating independently or not.  I mean, one could have

17   whatever theory behind what he did.  What I was saying

18   was that if one is pushing "these people are all on the

19   same page" story, you have one position being taken by

20   the government, a somewhat different position by the CEO

21   of AVIC headquarters and, clearly, very different

22   behavior by somebody at a subsidiary.  These are not

23   reacting in the same way to the stock market crisis.

24        Q    Well, I will tell you that a couple of days

25   ago, and they run together, it might have been

1467

1  yesterday, I think it was Wednesday, Judge Kaplan asked

2  Professor Jacobson if other state-owned entities act in

3  the way that Claimants are alleging.

4                You would have to agree with me, wouldn't

5  you, that AVIC would not be the first Chinese

6  state-owned entity to be sued and found liable on the

7  basis of alter ego?

8       A    I don't know of an instance offhand where

9  that's happened.

10      Q    Are you aware of the Taishan, that's

11  T-a-i-s-h-a-n, Gypsum Company vs. David Gross, et al

12  case pending in the federal district court in New

13  Orleans that's already been affirmed as to alter ego by

14  the Fifth Circuit Court of Appeals?

15      A    This is the Chinese drywall case?

16      Q    Yes, sir.

17      A    I'm slightly familiar with that case.  I

18  haven't looked at it from this perspective.

19      Q    Well, is your -- are you familiar with it

20  enough to know that the Fifth Circuit affirmed a finding

21  of alter ego against a parent based on alter ego?

22      A    No, I'm not.  I focused on it as a tort issue.

23                MR. JENEVEIN:  Jackie, can we see the --

24  I want to say 341, but it's the Ascendant loan e-mail.

25  And can we call out that -- yeah.  Starting there.

1468

1    Q    I believe you distanced yourself from this

2    e-mail, Professor, by saying that this was a relatively

3    low amount, 8 percent was a low interest rate or -- I

4    don't want to mischaracterize how you felt about 8

5    percent, but that this didn't have a lot to do with the

6    wind energy business, in any event.

7         Was there anything else other than what

8    I've just named that would discount any importance you

9    would place on this e-mail?

10   A    Well, I think, yes, in terms of the way in

11   which I discussed it; that is, my understanding of the

12   facts that matter for an alter ego determination or for

13   a Bridas discussion are that the particular instance of

14   lack of corporate separateness, lack of autonomy is

15   directly part of the transaction that's alleged to be

16   fraudulent or that we have a pervasive pattern of the

17   subsidiaries not having any separate existence.

18        So this goes into the category of, you

19   know, one swallow does not a summer make.  It would

20   be -- if, as described by Claimants, it would be a

21   problem, a transgression, if it happened in the way

22   described, but it doesn't seem to me directly bound up

23   with the issues here.  I may be missing something, but

24   it -- and it strikes me as a very small example if it is

25   offered to show that this is a pervasive pattern of

1469

1   behavior within the AVIC group.

2              The only other thing I would have to say

3   about this is, you know, the lore is that AVIC is a cash

4   rich company that's often trying to figure out where to

5   put money.

6   Q     I don't want to spend a lot of time on this,

7   but you will agree with me that this letter dictates the

8   following terms of a loan; who would be the lender, who

9   would be the borrower, how much would be loaned, how

10  long it would be loaned and what interest rate it would

11  be loaned at?  Is that fair?

12  A     Could you run those factors by me again?

13  Q     The lender, the borrower, the term, the amount

14  and the interest rate.

15  A     I think that's correct.

16             MR. JENEVEIN:  I can pass the witness.

17             CHAIRMAN ALDOUS:  Any of the other

18  Claimants have any questions?

19             MR. LOWENSTEIN:  I have one.

20             CHAIRMAN ALDOUS:  Mr. Lowenstein.

21             MR. LOWENSTEIN:  No, I'm not going to

22  commit to one quick one.  I have several questions on

23  one point.

24             CHAIRMAN ALDOUS:  Thank you.

25                       EXAMINATION

1470

1   BY MR. LOWENSTEIN:

2       Q    Dr. deLisle, you said, and I tried to quote

3   you as best I can, that the activities within AVIC are

4   parsed out to particular business units.  Do you recall

5   that?

6       A    I probably said something like that, yeah.

7   And I think that was in response to the list of areas in

8   which the AVIC group operates, and my point was that

9   there are typically business units that would be

10  specialized in those areas.

11      Q    And you saw the Memorandum of Understanding

12  that showed the business of wind energy was going to be

13  parsed out through AVIC USA to Soaring Wind at the time

14  of that Memorandum of Understanding?

15      A    I'm sorry, I missed the first part of that.

16      Q    The Memorandum of Understanding, so the

17  exclusive vehicle for wind energy that was being parsed

18  out, was going to be through Soaring Wind?

19      A    It said that CATIC USA and Soaring Wind -- I'm

20  sorry, CATIC USA and Tang, on the CATIC side, CATIC

21  would pursue wind energy through that vehicle.

22      Q    And is that consistent with what you were

23  testifying about about a business being parsed out to a

24  specific subordinate unit or business unit?

25      A    I'm not sure I characterize it that way.  I

1471

1   mean, different business units within AVIC have

2   different sort of functional foci.  I don't think it's

3   fair to describe those as being uniformly assigned from

4   on high to the low.  I think these things do grow

5   somewhat organically, and Mr. Zhang testified about

6   hotel business and things like that.

7               My understanding is not only in AVIC but

8   in other companies, some of this is from below, so I

9   can't speak definitively to how various competencies --

10  various business lines come into the purview of various

11  companies.  And, as I said earlier, one of the

12  complaints within AVIC has been overlap and duplication

13  among lines of business of subordinate entities.

14      Q    I must have asked a bad question.  Let me try

15  again.

16              Was this -- did you understand the

17  Memorandum of Understanding to be with respect to AVIC,

18  AVIC was committing to do wind energy business through

19  Soaring Wind?

20      A    I understand it as CATIC's commitment.  I

21  don't know that it says anything about AVIC

22  headquarters.

23      Q    Okay.  That's fair.  You're right.  So AVIC

24  IHC, which is what CATIC is now, right?

25      A    Yes.

1472

1    Q    With respect to AVIC IHC and its subordinates,

2  it was committing to do wind energy business at the time

3  of that Memorandum of Understanding through AVIC USA?

4    A    It is a memorandum to which AVIC -- I'm sorry,

5  CATIC, now AVIC International, purports to be -- yes,

6  that's -- it is -- a Memorandum of Understanding would

7  intend to pursue wind energy through that entity.

8    Q    And is that example of parsing out a

9  particular business to a business unit?

10   A    To a -- so from -- down to AVIC USA from AVIC

11 International or AVIC predecessor?

12   Q    Right.

13   A    I'm not sure.  I don't know with the internal

14 dynamics there.  It could be read that way, but I can't

15 say that I would necessarily see it that way.

16   Q    Let me ask you something different.  As of the

17 time of the Memorandum of Understanding, are you aware

18 of any other subordinate unit to AVIC IHC being

19 permitted or directed to do wind energy business?

20   A    I'm not aware of any direction.  I'm not aware

21 of any specific permission.  The way these companies are

22 set up, they have some latitude to pursue various

23 business --

24   Q    And are you aware of any -- at the time of the

25 formation of Soaring Wind, are you aware of any other

1473

1    business unit that had been set up at that time to do

2    wind energy business?

3        A    The ones I'm aware of were later.

4        Q    Which is IRE, which was not set up until 2010.

5        A    That's my understanding.

6        Q    So are you familiar with the Chicago

7    agreement?

8        A    This is the preliminary funding agreement,

9    Chicago agreement?

10       Q    Yes.

11       A    I have seen it, yeah.

12       Q    And that was formed around the same time of

13   Soaring Wind, right, that agreement?

14       A    I don't recall the exact sequence, but similar

15   times.

16       Q    It was --

17       A    2009.

18       Q    -- in 2009 before the formation of IRE?

19       A    That is my recollection.

20       Q    And are you aware of any other business unit

21   under AVIC IHC that was permitted to do wind energy

22   business as of the time of the Chicago agreement?

23       A    Any unit other than, I'm sorry?

24       Q    Other than AVIC USA through Soaring Wind, are

25   you aware of any other unit that was -- parsed out that

1474

1    business as of the formation of the Chicago agreement?

2         A    I have no specific information on it, no.

3              MR. LOWENSTEIN:  Pass the witness.

4              CHAIRMAN ALDOUS:  Any other Claimants

5    have any questions?  Mr. Denney.

6                        EXAMINATION

7    BY MR. DENNEY:

8         Q    Professor, I want to draw your attention back

9    to the conversation you had with Mr. Jenevein a few

10   minutes ago that began with a discussion on sovereign

11   immunity, and let's specifically look to the caveat that

12   you made with respect to AVIC HQ as a commercial

13   enterprise.

14        A    Yes.

15        Q    Did you have a chance to read Mark Chadwick's

16   report?

17        A    Yes, I did.

18        Q    I'm going to read a quote from his report,

19   section 4.10, and I'd like to see if you have any reason

20   to dispute that.  "Given that AVIC Group HQ is wholly

21   owned by the Chinese central government, I would expect

22   it to exercise control over what is a very substantial

23   commercial group in which it has made a substantial

24   investment."

25              Do you have any reason to dispute

1475

1    Mr. Chadwick's characterization of AVIC HQ as a

2    commercial enterprise?

3        A    I believe what he's saying is that -- is that

4    AVIC HQ would control its commercial activities and

5    subordinates, and we could talk about what he means by

6    control.  I don't -- I see him as speaking for what

7    would be the relationship up from those commercial

8    activities to AVIC HQ.  I don't think he's speaking to

9    sort of the other side of the pipeline, as it were.

10       Q    Well, let's make sure we're looking -- we're

11   treating the pronouns correctly.

12       A    Okay.

13       Q    He writes, "Given that AVIC Group HQ is wholly

14   owned by the Chinese central government, I would expect

15   it," it in this context, I believe, I submit to you, is

16   the Chinese central government.  "I would expect it,"

17   the Chinese central government, "to exercise control

18   over what is a very substantial commercial group in

19   which it," the Chinese central government, "has made a

20   substantial investment."

21            Do you dispute my interpretation of that

22   sentence?

23       A    That sounds like a plausible reading.  I --

24   you know, I don't know what he was thinking.  I don't

25   have the context, but that seems like a plausible

1476

1    reading.

2        Q    Okay.  Now, you would also -- you used a

3    phrase company -- single digit employee companies or

4    something to that effect?

5        A    I meant a small number, yeah.

6        Q    Right.  Right.  And so in that context we are

7    not talking about the AVIC pyramid of companies that

8    contain 400,000 plus employees.  So let me direct your

9    attention to single digit companies.

10       A    Okay.

11       Q    Wouldn't the appointment of only three or four

12   employees in a subsidiary entity like Ascendant signify

13   a greater degree of control by the parent than the

14   appointment of three to four employees in a subsidiary

15   that had 10,000 employees?

16       A    In the sense of de facto or actual control,

17   the kind of things Professor Naughton was talking about,

18   obviously, the larger the organization, the harder it is

19   to control it from the top or from the outside, I'd need

20   to know, you know, more about the structure.

21              If we've got a tiny entity where

22   virtually everybody is a fairly high level officer, then

23   it could be done consistently with ownership roles.

24   But, you know, as a descriptive matter, sure, if you're

25   appointing people to a small company, the likelihood

1    that you'll exercise influence or be able to affect what

2    goes on day to day in that company is higher because

3    you're talking about 3 or 4 people you've selected

4    rather than 100,000 people, including a factory worker

5    10,000 miles away.

6        Q    Okay.  Thanks.  And let's get even more

7    specific than that, Professor.  If the parent company of

8    Ascendant did not allow the president of Ascendant to

9    choose any of his employees, including providing a

10   nepotistic hire of someone the Ascendant president

11   referred to as an incompetent do-nothing, would you find

12   that to be an unusual degree of control?

13       A    I don't know that the competence of a hire

14   goes into questions of control.  I mean, I can pick a

15   great person or I can pick a terrible person; I've done

16   both.  The -- as I think I testified, if you have a

17   situation where this is being done through improper

18   channels, you know, again, under Chinese law owners have

19   a great deal of authority to pick managers and directors

20   of the firms in which they vest.  If it's not done

21   through a proper channel, then it is a displacement, it

22   is an act which would raise questions about failure to

23   respect the autonomy of the management.

24                    If it's done through proper channels,

25   then it's -- it may be a regrettable feature of Chinese

1478

1    company law, but it's a system that gives a lot of

2    rights to the owners at the -- compared to what we do

3    with directors typically.

4            So I don't know how much these statements

5    are colloquial about "I didn't actually get to make the

6    choice" versus, you know, because it was done through

7    the channels whereby they can make those decisions or

8    whether it's a -- you know, they actually came in and

9    said, "Here are your employees.  We're disregarding the

10   formalities."

11           The latter would be an instance of a

12   violation.  I said what I think about a one instance

13   proving the broader pattern of unitariness.

14       Q    Thanks.

15       A    Thank you.

16       Q    Let's look again -- we'll look back to

17   Chadwick's report.  In section 2.65, Mark Chadwick

18   cites, and I quote -- he's citing Professor Jacobson.

19   He says, "Professor Jacobson has not cited any evidence

20   to show that AVIC USA was set up with the intention 'to

21   perpetrate an injustice against an American business.'"

22   I'll let you write that down.  Let me know if you need

23   me to repeat it.

24       A    I got it.

25           CHAIRMAN ALDOUS:  Just for the purposes

1479

1    of the panel, could you tell us who Chadwick is?

2                    MR. DENNEY:  Mark Chadwick is

3    Respondents' rebuttal expert on alter ego and I believe

4    they have said that they were submitting his report to

5    you.

6                    CHAIRMAN ALDOUS:  So he hasn't testified;

7    he's just -- the report has been admitted?

8                    MR. MCNEIL:  That's correct.  And his

9    report is in your binder, and it is AVIC USA 193.

10                   CHAIRMAN ALDOUS:  Thank you.

11                   MR. DENNEY:  Sorry I didn't give context

12   for that.

13                   CHAIRMAN ALDOUS:  Well, no, no.  I tried

14   to follow along.

15        A    I'm sorry, can I get the last part, "effect an

16   injustice"?

17        Q    Absolutely.  I was going to read it again so

18   we can clarify that.

19                   MR. BAYLES:  And what's the section?

20        Q    So 2.65 Mark Chadwick states, and I quote,

21   "Professor Jacobson has not cited any evidence to show

22   that AVIC USA was set up with the intention 'to

23   perpetrate an injustice against an American business.'"

24        A    Okay.

25        Q    Is it your -- and I know that you told the

1480

1    panel just a minute ago that you're not an expert on

2    U.S. company law, and I'd already written the question

3    before you said that, so I'm going to ask you that.

4                    Is it your opinion that a subsidiary must

5    be established or set up with the intention to

6    perpetrate an injustice for alter ego liability to

7    apply?

8        A    You know, again, I'm not an expert on U.S. law

9    of alter ego liability.  I don't know what Mr. Chadwick

10   is referring to here.  The thing it most resonates with

11   for me is the context in Bridas where the allegation was

12   that this was a case of specifically setting up an

13   enterprise to defraud a foreigner.  Perhaps he has that

14   in mind.

15                    To the extent I understand that there are

16   other things that will do to at least raise questions of

17   corporate veil piercing, alter ego under some legal

18   standards.  And I've read instances where it looks to a

19   more broader -- a more broad, you know, pattern where

20   the subsidiary in question is completely a sham rather

21   than the transaction specific one.  Bridas strikes me as

22   transaction specific, which is what this language looks

23   like is my understanding that one could show and across

24   the board lack of separateness and substantiality.

25                    And, again, I am not offering an opinion

1481

1   on what U.S. law on this is.  My report, obviously, and

2   my testimony speaks to that in a variety of ways,

3   primarily as a response to the assertions of this

4   universal or sort of overall unitariness that was -- I

5   took to be the allegations or the conclusions of

6   Claimants' experts' reports.

7       Q    As a follow-up question to that, do you have

8   an opinion one way or the other about whether alter ego

9   law could apply to a subsidiary that was initially set

10  up without the intent to perpetrate an injustice but

11  later was used to perpetrate an injustice?  Would that

12  be a vehicle for the finding of alter ego?

13      A    I don't know.  I could imagine it would be,

14  but I'm not offering an opinion on the American law of

15  alter ego veil piercing, etc.

16      Q    Professor, my final question will be -- is

17  simply, are you aware that when making an alter ego

18  determination, a Court is to be concerned with reality

19  and not form in how the corporation operated?

20      A    Yes.  My understanding is that that is -- that

21  that is an important factor.  The legal factors,

22  obviously, enter into it.  It's on some of the Bridas

23  factors, and, know, where you have a set of legal rules

24  that say the allegations here would be severe

25  transgressions, you know, that can, it seems to me, be

1482

1    germane to a factual determination in the sense of if

2    all of this pattern has been going on, then if the

3    system is functioning properly, some of it could have

4    called for sanctions.

5            MR. DENNEY:  Pass the witness.

6            CHAIRMAN ALDOUS:  Any other Claimants

7    have any questions?  Any redirect, Mr. Bayles?

8                    FURTHER EXAMINATION

9    BY MR. BAYLES:

10       Q    Professor, do you have any information upon

11   which to conclude that AVIC USA set up another entity to

12   compete with Soaring Wind?

13           MR. SHAMOUN:  You are the only guy that

14   can hold a microphone that I can't hear.

15       A    I'm afraid I couldn't hear it either.

16           MR. SHAMOUN:  Would you do that again?

17           MR. BAYLES:  Is this thing on?

18       Q    Professor, do you have any information upon

19   which to conclude that AVIC USA set up another entity to

20   compete with Soaring Wind?

21       A    Not that I'm aware of.

22       Q    And just -- I wanted to put this -- mention

23   this to you.  This was admitted today.  You familiar

24   with this situation that's in AVIC USA Exhibit 276?

25       A    I've seen a couple of references in the media,

1483

1   including this Wall Street Journal article.  And I
2   believe that's the publication to which Professor
3   Naughton referred when he was talking about the -- his
4   discussion of the setting up -- of the importance of
5   wind energy and the setting up of wind energy specific
6   vehicles.
7       Q    And this would be the publisher of that
8   article that you've --
9       A    This would be the -- I'm assuming that we're
10  using consistent translations of the Chinese journal,
11  this is the same journal.  And, if I remember this Wall
12  Street Journal article correctly, the indication of the
13  corporate parent of this entity is consistent with his
14  description of that journal.
15      Q    Thanks.
16           MR. BAYLES:  Nothing more.
17           CHAIRMAN ALDOUS:  Any questions to my
18  left on the panel?  Any questions to my right?  Judge
19  Marshall first.
20                    EXAMINATION
21  BY JUDGE MARSHALL:
22      Q    As I understood your testimony at the
23  beginning, you were saying that the recent trend and so
24  forth and reforms were to promote independence of the
25  various corporations, even the state-owned corporations,

1484

1    from the government -- from governmental control; is

2    that right?

3        A    That's correct.

4        Q    Did I understand you correct?

5        A    Yes.

6        Q    Okay.  So I guess I'm a little confused

7    because in the Shanghai stock market collapse with the

8    argument that prevailed about selling short and so

9    forth, did I hear you correctly that it is a communist

10   party entity, the CDIC, that is investigating this on

11   behalf of the state?

12       A    No.  I'm sorry if I was unclear on that.  As I

13   understand it, and this is from news reports, I don't

14   have direct knowledge, but the reports are that the

15   CSRC, which is the China Securities Regulatory

16   Commission, it's like our SEC is, the closest analogy,

17   was investigating these short sales as possibly illegal

18   short sales that would be just -- you know, would be

19   barred by, as I understand it, a properly issued

20   document.  I haven't done the research to verify that,

21   but that's the reports.

22            The Central Commission for Discipline

23   Inspection is a party body that looks into any number of

24   forms of misbehavior, including corruption by people who

25   are party members, and that includes many senior

1485

1  executives at companies, many government officials and

2  so on.

3              I have no independent knowledge that

4  Mr. Yang [phonetic], who is reportedly under CSRC's

5  state securities regulator investigation, is also under

6  CCDI party corruption investigation or wrongdoing

7  investigation.  If he's a party member, which he

8  probably is, then he is certainly vulnerable to that.

9  It would not surprise me if he were facing that as well.

10 I just don't know.

11      Q    And you would have no way to inform the panel

12 as to any personnel relationships between the party

13 entity and the state entity conducting these

14 investigations, if any?

15      A    Well, again, senior leadership at state bodies

16 in China is vetted by the party and it mostly consists

17 of party members.  They are different organizations.  So

18 the CCDI, the party body, has its own staff.  It is

19 within the party, and it investigates all sorts of

20 misbehavior by people who are party members.  Often that

21 misbehavior comes in the performance of corporate roles

22 or the performance of government roles, but the issue is

23 not technically illegality or ultra vires actions or

24 something like that, it is about breaches of party

25 discipline.

1486

1          Now, obviously, things overlap.  If

2   you're taking money as a bribe, that is both a criminal

3   offense and a breach of party discipline.  So, you know,

4   there are -- they are overlapping fact sets that trigger

5   these kinds of investigations, but they proceed in

6   parallel to one another, sometimes after a party

7   discipline investigation, the individual being referred

8   for prosecution by the state authorities for criminal

9   offenses.

10     Q     Okay.  Thank you very much.

11          CHAIRMAN ALDOUS:  Mr. Byrne?

12          MR. BYRNE:  Yes, sir.

13                    EXAMINATION

14   BY MR. BYRNE:

15     Q     This morning, sir, I heard you make reference

16   to things that are allowable under Chinese law.  I heard

17   you say that frequently, and I was unable to connect

18   that up with the Bridas factors.

19     A     Right.  So, you know, there are 21 Bridas

20   factors.  I may not get to this completely, but I think

21   what you may be referring to was the -- not my first few

22   -- first one or two but like the next cluster of Bridas

23   factors that I discussed and that I said in my testimony

24   earlier, that Chinese law does allow a variety of forms

25   of action by owners and investors that are on the list

1487

1    of Bridas factors, like other countries' law allows it,

2    too.

3              So setting up a subsidiary, providing

4    capital to a subsidiary, owning shares in other

5    companies, having a role in the selection of directors

6    and owners of the -- directors and officers of the

7    companies in which you invest, setting strategic

8    guidelines and guidance for companies that are members

9    of an enterprise group or a subordinate, those are all

10   allowed under Chinese law.  They, obviously, intersect

11   with some of the Bridas factors.

12             Clearly, many, many companies would flunk

13   at least some of the Bridas factors.  I don't know quite

14   how to parse those if they are what they said.  I mean,

15   several of those, really, it does come in the vein of

16   what I testified to as proving too much.  That is, if

17   this is a violation, we're all in violation.

18   Q    Okay.  I just want to make sure that because

19   something is in compliance with Chinese law, you're not

20   telling us that that's an exception to a Bridas factor?

21   A    Oh, no, absolutely not.  I mean, that is not

22   -- I mean, just as in the Bridas case itself, I

23   assume -- I have no knowledge of Turkmenistan law, but I

24   assume that the legal act in question there was lawful

25   under Turkmenistan law just as, by the way, the

1488

1   expropriation of foreign property in China in 1949 was

2   perfectly lawful under Chinese law.  It didn't make it

3   okay, it didn't make it internationally lawful.

4       Q    All right.  Real quickly, did you have an

5   opportunity to review either the audio or the

6   transcripts of the recorded statements?

7       A    Of the telephone conversations?

8       Q    Yes.

9       A    Yeah, I did have an opportunity to review the

10  transcripts.  I have not heard the audio.

11      Q    Were you also given an opportunity to review

12  the depositions of those who were recorded or otherwise

13  hear their testimony and explanations here at trial?

14      A    I heard Mr. Zhang's testimony.  I have seen --

15  I have not read thoroughly but have seen Xu Hang's

16  deposition.  I read Mr. Jenevein's affidavit, so I've

17  seen some of that supporting documentation.

18      Q    What, if any, weight did you place on the

19  statements that were made in those recordings or their

20  explanations afterwards in reaching your conclusions?

21      A    Well, a couple of things.  One is I've tried

22  to steer clear of doing credibility determinations.

23  That strikes me as a question for the panel.  I've tried

24  to flag areas where, you know, the following, if true,

25  would support or not support a conclusion.  But that I

1489

1   don't see as my role.

2           I did in my report, before I had seen the

3   transcripts, when I had seen only the quotations and

4   then at my deposition after I'd had a chance to review

5   the transcripts, I suggested that there were

6   plausible -- in my experience dealing in China,

7   plausible explanations of the comments that were not the

8   explanations being offered by Claimants' experts or by

9   Claimants, including -- do you want me to give an

10  example or two?  I'd be happy to.

11      Q     Yeah, I'll take an example.

12      A     So one, for instance, where I believe it is

13  Mr. Zhang who was quoted as saying, "AVIC is like

14  China," which I believe was offered by one of their

15  experts, probably Mr. Jacobson, as showing this kind of

16  unitariness.

17           The way I interpreted that, from context

18  and from the way I've heard Chinese business people use

19  the term over the years, I took that being a statement

20  of when you say AVIC, you got to tell me what in AVIC

21  you're talking about.  To say China doesn't tell me

22  whether you mean Shanghai or Beijing, the province, the

23  county, you know, so it was like that.

24           As I testified earlier today, I think

25  Mr. Ma's statement sounded to me in text and, if I

1   remember correctly, context as recapitulating the

2   history of AVIC's emergence and development along the

3   lines we've discussed rather than a statement of the

4   current state of affairs.  And I put in my report -- and

5   I had no contact, I had not met Mr. Zhang or been told

6   anything about his views before this, but I put in my

7   report that one thing that is a plausible explanation, I

8   can't say whether it's true or not, but is a plausible

9   explanation of his representations about how yeah, this

10  is all kind of a mess is the attempt to kind of

11  sympathize and curry favor with somebody who's clearly

12  outside.

13          I've seen that happen in Chinese context

14  on many occasions, and to sort of deflect responsibility

15  saying, "Oh, it's somebody up the chain or it's somebody

16  down the chain who's responsible."  So, I mean, it's

17  resonated with experiences I've had.  I, obviously, have

18  no knowledge about what was in their heads at the time.

19      Q    So those are plausible explanations.  I guess

20  my question is, what weight, if any, did you place on

21  any of those statements?

22      A    I think all that I did with that was because I

23  could see explanations of those statements that were not

24  the ones offered by the Plaintiffs -- the Claimants, I

25  discounted them more than I would have if I had felt

1491

1    compelled to take them as the truth of the matter

2    asserted.

3        Q    And you offer no opinions or assistance to the

4    panel on an "if this is true, then this"?

5        A    I mean, I think there are parts where I've

6    done this.  As I said, some of the -- some of the claims

7    about what happened and the meaning of what was said, if

8    true, if taken as true, would represent individual

9    instances of transgressions.  I've given my view about

10   whether or not those add up to a lot.  And some of them,

11   as I said, I think don't add up to much of anything.

12   So, I mean, I don't want to recapitulate, but I've tried

13   to offer guidance at that level but I'm trying to steer

14   clear of credibility determinations.

15                CHAIRMAN ALDOUS:  Mr. Capshaw?

16                MR. CAPSHAW:  No.

17                CHAIRMAN ALDOUS:  Mr. Shamoun?

18                          EXAMINATION

19   BY MR. SHAMOUN:

20       Q    You mentioned investigations in China.  How is

21   it that the public, if you know, or us here will know

22   what investigations are going on?  Is that something

23   that is open and disclosed to people?

24       A    It varies.  Certainly, a lot of these things

25   do become public, so let me try to answer that

1492

1    succinctly, which is on the party side, the Central

2    Discipline Inspection Commission -- the Central

3    Commission, I'm sorry, for Discipline Inspection, the

4    CCDI, those processes are often very secret until late

5    in the game, but they go very public.

6              You may have heard of Bo Xilai, the party

7    chairman in Chongqing who was sentenced to life

8    imprisonment for his involvement for a killing of a

9    businessman by his wife, all that stuff.  So those

10   become public.  And, certainly, when somebody is

11   stripped and kicked out of the party, that becomes

12   public after the fact.

13             For stateside, government side

14   investigations like the CSRC, it varies.  Often they

15   come out very early.  This one with Mr. Yang has come

16   out before any conclusions has been reached.  Sometimes

17   they get a lot of emphasis because the state authorities

18   want to make clear they're going after a phenomenon.

19   But sometimes we hear about them only after the fact and

20   sometimes not so much that they're secret but they just

21   aren't publicized.

22      Q    Is it these investigations -- to your

23   knowledge, based on what you know, what you've learned,

24   what you studied, would they ever take place as a result

25   of activity conducted in the United States by a Chinese

1493

 1    subsidiary?

 2         A    Oh, yeah.  I've actually been involved in

 3    cases where that's been the case.  Certainly, activities

 4    abroad, yeah.

 5         Q    You understand the magnitude of what the

 6    Claimants have at least alleged in question here?

 7         A    I believe it's $7 billion or something like

 8    that.

 9         Q    And you understand the magnitude of what they

10    allege the facts to be for us to consider?

11         A    Yes, I think I do.

12         Q    To your knowledge, would that rise to the

13    level of initiating at least an investigation?

14         A    I would think it very well could.  I mean,

15    this, obviously, would be embarrassing, and we do have a

16    couple of precedents that suggest this.  I will flag two

17    of them briefly.  One is that -- and this is mentioned

18    in my report.

19              One of the things that led to some of the

20    reforms I was talking about was a case where the

21    Guangdong, that's G-u-a-n-g-d-o-n-g, International Trade

22    & Investment Company went out and made loans it wasn't

23    supposed to make, caused all sorts of concern,

24    particularly in Hong Kong.  There's a belief the state

25    would bail them out.  They didn't, so -- and that led to

1  imprisonment and criminal punishment for some of the

2  principals involved.

3           I personally was involved in a case

4  actually in Texas as an expert witness where Chinese

5  banks had entered into a joint venture with some real

6  estate people here.  And, banks and real estate, lovely

7  combination, and it got very ugly, and the -- some of

8  the principals in China were prosecuted and jailed for

9  their role in the transactions.

10  Q    And so would the panel be correct if they,

11  based upon your knowledge, testimony and experience, the

12  investigations that may have taken place here -- may

13  have taken place as a result of activity as alleged here

14  by these Chinese entities and people, has that, to your

15  knowledge, led to the reform that you spoke of?

16  A    I'm sorry, which reform?

17  Q    The reform.  You said that there's been

18  reformation in China about how they conduct their

19  business.

20  A    I think many, many factors fit into that, and

21  I think most of what goes -- the vast majority of what

22  goes on in China is about what goes on in China.  I

23  mean, there are -- this whole reform package is driven

24  by an attempt to have a more efficient economy, to have

25  companies that behave like companies, to, you know, have

1495

1   even -- and then there's an international component.

2   They want national champions and internationally

3   credible companies that can go out and compete.

4            But, you know, it's a very messy

5   situation.  Lots of bad stuff happens that doesn't lead

6   to investigations.  Sometimes poorly based

7   investigations go forward.

8            But the big deal reforms, that's been a

9   story that's been unfolding since 1978.  There are

10  profound reasons behind it, and, you know, it's a big

11  place, there's a lot of stuff going on, so as I tried to

12  suggest with the 2008/2009 restructuring of AVIC, there

13  were a lot of forces behind that, too.  And that's --

14  it's, you know, what makes this job interesting is there

15  are a lot of big questions and big forces you have to

16  wrestle with.

17      Q    Last question, I hope.  Before you came here

18  today, would it be fair to say that all of the

19  information that the Claimants' experts relied upon that

20  they disclosed they relied upon was the same information

21  you relied upon?

22      A    I don't think that's entirely true.

23      Q    Did you rely upon more information that the

24  Claimants' experts did not have?

25      A    Yes.  Certainly I looked at scholarship on the

1496

1    behavior and career paths and incentives of Chinese

2    state-owned enterprise managers.  I didn't see any

3    reference to that scholarship.

4         Q    That was a bad question.

5         A    I'm sorry.  You mean facts.

6         Q    I was talking about facts.  For example, were

7    you provided a list of all the officers and directors of

8    all of the entities on the board up there?

9         A    I'm sorry for misunderstanding the question.

10        Q    My fault.

11        A    I did have facts that I used that I don't

12   think are represented in their report.  Those are the

13   product of my own looking around through, you know, the

14   usual research tools that I use, which include asking

15   the Google and the Interwebs, define what I can running

16   searches in English and in Chinese for some of the key

17   terms.  And so I can't recall offhand specifically, but

18   I know that I did see websites and media coverage that

19   was not reflected in --

20        Q    Were you provided a chart that shows all the

21   officers and directors of all of the entities that are

22   on that demonstrative board behind you?

23        A    No.  I found information that overlapped with

24   some of that by finding websites that list officers and

25   directors of some of the entities, but I was not

1497

1    provided with nor did I find a systematic list of all of

2    them.

3        Q    Did you ask for it?

4        A    I don't believe I did.

5        Q    Would that have been helpful?

6        A    I don't think it would have made a major

7    difference in that, as I've testified, it is lawful and

8    common practice to have a lot of these two hattings, if

9    you were, people who are at a superior entity and occupy

10   a position at a subordinate.  It is common practice in

11   the Chinese state-owned enterprise structure for people

12   to rotate through positions to move across entities.

13             So I think the most it would have shown

14   me was some of that.  If there's wildly more than that,

15   you know, that would have been good to know, but I would

16   have expected to see more of that in the Claimants'

17   discussion.  And not knowing why people move around or

18   what they do would be hard for me to conclude from the

19   list.

20       Q    Last question.  When you look at that

21   demonstrative aid behind you and you see all the lines

22   and you see all those names of entities and you see at

23   the top AVIC, Aviation Industry Corporation of China,

24   knowing what you know about what you've testified you

25   know about, would you consider those affiliates of each

1498

1    other?

2        A    Would I consider them all to be affiliates of

3    each other?

4        Q    Affiliates of each other.

5        A    They're all part of the AVIC group of

6    companies.  Affiliates, I'm not quite sure what that

7    means.

8        Q    You don't know -- you're a professor of law?

9        A    Well, I mean --

10       Q    I'm not trying to cross-examine you.  I

11   mean --

12       A    I mean, they are -- I don't know specifically

13   about enough of the connections among the horizontal

14   entities to know whether I would characterize them as

15   affiliates.  I would characterize them as part of a

16   group, as part of a nested series of partially or

17   wholly-owned entities and as not existing entirely at

18   arm's length of strangers, but . . .

19       Q    Say that again.

20       A    They're not -- they do not have the kind of

21   stranger-like relationship that you would have of

22   companies that have no connection of ownership,

23   personnel movement, things like that.

24                  MR. SHAMOUN:  Thank you.  That's all I

25   have.

1499

1      JUDGE MARSHALL:  Mr. Chairman, I have two

2  short questions.

3      CHAIRMAN ALDOUS:  Okay.

4           FURTHER EXAMINATION

5  BY JUDGE MARSHALL:

6      Q    Professor, this is a Chinese law question.

7      A    Feel better with those.

8      Q    Well, you know more about it than I do.

9           Under Chinese law, would the president of

10  one of these entities be a legally designated person

11  whose signature would be capable of binding the

12  corporation under Chinese law?

13     A    The president or CEO or general manager, which

14  are equivalent positions depending on specifics of the

15  type of company, ordinarily would be the legal

16  representative person who would have the authority to

17  bind the company.

18     Q    So if they signed an agreement such as the

19  Soaring Wind, LLC, that would not require any further

20  upstream approval; is that correct?

21     A    Probably.  The issue is in some industries you

22  need government regulatory approval, but basically as --

23  to the extent it would be lawful for the company to do

24  that without further approval, and typically that would

25  be enough to make the commitment.

1500

1          JUDGE MARSHALL:  Thank you.  That's all I

2  have.

3                    EXAMINATION

4  BY CHAIRMAN ALDOUS:

5      Q    Guess what?  I get to go last.  So I do have a

6  question.

7               Has your work in the human rights with

8  respect to Taiwan affected your ability to travel to

9  China, mainland China, at all?

10     A    My human rights work is on China.  My work on

11 Taiwan has nothing to do with human rights but mainland

12 Taiwan relations.  I have never had any trouble.  I have

13 never been denied a visa or been denied entry.

14     Q    Is there any concern that if you were to take

15 a position that was not helpful that it would affect

16 your ability to travel to mainland China?

17     A    No.

18     Q    Do you think there's a conflict between

19 Chinese culture and U.S. laws of alter ego?

20     A    I don't think there's a conflict.  I think

21 that -- boy, I do not want to get into being an expert

22 on Chinese culture, but in my experience, you know, with

23 China, you know, there's a spectrum, and I would say

24 that it is less baked in to the perspective to have

25 quite the -- you know, I don't know whether they're

1501

1    weird or we're weird, but to have quite the degree of

2    emphasis on, you know, formality and role and all that.

3    It is somewhat weak in China, but, you know, obviously,

4    in one country at one point, 4 billion people; in

5    another country, 350 million people, those are big bell

6    curves that have a lot of overlap.  And, you know, we're

7    talking about people who deal in transnational business,

8    and so there could be one end of that spectrum.  But if

9    you want a sort of macro generalization, I would put

10   China down the spectrum from the U.S. in terms of that.

11        Q    Well -- and so you've testified about Chinese

12   law and, obviously, you're aware of that.  Do you see

13   any kind of conflict in Chinese corporate law with the

14   U.S. concept of alter ego?

15        A    I don't see any major conflict.  The corporate

16   law -- the company law of China is largely borrowed.  I

17   mean, it is significantly based on an amalgam of

18   European continental style company law, German company

19   law in particular, with a lot of American Delaware

20   influence.  So it's very much in that model.

21             Now, there are -- so, I think, you know,

22   most of what's there would be familiar to a Western

23   company lawyer.  There are some peculiar features.  I've

24   touched on them.  There's the funny issues about state

25   assets, there's this concept of the solely state-owned

1  corporation as a separate category, which mostly looks

2  like other companies but has a few special rules.  And

3  there is a system which, at least compared to the United

4  States, gives owners relatively robust rights compared

5  to the board and the officers, but it's a fairly

6  marginal difference.

7           There's this thing called the board of

8  supervisors, which I think one of their experts gets

9  wrong, that is borrowed from Germany.  They're minor

10 differences.

11     Q    Well, I guess what -- the reason for my

12 question is, if AVIC or any other Chinese corporation,

13 and I'm talking about AVIC from the HQ all the way down,

14 followed Chinese corporate law, then they shouldn't run

15 afoul of U.S. concepts of alter ego?

16     A    I --

17     Q    Would that be a fair statement?

18     A    Yes, that is a fair statement.  My only caveat

19 is I think a lot of companies, Chinese and otherwise,

20 would run afoul of some of the Bridas factors.

21     Q    Right.  But I think that any company

22 potentially could.

23     A    But if you are staying within Chinese law, you

24 should not wind up in a U.S. situation where one would

25 conclude as I understand this law in an alter ego veil

1503

 1    piercing type of situation.  I think that's a fair

 2    statement.

 3        Q    And, of course, I mean, I'm not saying they

 4    always follow -- everybody always follows the law.  I

 5    mean, we've got the Foreign Corrupt Practices Act, which

 6    is basically to make sure that -- people, obviously,

 7    violate it all the time.

 8             You said there was a reorganization in

 9    the late 2000s, and I believe you said 2007/2008 --

10        A    I think it was 2008/2009, but somewhere in

11    that region.

12        Q    Okay.  That was meant, in part, to prevent the

13    type of duplication of effort between the companies that

14    may have occurred before.  Did I hear you right?

15        A    Again, I'm basing this on probably the RAND

16    report and what I recall seeing in scholarly media

17    discussions and talking with people in China, some of it

18    back almost to that time.  And there were, I think, you

19    know, many factors feeding into that reorganization on

20    the standard account, and this is, you know, various

21    sources, that there was a sense that the AVIC I and AVIC

22    II split had failed.

23             That is, what happened in many sectors in

24    China was an attempt to deal with the problem of a

25    relatively monopolistic structure but without giving up

1504

1   state ownership, you would put two entities that have

2   either full or partial state ownership in competition

3   with one another.  This is happening in telecoms, the

4   wireless services.  And they did it, my understanding

5   is, with AVIC for a while.  It didn't work.  That is, it

6   was not providing the efficiency and quality and

7   competitive gains they hoped, so it was fixing that.

8              There was also a sense that -- this is

9   mostly the RAND report, a sense of frustration within

10  AVIC that different units were not well coordinated and

11  were duplicative.  I don't know of claims that that

12  specifically drove that.  I know it was a

13  contemporaneous concern.

14      Q    And you're not saying that that reorganization

15  affected this particular case in that the creation of

16  AVIC IRE, for instance, was meant to stop duplication of

17  effort for other AVIC subsidiaries?

18      A    I don't know that that was specifically the

19  case, but I've heard about the AVIC IRE part of this

20  was, as Professor Naughton, I think, mentions, it's part

21  of an attempt to improve corporate governance generally.

22              And, you know, one of the aspects of

23  corporate governance improvement in China has been to

24  make Chinese companies in one way or another interact

25  with foreign counterparts partly as competitors.

1505

1   Whether that's letting foreigners into China or telling

2   Chinese companies to go out and make their own way in

3   the outside world where, you know, the reforms they've

4   been pursuing are, to a significant degree, already in

5   place.

6                    CHAIRMAN ALDOUS:  All right.  Thank you,

7   sir.

8                    MR. SHAMOUN:  I have a question.

9                          FURTHER EXAMINATION

10  BY MR. SHAMOUN:

11       Q     Under Chinese law, did I understand your --

12  you studied Chinese law?

13       A     Yes.

14       Q     Thank you.  Under Chinese law, is there any

15  prohibition for subsidiaries to compete with each other?

16       A     No.  No.

17       Q     That's not a prohibition --

18       A     No.  No.

19       Q     -- under Chinese law?

20       A     No, it's not a legal prohibition.  In Chinese

21  law, companies are allowed to engage in any business

22  within their defined scope of business.  It's not quite

23  like American law where you incorporate saying for any

24  lawful purpose.  You tend -- although it's getting

25  looser, you tend to list a variety of scopes of business

1506

1    on your business license and then you can go back and

2    amend that over time.

3        Q    And, based on your studies, do they allow

4    their subsidiaries in the United States also to compete

5    with each other?

6        A    I don't know of any specific examples.  All I

7    can tell you is that it is, you know, generally accepted

8    that we do have instances of groups within the same

9    corporate structure of duplicating functions.  I don't

10   know specifically in the U.S.

11                    CHAIRMAN ALDOUS:  All right.

12                    MR. BAYLES:  One question.

13                    CHAIRMAN ALDOUS:  Go ahead, Mr. Bayles.

14                    FURTHER EXAMINATION

15   BY MR. BAYLES:

16       Q    I just want to make sure that I understood Mr.

17   Shamoun's question about Chinese law and the prohibition

18   against subsidiaries competing with each other under

19   Chinese law.

20                    That doesn't have anything to do with

21   what contracts might be in place that might prohibit two

22   subsidiaries from competing with each other?

23       A    Right.  So there is -- as a legal matter,

24   companies can do anything within their properly defined

25   scope of business.  Now, the investors or owners or

1507

1    leaders of a company have -- you know, can seek whatever

2    business license they want.

3              So it is open-ended in the sense that

4    there is no general Chinese law saying subsidiaries may

5    not compete with one another.  There are restrictions

6    that can come in either through what's put into the

7    scope of business in the business license or through

8    contractual arrangements.  Sure, that's fine.  You're

9    definitely allowed covenants not to compete.  Those

10   kinds of things are certainly permissible and often

11   exist.

12             CHAIRMAN ALDOUS:  All right.  May this

13   witness be fully excused?

14             MR. JENEVEIN:  Yes, Your Honor.

15             CHAIRMAN ALDOUS:  All right.  Thank you,

16   sir.  Appreciate you coming and offering your testimony.

17             Do y'all have any more witnesses?

18             MR. DEWOLF:  Your Honor, for Paul

19   Thompson, we do not and we're ready to rest, subject to

20   some housekeeping matters on documents.

21             CHAIRMAN ALDOUS:  Okay.  And what about

22   AVIC International USA?

23             MR. MCNEIL:  Same, Mr. Chairman.

24             CHAIRMAN ALDOUS:  All right.  So let's

25   take care --

1508

 1               MR. CAPSHAW:  Mr. Chairman, before we

 2    leave that, one quick -- Mr. Jenevein, could you provide

 3    us with the cite to the case that you were -- the New

 4    Orleans case on the Fifth Circuit?  Before I forget, I

 5    want to make sure that you-all make a note to provide

 6    that to the panel.  I don't know if you already have,

 7    but I would like to see that case.

 8               MR. JENEVEIN:  I don't think I have yet,

 9    Mr. Capshaw.  I certainly will.

10               MR. CAPSHAW:  Thank you.

11               CHAIRMAN ALDOUS:  What housekeeping stuff

12    do you have there, Mr. DeWolf?  It looks pretty thick.

13               MR. DEWOLF:  It's pretty easy, though.

14    So documents 1 through -- I just want to make sure the

15    panel knows what we got.  So documents 1 through 234,

16    Thompson exhibits, are all back there.  We gave them to

17    you.  They're there.

18               CHAIRMAN ALDOUS:  Right.

19               MR. DEWOLF:  I would point out to the

20    panel that just published it, I can give you an extra

21    copy if you want more paper, but Wendy Carlson, who's

22    our handwriting expert, is at Exhibit No. 182, 183.  And

23    we're only submitting her by report because that's what

24    those guys are doing.  So it's important that you -- I

25    highlight that so it doesn't get lost in the shuffle.

1509

1       CHAIRMAN ALDOUS:  So let me just say

2  this, that I don't want a copy because I have it on --

3  electronically.  Any member of the panel want a hard

4  copy of this particular exhibit, please ask for it.  But

5  I don't need it because I have it electronically and

6  it's easier.

7       MR. DEWOLF:  So let me just do that

8  before I get the next part.  Who wants one over on the

9  this side?

10       JUDGE KAPLAN:  And, Mr. DeWolf, these are

11  not in the exhibits that were tendered earlier?

12       MR. DEWOLF:  They are in the exhibits

13  that -- the big box --

14       JUDGE KAPLAN:  They are?

15       MR. DEWOLF:  Yes.

16       JUDGE KAPLAN:  So this is a duplicate of

17  what's already in there?

18       MR. DEWOLF:  It is.

19       JUDGE KAPLAN:  I don't need a copy.

20       MR. DEWOLF:  It's already there.  I'm

21  just highlighting it so you know.  Do you want one?

22       CHAIRMAN ALDOUS:  Mr. DeWolf, can you

23  rest quickly?

24       MR. DEWOLF:  I'm resting subject to --

25  let me finish with -- after I rest --

1510

1     CHAIRMAN ALDOUS:  You can take that up --

2     MR. DEWOLF:  Yeah, that's fine.

3     CHAIRMAN ALDOUS:  All right.  So we're

4  going to take a lunch break.  Do you have any witnesses

5  to call in rebuttal?

6     MR. JENEVEIN:  No, sir.  I've talked with

7  all Claimants' counsel and we are ready to close.

8     CHAIRMAN ALDOUS:  All right.  So

9  everybody's closing.

10     MR. JENEVEIN:  I also have some documents

11  I want to make sure y'all have.

12     CHAIRMAN ALDOUS:  Right.  We can take

13  care of that after lunch because I've been instructed to

14  hurry.  So then we're just talking about closing

15  arguments?

16     MR. DEWOLF:  Correct.

17     CHAIRMAN ALDOUS:  Have y'all given any

18  thought to how much time you want?

19     MR. SHAMOUN:  Can I tell them how much

20  time they got?

21     CHAIRMAN ALDOUS:  No.

22     MR. DEWOLF:  We're all about, I'll bet

23  ya, and I want a dollar if I'm close, 13:50.

24     CHAIRMAN ALDOUS:  Just tell -- wait a

25  minute.

1511

1        MR. SHAMOUN:  For who?

2        MR. DEWOLF:  For both of them.  Both of

3    us are about 13 hours and 50 minutes.

4        MR. SHAMOUN:  All right.  How much leeway

5    --

6        CHAIRMAN ALDOUS:  Wait a minute, wait a

7    minute.  So tell me this:  How much time do you want

8    because don't say "the rest of time"?  Just tell me how

9    much time you want because I'm going to put some

10   limitations on the argument time.

11       MR. DEWOLF:  Mr. Walters is arguing for

12   Paul Thompson.  I'll let him address that.

13       MR. WALTERS:  Yeah.  I can tell you I did

14   my best last night to get prepared.  There's a lot of

15   documents.  I need about an hour for me.

16       MR. MCNEIL:  Same.  I have an hour, ten.

17       CHAIRMAN ALDOUS:  Hour, hour.

18       MR. JENEVEIN:  We can do an hour and a

19   half total.

20       CHAIRMAN ALDOUS:  All right.  That's an

21   awful lot of time.

22       MR. JENEVEIN:  I think we'll --

23       MR. WALTERS:  I may give you some back.

24       CHAIRMAN ALDOUS:  The way it'll go is you

25   guys will go first, second and then last.  You don't

1512

1    have any more than half an hour on rebuttal.

2                    MR. JENEVEIN:   Okay.

3                    CHAIRMAN ALDOUS:   All right.   We're

4    taking a lunch break.

5     (A lunch break was taken from 12:02 p.m. to 1:07 p.m.)

6                    CHAIRMAN ALDOUS:   Before we get started,

7    there's some housekeeping issues that both sides have.

8    Do you have additional stuff, Mr. DeWolf?

9                    MR. DEWOLF:   Thank you, Your Honor.   So,

10   as I said before, we've given you, prior to the

11   arbitration starting, Exhibits 1 to 234.   I've also

12   given you what we call the key docs in a binder, which I

13   can see some of y'all have.

14                   Then documents -- just so everybody has a

15   record of this.   So documents 235 through 249 were

16   supplied to you on Sunday at 3:12, and some of those,

17   they referred to exhibits in Ms. Bramer's deposition,

18   and I have copies of the relevant portions of those,

19   which I would submit at this time.

20                   JUDGE MARSHALL:   235 to what?

21                   MR. DEWOLF:   235 to 249.   And there

22   are -- numbers 242 through 248 are references to Exhibit

23   No. 9 in Ms. Bramer's deposition, and I've given you --

24   here we have the exact -- I've got copies of those

25   documents or excerpts of them.   So I would submit those

1513

1    at this time.

2                    CHAIRMAN ALDOUS:  Go ahead and pass them

3    out.  By the way, anything else?

4                    MR. DEWOLF:  Just a few more.  It'll take

5    me five minutes.

6                    CHAIRMAN ALDOUS:  Why don't you just do

7    them all.  It'll save time.

8                    MR. DEWOLF:  Okay.  All right.  That's

9    fine.

10                   CHAIRMAN ALDOUS:  In terms of handing

11   them out.

12                   MR. DEWOLF:  Yeah.  All right.  So then

13   just that the panel knows, 250 is the Carter document,

14   which was Hong Kong funding, which the panel ordered.

15   You've got that.  251 is a document related to that.

16   252 is a new document, which we move to admit, which is

17   Thompson -- it's Jenevein's deposition, Mr. Patrick

18   Jenevein's deposition.  It's Thompson Trial Exhibit No.

19   252.

20                   And then the remaining documents, 254,

21   255, 256 and 257 have been supplied to you during this

22   arbitration, so y'all should have copies.

23                   So, with that understanding, we rest.  I

24   think the only one I have to move for admission is 252,

25   which is Patrick Jenevein's deposition.

1514

1          CHAIRMAN ALDOUS:  Any objection?

2          MR. JENEVEIN:  No objection.

3          CHAIRMAN ALDOUS:  All right.  It's

4   admitted.

5          MR. DEWOLF:  Now may I pass out?

6          CHAIRMAN ALDOUS:  You may.

7          JUDGE MARSHALL:  Are these documents on

8   thumb drives?

9          MR. JENEVEIN:  Did he ask if he could

10  pass out?

11         CHAIRMAN ALDOUS:  He did.

12         MR. DEWOLF:  Do you want me to pass out

13  literally?

14         MR. JENEVEIN:  No objection.

15         CHAIRMAN ALDOUS:  While you're handing

16  those out, Mr. McNeil?

17         MR. MCNEIL:  Yeah.  Quick question.  We

18  have a couple of demonstratives that we're going to use,

19  and I know that -- I didn't recall if the panel had

20  marked the demonstratives of the Claimants or if you

21  would like us to mark those ahead of time and then make

22  them -- I didn't want to close and then go to move and

23  get an objection that somehow they were after the close

24  of evidence.  Would you like me to mark them now and --

25         CHAIRMAN ALDOUS:  No.  So what I would

1515

1  like for each of you to do with respect to your

2  demonstratives is e-mail the panel with a PDF of

3  those, if you can, which would save us from having to

4  lug it around.  And that would be the best for us.

5           Is that all right?  Any objection?

6           MR. MCNEIL:  No, no, I have no objection.

7  So what I'm going to do, if it's all right, is during

8  the close, I will reference them and have a reference

9  number so the record is clear, and then we'll PDF them

10 and I just want to have the permission of the panel to

11 do that.

12          CHAIRMAN ALDOUS:  Yes.  You can tell I've

13 sustained so many objections in this proceeding.

14          MR. MCNEIL:  Yeah, I think there was one

15 and I think I take credit for that, so . . .

16          MR. DEWOLF:  252 is Patrick Jenevein's

17 deposition.  I've got one copy here.  Can we send other

18 copies to you guys?

19          CHAIRMAN ALDOUS:  You may.  In fact,

20 that'd be better.

21          MR. DEWOLF:  In fact, do you want a hard

22 copy right now?

23          CHAIRMAN ALDOUS:  No, I do not.

24          MR. CAPSHAW:  Oh, Mr. Chairman, with

25 respect to the Claimants' submission of depositions?

1516

1          CHAIRMAN ALDOUS:  Well, wait.  That's on
2    my list.
3          Mr. Jenevein, did you have some cleanup
4    to do?
5          MR. JENEVEIN:  Yes, sir, I do.
6          CHAIRMAN ALDOUS:  Is Ms. Jenevein going
7    to take care of that?
8          MR. JENEVEIN:  She's going to help.  I
9    have provided to the panel some items to include in the
10   notebook that we gave you with that cover, the white
11   notebook.  Behind tab 3 is a summary.  It looks like
12   this.
13         CHAIRMAN ALDOUS:  Have you already put
14   them in here?
15         MR. JENEVEIN:  Yes, sir.  And I provided
16   them to opposing counsel.  Behind tab 4 is that summary
17   that's already been admitted that David Jacobson did.  I
18   have as part of -- and I don't know if the panel would
19   like me to mark this separately, I'm happy to, but it's
20   one of the charts that was provided by Erica Bramer,
21   except this one breaks out all the projects by country.
22   It's the same as the summary chart.
23         What I'd like to do is three-hole punch
24   it and get it to you so we can fit it in that damages
25   section.  But that would be marked as Claimants' Exhibit

1517

1   2008, so I'd ask it be admitted.

2                    CHAIRMAN ALDOUS:  1008?

3                    MR. JENEVEIN:  Yes, sir.  1008.

4                    JUDGE MARSHALL:  Is this what goes behind

5   tab 5?

6                    MR. JENEVEIN:  1008 will go -- not that

7   one, Judge Marshall.  That goes behind tab 4.  That's my

8   Bridas summary.

9                    JUDGE MARSHALL:  Oh, okay.

10                    MR. JENEVEIN:  This 1008 document that

11  y'all haven't seen yet will be the -- maybe a

12  supplemental page behind the final tab that's the

13  damages tab.  I'll give you one three-hole punched page

14  after the next break.

15                    CHAIRMAN ALDOUS:  All right.

16                    MR. JENEVEIN:  The last thing -- do you

17  have the breakdown of the expenses?  This has been

18  marked as --

19                    CHAIRMAN ALDOUS:  Are these the expenses

20  of the litigation?

21                    MR. JENEVEIN:  Yes, sir.  This is the

22  breakdown that Mr. Byrne asked -- or Mr. Capshaw asked

23  about.

24                    CHAIRMAN ALDOUS:  You know, I'm going to

25  ask for that as part of the briefing.

1518

 1                    MR. JENEVEIN:  That's fine.  That's
 2    easier.
 3                    CHAIRMAN ALDOUS:  So why don't you hang
 4    on to that.  I don't want you to rush on that.
 5                    So does everybody have their pen and
 6    paper out?
 7                    MR. SHAMOUN:  Did you mean as part of the
 8    submission of the attorneys' fees and expenses?
 9                    CHAIRMAN ALDOUS:  Yes.
10                    Does everybody have --
11                    MR. DEWOLF:  Yes.
12                    CHAIRMAN ALDOUS:  Are those depositions?
13                    MR. JENEVEIN:  Yes, sir.  These are the
14    depositions that have all of our deposition submissions.
15    They were in these boxes over here.  If you want them
16    now, we can give them to you now or we can deliver them
17    to the deliberation room.
18                    CHAIRMAN ALDOUS:  I tell you what, why
19    don't we leave them there, but we know where they are
20    because that was on one of my questions is where are the
21    depositions that were admitted.  Mr. DeWolf is going to
22    submit one deposition by e-mail.
23                    MR. DEWOLF:  Right.
24                    CHAIRMAN ALDOUS:  The handwriting expert
25    reports are marked as exhibits.  Are there any

1519

1  depositions that you guys have on the -- that side of

2  the room, the Respondents' side of the room, that have

3  not been provided to us that you have said, you know,

4  I'm submitting this in lieu of a witness?

5              MR. MCNEIL:  No.  I -- with the one tiny

6  caveat that I'm fuzzy on.  I think Xu Hang's deposition

7  is one of those which has been submitted to the panel.

8  Am I correct?

9              CHAIRMAN ALDOUS:  Can you check with

10 Mr. Bayles?

11             MR. MCNEIL:  Yes.

12             MR. DEWOLF:  And, Judge, Mr. Walters and

13 I just discussed it.  We're going to submit Erica

14 Bramer's deposition as well.

15             CHAIRMAN ALDOUS:  That's fine.

16             MR. MCNEIL:  And we'd like -- anything

17 that comes in from the Respondents' side, will that be

18 considered a joint --

19             CHAIRMAN ALDOUS:  Sure.

20             MR. MCNEIL:  Okay.  Very good.

21             JUDGE MARSHALL:  Are all of these

22 exhibits and depositions on the thumb drives that --

23             CHAIRMAN ALDOUS:  No, they're not.

24             JUDGE MARSHALL:  -- have already been

25 submitted?

1520

1    Then is there any reason why they can't
2  be now put onto a thumb drive and have that sent to us?
3    MR. JENEVEIN:  We can certainly do that.
4  We can send one thumb drive with everything.
5    JUDGE MARSHALL:  Because I don't want to
6  carry around all this paper.
7    MR. MCNEIL:  I'm fully in agreement.
8    JUDGE MARSHALL:  Thank you.  Wish I had
9  that on the record.
10    MR. MCNEIL:  I think it is.  I think it
11  is.
12    CHAIRMAN ALDOUS:  So the easiest way for
13  the panel to consider all this is to have all of it
14  delivered on the thumb drive just as Mr. Bayles did with
15  the -- all the exhibits.  That way, whether we combine
16  it or not, each one of us can carry it around and use it
17  to the extent and if we want.
18    The only thing that I would suggest is
19  that when -- with regard to your PDFs, do not combine
20  exhibits.  Have them separately so that you can click on
21  an exhibit if you want and not have to scroll through
22  five exhibits to get to one.  For instance, they did it
23  to where you -- they called an exhibit, you can go right
24  to it.  You guys had several that were in single folders
25  which mean you had to sometimes scroll through, and

1521

1  there was no easy way to get to it.  So the easiest way

2  is if you do it that way.

3            And since I'm going to give y'all a

4  timetable for some of this stuff, you know, should make

5  it to where you can submit it to each one of us rather

6  than having us carry these notebooks around.  I know

7  y'all spent some money to do that and some people do

8  like the hard copies.  I just happen not to be one of

9  them.

10            MR. MCNEIL:  May I just add one thing?  I

11  am in full agreement.  The only thing I wanted to say is

12  can you also order that we provide the operative

13  pleadings on that thumb drive, because I think I may

14  have mentioned at the outset --

15            CHAIRMAN ALDOUS:  Yes.  But I would like

16  for those to be in a separate folder marked pleadings.

17  In other words, don't have it as a -- so, in other

18  words, you'll have a folder for pleadings, a folder for

19  motions, if you want motions or whatever, folder for

20  exhibits, a folder for depositions.  And then each one

21  is in a separate file within that folder, if that's

22  acceptable to everybody.

23            Now, if you would, for post hearing

24  briefs, which we will accept, the transcript is going to

25  be -- we're going to give her 21 days to do it because

1522

1    she prevailed upon me, and so the transcript deadline is

2    September 4th, 2015.  The post hearing briefs are due on

3    September 25th, 2015.

4                You can file a reply limited to ten pages

5    by October 16th, and then -- yeah, October 16th.  In

6    your post hearing briefs, we expect you to submit the

7    attorneys' fees and expenses along with that.  And,

8    therefore, you know, whatever your fees and expenses are

9    in an affidavit format and your objections, if any, to

10   the attorneys' fees will be part of your reply.

11               MR. DEWOLF:  Would that include

12   objections to -- I think they've got some expenses --

13               CHAIRMAN ALDOUS:  Yes.  Whatever

14   objections that you have.  And what I would like to do,

15   though, is to make sure that those objections are

16   succinctly stated, so I'm going to make that part of the

17   ten-page limit.

18               In your post hearing briefs, I would like

19   attached or incorporated proposed findings of fact and

20   conclusions of law.  The agreement -- the Soaring Wind

21   agreement requires findings of fact and conclusions of

22   law.  As a result, for at least the ones submitted to

23   me, need to be in Word format.  You know, you can

24   eliminate all kinds of secret stuff that I would look at

25   in the document.  I don't mind that, but I would like it

1523

1    in Word.  Does everybody want a Word copy?  I think

2    everybody wants a Word copy, and I suspect that it would

3    be helpful to everyone in that manner.

4              MR. MCNEIL:  We need not submit --

5              MR. ASHWORTH:  I would like a hard copy

6    of the brief.  I assume we're talking about that.

7              CHAIRMAN ALDOUS:  I forgot.  The --

8    there's at least one panel member, two, three, who

9    prefer hard copies.  So -- of the briefs.

10             Any member of the panel that wants a hard

11   copy of any of the briefs, raise your hand now.  One,

12   two, three, four, five.  Oh, my God.  Five.

13             So, if you would, please make a note of

14   those who raised their hand and make sure they get a

15   hard copy.

16             MR. DEWOLF:  Could y'all do that, I'm

17   sorry, one more time?

18             CHAIRMAN ALDOUS:  If you hyper -- we

19   expect record references in your findings of fact and

20   conclusions, wherever you believe they're appropriate,

21   we expect them to be annotated.  You know, you don't

22   have to hyperlink them.  If you want to, great, but --

23   for those who are uninitiated, that means that when they

24   have a footnote to a specific exhibit, you click on it

25   and it goes straight to that exhibit.  But that's on

1524

1    electronic, so you may not be interested.  But I'm just

2    saying, it's great if you do it.  It's not necessary.

3    So for those of you that have younger associates that

4    can do that kind of work, awesome.

5              MR. DEWOLF:  Your Honor, was there a date

6    that you wanted the pleadings, motion, exhibits and

7    deposition sent to y'all?

8              CHAIRMAN ALDOUS:  I need to make sure

9    that when I say the record, I'm referring to both the

10   exhibits and/or the testimony.  Particularly helpful to

11   us are the references to the depositions that have been

12   submitted.

13             And I have a general question.  Is there

14   anyone who believes that the handwriting issue related

15   to the contract is legally significant?  All right.  So

16   then that includes references, then, in the handwriting

17   stuff for that.

18             Do you have something to say?

19             MR. DEWOLF:  My question was just the

20   pleadings, motion, exhibits and depositions in folders,

21   did you give us a date for that?

22             CHAIRMAN ALDOUS:  September 25th.

23             MR. DEWOLF:  For those documents, as well

24   as the brief?

25             CHAIRMAN ALDOUS:  Yes.

1525

1          Does anyone have any questions about the

2    issues that I've just discussed.

3          MR. MCNEIL:  I had just one.  When the

4    panel asked for the Word versions of the findings of

5    fact and conclusions of law, I take it that's for the

6    panel?  We don't have -- we can serve a copy of it, but

7    a PDF copy on opposing counsel.

8          CHAIRMAN ALDOUS:  PDF copy on opposing

9    counsel is acceptable and it's only for the panel.

10          With regard to -- you just made me lose

11    my place.  I consider this hearing opening -- still open

12    until such time as the last briefing is submitted in

13    October 16th, 2015.

14          Is there any objection to that from AVIC

15    International USA?

16          MR. MCNEIL:  None.

17          CHAIRMAN ALDOUS:  Is there any objection

18    to that from Paul Thompson?

19          MR. DEWOLF:  No, Your Honor.

20          CHAIRMAN ALDOUS:  Is there any objection

21    from any of the Claimants?

22          MR. JENEVEIN:  Not from Tang and Soaring

23    Wind.

24          MR. DENNEY:  No.

25          MR. BRACY:  No, sir.

1526

1        MS. PERRY:  No, Your Honor.

2        MR. LOWENSTEIN:  Not from Young, Your

3   Honor.

4        CHAIRMAN ALDOUS:  All right.  So that

5   means that the hearing is open pursuant to the agreement

6   until October 16th when the last briefing is submitted.

7   I'm sorry, now.

8        MR. SHAMOUN:  When y'all cite to the

9   depositions that have been admitted in toto, please cite

10  to the specific line and page that you are referring to

11  in your findings of fact and conclusions of law as

12  opposed to Exhibit No. X that's the, you know, 500 pages

13  of a depo, please.

14       MR. MCNEIL:  I was just reminded by David

15  that we -- I think we did not submit the deposition of

16  Keith Young, but I referenced it in the opening and I

17  would like to also submit that deposition.

18       CHAIRMAN ALDOUS:  And that's no problem.

19       MR. MCNEIL:  Thank you.

20       CHAIRMAN ALDOUS:  It may be that when we

21  walk out of here today you go, "Crud, I knew that I was

22  supposed to submit X."  As far as I'm concerned, if it's

23  been referred to in this hearing, it will be accepted.

24  If it's something new, it will not.

25       MR. DEWOLF:  So Carter and Young

1527

1    depositions, if we want to submit them, Dr. Jan, no

2    problem?

3                    CHAIRMAN ALDOUS:  What I'm saying is I

4    don't want new exhibits.  And this is only exhibits, not

5    attorneys' fees and all that stuff, this is new exhibits

6    for the issues in this other than attorneys' fees and

7    expenses.

8                    MR. SHAMOUN:  Will y'all be submitting to

9    both sides before y'all submit it to us this

10   comprehensive, consolidated thumb drive with all the

11   exhibits?  I mean, we don't want to hear any disputes

12   over exhibits not being allowed to be admitted until

13   y'all have had an opportunity to, you know, vet it out

14   amongst yourselves.

15                   MR. JENEVEIN:  I hope -- maybe I'm

16   optimistic.  I don't think there'll be any disputes over

17   that.  But if there are disputes, we'll sure confer

18   about them.  In fact, do you want us to follow the JSR

19   procedure if we don't have an agreement?  The Joint

20   Statute Report?

21                   CHAIRMAN ALDOUS:  Yes.

22                   MR. JENEVEIN:  Okay.

23                   CHAIRMAN ALDOUS:  And so the thumb drive,

24   to me, it may be helpful if you are to submit that prior

25   to the briefing, and I'm talking about with the exhibits

1528

1   and depositions.  There's some early birds that might

2   get started on it earlier, and if I gave you until

3   September 4th for that, which is the same time the

4   transcript, would there be a problem with that?

5                    MR. MCNEIL:  No.

6                    MR. DEWOLF:  No.

7                    MR. JENEVEIN:  No.

8                    MR. MCNEIL:  Believe it or not, on the

9   first point regarding evidence that's here versus not

10  here, there is a hybrid.  And that is we actually asked

11  for the Chinese translations that were discussed to be

12  translated.  So we have translations, but Mr. Bayles

13  needs to go down and have them printed in the -- we'll

14  submit them today.

15                   CHAIRMAN ALDOUS:  Translations just of

16  what?

17                   MR. BAYLES:  Some of the websites that

18  have Chinese writing on them.

19                   CHAIRMAN ALDOUS:  Do you have any problem

20  with that, anybody on the Claimants' side?

21                   MR. JENEVEIN:  It's evidence.  It's fine

22  with me.  I mean, we don't want to stipulate that their

23  translation is right.  They didn't stipulate to ours.

24                   CHAIRMAN ALDOUS:  How about this?  If you

25  receive this and your Mandarin expert or your Chinese

1529

1 character expert disagrees with any of the translation,

2 I will give you an opportunity to let us know about

3 that.

4                    MR. JENEVEIN:  Okay.

5                    MR. DEWOLF:  And, Bob, just so it's

6 clear, depositions of Carter, Young and Dr. Jan, you

7 don't have any problem with us putting those in?

8                    MR. JENEVEIN:  No, sir.

9                    MR. BAYLES:  And can we have till Monday

10 to circulate the translations?

11                    CHAIRMAN ALDOUS:  Yes.

12                    MR. JENEVEIN:  Just making sure I'm not

13 running afoul, the depositions that we have submitted

14 make references to exhibits, that's one of the reasons

15 those notebooks are so thick, I'm assuming that's

16 considered in --

17                    CHAIRMAN ALDOUS:  That's considered part

18 of the deposition, from my perspective.

19                    MR. MCNEIL:  And, for the ease of the

20 panel, if there's a citation, for example, to a page, do

21 you want us to give you the entire transcript that will

22 reference to the page, because I heard Mr. Shamoun's

23 question earlier, or do you want only those pages that

24 are specifically referenced in connection with the

25 citation?

1530

1          CHAIRMAN ALDOUS:  So if I usually ask

2    that of a lawyer, the lawyer says he wants to give you

3    the whole thing and just cite to the part.  If I ask

4    somebody making the decision, they say they only want

5    the part that you're citing to.

6          But, just for ease of reference, go ahead

7    and give us the whole thing since you're giving it

8    electronically and provide specific references to the

9    testimony that you would like us to consider.  You know,

10   this is an expensive process already, so the more that

11   you have us review, just make sure you really want us to

12   review it.

13         MR. DEWOLF:  And the five folks that want

14   it in hard copy, that's for the brief, which the

15   prehearing -- or post hearing brief.

16         MR. JENEVEIN:  All briefs.

17         CHAIRMAN ALDOUS:  No.  Just everything

18   filed from here on out other than the thumb drives.

19         All right?  Is there any more question?

20   All right.

21         MR. JENEVEIN:  I have the citation that I

22   think Mr. Capshaw asked me for.  It's 753 F.3d 521.

23   That's the Fifth Circuit, May 20th, 2014, In Re: Chinese

24   Manufactured Drywall Products Liability Litigation.

25         MR. CAPSHAW:  753 . . .

1531

1          MR. JENEVEIN:  753 F.3d 521.

2          CHAIRMAN ALDOUS:  Let's get started.

3    Just so you know, we will be taking a break in between

4    presentations to maintain sanity.

5          MR. JENEVEIN:  Mr. Chairman, I'm going to

6    give you a lot of time back.  I am heeding the advice of

7    the panel and --

8          CHAIRMAN ALDOUS:  Thank you,

9    Mr. Jenevein.

10         MR. JENEVEIN:  -- more importantly, I

11   believe I started this case telling you-all this was a

12   simple case.

13         CHAIRMAN ALDOUS:  Are you starting now?

14         MR. JENEVEIN:  Yes.

15         CHAIRMAN ALDOUS:  All right.  He's

16   starting now.  Go ahead, Mr. Jenevein.  I apologize.

17         MR. JENEVEIN:  It's simple in a number of

18   reasons, in a number of respects, but maybe most

19   importantly there are not very many genuine disputes.

20   And let me explain what I mean by that.  There is no

21   dispute about what the Soaring Wind agreement said.  I

22   don't think I've heard a single dispute about section

23   6.10.

24         I've heard a dispute about what 2.3 means

25   because some witnesses have come before you and told

1532

1    you, including, I think, most notably Mr. Zhang who

2    signed this agreement, that when it says "and developing

3    wind farms," what it means is "and marketing developing

4    wind farms," notwithstanding that there's no such

5    industry, notwithstanding Mr. Zhang's recognition that

6    when he signed and approved -- I'm sorry, not signed,

7    when he reviewed and approved the Memorandum of

8    Understanding, it clearly provided for the development

9    of wind farms.  I'm not going to spend a lot of time on

10   that, gentlemen, because I don't think that's a genuine

11   dispute.  That's the promise.

12            There is also no dispute about what AVIC

13   IRE has said it did.  It said it developed, past tense,

14   wind farms in nine different countries, and you find

15   corroboration for that in other places on their website

16   where they tell you the megawattage in three of those

17   countries.  Not just three projects, mind you; I think

18   the total is six projects in three different countries.

19            Now, we'll get to what Dr. Safir calls

20   the better evidence in a minute, but there is no dispute

21   of any kind about what they said on their website.  So

22   that gets you a breach.

23            Let's go to damage.  If you believe what

24   they say, no one has suggested that Ms. Bramer's

25   calculation about what it cost to build a megawatt of

1533

1  wind power is wrong.  It's not disputed.  No one has

2  said that if you add up that $1.44 billion that they

3  must have invested, and you invest it at their required

4  rate of return, no one has said you don't end up with

5  the numbers that she calculated.  The required rate of

6  return was what they said.  Not once, as Dr. Safir said.

7  In two different e-mails.  One, an external e-mail

8  to Tang, the other an internal e-mail to someone else

9  at AVIC.  Two different authors, same required rate.

10             In Paul Thompson's deposition, you'll see

11  that he wouldn't tell us what it was but he said it was

12  double digits.  There's no evidence that says it's not

13  15 percent.  So when Dr. Safir says, "Oh, if you build

14  assumptions upon assumptions in your fantasy world, you

15  can get any number you want," how could you get, for

16  example -- let's say you wanted to get to $10 billion,

17  how would you do that?  Well, you couldn't assume more

18  and still be a conservative, rational expert.  You

19  couldn't assume a different rate of return because 15

20  percent is what they said and what they repeated.  And

21  the last variable is, you couldn't assume some life

22  other than 25 years.  Well, that's not right.  If you

23  believe Rich Saunders, you could go 30 years, 30 years

24  plus.

25             There is certainly evidence in the

1534

1    record, if you wanted to find it, that you could have a

2    wind farm for 30 years.  The Claimants aren't asking you

3    for that.  Nobody came in here and said 25 years was

4    crazy.  Nobody.  All the evidence, even their witnesses,

5    was 20 to 30 or more.  That's why we're asking for 25.

6              So where's the dispute there?  The

7    dispute is what you guys should do.  This is the

8    chronology that I showed you in opening statement for

9    the year 2015, much of what you're familiar with.  And

10   at the risk of beating a dead horse, this is what makes

11   this arbitration bigger than Soaring Wind Energy, LLC.

12             Because we got folks that come in here

13   and sign an arbitration agreement and then decide they

14   are going to game the American legal system.  They don't

15   care.  The first order you guys gave at our request, the

16   first one, was agreements between the Respondents.

17             There was an agreement that we found out

18   about yesterday that proved that CATIC TED and CATIC IRE

19   or AVIC TED and AVIC IRE were participating, that they

20   were sharing in the expenses of these lawyers.  You

21   ordered that agreement produced in January, and they

22   filed death penalty sanctions requests with you when

23   David Denney did not produce what he contended was not

24   an agreement because there was no meeting of the minds

25   between two or more people.  Because of that, they

1535

1  sought death penalty sanctions.  All the while they were

2  holding their own agreement in absolute defiance of your

3  order.

4           I'm not trying to add the drama to that.

5  That's the fact.  And that's just the first time they

6  did it.  I don't need to go through all of these, but

7  they ignored order after order after order from you

8  until the very end.  And, really, the Respondents'

9  approach to this litigation is focused on what they did

10  on May 29th because two things happened on that day.

11  One they cared about, one they didn't.

12           They got Erica Bramer's damage report and

13  they said, "Uh-oh, our own website is the basis of the

14  Claimants' report and it starts with a B, and it's more

15  than one."  The second thing that happened that day was

16  you issued Order 18.  Order 18 was the last Motion to

17  Compel that we filed.  You may recall we had asked -- on

18  the last day that we could we propounded written

19  discovery and we targeted financial information.  And

20  what did we get?  Nothing.  From these entities who

21  pretended that they weren't participating.  Nothing.

22           And focus on IRE, if you will.  You

23  ordered AVIC IRE to produce financial statements, profit

24  and loss statements, lists.  You ordered them to

25  identify documents they had -- projects they had

1536

1    considered, projects they had undertaken.  And what did

2    you get?  Nothing.  What did we get?  Nothing.

3                But they reacted.  Four days later, AVIC

4    IRE's lawyer writes Xu Hang, the vice president of IRE,

5    a letter, and he says, "We have to produce information

6    now."  Did he say it was because of an order?  No.

7    That's why I say their gaming of the American judicial

8    system was focused on this moment.  He didn't care about

9    your order, didn't even mention it to his client.

10   Instead, he told his client "We need some specific

11   information to beat this Erica Bramer report."

12               And so they hustled, they set about to

13   make it happen.  Two days later, the president of the

14   company sends a sealed letter back to the lawyer.  On

15   June 30th they produce Xu Hang for deposition in Hong

16   Kong, after we had requested his deposition a year

17   earlier.  A year.  And we had been asking for it and

18   been asking for it.  They ignored your subpoena of Xu

19   Hang and they ignored a federal subpoena for Xu Hang.

20               They told us then "You can't serve that

21   subpoena on us because we don't represent him

22   individually and he's not going to appear."  You're

23   going to see in the deposition of Xu Hang that Xu Hang

24   swears that from the beginning Randy Walters was his

25   lawyer, his personal lawyer.

1537

1        Now, when we started this hearing, I was
2   confident that that was an example of Mr. Xu's lack of
3   veracity.  You will have to decide for yourself if he
4   was telling the truth or not.  But the point is, if he
5   was represented, he ignored a subpoena.  If he wasn't,
6   then they manipulated the system for their benefit by
7   refusing to accede to our requests for his deposition
8   until they wanted his testimony.
9        Members of the panel, you have to ask
10  yourselves what the heck were the Claimants supposed to
11  do here?  It really comes down to this:  Is there any
12  justice available for these Texas investors?  I'm not
13  exaggerating.  Let me explain.  They consider themselves
14  bound by the Soaring Wind agreement, and that includes
15  the arbitration provision that says every dispute among
16  the members or anything related to it must be arbitrated
17  with a panel like this.
18       And so that's what they did.  And they
19  complied with every order you made.  And I think it's
20  fair to say that if you guys saw a Motion to Compel,
21  generally, you granted it.  It was apparently the view
22  of this panel let's open it up, let's have lots of
23  exchange so nobody's complaining about that.
24       And we never complained about an order to
25  provide something to the other side that you ordered us

1538

1    to provide.  We provided 100,000 pages of responsive

2    information.  Now, that's been called not -- more than

3    once a document dump, but nobody's asked Patrick

4    Jenevein what document was dumped, what document wasn't

5    responsive to one of those requests, hundreds of

6    requests about scores of entities, all of that.  Tax

7    returns, highly confidential, highly personal

8    information produced without reservation, without delay

9    when you ordered it.

10                 We propounded the discovery that you

11   allowed us to propound.  We asked for depositions and,

12   to the extent, that you ordered them, they were ignored,

13   except for Sherman Zhang, Paul Thompson and Steve

14   DeWolf.  That's what we got.  Until experts; and we got

15   Dr. Safir and Professor deLisle.  We passed on

16   Mr. Chadwick, who was available in Singapore.  He's the

17   expert who didn't make it to the hearing.  I think --

18   for the reasons that he didn't make it, I think you can

19   assume the reasons we didn't feel like we needed to take

20   it.

21                 But that's all we got.  We produced to

22   them every expert they -- every fact witness they wanted

23   until they had exhausted the eight depositions that you

24   had allotted.  Then we allowed them to take a ninth with

25   Xu Hang.  Then we allowed them, by agreement, to take

1539

1    Erica Bramer.  They got their discovery.  We did not.

2    We have never -- I mean, you guys know this.  I know I'm

3    preaching to the choir, but in this system the idea is,

4    before you put your damage model up, you get to conduct

5    some discovery.  Did we have that chance?  Heck, no.

6    Not even close.  We got nothing except what we were able

7    to mine from their website.

8              So the Soaring Wind agreement and the AAA

9    commercial rules allow you-all to draw an inference, and

10   we're going to ask you to.  And, buckle up, because

11   here's the inference I would like you to draw:  I hope

12   you will draw the inference that when AVIC IRE publishes

13   a statement of fact that's unambiguous, that's couched

14   in the past tense and when they publish that statement

15   to the world, it's true.  That's the dramatic inference

16   I would like for you to draw.

17             Frankly, you don't need the inference.

18   You have the right, of course, to draw credibility as

19   you will, but their defense to this case is that's bogus

20   evidence.  That's their defense.  Well, that's the first

21   prong of their defense.

22             The second prong of their defense is

23   Patrick Jenevein is dishonorable.  I mean, if this was a

24   court case, most of that stuff wouldn't have been

25   admissible, but they wanted to come in here and say

1540

1   Patrick Jenevein is a dishonorable guy.  Ignore for a

2   moment the fact that when you recorded us without our

3   knowledge, we lied every time and on every occasion and

4   those are our private comments and ignore the fact that

5   what we say in public is also a lie.

6            Now, they haven't said that, but every

7   witness they have produced laughs at the notion that we

8   would consider seriously something that they published

9   to the world.  They don't come in here and say that

10  statement on AVIC IRE's website is ambiguous.  They

11  don't say it's a stretch.  It's not like puffery.  It's

12  not as if that website said "We're the best wind farm

13  developer in the world."  It's not as if they said, "You

14  can count on us as your partner in business."  They

15  didn't say that stuff.  They said, "We have developed

16  projects, in addition to the U.S., in nine different

17  countries and so on," they say.

18            If you require the Claimants to have

19  different evidence, then you have denied us any access

20  to justice here.  I haven't heard anybody suggest that

21  we could have done something different.  We asked the

22  right questions, they refused to answer.  We went to

23  you, they refused to comply with your orders.

24            So you guys have the tough job of

25  deciding -- and I don't mean to minimize it.  You have a

1541

1  tough job of saying "Are we going to let those people

2  get away with this or are we going to let these people

3  suffer the consequences for their obstruction?"  That's

4  what it comes down to.  And I think we all know this

5  isn't the last stop for this case.  I hope that you will

6  make findings on these things regardless of what your

7  finding is.

8            The worst thing that you could do to us

9  is not make findings because this is our chance.  And

10  the inference from you that they're telling the truth is

11  the only way we can get your help.  It's the only way we

12  cannot have the door of justice slammed against us.

13  That's the only way.  That's what this case is about,

14  and that's it.

15            Thank you.

16            CHAIRMAN ALDOUS:  Thank you,

17  Mr. Jenevein.  Who will be going first for the

18  Respondents?

19            MR. WALTERS:  I'll be going first.

20            MR. BRACY:  Are we going to start on this

21  side?

22            CHAIRMAN ALDOUS:  I do this every time.

23  I really apologize for that.  Mr. Bracy?

24            MR. BRACY:  Yeah.  May I start?  And this

25  will be brief.

1542

1        That was an impassionate and wonderful

2    closing by Bob that does summarize the way that a lot of

3    us on this side of the room feel.  And, remember, I

4    represent Jan Family Interests, a family limited

5    partnership, Dr. Jan, as a representative here, who's

6    been here all week.

7        And Bob mentioned access to justice, and

8    that's exactly what this is about, that agreement

9    providing one avenue for us to get that access, and

10   that's today.  That's what's been going on this week.

11       You know, promises were made about what

12   was going to happen in this agreement, promises were

13   made about funding wind farm development deals, promises

14   were made about exclusivity, and those promises were

15   broken.

16       Dr. Jan and his family limited

17   partnership invested based on those promises.  This is

18   their access to justice to make this right and help them

19   get to where they should have been, and we're glad that

20   this week is over and we're glad this is being submitted

21   to you.  We trust the panel to do justice for Jan Family

22   partnership and the other Claimants as well.

23       Thank you.

24       CHAIRMAN ALDOUS:  Thank you, Mr. Bracy.

25       Mr. Denney?

1          MR. DENNEY:  Thank you, gentlemen.  As
2    you know, I represent Mike Carter.  He, too, has been
3    here this week.  Don't stand up.  You'll block me.
4    You're really tall.

5          We want to thank the panel for its
6    participation, for asking good questions, for focus, for
7    being a part of the process.  Mr. Jenevein covered most
8    of the really cool things I was going to say, but I do
9    want to focus on a couple of things.

10          First of all, the fact that Patrick
11   Jenevein had to record people that were his friends,
12   you've seen witnesses get up and testify how badly it
13   hurt their feelings, despite the fact that recordings
14   were made of Mr. Thompson and others were perfectly
15   within his rights.

16          So how bad had Mr. Jenevein had to have
17   felt to have taken that extreme when he testified he had
18   never recorded a conversation ever before in his life.
19   So thank God we have those recordings and thank God we
20   have a body of law that allows for alter ego liability.
21   Thank God we have a body of law that allows a document
22   that includes the terms this is a nonbinding document to
23   occasionally be found to be binding.  That body of law
24   exists.  It's a real thing.

25          And thank God that we've been able to

1544

1   come here together, put that evidence on for you,

2   despite the chicanery and obstruction of the other side

3   and put this case before you.  And we thank you for your

4   participation and we look forward to seeing what the

5   panel does with it.

6                    CHAIRMAN ALDOUS:  Thank you, Mr. Denney.

7                    Ms. Perry?

8                    MS. PERRY:  I'm actually going to come

9   around to make sure y'all can hear me.

10                    CHAIRMAN ALDOUS:  That'd be fine.

11                    MS. PERRY:  I think I can do without the

12   karaoke mic, but if you can't hear me, Mr. Shamoun,

13   please let me know, okay?  All right.

14                    I just had a couple of comments that I

15   wanted to make.  In his opening statement Mr. DeWolf

16   told you something to the effect of "Trust me, Patrick

17   Jenevein wanted to use the arbitration clause in the

18   Soaring Wind agreement to exact damages for HT Blade

19   because he did not want to go to China to sue on HT

20   Blade."

21                    I think over the course of these

22   four-and-a-half days we've demonstrated to the panel

23   that that's not what this case is about.  This case is

24   not about HT Blade.  It's about, as Mr. Jenevein said, a

25   promise that was made and a promise that was broken.

1545

1    In his opening Mr. McNeil, I believe,

2    said that our case is about xenophobia, innuendo and

3    hyperbole.  And I was, frankly, fairly offended by that,

4    and I think that we've demonstrated to this panel

5    through the testimony of Patrick Jenevein, who for

6    years, for scores, to use his word, had a great

7    relationship with his Chinese partners, that this case

8    is not about xenophobia at all.

9    And I believe that we have shown with our

10   four experts that y'all have heard, three on alter ego,

11   one on damages, that this case is not about innuendo and

12   hyperbole.

13   I appreciate the time and attention y'all

14   have paid and we look forward to your decision.

15   CHAIRMAN ALDOUS:  Thank you, Ms. Perry.

16   Mr. Lowenstein?

17   MR. LOWENSTEIN:  Yes, sir.  Thank you,

18   members of the panel.  Bob hit on it but I can't let it

19   go, so I've got to return to this abuse of this process

20   by our opponents here.  And I'm sure you took from the

21   questions that most interested me and with a lot of

22   these witnesses that, you know, litigation's supposed to

23   be about getting all the facts out there and letting the

24   trier of fact decide who's right and who's wrong.

25   We were completely shut out of that.  And

1546

1    it doesn't stop there.  They held back everything they

2    could from giving you the guys the full picture and then

3    they threw out a bunch of crap to waste everybody's

4    time.  And it really bothers me.

5                    I mean, we spent time and money on

6    experts about whether this document was forged.  And you

7    heard Mr. Thompson say "I'm bound by this agreement, I

8    was always bound by this agreement, I thought I was

9    stuck to this agreement."  We had two experts on each

10   side looking at this stuff.  There was all this money

11   spent, and that was just to throw up some smoke to make

12   you guys ignore the fact that the real issues, which is

13   what is the backup information for what went on with

14   these projects, was completely hidden from you.  So we

15   got to spend time on that, we got to spend time on a

16   claim against these gentlemen.

17                   You never heard one single piece of

18   evidence that Mr. Carter, Mr. Young, Mr. Jan -- Dr. Jan

19   had anything to do with any allegations of Tang

20   breaching this agreement.  You never heard a single

21   piece of evidence on that.  Yet, there is a claim before

22   you that all of these Claimants somehow breached that

23   agreement.  They didn't even try to put on evidence of

24   it.  They didn't even touch it, but we had to defend

25   against it.

1          They had a damages expert say that all of

2    these gentlemen were liable.  He got here and said he

3    wasn't.  The president of the company sat down and said,

4    "I don't even know why we're suing them," but we spent

5    time and we spent money on defending against those

6    things.

7          That's the distractions you had to deal

8    with so you that you forgot that when we asked for the

9    information -- and all we wanted was the real

10   information.  I mean, you heard Ms. Bramer say, "I would

11   have loved to look at the EPC contract.  I would have

12   loved to see who owned these projects."  I'm sure she

13   would have loved to go to New Zealand like Dr. Safir did

14   and actually see these new wind farms.

15         But what happened?  We got none of it and

16   they had every opportunity to get it.  You heard the

17   lawyer for IRE, Mr. DeWolf, he got to send a letter to

18   the president of that company and say "Here's the

19   information I want," got it in two days.  But he didn't

20   ask for any of the things we wanted to see.

21         The president of Ascendant, Mr. Thompson,

22   calls his buddy Xu Hang and says, "I need information

23   from you.  I need you to sit down for a deposition."  He

24   didn't ask for any of the information we needed.

25         Their expert gets to call up Xu Hang, Dr.

1548

1   Safir, and have a conversation with him, and he said, "I

2   didn't care about that information.  I didn't ask for

3   it."  They didn't want it because it didn't help them.

4              So, I mean, you can look at the rules in

5   the agreement on the inferences you can draw, and I

6   don't think you have to really stretch to draw an

7   inference here because, as Bob eloquently said, that's

8   their own admission.  But to the extent you want to find

9   a case where the inference is proper, they had every

10  ability to provide this information on all of these

11  projects, and they didn't do it.  And they didn't do it

12  because it would have hurt their case because you would

13  have found out that their representations about these

14  projects were absolutely true and that they were out

15  doing these developments and they were cheating on their

16  company.

17             You heard Dr. deLisle say the only

18  company set up back when Soaring Wind was formed under

19  the IHC umbrella to do this business was Soaring Wind.

20  That was where everything was supposed to go.  You saw

21  the Chicago agreement that followed it, and that's where

22  this business was supposed to flow, and they just up and

23  set up IRE, and you heard about all the reasons that

24  happened, and they cheated on that company.  And there's

25  just no dispute about the breach or anything else.  You

1549

1   just don't have the information that goes beyond it to

2   see, you know, their alleged nonparticipation or the

3   nonexistence of these deals.

4               I was reminded of one other thing your

5   time was wasted on.  Not only did Paul Thompson say that

6   his agreement was forged on that second agreement and

7   that somehow impacts the decision here, and Mr. Chairman

8   asked that question at the beginning because I think

9   it's well taken that it was pretty much a waste of our

10  time.  But on top of that he alleged "If I did sign it,

11  it was under duress."  And so we had to contend with

12  that allegation as well.  I don't even know what means.

13  I don't even know what he means by "I was forced to sign

14  a document I said I didn't sign under duress," but I'll

15  just let that hang with you.

16              So when you look at your obligations and

17  considerations as a panel, that there's two things to

18  look at.  One is this adverse inference and one has to

19  do with the special allocation of costs, I don't think

20  we wasted your time with our claims here.  We were

21  accused of having a unprofessional damages expert.  We

22  were accused of having fraudulent claims of alter ego,

23  and I think you can all rest assured that you were

24  presented a case that none of those things were a waste

25  of your time.

1550

1    And then you can consider all of the time

2    that we wasted on what you were forced to consider and

3    what we were forced to contend with from that side.  And

4    I ask that you consider that and I ask that you find for

5    the Claimants in this case and you dispel any of these

6    notions that there was some kind of counterclaim to be

7    asserted here, and I appreciate your time and your

8    careful consideration.  I know this was a big commitment

9    for all of you and I feel like we've gotten a really

10   great opportunity to present a case to you and I really

11   appreciate your participation.

12        Thank you.

13        CHAIRMAN ALDOUS:  Thank you,

14   Mr. Lowenstein.

15        Let's take a short break.  I've been

16   requested to make sure we do that.  Let's just do about

17   five minutes, if you don't mind.

18   (A break was taken from 1:56 p.m. to 2:06 p.m.)

19        CHAIRMAN ALDOUS:  Let's take our seats.

20   All right.  Mr. Walters, are you ready?

21        MR. WALTERS:  I am.

22        CHAIRMAN ALDOUS:  You may begin.

23        MR. WALTERS:  The first thing I want to

24   do is I want to thank y'all for your attention this

25   whole week.  I mean, I know it has not been easy at

1551

1    times listening to Chinese translated deposition

2    testimony by video.  I can't imagine a worst fate than

3    having to listen to that.  But it has been interesting,

4    especially for an old sore back lawyer like me to be

5    involved in something like this.

6                   But, unfortunately, when I listen to the

7    closing arguments and look at some of the documents in

8    this case, you can tell that the tone between the

9    attorneys in this case has not been positive, and

10   there's been some documents to support that and some of

11   the allegations that I heard in this closing argument.

12                  And what's important about that is when

13   did this tone, as it applies to Paul Thompson, his wife,

14   Cheryl's with him, when did this begin?  When did this

15   all start turning negative towards Paul Thompson?  And

16   what the evidence has shown in this case is that

17   started, shown on Trial Exhibit No. 233, on April 30th,

18   2014 when Paul Thompson responded to Patrick Jenevein

19   and said, "Most of the comments" -- you know, he sent

20   him this three-page document and wanted him to verify

21   these things.  And Paul Thompson said, "Unfortunately,

22   most of the comments you attributed to me are

23   inaccurate."

24                  Well, what's important about that is what

25   Patrick Jenevein didn't put in this e-mail that he

1552

1    sent to him on April 16th.  What he sent to him that

2    said, "I think having clarity on our position will make

3    a friendly resolution more likely," but what he didn't

4    tell him in there is on February 18, 2014, roughly, two

5    months earlier, he had already met, he and Bob Jenevein,

6    with Ms. Bramer.  Her billing records indicate that.

7                What he doesn't put in there is that on

8    February 21st, 2014, three days later after meeting with

9    Ms. Bramer that he had taken a recorded statement,

10   unbeknownst to Paul Thompson on February 21st, that's

11   three days after he had already met with Ms. Bramer.

12   What he doesn't put in there is that on April 11th,

13   2014, now, that's five days prior to his e-mail to

14   Paul of April 16th, 2014, that just five days earlier

15   that he had recorded him again.  And that's not, as

16   Mr. Jenevein testified, that he recorded him only twice.

17   He actually recorded him four times.  These two that

18   we've looked at and where he was on a phone call and one

19   where they were at an airport somewhere together.

20                I normally start in most of my cases

21   telling you what the evidence I think has shown you so I

22   could be of some help to y'all in reaching some

23   decisions in this case, but I think I've got to start

24   with what the evidence doesn't show you in this case,

25   what there's no evidence of in this case.

1553

1          Before I do that, I want to remind you

2     just briefly, though, at the very end of the statement

3     that he recorded from Paul Thompson, remind you what

4     Paul Thompson told him, he said, "I can't prove it.  I

5     can't prove it."  And this was before he sent this later

6     saying, "I want you to verify all this stuff," Paul

7     Thompson had already told him he can't prove it.

8          What is there no evidence of throughout

9     the five days that we've been here?  And this is the

10    slide I took from Steve's opening statement.  Is there

11    any evidence related to HT Blade as it relates to Paul

12    Thompson that he did something wrong, violated some

13    agreement as it relates to HT Blade?  No.

14          Cirrus Aircraft.  Any allegation against

15    Paul Thompson, any evidence against Paul Thompson that

16    he had anything to do with the complaints against Cirrus

17    Aircraft?  Absolutely not.

18          The Chicago agreement.  Any evidence, any

19    allegation in this proceeding from day one up until now

20    that he had anything to do with the Chicago agreement or

21    any violation of the Chicago agreement?  No.

22          As it relates to the other allegations

23    that they've made against Paul Thompson, and they talked

24    to you about what they've had to defend in a

25    counterclaim in this case.  These are all causes of

1554

1  action that Paul Thompson has had to defend since day

2  one in this case.

3           Breach of fiduciary duty.  Did you hear

4  any evidence of breach of fiduciary duty?  And, in fact,

5  what they didn't tell you about is 6.8 of the Soaring

6  Wind agreement where it is specifically mentioned that

7  each such member shall have no fiduciary duty or other

8  duty to represent or act in the best interest of the

9  other members.  That's 6.8 of the Soaring Wind

10 agreement.

11          As to theft of trade secrets, a cause of

12 action we've had to defend since day one in this case,

13 did you hear any evidence that Paul Thompson took some

14 trade secrets in this case?  No evidence of that cause

15 of action.

16          Tortious interference with a contract, no

17 evidence.  Tortious interference with perspective

18 contracts, nothing; and no evidence of conspiracy.  I

19 didn't hear one time where they said, "Well, you went

20 and met with Xu Hang or you met with Sherman Zhang or

21 you met with any of the people on that board to conspire

22 to somehow mess around Patrick Jenevein or Tang Energy

23 Group."  Not one scintilla of evidence on these causes

24 of action that we've had to defend since day one in this

25 case.

1          Likewise, there has not been any evidence

2    in this case of any damage caused specifically by Paul

3    Thompson.  You heard Ms. Bramer's testimony that she

4    could not specifically identify any particular damage

5    that she can directly relate to Paul Thompson.  There

6    was no damage as related to HT Blade that she could

7    identify to Paul Thompson, Chicago agreement or even the

8    Cirrus 1 project that was talked about.

9          You heard Ms. Bramer talk about the

10   Cirrus 1 project Steve was involved in.  She did not

11   have in any of her calculations anything that she could

12   say was damage caused by Paul Thompson.  And the reason

13   for that is what -- you got to ask yourself, why would

14   they allege all these causes of action against Paul

15   Thompson, have their damage expert come here and testify

16   that she couldn't say any particular damage against Paul

17   Thompson and why is he in this case?  Why is he in this

18   case?

19         And the reason is because of what Steve

20   said at the beginning of this case is because it is

21   punitive as to Paul Thompson.  And the other reason is,

22   we talked and we joked about this maniobra deal.  And,

23   Steve, you're right, he went straight to number three on

24   this when he talked about it.  But there is a number 2

25   and there is a number 1, and they're not a whole lot

1556

1    different; maneuvers and even military maneuvers.

2                    And Paul Thompson is collateral damage in

3    this thing.  That's what Paul Thompson is.  He's

4    collateral damage in this whole proceeding.  And how do

5    we know that?  And, by the way, it was amazing to me to

6    see the e-mail from Patrick Jenevein to this Fernando

7    Villa at Prax Capital, who's funding this whole thing,

8    that through Tang Energy -- Wind Energy Hong Kong and to

9    use that word in an e-mail to him of maniobra, and

10   then when Patrick Jenevein was asked "What does that

11   mean?"  "I don't know.  I don't know what that means."

12   You use that word -- that's not the first time you use

13   that word.  That's not a word you use when you don't

14   have any idea what the meaning of that word is.

15                   So who is doing the maneuvering for all

16   of this since 2014, March of 2014?  Who is doing the

17   maneuvering?  Well, we had a clue sifting through the

18   100,000 documents that were produced.  And our first

19   clue was Exhibit -- what's been marked as Exhibit No. 19

20   in this matter, and that's an e-mail from this

21   Mr. Villa dated February 24th, 2014 saying he had been

22   in Dallas a week ago, there was a proposal made and that

23   they're going to treat these two claims as one and

24   they're going to fund this thing.

25                   Well, ask yourself what does Prax Capital

1557

1   or Tang Energy -- Wind Energy Hong Kong have anything to

2   do with the Soaring Wind agreement?  Has nothing to do

3   with the Soaring Wind agreement.  It has everything to

4   do about the allegations of HT Blade messing them out of

5   their alleged $8 million in the HT Blade company.  It

6   has nothing to do with the Soaring Wind agreement.

7            But why in the world would Prax Capital

8   be entering into an agreement to treat both actions as

9   one single action and to share in the resulting awards

10  if it didn't have to do with what Mr. DeWolf told you at

11  the beginning being HT Blade.

12           And then you notice as of February 24,

13  2014, he's introducing -- he's going to introduce his

14  other investors in Prax Capital, I think it's a hedge

15  fund of some sort, to Bob Jenevein.  And then they --

16  what's incredible is they want to say -- and I'm the one

17  asked Paul Thompson after his testimony "Go get those

18  reimbursement agreements for these other nonsignatories

19  because it doesn't matter."

20           But they want to say that we violated

21  some court order by Paul Thompson that says produce all

22  agreements between Respondents on that deal, but, yet,

23  at the same time, we've been asking from day one

24  regarding specifically agreements regarding division of

25  proceeds.  Not who's paying the attorneys' fees, the

1558

1   division of the proceeds, because we had the suspicion

2   from this that this was all about HT Blade and not about

3   the Soaring Wind agreement.

4               And this panel issued orders saying,

5   "Give it to them.  Give it to them."  And it wasn't

6   until we had to come here during this arbitration

7   proceeding and get Exhibit No. 250 showing the division

8   of proceeds.  And their only explanation was well,

9   that's not an agreement.  In fact, their e-mail said

10  agreement of or anything close to or of any kind is what

11  they responded that they didn't have.

12              But we get this and it shows that the

13  expenses are going to be shared 40 percent between Tang

14  Wind Energy Hong Kong and Soaring Wind and that, in

15  fact, the arbitrators -- you get reimbursed if you

16  select arbitrators subject to Tang's approval.

17              So what has the evidence shown?  And,

18  Chairman Aldous, you asked the question, "Man, does

19  anybody really say that there's a problem with this

20  Soaring Wind agreement and the signature on this thing?"

21  Well, there is.  And I think this is some evidence of

22  what I'm talking about.

23              This is part of their handwriting

24  expert's exhibits.  We talked about this a little bit.

25  This was a unanimous written consent of members for the

1559

1  limited liability, the Soaring Wind.  Shows these

2  gentlemen here, and it shows in witness whereof members

3  of the company have executed this consent as of June

4  11th, 2008.  Paul Thompson's got a single line on the

5  second page of this handwriting exhibit example that

6  their handwriting expert used.  And you heard me ask

7  Paul Thompson, "Is that your signature?"  And he said,

8  "No, absolutely, it is not."

9          Well, here's the interesting thing about

10  that.  That date of June 11th, 2008 is the exact same

11  date that Mike Carter, the president of Soaring Wind,

12  mind you, he's the president of Soaring Wind, is writing

13  to Paul, who's now gone back to Lubbock, was here in

14  Dallas, wouldn't sign it here in Dallas, and sends him

15  an e-mail saying "Disappointed to hear you felt you

16  were pressured to the Soaring Wind document without

17  first being given an opportunity to read it," exactly

18  what Paul Thompson told you.  "It's now six days later

19  and we still haven't received your signature."

20  So you'd have to believe that he signed

21  something else on June 11th, 2008 when he was already

22  back in Lubbock on June 11, 2008 and still had not yet

23  signed the Soaring Wind agreement at all.  And the

24  reason, his testimony was, "because I didn't get what

25  they -- they weren't giving me in that agreement what

1560

1  they had told me about in that initial employment offer

2  that we already talked about, the health insurance, the

3  interest, the vesting in two years as opposed to five

4  years, those sort of things."

5           And then Mr. Patrick Jenevein testified

6  "well" -- I think it was actually Bob Jenevein was

7  questioning and was saying, "Well, Patrick didn't say

8  when he testified before this panel that they didn't

9  provide you health insurance.  What he said is you had

10  health insurance," because he had it from COBRA.

11          What else has the evidence shown?  Paul

12  Thompson was terminated from Soaring Wind in August of

13  2009, told him "We're not going to pay you anymore," but

14  before he was terminated, this is Trial Exhibit No. 108,

15  he wrote to Mike Carter.  Because this is when they're

16  talking about not paying him anymore.  They actually

17  stopped paying him later.  "Just to be clear, the

18  consulting work would be -- would specifically be exempt

19  from the provision of the partnership agreement

20  requiring all wind business to be performed through

21  Soaring Wind."

22          So he wanted to know can I go out and

23  make a living for my family or is there going to be a

24  problem with this.  And the response was, fine, as long

25  as there's not a conflict, you can assist clients in

1561

1   things like FAA reports, all of those things mentioned

2   there.  And that's wind energy development.  Those are

3   the types of things that Paul Thompson does, but you

4   can't do it if you're going to represent another turbine

5   manufacturer.  That's what he told him.

6              And why is that important?  And Judge

7   Marshall asked a really good question.  Well, did all

8   the other members of Soaring Wind approve what Mike

9   Carter was telling you, Paul Thompson?  Well, go back to

10  the Soaring Wind agreement.  Mike Carter was the

11  president of Soaring Wind when he told Paul Thompson

12  "Yeah, you can go do consulting work doing wind farm

13  development."  Shall have the full authority to execute

14  all documents, take all actions that the company may

15  legally take.

16             And then Mike Carter tells him, Paul, on

17  April 22nd, 2009, this is Thompson Exhibit 76, "I spoke

18  with Patrick about our conversation.  We agreed on the

19  following:  Soaring Wind Energy's main concern is to

20  sell turbines.  Soaring Wind directs some other entity,

21  may entail some development work," and then he says, "If

22  we run across a project that requires us to spend money

23  for development, that would be beyond Soaring Wind's

24  scope and financial resources.  You should pass that on

25  to Patrick if he has an interest."  That's April 22nd,

1562

1    2009.  And that's exactly what Patrick Jenevein did.

2                We know April 28th, 2009, just six days

3    later after Mike Carter says, "Hey, Soaring Wind doesn't

4    have that capability.  If there's some sort of wind farm

5    development deal, pass it on to Patrick," meaning Tang

6    Energy.  And what happens is the Chicago agreement six

7    days later, Tang Energy Group signs it, and there is not

8    one mention of Soaring Wind in that agreement.  Not one.

9    And that's because Soaring Wind truly wasn't doing wind

10   farm development.  Just exactly what the president of

11   Soaring Wind said.  Their main concern was turbine

12   sales.

13               What else happened?  August of 2009.

14   This is towards the very end of Paul Thompson's

15   employment, and this is correspondence and e-mails

16   between Matt Mooney, Patrick Jenevein and Rich Saunders,

17   the gentleman who came here from Austin who testified.

18               So by August of 2009, Patrick Jenevein's

19   doing exactly what Mike Carter said, if there's some

20   other wind farm development, we don't have the

21   resources, pass it on to Patrick, Tang Energy Group.

22   And they're talking about with Rich Sanders doing the

23   Katz oilfield project and talking about forming a joint

24   venture to do these type of projects with Rich Saunders.

25               And you heard Mr. Saunders.  He doesn't

1563

1  have an axe to grind in this deal.  Rich Saunders came

2  up here and said, "I'd never really even heard Soaring

3  Wind.  There was no discussion of Soaring Wind.  It was

4  all Tang Energy Group.  And not even that, but, more

5  importantly, man, if I had known about this Soaring Wind

6  agreement, I wouldn't have even done business with them

7  because it conflicted with my company, with Colt Power,

8  my company."

9              And what's interesting about these

10 e-mails, you look at this, this is early August 2009,

11 Paul's actually still with Soaring Wind at the time as

12 the manager.  We also know that Mike Carter's still the

13 president of Soaring Wind at the time, and they're not

14 involved in any of these e-mails with Rich Saunders

15 for doing this Katz oilfield wind energy development

16 project.  And why?  Because Soaring Wind didn't do that.

17 Tang Energy Group was doing that, just like Mr. Saunders

18 told you.

19             And we showed this chart and there was

20 some objections made about it.  Well, what's alter ego

21 got to do with all of these Tang entities.  And then we

22 heard questions about well, there's a lot of these Tang

23 entities but they were special purpose vehicle entities.

24             Well, Gallop Power was not a special

25 purpose vehicle entity.  That's a joint venture that

1564

1    Tang Energy and Colt went into together to develop wind

2    farm projects.  And there was another company called

3    Balance Power Partners that Tang Energy Group did a

4    joint venture with to do the exact same thing.

5                    And we know from some corporate documents

6    we were able to obtain that Gallop Power was formed in

7    August of 2009.  And the reason this is important is

8    because you heard their position, "Well" -- or they

9    tried to take the -- "Well, we presented everything to

10   AVIC USA first and it was only after they didn't respond

11   to us that we went and did this stuff on our own."

12                   Well, that's just not the case.  Because,

13   if you remember, the first time they sent anything to do

14   with Flatwater, which is Gallop Power.  Gallop Power was

15   the joint venture that developed Flatwater.  The first

16   time that they sent anything to AVIC USA was February

17   24th, 2010.  They had already formed Gallop Power back

18   in 2009.  And I asked in 100,000 documents is there

19   anything to indicate before February 24th, 2010 that

20   they ever put any AVIC entity on notice of this Gallop

21   Power Flatwater wind project, and there's not.

22                   What else do they do?  They, being Tang

23   Energy Group in wind farm development, Thompson Trial

24   Exhibit 156.  They were discussing trying to do wind

25   farm projects with a company in August of '09 by the

1565

1    name of CGN Wind Power Company.  Thompson Exhibit 84, a

2    company called China Guodian, nothing to do with any

3    AVIC companies, trying -- in June of 2011, wanting to

4    build a portfolio of wind farms.  Nothing mentioned

5    about Soaring Wind in either of these two documents, by

6    the way.  On Tang Energy letterhead, don't mention

7    Soaring Wind one time at all.

8                   Balance Power Partners, another joint

9    venture that Tang Energy and Mr. Jenevein formed.  July

10   2011 they put together a North American wind strategic

11   investment proposal and shopped it around to various

12   companies to try to get money to go into a joint venture

13   doing North American wind strategic investment.

14                  And the interesting thing about that is,

15   and you've got Mr. Xu's complete testimony is, not only

16   did they shop it to a lot of companies, they shopped it

17   to AVIC IRE.  They went over there and met with AVIC IRE

18   about this, this Balance Power Partners joint venture,

19   trying to see if he would enter into this agreement with

20   them.

21                  And ask yourself why would they need to

22   do that if they truly believed that Soaring Wind was

23   already in existence and these companies are all alter

24   egos of one another.

25                  They also, September of 2011, talk about

1566

1    doing wind farm projects with a company called GD Power,

2    Thompson Exhibit 123.   Thompson Exhibit 159, now going

3    into September of 2011, trying to do business with JP

4    Morgan Capital.   Not one mention of Soaring Wind in any

5    of these documents.

6                    And then Thompson Exhibit 221, thinking

7    about using Balance Power Partners to pursue wind farm

8    interest acquisitions.   And then offering Nolan,

9    Dr. Jan, Tony, Lewis, Patrick, Bill interest in this

10   Balance Power Partners project.   Not one mention about

11   Soaring Wind.

12                   We talked about the Soaring Wind

13   agreement, and the testimony has been in this case that

14   Paul never hid the fact that he went to work for

15   Mitsubishi, never hid the fact that he went to work for

16   Ascendant.   I'm not going to go back through those

17   exhibits.   I think they're pretty clear.   And there was

18   no complaint whatsoever by Patrick Jenevein or anybody

19   at Soaring Wind about him going to work at Mitsubishi,

20   he never got to sell a wind turbine there, and then

21   going to work at Ascendant.

22                   In fact, all of the e-mails were

23   congratulatory.   "You're now the biggest player in WTG

24   development."   And I want you to keep in mind, we looked

25   through these 100,000 documents, not one single document

1  could we find where there was a complaint about Paul

2  Thompson going to work at Mitsubishi or Ascendant.  Not

3  one.  Not an internal memo, e-mail between all of them

4  complaining about it.

5              And after reviewing those documents -- I

6  want you to keep in mind, we got those documents and

7  then the position changes because the position before

8  that was -- let me back up.

9              Mr. Jenevein came here, Patrick Jenevein,

10  and said, "Yeah, that's right, we had no complaint about

11  him going to work at Mitsubishi.  Yeah, that's right, we

12  didn't have a complaint about him going to work at

13  Ascendant."  In fact, you remember the word he used?

14  "We were thrilled.  We were thrilled about that."  But

15  that was after he had already given his deposition but

16  before we alleged and got these documents that there was

17  waiver and that there was no notice.

18              Because the Soaring Wind agreement

19  provides that each member shall notify each other in

20  writing promptly regarding the discovery of any problem,

21  any breach.  So can we play what Mr. Jenevein said in

22  his deposition before coming here and saying he was

23  thrilled.

24          (Video deposition of Patrick Jenevein playing.)

25              MR. WALTERS:  And the reason that that's

1568

1  also important is because of the legal defenses that we

2  talked about at the beginning of this.  Statute of

3  limitations, three-year statute of limitations.  They

4  knew way more than years before this that Paul Thompson

5  had gone to work at Mitsubishi and Ascendant, waiver and

6  laches.

7            And also I heard during this deal that we

8  talked about this restriction on being able to earn a

9  living for your family, that even though it says

10 worldwide, they said, "Well, but it wasn't in

11 perpetuity, it was for 20 years."  You know, they wanted

12 to make that point, remember?  Well, that's not any

13 better.  Really?  That doesn't survive the

14 enforceability of a covenant not to compete in any

15 jurisdiction that I know of.  So it's okay to say you

16 can't earn a living for your family for 20 years?

17            What about the damages in this case?

18 First they file this with the AAA for $2.25 billion,

19 based upon what they say is a BVA report that they'll be

20 happy to provide to anybody if they just ask for it.  We

21 asked for it.  It doesn't exist.

22            And then Ms. Bramer comes and gives her

23 report for the first time on May 29th of this year,

24 2015, the first time there's a report, and they want to

25 say, "Well, yeah" -- and then they scrambled.  Oh, my

1569

1  God, they scrambled.  Steve's e-mailing Xu Hang trying

2  to get a letter, trying to get a deposition.

3          And the reason for that is not one time

4  before May 29th, 2015 did they ever mention these

5  projects that they say occurred internationally or a

6  300-megawatt U.S.A. project.  Not mentioned once.  Not

7  in any fourth amended complaint before this, fifth

8  amended complaint or the ones even prior to that.

9          And I'll grant you this, for a guy that

10  graduated from UT Dallas, I'll give them one thing,

11  Ms. Bramer's a smart lady.  I give you that.  Wharton

12  School of Business.  She is a smart, smart lady, but her

13  testimony is speculation.  There's no question that the

14  testimony's speculation.

15          What she reported ignores things.  It

16  ignores the stamped response by Ms. Lili to Steve's

17  e-mail.  I never saw Steve's e-mail before he brought

18  it here and gave it to you, and I was expecting it to

19  say something like "Isn't it true, Ms. Lili that da, da,

20  da, da, da."  That not what it says.  He asked the

21  questions, she gives him the answers.

22          Xu Hang.  She ignores Mr. Hang's

23  testimony, who I -- I got to go to Hong Kong, by the

24  way.  It's actually a really cool place.  15-and-a-half

25  hours.  I wouldn't recommend that part of it, but Xu

1570

1   Hang testified, and she has to ignore that testimony.

2            But what's interesting is we had been

3   asking for Ms. Bramer's deposition since basically she

4   designated and gave this report.  She was too busy to

5   give her deposition is what we were told until the

6   Thursday before this arbitration proceeding, okay.

7            And the Thursday before this arbitration

8   proceeding on August 6th, 2015, what did she say?  "Did

9   you assume the Wu Lili letter was truthful?"  "I suppose

10  so.  I -- I didn't -- yes.  I don't have any reason to

11  think it isn't."  The Thursday before this arbitration

12  proceeding, "Let me ask you the same questions of Xu

13  Hang.  Do you have any reason to believe that he was

14  being dishonest in his deposition testimony?"  "Not

15  specifically, but I would leave weighing the evidence to

16  the trier of fact."

17           And what it also ignores is the fact that

18  there's not one piece of secondary evidence to show that

19  any of these projects were ever done, completed or that

20  AVIC IRE had equity in any of these projects.  There's

21  not anything in any trade report or journal in the wind

22  energy business, any media.  How about on the web from

23  some other source?  How about something from Mongolia or

24  South Africa or the other countries saying "Gosh, we're

25  now doing a wind energy project."  There's not one thing

1571

1    on the internet other than the AVIC website that talks

2    about these projects.

3                    And ask yourself this.  I told you

4    Ms. Bramer is a smart lady, and I stand by that.  Don't

5    you think for $350,000 in expert fees, if it was out

6    there, they would have found it?  I mean, my goodness.

7                    And it also -- the problem with their

8    damages, and I'm not going to read this, but it ignores

9    the Soaring Wind agreement.  And I deal with lost wages.

10   I'm called to trial in Judge Tapscott's court and I

11   think the amount in dispute next Tuesday is $20,000, but

12   I do know what special damages mean, lost wages, medical

13   expenses, loss of earning capacity, and this says you

14   can't get any of that.

15                   And what Steve told you at the beginning

16   is absolutely right.  It has everything to do with HT

17   Blade.  And we know that because of the documents we've

18   been able to get.

19                   And I thought about this last night.  I

20   heard Ms. Bramer talk about returns on investment,

21   returns on investment, and I actually thought man, you

22   know, it'd be interesting to see what the return on

23   investment is if I invested $350,000 but I could get

24   $7.6 billion back.  The problem is I can't find a

25   calculator that does that.  Can you imagine that return

1572

1    on investment?  Because that's what they have into this

2    is $350,000 and they're asking for $7.6 billion.

3                    The reliance damages.  They put in the

4    reliance damages the Flatwater wind project, the Corpus

5    Christi project that they were already doing long before

6    any of this.  They put in their reliance damages the

7    Greenville biomass project.  And you heard when I asked

8    Rich Saunders that, "Did the Greenville biomass project

9    have anything to do with wind energy," he almost

10   laughed.

11                   And then they want to make light of how

12   being sued and having one of your friends secretly

13   record you, how that might affect somebody.  What they

14   tell him is -- or what they tell me, actually,

15   malpractice, Steve DeWolf, malpractice as to Paul, he's

16   paying his own attorneys' fees which make no sense, he

17   needs to grow up, get over the fact he's been sued,

18   figure out which side he's going to be on.  This is

19   November of last year.  And if he would go to their

20   side, it could benefit him directly and substantially.

21                   And then you remember they cross-examined

22   him with this deal, that if he would just sign an

23   affidavit -- and, by the way, the timing of this is

24   important because this doesn't occur until June of this

25   year, just a couple of months ago.  If he'll sign this

1573

1    affidavit, which was absolutely true, he had no problem

2    signing it, they would not seek any of these

3    around-the-world claims against him and state -- they

4    would stipulate he's not personally liable for damages

5    outside of the United States.

6                    Well, they wouldn't agree to say all

7    damages, and they were still claiming a 300-megawatt,

8    which Ms. Bramer calculated as damages of over $500

9    million based upon this 300-megawatt project that no one

10   can find.  So they would say okay, you sign an affidavit

11   that AVIC International didn't -- you don't know of AVIC

12   International doing any of these international projects

13   and we'll release you from that, but they wouldn't agree

14   about this 300-megawatt.  So we said, "If you'll release

15   him completely, he'll sign that affidavit because it's

16   all true.  He doesn't know anything about that stuff."

17   That was the response.

18                    And, Mr. Shamoun, it's their exhibit --

19   and, by the way, I've never had a case that went this

20   high, by the way.  Claimants Exhibit No. 1000.  So

21   that's easy to remember.

22                    And how has it affected Paul?  I mean,

23   my, gosh, man, Thompson Exhibit No. 43.  His son was

24   born and he included one, two, three, four, five people

25   on the announcement, one of which was his friend Patrick

1574

1    Jenevein.  And you guys -- y'all are not a jury and I

2    apologize if I'm making too much of a jury closing

3    argument, but one thing I can do because you're not a

4    jury is I can do this:  I can tell you put yourself in

5    his shoes.  How would you feel?  Think of your four best

6    friends that you have in this world and think of one of

7    them calling you over to his office and secretly

8    recording you four times and not telling you about it

9    and then sending you e-mails after the fact and not

10   telling you about it.

11            Why wouldn't you be up front first and

12   say, "Hey, Paul" -- and that's an interesting point

13   because that was his testimony.  He said, "Well, I had

14   to record it because I sent him this e-mail and he

15   would not respond to me."  That e-mail was long after

16   he had recorded Paul Thompson, long after.

17            So think about how any of us would feel

18   if one of our four best friends does that to us.  Why

19   wouldn't you go to your best friend and say "First,

20   here's the list of things I want you to confirm.  Can

21   you confirm it?"  Why wouldn't you do that first?  And

22   if you're really a friend and your friend says, "I can't

23   confirm it," you don't go sue your friend, you don't go

24   secretly record your friend.

25            And it's punitive.  It's punitive as to

1575

1  Paul Thompson and he is collateral damage in all of this

2  arbitration.  I would ask on behalf of Paul Thompson and

3  his family, he no longer works at Ascendant, but I would

4  ask that all of these causes of action that they've

5  alleged against him that there be no finding of

6  liability.  And even though he hasn't paid his

7  attorneys' fees, I would ask for the attorneys' fees

8  back necessary to defend Paul Thompson in this action,

9  respectfully submitted.

10              Thank you.

11              CHAIRMAN ALDOUS:  Thank you, Mr. Walters.

12              Mr. McNeil?  Mr. McNeil, can we just do a

13  water while you're --

14              MR. MCNEIL:  You know, that's what -- I

15  was going to ask for a four-minute break.  Thank you.

16       (A break was taken from 2:49 p.m. to 2:59 p.m.)

17              CHAIRMAN ALDOUS:  Mr. McNeil, if you're

18  ready, you can get started.

19              MR. MCNEIL:  I'm ready.  Thank you.

20  First of all, gentlemen on the panel, I want to say I

21  thank you for your attention this week because I know

22  there's been a lot of evidence and the key is to, of

23  course, fit all of that evidence into a picture and a

24  picture where you're able to figure out what happened

25  and we're able to then say here's how we should rule

1576

1    because here's what the evidence produced for us.

2                    I've always been taught opening statement

3    is something, as I said earlier, that are promises that

4    I was going to make to the panel regarding this case.

5    And I know that the opening statement was bold in a lot

6    of the things that I said to the panel, but I was

7    comfortable with that boldness because I knew what the

8    evidence was going to be.

9                    You've seen this case fully briefed and

10   as you saw the fully briefed case you also saw proposed

11   findings of fact and conclusions of law that came from

12   us, so the case was pretty transparent in terms of where

13   everybody was going to go and what the panel was going

14   to see.

15                   So when I said things such as this case

16   is filled with xenophobia and innuendo and those kinds

17   of things, I meant that, and I'm going to tie it all

18   together for you now because I think all the evidence is

19   out on the table and it's going to make more sense at

20   this point.

21                   So I apologize that Ms. Perry may have

22   been offended by everything, but I think I understood

23   from her presence here that she heard all of the same

24   evidence or purported evidence that everybody has heard

25   in this case.

1577

1           And the big issue is there is no

2   evidence.  I'm going to point that out to the panel.  I

3   know we already have a brief and I'm going to point out

4   tidbits of that because we have three weeks now to sort

5   of tie more together for the panel and to make these

6   remarks directly related to the evidence as it's been

7   presented.

8           But the one thing that's been chomping at

9   the bit as I've been sitting here and shaking my leg and

10  tapping and making notes and just sitting here trying

11  to -- waiting for my turn is that there's a continuous

12  theme in this case, a continuous theme of a negative

13  inference that they want you to draw as a panel because

14  my, God, Ms. Bramer could not get the evidence that she

15  wanted from these folks.  And they keep saying "they"

16  and I say "they."  And, so that we're clear, when I say

17  "they," I'm referring to "they" being the Claimants.

18          This is a joint venture claim against my

19  client.  That's the joint venture over there.  And I

20  don't necessarily blame any of the individual Claimants

21  themselves except for Patrick Jenevein, of course,

22  because I think the evidence has been pretty clear that

23  he has been the one that has been leading the charge for

24  his own reasons.

25          So the first point that I want to raise

1578

1    is we have responded in AVIC USA to every single

2    discovery request and we've done so fully and

3    completely, and so has Paul Thompson.  So when you hear

4    this "they" stuff, the "they" stuff is they're trying to

5    impute nonsignatories where there's no jurisdiction

6    where they served discovery requests on us and say "Oh,

7    those discovery -- see, we have served all of those

8    people that we have no right to serve and we've served

9    Cedric Chao a subpoena in San Francisco and we've served

10   somebody else in Mongolia and Bulgaria, and nobody's

11   responded and it's all their fault, so please draw the

12   negative inference that they're all hiding information.

13   And since they're all hiding information, we would like

14   to get you to award us $7.2 billion."

15             Well, don't buy it because it's not true,

16   and I'm making that representation.  There's not one

17   piece of evidence in this record that demonstrates that

18   that has occurred.

19             Now, what I will tell you is that the

20   best evidence in this case is the fact that they don't

21   present any evidence on particular points.  When you

22   look at the case and you look at what you have to do --

23   I've created a schematic for the panel, and I'll get to

24   the schematic in a minute.  But the schematic is if

25   this, then this and if this, then this.

1579

1          But before I do that, I've had the

2     misfortune to have to look at these boards most of the

3     week and not really comment on them.  It's interesting

4     because you see timeline highlights going back to 1997,

5     and then you see the next one 2008, 2009, and then the

6     next thing you see is stuff going on in 2015 right

7     there.  Don't see anything for 2010, 2011, 2012, 2013.

8     You don't see anything in the middle because nobody was

9     complaining about anything.

10          You just heard a clip from Patrick

11     Jenevein, "I complained to Paul Thompson dozens of

12     times, scores of times," but you can't find an e-mail

13     about it, can't find him saying anything -- you heard

14     even here that with respect to Paul Thompson, Paul

15     Thompson had to be laid off at one point in time by Mike

16     Carter.  And that was after the purported preliminary

17     Chicago agreement.

18          And if that really was an AVIC USA

19     contract or a Soaring Wind contract, wouldn't you have

20     seen a letter from Mike Carter perhaps to Sherman Zhang

21     or to somebody else saying, "Give me some money because

22     I got to lay off one of our guys.  Where's the money?

23     Give me a fraction.  Give me one-tenth of one-tenth of

24     one percent of that money so that we can keep our

25     operating entity going," which is the Soaring Wind

1580

1    entity, which is what they want you to believe.  But you

2    didn't see that.

3              You don't see any evidence that there was

4    communications with Sherman, no communications that

5    there was communications with Paul Thompson -- or,

6    excuse me, there were communications with Paul Thompson.

7    "Congratulations, good job, proud to know you," whatever

8    he said in those congratulatory e-mails.  But nothing

9    like "By the way, who is this Ascendant company that

10   you're working for and gee, tell me more about them and

11   gosh, I'm concerned."  Nothing like that.  Because

12   nobody believed that the Chicago agreement had anything

13   to do with Soaring Wind.  If that were the case, you've

14   heard no adequate explanation as to why the Soaring Wind

15   contract, it should -- excuse me -- strike that.  You

16   saw nothing as to Exhibit 3, which is the preliminary

17   Chicago agreement, why wasn't that in the name of

18   Soaring Wind.  There was no explanation for that.

19             It's funny.  We've been hearing about the

20   Bridas factors, and there's a Bridas 1 and a Bridas 2.

21   And in connection with both of these entities, you're

22   going to see -- well, you know what, but before we

23   get -- let's see, I just want to decide what is the best

24   way of doing it.  I think what we'll do is we will turn

25   to the Bridas 1 and Bridas 2.  And if the panel hasn't

1581

1   had a chance to review the Bridas case, we will include

2   it in our stick that we send to the panel, but the

3   Bridas 1 case is still good law.  And Bridas 2, of

4   course, is the case where it was resent in order to

5   examine the alter ego factors, which we've spent a lot

6   of time on here.

7            But I told you also in the opening

8   statement that this is -- there's going to be a lot of

9   misdirection in this case.  And that's all it's been is

10  misdirection.  The misdirection has been, as I mentioned

11  in the opening statement, you got to look at the conduct

12  of this transaction and this entity and determine if

13  there's any liability on the part of AVIC USA.  And if

14  there is liability on the part of AVIC USA, then you're

15  going to say "Gee, are there alter ego -- does the alter

16  ego doctrine apply to AVIC USA in this case?"

17           Well, what they're doing is they're

18  reversing it, and as a result of improperly naming all

19  these other Defendants -- or Respondents in the case,

20  they want you to reverse it and impute some of the

21  conduct out there and then drag it down and give it to

22  AVIC USA.  And we'll go through the factors in a moment,

23  but the short story is that they use these artificial

24  exhibits now to change what you see as the possible

25  relationship between the parties.

1582

1      David, can you show me, please, the
2  claim, the fourth amended claim, and the diagram from
3  the fourth amended claim?
4      This we've had to look at all week.  What
5  you have on the -- up here is a page, and that's my
6  handwriting and that's to direct us, there's no
7  attorney-client privileged communications there.  But if
8  you look at how the entities are set up here, it was
9  meant to give you preconceived notions on this concept
10  of the relationship among the parties.
11      Because you see AVIC is on top, and, of
12  course, that's there on purpose.  And then you have
13  CAIGA here and AVIC IHC and AVIC TED and AVIC Ascendant
14  and AVIC IRE, and then you have AVIC IRE owning AVIC
15  USA.  At least that's the impression that it's meant to
16  give because you see the connection between IRE and USA.
17      And it's already well established, and I
18  don't think it's even -- it's controverted in any
19  fashion in this hearing, but, in fact, we all know that
20  AVIC USA is owned by Holdings, AVIC International.  And
21  I said, "Is this true?"  No.  Look at their own exhibit.
22      We then look at their exhibit here
23  where -- same kind of thing.  They're creating these
24  connections.  They're not creating any sort of a
25  schematic where you can follow ownership of the

1583

1    companies.  What they're doing is they're doing what the

2    old X-Files show used to say at the conclusion, which

3    was deceive, inveigle and obfuscate.

4                So if we deceive, inveigle and obfuscate

5    and sort of mix them up and then present them to the

6    panel and then talk to the panel about all these side

7    issues, maybe we're going to be able to convince the

8    panel that the Chicago agreement, which is unsigned by

9    AVIC USA, is actually signed by AVIC USA.

10                And then what we can also do is the

11   MOU -- we'll talk about the MOU.  I don't care about the

12   language in the MOU at the first instance of it being

13   binding or nonbinding; the question is, did the MOU end

14   up being a document that became part of the Soaring Wind

15   contract or the operating agreement.  The answer is yes.

16   It says right here in the -- I don't care who signed the

17   Memorandum of Understanding either.  You know why?  The

18   Memorandum of Understanding was actually implemented by

19   virtue of the Soaring Wind agreement.

20                When you look at this, it says, "The

21   partners will include CATIC USA, a U.S. corporation."

22   Pure and simple.  And Patrick, who touts all of his

23   experience and all those wind energy experience and all

24   those things that you heard about and this whole group

25   of interrelated Tang this, Tang that and tagging

1584

1    somebody else and we schlepped it with the name Tang for

2    the benefit of making it a good word in China so maybe

3    going to be easier to raise money from investors.

4              So you have that going on, and what

5    transpires is that the company, we can now say that the

6    Chicago agreement in the name of Tang, not to promote

7    Soaring Wind, can be used by his company to take that

8    company perhaps to a next level or to raise money from

9    investors.  And we know that occurred at least once in

10   connection with the sale of shares that Ms. Bramer was

11   talking about which occurred with the company in Hong

12   Kong.

13             So what happens is the Memorandum of

14   Understanding comes into play.  After it comes into play

15   and the joint venture is created and Patrick Jenevein

16   goes out and brings in his investors and the Soaring

17   Wind agreement is signed, now we're off to the races.

18             Did we think that the Soaring Wind

19   agreement is truly meant to cover wind farm development?

20   No.  The evidence doesn't show that.  The only -- you

21   have the language in the agreement, understood, but you

22   also have a firm that we've already established -- I

23   think we've hit that nail several times after it was in,

24   Fulbright and Jaworski was hired by Mr. Jenevein.  They

25   were the only -- he was the only one that gave them

1585

1   input.  The discussions of Mr. Zhang with Patrick all

2   were engrained into a $350,000 investment in Soaring

3   Wind.

4               That investment was going to be for the

5   benefit of wind farm development -- excuse me, strike

6   that; for the benefit of wind farm machinery turbines,

7   those kinds of things.  But they want you to believe

8   that $350,000 was going to fund wind farm development.

9   Well, we all know, based on everybody's testimony, that

10  no way that was ever going to happen.

11              So when we move forward and we see that

12  Soaring Wind as it's proceeding forward and you see the

13  lack of any communications talking about breach, breach,

14  breach, what happened?  Well, we know that we have a

15  document that was provided by Tang showing that they

16  actually owned 55 percent of Soaring Wind on their own

17  chart somewhere.  It's actually one of their charts, but

18  I'm sure that the tribunal recalls that exhibit.

19              And the explanation from Patrick Jenevein

20  when I asked him about it was it's not untrue, it's only

21  inaccurate.  I'm not sure what that means, but I think

22  you can determine for yourselves what I had to go

23  through during his deposition.  You'll have a chance to

24  read his deposition and see exactly what transpired and

25  you're going to be able to see that during his

1586

1    deposition, as I mentioned earlier, I counted 83

2    instances of evasion and obfuscation and he didn't

3    recall.

4                  Very interesting what he recalls on

5    direct and very interesting what he doesn't recall when

6    you ask for specific dates as you've just seen from the

7    clips shown by Mr. Walters.  What you just saw on the

8    clip was an example.  "I don't remember how many times

9    but I do know it was dozens of times."  "But you

10   couldn't put it in writing once, could you, Mr.

11   Jenevein?"  So he's very good at crafting evidence that

12   cannot be verified from any other third-party source

13   except from his own brain.  And that's what you are

14   faced with in this case.

15                 In the -- you know about the flurry of

16   activity which occurred just before the start of this

17   arbitration, and that's very important that you know and

18   be very clear on what was transpiring because they filed

19   their emergency motion to abate.  And when they filed

20   their emergency motion to abate, it was an interesting

21   document to read and to respond to.

22                 And what we've done is we've taken a

23   snippet out of it, which is marked as AVIC USA 272, page

24   2.  And it says, "To proceed only against the nominal

25   signatories," and that's, obviously, the nonsignatories,

1587

1    "would either defy the ruling as to the parties who are

2    identically situated as Ascendant, by hearing alter ego

3    evidence except as to Ascendant, or deprive Claimants of

4    an opportunity to present the largest portion of their

5    case by declining to hear alter ego evidence.  This is

6    an alter ego case."

7                    This is what I want you to really focus

8    on.  I want you to focus on all of it, really, but I

9    want you to really focus on this.  "Claimants do not

10   allege that AVIC International USA acted under its own

11   name to violate that provision.  Rather, Claimants

12   allege that AVIC International is an alter ego to

13   corporations related to it."

14                   They can't reverse the presumption.  The

15   issue is they want to have everybody abide by this

16   agreement and hold them specifically to every single

17   term of an agreement when my client signed it on behalf

18   of AVIC USA and have this panel impute that other

19   parties should be part of it, but -- and they also want

20   you to impute that the Chicago agreement should also be

21   litigated here.

22                   Why should the Chicago agreement be

23   litigated here?  Is there any reason why that agreement,

24   which does not have an arbitration provision in it,

25   should somehow -- and it does not have a mention of

1588

1    Soaring Wind in it and doesn't have anything else going

2    on in it but is being brought here to this tribunal to

3    say, "Wait a minute.  We're going to glom on to the

4    Soaring Wind operating agreement by attaching Chicago."

5                 You know why?  The whole thing is a

6    scheme.  I'm sorry to say that, and I know that we are

7    not a jury and you all are lawyers and judges and

8    respected jurists, and I'm happy that you're hearing

9    this case because the issue here is that they start with

10   this -- with the concocting of an -- of unfortunately

11   having to put together a panel of nine arbitrators.

12                When you read -- in the reports that are

13   attached in your binders, which we will emphasize later,

14   there is a specific report from John Townsend, who I

15   also mentioned in the opening of this case.  And John

16   Townsend talks about two points that he wanted to raise.

17                Number one is, even in multinational ICDR

18   litigation -- excuse me, arbitration, in the ICC and

19   ICSID, anywhere you want to talk about, what happens is

20   that the whole idea of the concept of contractual

21   arbitration is one where the parties want the process to

22   be fair and impartial.  It has nothing to do with

23   biases, has nothing to do with me accusing all of you of

24   doing something wrong or being biased for one side or

25   the other.

1589

1        The issue is the parties have the right

2   to select characteristics.  One side picks their

3   arbitrator based on characteristics and experience and

4   the other side picks their arbitrator based on the

5   characteristics of that party, and then they get

6   together and they select their third.  We see that.

7        There was a recent decision that just

8   came out involving the Government of the U.K. vs. Italy.

9   They have a massive dispute involving 3 pipelines, $17.5

10  billion at issue and you have a panel of 3.  And the

11  reason for that is because those are internationally

12  accepted norms.

13        What happened in this case instead, you

14  had a jerry-rigging of the process so that what they did

15  is they said, "Okay, fine, we're all going to join in

16  everything.  Once we join in everything, we're going to

17  select a panel and maybe selecting that panel is going

18  to give us some sort of an advantage."

19        That's why we fought the issue and that's

20  why we retained Mr. Townsend.  Nothing personal to any

21  member of this tribunal at all, obviously.  The reason

22  why we did it was we didn't want to have to incur the

23  cost and expense because I represent a client who's

24  paying for this thing himself.

25        So the answer is that's why that issue is

1590

1  before the panel and I raise it again because it was one

2  of the original issues and it's a threshold issue in

3  this case.  It's a threshold issue that you need to

4  decide, and you're going to see it in your papers.  And

5  Mr. Townsend says, in order to read the provision in the

6  operating agreement for the arbitration provision to

7  call for a panel as large as we have now is a misreading

8  of the provision.

9         And I'm going to refer you -- what is his

10 report number?  It's in your binder, the Exhibit Number

11 265.  And what he says is that -- because I want to make

12 sure this is clear, "because one side would have a

13 disproportionate ability to select arbitrators having

14 the characteristics that it expected to favor its

15 viewpoint, even if the arbitrators it selected met the

16 standards of the code of ethics."

17        Now, the issue -- I stress that part of

18 his decision because I don't want there to be any

19 suggestion or laugh or snickering or anybody saying "Oh,

20 wow.  Why are you attacking the panel?"  I'm not

21 attacking any panel.  I'm demonstrating for you that the

22 jockeying started well before even this filing of the

23 arbitration demand in June.

24        It started because we all know that

25 Ms. Bramer was brought into this case well before

1  because we don't have evidence.  What are you going to

2  do if you don't have evidence?  Well, I guess what we're

3  going to do is we're going to manufacture that evidence.

4            So what we're going to do is we don't

5  have -- we're missing all these communications, you have

6  the wrong party signing an agreement, we're trying to

7  get money out of HT Blade.  And, yes, it is an HT Blade

8  dispute, okay.  I fully concur with Mr. Walters on that

9  issue.

10           In the original -- they spend in the --

11 in the first amended claim, second amended claim, third

12 amended claim, fourth amended claim, which I need you to

13 review when it comes time to deliberate, you need to

14 review all of those.  Why?  Not because of the --

15 obviously, the fourth amended claim, together with your

16 order, adding the disgorgement claim, that is,

17 theoretically, the operative pleading.  But the

18 evolution of the theory is fascinating.  The evolution

19 of their theory from the beginning to the end

20 demonstrates the motivations as to why this case was

21 brought.

22           That motivation was that, you know, what

23 we're going to do, we'll hire an expert, I'll go out and

24 I will secretly record my folks.  And one of our motions

25 that I think that we brought at the outset, and I know

1592

1  everything's being held until the end of the close of

2  evidence, but we do want to make a motion to exclude the

3  statements that were the illegal statements that were

4  recorded against my client.  And they are illegal under

5  California law, and the criminal cases that are pending

6  are still pending, the investigations, and they are

7  still pending, and as far as we're concerned, even if

8  they were not still pending and the cases were closed,

9  we would still ask the panel to exclude those statements

10  because that's the proper thing to do since the

11  recordings took place in California.

12              What I would say to you is that once we

13  -- so we get Paul Thompson and we get Sherman Zhang.

14  And Sherman, of course, I'll focus on him because

15  Mr. Walters is representing Paul Thompson.  But Sherman

16  Zhang gives him a hotel room, goes to the hotel room,

17  brings him in and says, "Okay" -- lures him into a

18  series of conversations.

19              We don't find out about those right away,

20  by the way.  We don't find out about those statements,

21  no one brings them to our attention until much later in

22  the discovery process in this case.  Not until just

23  prior to the deposition of Mr. Zhang.

24              So what transpires then is that in order

25  for their theory to work, though, you heard a couple of

1593

 1  anomalies here.  The first theory -- or the first

 2  anomaly, I should say, of the theory is that in order to

 3  make all of this work and in order to make the Soaring

 4  Wind agreement, which is signed by AVIC USA and the

 5  Chicago agreement, which is signed by Tang in order to

 6  somehow craft those -- or cobble those agreements

 7  together, what you got to do is go oh, everything that

 8  Tang was doing was for the benefit of Soaring Wind.

 9  Everything.  Every single thing.

10          Because we need to make this worthwhile

11  because this is going to be an expensive process, so --

12  and if we truly want to embarrass the Chinese side and a

13  company like AVIC that has publicly traded subsidiaries

14  and we sort of want to badger them into a settlement,

15  let's bring in as many of these entities as we can.  So

16  we'll bring IRE and IHC and we'll bring in everybody

17  else.  Even though we know there's no jurisdiction over

18  those companies here, but we'll bring them into the case

19  because that way we can boost up the damages and boost

20  up the exposure and possibly settle the case.

21          So what happens is that the Chicago

22  agreement is used as a tool to attach to the Soaring

23  Wind agreement in order to have us here.  So the second

24  issue that you're going to need to decide is what is the

25  scope of the arbitration hearing.  Because the scope, if

1594

1  you're looking at the Soaring Wind agreement, the

2  Soaring Wind agreement provides for a resolution of

3  disputes between AVIC USA and these Claimants.

4           If that's the case, then we look at the

5  conduct of AVIC USA.  And I also think that that nail

6  has been hit in three or four times right here.  They do

7  not allege that AVIC USA did anything wrong.  They're,

8  of course, sneaking in the issue of alter ego, but the

9  issue is they have to do that because they have no other

10  theory.

11           They put a bunch of stuff into the

12  pleadings, but a bunch of the stuff that go into the

13  pleadings are things such as principal and agent and,

14  you know, those kinds of things.  But I told the panel a

15  few minutes ago that when you have a chance to look at

16  Bridas, make sure you look at Bridas 1 and Bridas 2.

17           When you're analyzing the issue of the

18  Chicago agreement, it's important that you look at the

19  language in Bridas because Bridas 1 talks about these

20  other miscellaneous theories beyond alter ego, that the

21  mere fact that one is dealing with an agent, it should

22  be a danger signal.  And here it says -- it had Bridas,

23  and I put in brackets the names here to make it relevant

24  to this arbitration, truly felt that somebody was

25  signing the agreement not for itself but on behalf of

1   the government, AVIC, it had the obligation to make that

2   fact clear on the face of the agreement.  Obviously, it

3   didn't do that.  So he didn't make it clear on the face

4   of -- and we have copies for you and we're going to

5   include this so you won't to have carry this away with

6   you anywhere.

7            But it basically says we will not bind

8   AVIC to the agreement simply because Tang lost a gamble

9   that it was willing to take.  To do otherwise would

10  vitiate the predictability of the legal backdrop against

11  which the parties voluntarily agreed to do business.

12           Now, we know that Tang did not on its own

13  intend for any of these post SWE projects to be part of

14  SWE.  And we know that because of the lack of

15  information, the lack of documentation.  You have to

16  take Patrick Jenevein's word on it.  I think that

17  Ms. Bramer said something like 30 percent of her time

18  was -- or somebody said -- may or may not have been

19  Ms. Bramer, but somebody said that they spent 30 percent

20  of their time talking to Patrick Jenevein.

21           Pretty large amount of time for any of

22  the experts to be talking to Patrick Jenevein and

23  relying on Patrick Jenevein so that he could then cobble

24  together all those issues and bring them to the panel.

25           As I said a few minutes ago, there is

1596

 1    no -- oh, by the way, now I do want to turn at this

 2    point specifically to that large -- at this moment it

 3    may be an 800-pound elephant in the room, but it hasn't

 4    been that during the course of this arbitration.

 5                    I understand the tribunal's decision to

 6    hear the evidence before it ends up ruling and I

 7    understand the liberality of evidence that comes in

 8    during an arbitration tribunal, and with the flurry of

 9    activity which occurred last week it was hard for this

10    panel to really fully assess the merits or demerits of

11    the impact of Judge Kinkeade's ruling on this case and

12    also whether or not alter ego itself should be heard.

13    So we understand that.

14                    And so -- but let's not be sidestepped by

15    these purported experts that came in here.  Or else I

16    won't say purport, I'll say learned experts.  I --

17    unfortunately, I didn't think much of Mr. Stokes'

18    testimony because his theory was so overbroad, as was

19    brought out by Professor deLisle, that it really doesn't

20    have any weight whatsoever.

21                    It was interesting to listen to Professor

22    Naughton in his testimony because both -- because

23    Professor Naughton was talking about alter ego and all

24    of the theories were talking about the 30,000-foot view

25    because it was necessary for them to do that.

1597

1           The stakes were so high in this case that
2    it was necessary for them to find -- in order to find a
3    unitary structure of 800 companies, we have to create a
4    theory that is going to apply basically to every Fortune
5    500 company that exists.

6           So you can get on the websites of any
7    companies.  You can get on the websites of General
8    Motors, Fluor, Chubb and you can look at what they do
9    and how they form their entities and their theories, if
10   accepted, Professor deLisle pointed out correctly, means
11   every entity that you end up that does business and does
12   business multinationally is going to be deemed to be the
13   alter ego of every other company.

14          The theories that allow for that, though,
15   in Bridas 2, which is an interesting case, because it's
16   the case of Turkmenistan and it passing laws, and it
17   passed the laws that basically made a company that was
18   doing business in Turkmenistan, it made that company
19   illegal and made it illegal to import and export.  So
20   when it brought the action, it was determined later the
21   government of Turkmenistan, in fact, funded this company
22   with $17,000, they changed the names -- actually, they
23   changed the names in the agreement, substituted parties
24   and did a lot of other shenanigans, all of which are
25   absent from this case.

1598

1          And Bridas 2, I believe, was correctly

2   decided.  But the key is that they said you must look at

3   the transaction itself and you must look at the entity

4   itself, and they focus on what was going on with the

5   subsidiary of Turkmenistan and they looked at all these

6   factors and they said, "Yes, we are looking at the

7   subsidiary and we're seeing what it was doing and

8   whether or not what it was doing was, in fact, an arm of

9   a parent, which was immediately owning that company.

10         And what we learned from Mr. Zhang's

11   testimony is that when we focus on AVIC International

12   USA, Inc., these are the relevant factors, not the

13   board, which I won't waste time looking for, but these

14   are the factors.  And we have them on the -- we've also

15   put them here on the Elmo.

16         And you'll see no common stock ownership,

17   no common officers or directors, no common business

18   departments, no financing support of AVIC USA, no -- the

19   formation of subs.  That's not an issue because all

20   companies do, as you've heard.  Adequate capital.  AVIC

21   USA's consolidated financials, as most companies do, if

22   not all Fortune 500 companies.  AVIC pays its own

23   salaries.  It observes all of its corporate formalities.

24   It deals at arm's lenth in all of its dealings.  AVIC

25   USA is owned by a holding company, not AVIC China.  AVIC

1599

1    USA is self-contained.  AVIC USA pays its own selected

2    lawyers, professionals and their fees.  AVIC USA holds

3    its assets in its own name and it uses its business

4    judgment as it did in investing in Soaring Wind.

5              There was not one stick of evidence, not

6    one, that suggested that AVIC USA somehow is manipulated

7    to do anything in connection with this transaction.  In

8    fact, I don't want to hear anything about negative

9    inferences or anything like that because this tribunal's

10   had the opportunity to hear Sherman Zhang testify, the

11   president of a company for ten years, how he determined

12   what he wanted to do in terms of bringing equipment into

13   the United States, how he met with Mike Carter and

14   Patrick Jenevein, how they entered into the Memorandum

15   of Understanding, how it led to the Soaring Wind

16   agreement, and then all of a sudden Patrick Jenevein

17   drops off the face of the earth.  Drops off the face of

18   the earth as to AVIC USA.

19             Because what happened at that point is

20   somewhere along the line in there Patrick saw that he

21   was going to tie his horse to a different wagon.  And

22   that different wagon was maybe he's going to go out

23   somewhere else.  I know he's got the Tang commitment,

24   etc. and as a result of that Tang commitment over there,

25   now he's all of a sudden no longer talking to Sherman

1600

1  because, obviously, Sherman wasn't instrumental for him

2  at any time.

3              In June 2010, when you saw the exhibit

4  showing that he's claiming that Tang is a 55 percent

5  owner of Soaring Wind, you don't see Soaring Wind tied

6  to any other Tang entity in their document that they

7  prepared.  You see Tang is totally separate and Soaring

8  Wind is in there as a little subsidiary.  He wasn't even

9  treating them as one company.

10             So what happened is is that the -- that's

11  why it was frustrating in preparation for the case

12  because we did find ourselves, in a sense, trying to

13  prove a negative.  Proving a negative is to come in here

14  and say, wait a minute.  I took the deposition of

15  Patrick Jenevein, and during the deposition, I -- first

16  question -- one of the first questions I asked him was

17  "What do you claim that my client, Sherman, did wrong?"

18  "I don't claim Sherman did anything wrong."

19             Well, then that brings me to the question

20  why are we here?  Why are we here?  What is the dispute?

21  You've heard all of this purported evidence.  When you

22  hear about a multinational company, I could go out there

23  and probably craft my own case if I decided to go take

24  the recorded statements of a couple of officers of

25  General Motors and get them to sign some agreement at a

1601

1  dealership level somewhere and somehow impute it up to

2  the head of General Motors, record those statements, get

3  an expert to put together all of the evidence of what

4  all the future work would be over the next 30 years and

5  I could probably create my own case.

6           What would be missing if I did that,

7  though, is going to be the back and forth

8  communications, other negotiations, other normal and

9  natural communications, etc.

10          So that brings us forward now to we hear

11  nothing.  Sherman, as you know -- there's been no

12  testimony here that Sherman heard Patrick Jenevein go to

13  him before this meeting in 2014, which we'll get to in a

14  minute, but there's no evidence here that he at that

15  meeting -- or before that meeting that there was any

16  meaningful communication between the two.

17          That's what you should be drawing the

18  inferences from.  Draw the inferences from if Patrick

19  Jenevein was not complaining to Sherman about a $300

20  million commitment, then maybe there wasn't a $300

21  million commitment on the part of Soaring Wind.  Maybe,

22  in fact, that was a concocted theory.  Maybe, as a

23  result of what the evidence shows, Patrick Jenevein was

24  being threatened by his own people.

25          That's what he told Sherman Zhang.

1602

1    Sherman picks him up at the airport, gives him a hotel

2    room and on the drive back, what he tells Sherman is "I

3    lost my home.  I'm being threatened by my investors.

4    Things are really rough for me.  Sherman, you got to

5    help me solve this HT Blade in China.  Let me ask you a

6    few questions.  What do you think about those AVIC

7    people?  What do you" -- so he makes sympathetic remarks

8    and sympathetic statements back saying, "Okay, fine."

9    Takes him back to the hotel, they have breakfast and

10   then they go off and he does his own thing.

11              The second meeting takes place in June, a

12   telephone call with Mr. Ma present.  Mr. Ma, who's the

13   corporate counsel, Mr. Ma says, "Yeah, you know, AVIC is

14   in China and that's -- and traditionally this is what

15   AVIC did," and that gets twisted into AVIC today.

16   That's AVIC today.

17              So what happens is now we think we have

18   enough evidence, so two days later, I think it is, this

19   claim gets filed and now the claim gets filed but the

20   stakes are really high.  $2.2 billion are at stake at

21   that time is what Mr. Walters showed you.  At that time.

22              And now we see over a period of 18 months

23   it goes from 2.2 to $7 billion.  And we had to seek some

24   relief from this panel.  Because they realized -- they

25   thought it was going to be easy pickings in settling the

1603

1    case very easy.  That's why they went and got Prax there

2    to agree to fund the litigation.  You can see from the

3    e-mails, and what's the word, maniobras.  I forget what

4    the word is, maniobras.  Yeah, that word is being used

5    because it's like "Hey, give me some money to file this

6    case and, you know what, we'll be able to collect.  And

7    when we collect and pay all the fees, we're going to

8    split it with you."  Doesn't that sound like a great

9    idea?

10                   It's champerty, gentlemen.  That's all it

11   is.  It's an ancient common law theory but it's the

12   worst kind of financing of litigation that you can

13   possibly imagine.  It was 500 years ago made it illegal,

14   and we all know the evolution of the law of champerty,

15   but this is exactly what it was meant to stop.  It was

16   meant to stop not contingency fee agreements between

17   lawyers and clients or those kinds of things.  Well,

18   what it's meant to stop is people funding litigation for

19   improper purposes.  And I'm telling you that this is one

20   of the worst examples of litigation being funded by

21   somebody having nothing to do with this case and they

22   engage in champerty and he's even winking at his partner

23   in this litigation by saying maniobras and the whole --

24   in connection with the whole deal.

25                   So now we saw -- we had to seek relief

1604

1    from the panel, as you know, a few weeks ago because the

2    next thing you know Patrick's out there -- presumably

3    it's Patrick.  I don't know who exactly.  All I know is

4    there's a flurry of activity, and the next thing I think

5    it was in The Dallas Morning News.  Now they have an

6    article in the paper saying "We have now been advised

7    that it's no longer a $2.2 billion claim but it's a $7.5

8    billion claim."  I'm getting phone calls from reporters

9    a month before this hearing.  How did that happen?

10   Arbitrations are private.  How do you think the reporter

11   got some news like that?

12              Well, we know that there can only be a

13   couple of sources, and I represent to you that my client

14   didn't call the newspapers to advise them that "Oh, now

15   there's a $7.5 billion claim against AVIC."  That was a

16   Hail Mary.  That was a toss at the last minute to see if

17   maybe if we do this and we embarrass AVIC really badly

18   before the arbitration, they're going to enter into

19   settlement discussions and we're not going to have to

20   put on a sham case.  That's really what was going on at

21   that point.

22              I promised you a few minutes ago that I

23   would give you a schematic.  And bear with me for a

24   minute.  I just dictated it last night and I did it in

25   order to save time, so you can see how good that worked

1605

 1    out.

 2              So let me sort of recap a little bit of

 3    what we've been talking about or what I've been talking

 4    about and yelling about is that we first talked about

 5    the issue of the composition of the panel in John

 6    Townsend's report.

 7              The next issue is one of those things

 8    that -- this sticks in my craw especially as a

 9    professional lawyer trying to explain this to my client

10    when he asks me a question -- I will say hypothetically

11    asks me a question so I don't breach any privileges, but

12    it's "How can Tang sue me?"  I say, "Well, you have an

13    agreement".  "Well, but how can he sue me and use his

14    own lawyer to sue me?  And he's suing my company that I

15    own 50 percent in?  How can the same man who represents

16    him also sue me, too?  It doesn't make sense."

17              Well, that's one of the issues that we've

18    been talking about all along.  That's why we instituted

19    the Delaware action.  Because we tried to get relief

20    from a Delaware court because if you look at the Soaring

21    Wind agreement, there's no authority in there.  We're

22    not trying to defeat any claims of Soaring Wind, but we

23    want this tribunal -- you've heard Mr. Jenevein say

24    several times during this case on behalf of Tang and

25    Soaring Wind.

1606

1           Well, I don't want to face that.

2    Unfortunately, we're facing it because that's what's

3    going on here, but the agreement itself controls, and

4    the agreement says that the management committee can do

5    things that are related to the business.

6           And what they did is -- and they did an

7    end run around voting as members, which is required

8    under the agreement, as required that it be a two-thirds

9    vote to institute litigation and it's required also

10   under Delaware law that you have a majority vote.  We

11   know they could never have a majority vote.  Forget the

12   two-thirds vote.  They could never have majority because

13   he -- AVIC USA owns 50 percent and Mr. Thompson owns a

14   percentage, 2 or 3, 5 percent, whatever it is, but the

15   bottom line is the panel can easily conclude that they

16   can never get a majority.

17          What they do is they go out and they have

18   a sham management committee meeting in August and say

19   "We're going to also sue in the name of the company,

20   too."  So that's what we're also facing with.  We're

21   faced with a position where we have to defend with the

22   same law firm.  And we had discovery disputes along the

23   way.  And I said, "You can't do that," and, of course,

24   Mr. Jenevein said, "Yes, you can," and so I went, "Oh,

25   well."

1607

1        And then -- and, unfortunately, we

2   probably should have started the Delaware action much

3   later, but the problem -- or much earlier, I should say,

4   but it came later because it was expensive.  It was

5   expensive for the client to start a new action in a new

6   forum, but I had to recommend it and that's what we did

7   and we're waiting for that decision.

8        But it doesn't change the facts, and the

9   facts are that there is no -- that Soaring Wind is not a

10  legitimate party to this case because it's governed by

11  the agreement, and you'll see when you deliberate, the

12  agreement is very clear on that issue.

13       That's why we filed the motion, which was

14  denied.  We filed a motion that we didn't want

15  Mr. Jenevein representing Soaring Wind at the very --

16  that's why you heard me ask Patrick Jenevein.  "I told

17  you that there was a dispute, didn't I, that there was a

18  conflict?"  "Yeah."  "Did you hire another lawyer?"

19  "No."  "Did you get an opinion?"  "No."  Yet he

20  represents himself to be the head of Soaring Wind right

21  now in the pleadings but still did nothing in order to

22  avoid that conflict.

23       The next step after you look at the

24  composition of the panel issue and then you look at the

25  Soaring Wind agreement and whether or not Soaring Wind

1608

1    is a proper party to this case, the next step is at that

2    point to discuss the issue of alter ego.

3              And when you look at the issue of alter

4    ego, you have to look at only a simple number of facts.

5    On this point I do agree with Mr. Bob Jenevein, and that

6    is that the case is relatively simple.  Despite all that

7    evidence and all the money that's been spent, a lot of

8    money's been spent, I'm sure, on both sides in

9    connection with alter ego, but the reality at the end of

10   the day is the analysis is simple.

11             There is no claim that Sherman did

12   anything wrong on behalf of AVIC.  The sole contention

13   is that Xu Hang signed some other agreement with some

14   other entity and that action should be imputed to AVIC

15   USA.  That's the only evidence.

16             The theory doesn't work because, as you

17   see from all of the factors, Xu Hang was never an

18   officer or a director of AVIC USA.  So, at best, they

19   have to go sideways.  See, this is the hardest part of

20   their theory, is that it's one thing to go up and down

21   and say, "Well, there's a parent up there and let's sort

22   of impute conduct all the way up to the parent," but

23   they have to impute conduct side to side.

24             And that's where the other odd part of

25   the theory is, that they want to try -- that's why you

1609

1 heard some comments about affiliates and those kinds of

2 things because, in fact, under the Soaring Wind

3 agreement it says that an affiliate of the parties to

4 the Soaring Wind agreement is defined as a party who

5 controls another party.

6          Well, there's no evidence that AVIC USA

7 controls Ascendant or that Ascendant controls AVIC, so

8 there's no relationship between the parties.  And Paul

9 Thompson testified, I believe, that he hadn't had any

10 communication with Sherman over several years either,

11 not until this litigation.

12          The next step is if they want to focus on

13 Mr. Liu, let's focus on that for a minute.  Mr. Liu had

14 every right to come here and sign the MOU.  He was a

15 director of AVIC and I think the -- of AVIC Holdings --

16 excuse me, a director of AVIC USA.  And, as a result of

17 that, he had every right to sign the agreement because

18 the MOU itself says that the party that will be a

19 signatory to the agreement is CATIC USA.

20          So if you're going to say that he signed

21 it on behalf of some other entity, even, and let's

22 assume that's the case, it was merged into the Soaring

23 Wind agreement, into the MOU -- excuse me, into the

24 operating agreement.

25          Now, when you see the MOU and the

1610

1   operating agreement together, we're clear that they --
2   that the Soaring Wind agreement is what controls
3   because, obviously, it has an integration provision.
4   I'm not going to -- I had Mr. Bayles standing nearby to
5   show you that, but I'm not going to have him show that
6   to you.

7              So the best situation is that at that
8   point that you determine alter ego doesn't apply.
9   Secondly, you know from case authority that alter ego is
10  not to be decided as to nonsignatory defendants except
11  by a court.  So at the end of the day you need to focus
12  on that issue, too.

13             If you even think that there's a
14  possibility of alter ego in this scenario that I just
15  told you, AVIC USA to impute up to a parent, you don't
16  do that in any event because they recognize and they
17  acknowledge in their emergency application that no, I'm
18  sorry, but you know what, this is an alter ego case and
19  those issues have to be decided by a different tribunal
20  than this one.

21             The nonsignatories, as we know already,
22  are not parties to this action.  The nonsignatories we
23  know are not parties because we know that from both what
24  I just showed you from the emergency motion to abate, by
25  case authority, which is clear, and also by Judge

1611

1    Kinkeade's ruling because Ascendant brought its action.

2    When it brought its action that nonsignatories can only

3    be brought into the case via a court proceeding.

4              So, therefore, what we have now is AVIC

5    USA, who did nothing wrong entering into an operating

6    agreement, that makes its capital contribution to the

7    company at $350,000, and that money looks like, as we

8    sit here today, looks like it's gone forever.  But all

9    we know is that in order to go after that, in order to

10   proceed at that point, they have to find some other way

11   to maximize their damages.  So they look at the four

12   corners of the agreement and interpret a clause as

13   providing a worldwide provision for all wind energy

14   anywhere.

15             I think one of the witnesses testified

16   that there is a -- that it's a $10 billion industry or

17   something like that.  So what they want you to believe

18   is that there was a $10 billion industry that was all

19   tied up into one Soaring Wind agreement -- in an

20   agreement, which was crafted by Patrick Jenevein's

21   information which he gave to a lawyer here in Dallas.

22             So what is really -- I told you one of

23   the other promises that I made was I said you're going

24   to see that this is a fraudulent application of the

25   alter ego doctrine.  I think Mr. Lowenstein's comments

1612

1    at the outset were meant to challenge me on that a

2    little bit.  No, sorry.  I'm doubling down on that one.

3    I'm doubling down on that one because it's true.

4              When you look at the factors and you look

5    at the law and see how alter ego is to be applied, I

6    said to you as legal professionals, we all know how

7    alter ego applies.  I represent clients from around the

8    world; China, Europe, the Middle East.  I represent

9    clients from Abu Dhabi, Dubai, Lebanon.  I represent

10   clients from -- and I know how people do business, how

11   they engage in their practices and how alter ego can

12   stick clients if they really don't do their homework.

13   It can stick a client if they don't engage in their

14   corporate formalities and they treat their bank account

15   as their own personal bank account and etc, etc., etc.,

16   they're going to get yanked and they're going to get hit

17   with alter ago.  And I've used it as a sword.

18             Does anything in this case reek of alter

19   ego, and the answer is absolutely not.  It doesn't reek

20   of alter ego because we don't see any of the conduct,

21   none of the conduct that they see is necessary in

22   connection with establishing an alter ego claim.

23             And so what happens is so now, in summary

24   up to that point, we have a company that has been in the

25   United States since 1987, run by a president who's been

1  there for ten years and the short story is that in order

2  to boost up those damages, you know what, the $10

3  billion wind industry wasn't even enough.  It wasn't

4  even enough to include the wind industry in this.  We

5  have an aircraft company.  We might as well throw that

6  into the mix and get an expert opinion on how much the

7  Cirrus Aircraft transaction was.  You know what, why

8  don't we also throw in the biomass project.  Now we've

9  got a biomass project, we got the wind industry, we got

10  all this and we're to -- then we can really boost up

11  that damage claim, boost up that exposure and maybe we

12  can convince people to settle.

13            Well, at the end of the day, it doesn't

14  work.  By its very terms, if they want to hold everybody

15  to the agreement, where is the aircraft company, where

16  is the biomass company?  You hear Patrick Jenevein

17  saying "Everything I did for Tang, it was for Soaring

18  Wind."  Well, all I can say is that, as we already

19  talked about, he already drafted the agreement.  He knew

20  that Sherman didn't have second -- he knew Sherman's

21  English speaking capabilities were a second language.

22  So if it was a second language, what does that mean?

23  That means maybe he should have taken a little more

24  prudence and said to Sherman "Before I want you to even

25  look at this, let's get everybody to get lawyers."

1614

1    So what he does is he spends over

2    $10,000 -- we know it was much more than 10,000, but I

3    asked him, "Was it 10,000?"  More than 10,000 to get the

4    Soaring Wind agreement looked at and crafted by

5    Fulbright & Jaworski.  So more than 10,000 for a

6    $700,000 investment, but we have a $300 million

7    investment.  We're going to rely on a $300 million

8    investment being embodied in a 2-page contract that was

9    crafted by somebody who's a foreigner.

10    Does that make sense to you?  Where was

11    his fiduciary to that entity and to Tang and to Tang's

12    owners when he didn't do anything to turn a preliminary

13    agreement into a bona fide agreement with timetables and

14    periods of time when investments were going to be made

15    and what the project's terms and conditions would be.

16    Well, at the end of the day, when all of

17    that's said and done, that's the first 29 hurdles that

18    they have to get over in order to get where they want to

19    go, okay.

20    30th hurdle is what are the damages?

21    There are no damages.  I mean, Mr. Walters is kinder, I

22    think, to Ms. Bramer than I would be, and we sat with

23    her in her deposition last Thursday and had to listen to

24    the basis for the damage calculations, and it was -- I

25    guess clever is a good word, but that's about it.  Let

1615

1   me be kind and say they were not legally sound.

2                    I'm sure that Ms. Bramer is doing the

3   best that she could.  With the material that she was

4   given, she was being asked to make a gold purse.  And

5   the problem is it didn't.  It turned into a -- it's

6   really a sow's ear, but it was a gold purse that she was

7   being asked to create, much like the poor gentlemen who

8   were forced to support an alter ego theory were forced

9   to testify to, too.

10                   They had to deal with picking out a

11  million -- out of a million facts in the universe, they

12  pick out 12 in order to show that there's some sort of

13  alter ego theory running up and down and side to side.

14                   The -- and Bramer's report,

15  unfortunately, is replete with mistakes.  We'll point it

16  out in the brief afterwards, but I'd like to show you at

17  least one of them.  They're all the bases for her damage

18  calculations, the facts are just wrong.

19                   David, do you have the page of -- from

20  the Bramer report with the footnote on it?  This is just

21  an example.

22                   I don't know how much time I have,

23  Mr. Shamoun.

24                   MR. SHAMOUN:  Take as much time as you

25  need.

1616

1        MR. MCNEIL:  Thank you.

2        CHAIRMAN ALDOUS:  I have ten more

3   minutes.

4        MR. SHAMOUN:  Wait a minute.  I'm the

5   timekeeper.  No.  I defer to the Chairman.

6        MR. MCNEIL:  And I appreciate that

7   liberality, but I'll defer to the Chairman, too.

8        MR. SHAMOUN:  I was just enjoying -- I

9   was enjoying the closing.

10        MR. MCNEIL:  Okay.  Thank you.  Thank

11   you.

12        As noted above, when I reference AVIC --

13   this is her report, Ms. Bramer's report.  I collect -- I

14   refer collectively to AVIC and its subsidiaries and

15   affiliates.  First of all, you hear her on the one hand

16   say "Look, I'm assuming liability as a presumption," but

17   no, you look her through her report.  You read her

18   report.  All during that report she's actually acting as

19   an alter ego expert in a lot of her comments and her

20   report and in her rebuttal.

21        And then it says, "One of AVIC's

22   affiliates is AVIC International USA," my client, "which

23   I understand is a direct subsidiary of AVIC

24   International TED."  I don't think there's any dispute

25   that that's wrong.  It's just dead wrong.  It's a

1617

 1    subsidiary of AVIC International Holdings.

 2              But she was asked obviously and

 3    presumably asked to put together some sort of a theory

 4    that we can glum them together and make them look like

 5    they're all symbiotic and all Siamese quadruplets or

 6    whatever, maybe that's what they were looking for, but

 7    it doesn't work.

 8              So when you look at the clear theory and

 9    you look at the rest of her report, there's a variety --

10    what is that exhibit number, please, Mr. Bayles?

11              MR. BAYLES:  901.

12              MR. MCNEIL:  It's 901, for the record.

13    It will be on the stick when we give it to you.

14              MR. BAYLES:  I'm sorry.  903.

15              MR. MCNEIL:  No.  Okay.  It's 903.

16              Now, I wanted to focus on a couple of

17    other issues.  I mean, you had the opportunity to hear

18    from Dr. Safir.  Dr. Safir's worked on cases for the

19    State of California.  He's worked in both the government

20    and private sector and has lots of experience.  You had

21    the opportunity to hear his presentation, you've had the

22    opportunity to hear his analysis of the reports.

23              I'm not going to go any further into that

24    because I think the evidence should be pretty fresh

25    since it was heard yesterday, but the short story is

1618

1    that when you look at this issue and look at his

2    explanation of how they end up getting damages that go

3    out 30 years, well, when the agreement itself provides

4    that there's going to be no damages for breach of

5    fiduciary duty in one part and also no damages for

6    remote, speculative, consequential, special damages, no

7    punitive damages, what did the agreement mean?

8              It meant that you better have some very

9    specific cause of action that you're going to allege

10   regarding some very specific things such as taking money

11   out of the till, and then maybe you're going to have an

12   action in this case.  But you're not going to be able to

13   talk about projects in the future.

14             And I submit to you, without trying to be

15   funny or cynical, I mean, I'm going to tell you, though,

16   that if Patrick Jenevein had presented a McDonald's

17   franchise to Soaring Wind and they elected not to buy

18   it, you'd be seeing a damage report here on how the

19   McDonald's franchise would have earned X money over Y

20   number of years.

21             That's what you'd be seeing because

22   Patrick Jenevein introduced the McDonald's franchise to

23   Soaring Wind and everything that he was doing at Tang

24   was meant to support Soaring Wind, so that McDonald's

25   franchise should be part of the damage equation, too.

1619

1    It's nonsense.  It's absolute nonsense.

2                I talked to you before and I said that

3    there was -- that this case has been misdirected.  I

4    said deceive, inveigle and obfuscate.  That's true.  You

5    know, one of the comments that Mr. Denney made during

6    the opening was fantastic.  He said, "This is" -- or,

7    excuse me, not during the opening.  I -- not during the

8    closing, he said today that -- I'm too excited, excuse

9    me.  He said that this is -- it's a case about reality,

10   about reality.  And I agree totally with him.

11               You look at the reality of the

12   relationship, look at the reality of what Soaring Wind

13   did, look at the reality of the genesis of Soaring Wind,

14   you look at the reality of the relationship with the

15   other companies, you look at the reality of his

16   independence.

17               You look at all of those things and the

18   reality of the situation is that Soaring Wind was

19   apparently a vehicle being created to bring my client's

20   innocent determination that he was going to import some

21   blades and turbines into the country and make some extra

22   money for AVIC USA turns into a broad, worldwide scheme,

23   and whatever happened in that case that this turned into

24   some sort of a conglomerate that it never was.

25               Because we know that at the end of the

1   day, Mr. Jenevein was not an 87-year-old widow.  We know

2   that he says that he had all these companies here that

3   you are looking at, so we can presume from that --

4   actually, we can draw from an inference, draw an

5   inference that he was a sophisticated businessman who

6   knew what he should have done if he wanted the Chicago

7   agreement to be part of the operating agreement.

8              One last thing, and that is because I

9   asked a few minutes ago for you to make sure that on

10  your sticks, on the disc drive, that you get that you

11  have the operative pleadings.  The reason why I want you

12  to have the operative pleadings on there is because when

13  you read the fourth amended claim, it's fascinating.

14             It's fascinating because I told you a

15  little while ago I made promises, and one of those

16  promises was that you're going to see that there's a

17  jumble of facts and from that you're supposed to

18  conclude something different.

19             On page 9, I think it is, of the claim,

20  the fourth amended claim -- do you have the fourth

21  amended claim handy?

22             I just want to give you an example, a

23  flavor of this, because I think it's important for when

24  you would deliberate and you analyze.  Well, here's one

25  of them.  They're telling you it has nothing to do with

1621

1   HT.  That's my caligraphy on there that says HT.  And

2   when you look at this page, which is page 9, they're

3   giving you the turn of events in China.  HT, HT, HT, HT,

4   HT, HT, HT, HT, HT.  They realize that -- but they told

5   you here that this case has nothing to do with HT.

6            Okay.  Mr. Walters and Mr. DeWolf told

7   you it has everything to do with HT, but they're saying

8   no because they realize that it's transparent.  They're

9   distancing themselves from the HT claim and have it

10  pulled out of Bramer's report or removed or whatever

11  happened there.  But they did all of that because they

12  don't want you to be focusing on HT, because you know

13  why?  If you focus on that and read the facts of that,

14  you're going to realize that this is all about HT.

15            This is all a device and an artifice in

16  order to drag my client down here into court and to drag

17  my client's other entities that exist out there, all the

18  AVIC entities and Ascendant and all of that, and to drag

19  them into court here and do what I said earlier, which

20  is to force some sort of resolution, which would be --

21  which itself would be injustice.

22            I'm almost done and I'm sure I have about

23  two minutes left.

24            MR. SHAMOUN:  I just want you to know I

25  quit taking time when you started.

1622

1          MR. MCNEIL:  Okay.  Thank you.

2          This is actually a pretty good point to

3   try and wrap up on, and that is, and now they're going

4   to triple down.  Because when you turn to the prayer of

5   the fourth amended claim, it's fascinating because when

6   there was this discussion the other day about whether or

7   not Sherman knew or didn't know there were claims

8   against the other Claimants or exactly what was going

9   on, that's one of those excusable things.  The claims --

10  he knows he has a cross-claim.  The question was who has

11  a cross-claim against whom.

12          I went back before this hearing started

13  and then I went back last night and read the claim

14  because I seem to recall that even in that corres --

15  that nasty correspondence that we're talking about, the

16  nasty correspondence -- well, I call it nasty, between

17  either Randy Walters and Steve DeWolf on the one hand

18  and Robert Jenevein on the other hand, I call it a nasty

19  piece of correspondence because it -- and the first part

20  of it is bribery.  "Join our case and we're going to

21  give you $60 million.  But if you don't join our case,

22  we're going to file a complaint against you for

23  disgorgement of your interest in the company.  So it's

24  your choice.  Those are your two options.  Either join

25  us and say whatever you have to say or . . ."

1        So I went back and said, "Wait a minute.

2   That's not even a legitimate offer that's being made, is

3   it?"  Because would that have resolved the case?  And

4   Mr. Walters and Mr. DeWolf handled it for their client

5   on their own, but it was interesting, when I read the

6   claim and I went back to what they want, keep in mind,

7   they're saying all Respondents jointly and severally as

8   the panel may determine will get all these damages, all

9   fees reasonably incurred, all fees incurred, all fees

10  incurred, all fees incurred.

11       Not only do we all file claims and we're

12  not quite sure what's going on in the beginning, but you

13  want to have your claims somehow related to what you're

14  ultimately going to -- there should be some rational

15  relationship between your first set of claims and what

16  you end up with in court.

17       And then we look at the next page, which

18  is page 17, and look at -- because I just want you to

19  notice that 7.2 billion.  Now, by time we get to three,

20  Claimants' damages are unlimited.  Gosh.  I mean, when

21  you start to read the claim and you see what's

22  happening, what's happened is they weren't -- they

23  didn't even want to limit themselves even to whatever.

24  It was going to be whatever they were able to throw into

25  the suit and whatever the suit was going to come out and

1624

1    deliver to you as a panel.

2              You know, I'm only going to need about 30

3    more minutes.  I'll be done.

4              MR. SHAMOUN:  Take as much time as you

5    need.

6              MR. MCNEIL:  There was one point -- or

7    one sentence, which is very interesting that I heard

8    from Professor deLisle.  And I represent and warranty

9    I'd never heard it before in my entire life, but when he

10   was talking about these facts and the components that go

11   into alter ego and all of that, it was funny, he says, I

12   think his statement was, "One swallow does not a summer

13   make."  And I'd never heard that phrase before and I'm

14   not too far from San Juan Capistrano, and I know that

15   song, so I just never heard it before.

16             But it's applicable to a lot of different

17   allegations that are made in this case.  And the problem

18   for their side is -- and I am closing, I promise.  I'm

19   in conclusion now because I want to turn to the

20   cross-claim.

21             One of the biggest problems with their

22   theory besides this whole unitary theory up and down and

23   side to side and from there to there and all of that,

24   which they can't establish under the law, besides that,

25   they have to, as I said earlier, tie all of Tang's

1625

1    conduct to the Soaring Wind agreement when we know that

2    Soaring Wind is only one of perhaps 4, 7, 10, 13,

3    there's like 18 entities on this chart, and Soaring Wind

4    is one of them, but has to sort of say they're all one

5    entity in order to get before this tribunal.

6                So what that does is, now what they've

7    done is they've drawn into question or drawn before this

8    panel all of the money of Tang.  Now, why do we know

9    that Soaring Wind -- that Tang's other wind energy

10   development projects and all these special purpose

11   vehicles it has have nothing to do with Soaring Wind?

12   We know because none of them have Soaring Wind's name on

13   it.

14               But even more than not having Soaring

15   Wind's name on it, you heard me have to pin down Patrick

16   Jenevein, ask, "Did you pay any money to the" -- "I

17   don't know what you mean by pay."  "Well, did you give

18   any money?"  So finally I said, "Well, did you write a

19   check at any time from any Tang entity to Soaring Wind,"

20   and finally I got a, "No."

21               So that gave you the answer right there.

22   That shows did he treat his Tang entities as part of

23   Soaring Wind?  No.  We know that because the course of

24   conduct demonstrates it fully and completely.  However,

25   since he's done that, because he had to tie his horse to

1626

1  that wagon, as I said earlier, since he did that, what

2  did he have to do?  Now he's exposed himself to damages.

3  Obviously, that wasn't contemplated by anybody.  It

4  wasn't contemplated by anybody.  That's why they had to

5  turn over their tax returns.  They're acting like it's a

6  gift from God that we received tax returns and personal

7  information from them.  Well, if you're going to -- the

8  phrase that I didn't hear during this arbitration was

9  what's good for the goose is good for the gander.

10         So the reality is, we want to take their

11  position and take the position that, in fact, the Tang

12  entities are all acting for the greater good of this

13  brand new entity called Soaring Wind, then you have to

14  share the profits.  And if you're going to share the

15  profits in all the Tang entities, we didn't get all the

16  information regarding all the special purpose vehicles

17  either, by the way.  But with the information we had at

18  hand, Dr. Safir was able to give you his opinion.

19         And the first one is AVIC USA Hearing

20  Exhibit 184, page 777.  And during this he says right

21  here under Conclusions, "The profit earned by Tang

22  Energy Group in breach of the agreement totals at least

23  $24.8 million."

24         So somewhere along the way there was --

25  there's even a snide remark and I think a snicker about

1627

1    "Oh, you're expecting Tang to pay money."  Well, the

2    reality is what's good for the goose is good for the

3    gander.  If, in fact, you're making those contentions,

4    you got to live with it and you got to die by it.  And

5    the answer is, at the end of the day -- there was no

6    dispute over that number, by the way.  The number is the

7    number.  But if, in fact, he has to share that money,

8    he's got to share that money with Soaring Wind.

9                CHAIRMAN ALDOUS:  You're about out of

10   time.

11               MR. MCNEIL:  Please indulge me for one

12   minute.  I think that's where I want to wrap up, but

13   just one minute.

14               CHAIRMAN ALDOUS:  You now have a former

15   federal judge and two former state judges that are

16   timing your minute.

17               JUDGE MARSHALL:  40 seconds.

18               MR. MCNEIL:  You know what, with that in

19   mind, I've been practicing long enough to know when it's

20   time to say thank you for your indulgence very much,

21   panel.

22               CHAIRMAN ALDOUS:  Thank you.

23               MR. WALTERS:  Do I have permission to

24   give the court reporter a hug?

25               CHAIRMAN ALDOUS:  No.  But you can give

1628

1   her some Bengay for her hands.  Let's take about three

2   or four minutes so she can rest her hands.

3        (A break was taken from 4:04 p.m. to 4:14 p.m.)

4             CHAIRMAN ALDOUS:  Are we ready to

5   proceed?

6             MR. MCNEIL:  Yes.

7             CHAIRMAN ALDOUS:  Mr. Jenevein?

8             MR. JENEVEIN:  I'm going to defer to

9   Mr. Lowenstein for a couple of minutes.

10             CHAIRMAN ALDOUS:  All right.

11   Mr. Lowenstein, go ahead.

12             MR. LOWENSTEIN:  Hopefully I won't use

13   the whole two minutes.  I've been trying to keep track

14   of all the metaphors being thrown from this side of the

15   room in this case.  We heard all hat, no cattle, we

16   heard one swallow does not a summer make several times,

17   we heard goose and gander.

18             What they skipped was horse's mouth.  And

19   why that's important here is because you heard audio

20   recordings straight from the horse's mouth.  You saw

21   websites straight from the horse's mouth.  I didn't hear

22   any explanation for what happened, why isn't there --

23   why didn't they stand up and say those things didn't

24   happen or we're relying on our website or anything like

25   that.  That's straight from the horse's mouth.  That's

1629

1   the one you didn't hear about and that's why I want

2   you-all to go back and think about is what did their

3   people say in this case and how do you explain that

4   away.

5                    And the other -- the last one, and then

6   I'll sit down and let Mr. Jenevein take over, was their

7   own expert said that AVIC USA, through Soaring Wind, was

8   the sole vehicle when it was formed to do this kind of

9   project, to do wind energy business.  The Chicago

10  agreement was created at the same time or right after

11  the creation of AVIC USA, and there's no other

12  explanation, there's no other entities shown for where

13  that money was going to go other than AVIC USA.  That's

14  straight from the horse's mouth.  That's from their

15  expert, the world renown Professor deLisle, who I did

16  respect, and I think he was telling the truth when he

17  said he didn't know of any other entity that existed.

18                    So with that, I'll pass to Mr. Jenevein.

19                    Thank you.

20                    MR. JENEVEIN:  I want to defer another

21  minute or so to David Denney.

22                    CHAIRMAN ALDOUS:  Mr. Denney.

23                    MR. DENNEY:  Thank you.  Less than one

24  minute.  Just thought I'd tie up after having heard

25  Ms. Bramer take a lot of arrows this week about

1630

1    speculative damages and whatnot.  I was just thinking

2    during the close, if I walk out of this hotel today and

3    a chandelier drops on my head, in the lawsuit that my

4    wife brings against the hotel that's going to

5    calculate -- Ms. Bramer's going to come to that case and

6    calculate my expected lifetime earning capacity, and

7    that's not a speculative damage.  That's what I'm going

8    to earn in the future.  That's what I'm going to earn

9    down the road.

10             And so all of this that we've heard about

11   these economic analyses of future projects that have to

12   do with wind farms that came off websites that AVIC

13   controls are not speculative.  Speculative is guesswork,

14   and this is again from the horse's mouth.

15             That's all I had to say to tie that up.

16   Thank you.

17             MR. JENEVEIN:  All right.  Let me see

18   if -- if the panel will forgive me, I think if I sit

19   down I can actually be a little quicker because I just

20   have about six or seven pages of notes I want to look

21   at.

22             CHAIRMAN ALDOUS:  You can sit, do

23   whatever you want.

24             MR. SHAMOUN:  Pull that microphone

25   closer.

1631

1         MR. JENEVEIN:  Is that better?

2         MR. SHAMOUN:  Yes.

3         MR. JENEVEIN:  And I will go quickly

4   through my notes, and my great fear, and you-all would

5   share it if you were the lawyer on the case, is that

6   your memories of what you've heard and seen are fresh

7   right now, but there won't be an award for a long time,

8   and that's just how it has to be, I understand that, but

9   I want to make sure that a couple of things are in

10  context.

11        HT Blade is a nonissue.  That's what

12  they've said.  I think the evidence is pretty clear in

13  front of you, and all you got to do is look at the

14  pleadings themselves that Tang has filed, where this

15  claim in Beijing is described, and the word that we use,

16  and I think it's artful because I can't do any better,

17  is that Tang Wind Energy Hong Kong, you may have noticed

18  this, has entrusted that claim to Tang.

19        I can't really tell you what it means.

20  They didn't sign it because I don't think it's

21  arbitrable.  But it's a real claim, it's a real damage

22  and that's why we told you what happened.  Is that

23  related to the Soaring Wind agreement?  I can't sit here

24  with a straight face and say, "Oh, yeah, that's related

25  to Soaring Wind."  And I wouldn't do that.

1632

1          It's been revived in this case only

2    because the other side has said those claims are now

3    relevant to the damages they claim.  Those are the

4    facts.  If this were about HT Blade, you could find

5    something about HT Blade in our damages or we might have

6    joined the other shareholders in HT Blade.  They're not

7    parties.  They're not even mentioned.

8          Patrick Jenevein was sneaky.  They say he

9    recorded Paul Thompson four times.  And when Paul gave

10   that testimony, I thought Paul's just mistaken because I

11   know there were two times in Patrick's offices where a

12   recording was made and then I know that Paul was

13   actually recorded, along with Xu Hang, at the airport.

14   And that's three, but I don't know where they're getting

15   this fourth.

16         Well, his lawyer just told you the fourth

17   time was on June the 12th, 2014, the day before the

18   initiation of the arbitration.  That was the telephone

19   conference that was recorded automatically, but Paul

20   wasn't a part of that conference.  But you wouldn't know

21   that if all you do is look at the transcript because the

22   transcript says "Paul."  It doesn't mean Paul Thompson.

23   If you listen to the transcript, you'll know immediately

24   it's someone to whom English is a second language.  And

25   I have assumed --

1633

1          MR. WALTERS:  I hate to interrupt --

2          MR. JENEVEIN:  -- that the reason for

3   this mistake --

4          MR. WALTERS:  -- closing argument, but I

5   never said that.

6          CHAIRMAN ALDOUS:  Well, the panel will

7   recall whatever's said.  This is closing argument and I

8   expect that -- both parties taking liberties.  Go ahead.

9          MR. JENEVEIN:  I'm going to try really

10  hard not to take any liberties, and I don't know any

11  reason why that misrepresentation would be made, even if

12  it's a mistake, unless somebody was trying hard not to

13  have what Paul Ming Ma said, as the lawyer for AVIC USA,

14  held against AVIC.  If it's Paul Thompson, it's not an

15  admission by AVIC USA.  I'll let you-all be the judge of

16  that.

17          Trade secrets.  Thompson's lawyer said

18  there's no evidence, not an iota of evidence of trade

19  secrets being taken from Tang.  Remember that in

20  November of 2011, Paul Thompson and Xu Hang came to the

21  offices of Tang Energy, accompanied by the people from

22  China Creative Wind, their partners in Cirrus.  That was

23  November of '11.  And Patrick told you they talked about

24  Power Purchase Agreements and project finance and all

25  the things that Patrick Jenevein has expertise in, and

1634

1    then they left.  And he was never included in that

2    project, despite their representations to the contrary.

3    That is the evidence.

4              They said there's no evidence of damages

5    against Paul.  Bless her heart, I thought Ms. Bramer was

6    as clear as she could be.  My report never says this is

7    a Paul Thompson damage, and we could stipulate to that,

8    but she said "I attribute to him those damages caused by

9    Ascendant where he was the president and sole officer

10   and a member of the board of directors."

11             They say that this is a punitive case

12   against Paul, but that doesn't even make sense to me.

13   They show you these terrible e-mails that Patrick

14   Jenevein wrote Paul threatening to pay his attorneys'

15   fees.  Where is the evidence that Patrick Jenevein had a

16   particular grudge against Paul Thompson?  And they say

17   this has been so devastating to Paul Thompson.

18             We haven't spent a lot of time talking

19   about the emotional distress that this has caused the

20   parties, but just imagine how it was for Patrick

21   Jenevein in November of 2013 when he got that e-mail

22   from Xu Hang.  The purpose -- the point of which,

23   inescapably, was all this stuff that you've been told is

24   lies and we have taken your business, to the extent that

25   we could, we've locked you out of the wind energy

1635

1  business by a noncompete and we've been doing it without

2  you.

3          They say, just in their closing

4  arguments, that clearly Paul Thompson's signature on

5  June 11th, 2008 was forged, and their evidence is he

6  agrees, and no one disputes, that he didn't sign those

7  two pages and left and was gone for six days, but yet

8  that date was printed on that agreement.

9          You guys understand that agreements don't

10 always get signed on the date that's printed on the

11 agreement.  And nobody's offered evidence one way or

12 another.  Here's what's wrong with that:  There's no

13 dispute in this case that Paul signed that version of

14 the agreement.  No dispute.

15         He says his signature was forged on the

16 next version, the one where all the signatures are on

17 the same page.  So to say that that -- and you'll

18 remember, he showed it up here just now, he showed you

19 this one page that had Paul Thompson's signature on it.

20 Look at our Exhibit 2.  That's the one we're suing on.

21 His signature's not on a separate page.  It's right

22 there with all the others, and that's the one they say

23 is a forgery.

24         Mr. Walters said a joint venture can't be

25 an SPV.  I don't know where he gets that.  A special

1636

 1    purpose vehicle is the corporate entity that Patrick

 2    Jenevein and everybody who talked about them and agreed

 3    would be formed for the purpose of owning all the assets

 4    and all the liabilities related to a particular project.

 5    No reason it can't be a joint venture between more than

 6    one party.

 7                    All these projects -- I don't think I

 8    need to remind you-all -- well, I can't take a chance.

 9    You can't say this is a Soaring Wind project if Soaring

10    Wind hadn't given you permission to do it.  You just

11    can't.  Soaring Wind never gave Tang permission to put

12    Soaring Wind's name on a single project.  Not one.

13                    Now, does any of this matter?  Hardly.

14    For two reasons.  All these projects never came to

15    fruition except for two.  All those that didn't come to

16    fruition, even if it was a breach of contract, it would

17    be a breach of contract claim with no damages.  But

18    that's undisputed.

19                    The two that make money were Corpus

20    and -- Corpus Christi, the Harbor Winds project and

21    Flatwater.  I know you guys have got this.  You've seen

22    the e-mail where they were both sent to Sherman Zhang.

23    They were presented.

24                    They say that's still a breach of

25    contract.  And this is the second point I want to make

1637

1    about that.  Please recall, gentlemen, we had to go

2    through the machinations of calling a management

3    committee meeting of Soaring Wind, having a resolution

4    passed with Sherman Zhang's participation so that

5    Soaring Wind could come in here and assert those claims

6    that the Respondents said were only Soaring Wind's

7    claims to assert.  And we did that.  They have not done

8    that.

9              And the reason we did that is because

10   they told you guys you got to strike those claims.  And

11   on December 18th you heard a motion.  You deferred it

12   because it was a dispositive motion and you wanted to

13   put that in the scheduling order, but you heard a motion

14   on December 18th from them to strike those claims for

15   lack of standing.

16             If Tang had a lack of standing to assert

17   those claims, they have a lack of standing to assert

18   those claims.  That's in our pleadings, that's pled.

19   That should be the end of the discussion about whether

20   there's a breach of contract here by Tang.

21             They have never done what they could

22   have.  All they had to do was come to Soaring Wind and

23   say, "We want a management committee meeting.  We want

24   the manage committee to vote to pursue claims against

25   Tang," and either the management committee would have

1638

1    voted to do it, or, if they didn't, then AVIC USA would

2    have standing under Delaware law to assert a derivative

3    claim.  And if you don't believe me, just read their

4    motions to strike.

5              Today in closing argument is the first

6    time we heard the defense that Mike Carter, as the

7    president of Soaring Wind, had the ability, the legal

8    authority, to unilaterally amend the agreement.  I don't

9    need to comment further on that.

10             On whether or not Patrick Jenevein was

11   concerned when Paul Thompson went to work for Ascendant,

12   he test -- Patrick testified, and please recall the

13   testimony, he felt differently about Mitsubishi than he

14   did about Ascendant, and he told you he thought he might

15   have been confused in his deposition.  You have to

16   decide if you think that's credible, but Mitsubishi and

17   Ascendant were fundamentally different.  When Paul went

18   to work for Mitsubishi, that was potentially

19   competitive.  Patrick wasn't happy about it.

20             When he went to work for Ascendant, that

21   was not competitive.  That is with Soaring Wind, and

22   that's a key issue in this case.  It was like going to

23   work for AVIC USA, as far as Patrick Jenevein was

24   concerned.  He now had somebody in AVIC that he thought

25   would call him back.  That is the evidence.

1639

1      A waiver under section 17.12 of the

2  Soaring Wind agreement must be in writing signed by a

3  member.  There's no waiver here.  They talked very

4  briefly about the covenant not to compete, so I don't

5  think it's something anybody in this room takes very

6  seriously.  This is not a covenant -- 6.10 is not a

7  covenant not to compete that governs a former employee

8  or even a former member.  It governs current members,

9  current owners of Soaring Wind.  It's just, I believe, a

10  reaffirmation of the duty of loyalty.

11      That is why in our pleadings we argue

12  that specific affirmation of that fiduciary duty

13  overcomes the general prohibition that, I grant you, is

14  there.  There's a general prohibition in the agreement

15  against fiduciary duties that 6.10 seems to me that's

16  how you have to interpret that.  The owners of this

17  business say we're in it together.  We're not going to

18  compete with each other.

19      Why should the Chicago agreement be

20  litigated here, Mr. McNeil asks.  He says it's a

21  concocted scheme.  That's what I wrote down.  It should

22  be litigated here if it's related to Soaring Wind, and I

23  haven't heard -- well, they have an argument.  I

24  shouldn't say that.  I think it's fairly clear that this

25  was, if nothing else, an agreement for the financing of

1640

1   wind power projects.  And if you believe that Soaring

2   Wind definition includes the development of wind farms,

3   they're related.

4              Why couldn't Soaring Wind be that

5   partner?  Because Soaring Wind is 50 percent AVIC and 50

6   percent Texans.  The Chicago agreement was trying to

7   follow the same percentages.  It was the agreement by

8   which the AVIC side would finance Soaring Wind projects.

9   That's why it's 50/50.  I don't say it's 50/50.  Xu Hang

10  says it's 50/50 and he wrote the agreement.

11             Everybody agrees with that because AVIC

12  put it on their websites.  If it had been between CATIC

13  TED on one hand and Soaring Wind on the other, you see

14  how that would have reduced the Texas investors from 50

15  to 25.  That half of Soaring Wind would now be half of a

16  half.

17             Don't forget the testimony of Colonel

18  Stokes of the SASTIND directive.  SASTIND stands for

19  State Administration of Science Technology Industry for

20  National Defense.  I think he said that came down

21  December of 2007 and that was the "go do wind power"

22  directive.  It was shortly after that that we had the

23  reorganization and in April of 2010 the creation of AVIC

24  IRE for the purpose of pursuing renewable projects.

25             The alter ego problem here is that

1641

1  CATIC -- and, you know, I stand by the testimony of

2  David Jacobson, who sat here as a gentleman, having

3  never been an expert witness before.  He's just a little

4  guy who knows a hell of a lot about business in China,

5  and he answered every question he was asked of opposing

6  counsel and of the panel, and I hope you found him

7  credible because I did and, well, he cost us $100,000.

8  And I think he did the right thing.  I thought he was

9  very clear saying that the Soaring Wind agreement was

10  the idea of CATIC.  CATIC dictated that AVIC USA would

11  be there.  To not believe him, you have to believe

12  Sherman Zhang who said, "Oh, it was all my idea."

13          Professor Barry Naughton, who is a close

14  colleague and friend of Professor Jacques deLisle, well

15  respected, cited 9,000 times, told you in the most

16  objective and, I think, distinguished way that's just

17  not plausible.

18          John Townsend.  To the extent that

19  you-all do feel any obligation to comment on the

20  objections to the process by which arbitrators were

21  selected, please don't forget every Respondent in this

22  case cited the Hooter's case from the Fourth Circuit;

23  every one of them.

24          When I saw that -- I think we talked

25  about this in December.  The first thing I did is I

1642

1    contacted those guys, four guys designated by the Fourth

2    Circuit as experts on arbitration fairness.  Four guys.

3    One of them, older guy, retired, didn't want to be

4    involved and sent me an e-mail saying, "I'm an

5    employment contract guy, labor contracts.  This is a

6    commercial deal.  I'm out."

7              The other three have provided reports,

8    and they're in the record.  I can't cite you to the

9    exhibit numbers right now.  All three of the other three

10   experts from the Hooter's case side with us and say you

11   got to go with the party's agreement.  And if they

12   didn't like the way arbitrators were supposed to be

13   selected, they should have said something about it

14   before they signed the agreement.  The exhibit numbers

15   are 827 through 829.

16             I got to come to the defense of my good

17   friend Erica Bramer.  By listening to the lawyer for

18   AVIC USA, you would think Ms. Bramer is a full-service

19   stop; that she's going to help you figure out how to

20   record people secretly, then she's going to give you

21   definitions on alter ego and get all those facts right

22   and, on top of that, as a bonus, she's going to render

23   some financial opinions.

24             Just remember that when they came to

25   criticize Ms. Bramer today and they decided you know

1643

1   what, we're going to put something up there on the board

2   to show how this report is unreliable.  The fact that

3   they put up was a footnote where she included the word

4   TED when she should have left it out.  It's a mistake.

5   She corrected it in her deposition.  You didn't hear

6   about that today.  But if that's the mistake that she

7   made, I'll stick with her.

8              Cirrus is unrelated to wind energy,

9   biomass is unrelated to wind energy.  On Cirrus, just

10  ask the buyer and the seller.  They're the ones that

11  matter the most.  Patrick was right.  AVIC wanted that

12  deal and it was a good deal for AVIC, and the proof is

13  in the pudding.

14             The Greenville biomass.  The DOE FINLA,

15  Department of Education -- Department of Energy FINLA,

16  I'm not even going to try to tell you what F-I-N-L-A

17  stands for because I don't know.  That's the grant that

18  they were trying to get and that's the grant -- C-O?

19  I'm sorry, FINCO, F-I-N-C-O.  That's the grant they were

20  trying to get, and all they had to do was show that they

21  had exposure to four different kinds of energy; biomass,

22  wind, solar and reduced transmission, I think it is.

23  They had to have all four.  That's why that project was

24  pursued and, unfortunately, it was a huge loser.

25             Thank you very much.  It gives me great

1  encouragement that you-all have been paying attention

2  and that you've gotten a lot of this stuff.  That's why

3  I'm not going into any more detail.  I'll defer the

4  balance of the time to Mr. Moseley.

5              MR. MOSELEY:  I was wondering why I've

6  been sitting here.  I want to talk for a few minutes

7  today to a couple of things.  One, I want to try to save

8  you some time down the road in terms of picking out

9  where you're going to find the law that you need to

10  apply to this case.  And, number two, I'm going to try

11  to save you from having to go down a couple of rabbit

12  trails.  And so I don't intend to take a lengthy period

13  of time, but I want to try to be helpful to the panel in

14  that regard.

15              MR. WALTERS:  Mr. Moseley, Judge Moseley,

16  I don't mind, obviously I don't, but I just want y'all

17  to know they represent the same parties, so I'm

18  actually -- if he's making a legal argument, which it

19  sounds like he is, about something in the case like a

20  post closing argument type motion, I have no problem,

21  but they do represent the same parties.

22              CHAIRMAN ALDOUS:  That would apply to

23  questioning witnesses and objecting.  I don't mind them

24  splitting up the --

25              MR. WALTERS:  I don't either.

1645

1          CHAIRMAN ALDOUS:  Thank you.  Go ahead,
2   Judge.
3          MR. MOSELEY:  I'm guessing I can do this
4   faster than Bob can.  That's why I'm here.
5          Let's talk alter ego for a second.  Alter
6   ego is a equitable concept.  When you're dealing with
7   those equitable types of concepts, you're going to look
8   around and say okay, the totality of the circumstances,
9   looking at all the factors, is it equitable to maintain
10   or honor the corporate separations between different
11   entities in this situation.
12          And AVIC 1 and AVIC 2 talk about that.
13   They set forth those factors and we put those in a
14   brief.
15          MR. JENEVEIN:  Bridas.
16          JUDGE MOSELEY:  I'm sorry, the Bridas
17   factors.  We put those in the brief to say those are the
18   appropriate things for you to look at.  It's a
19   handy-dandy checklist.  It's not exclusive but it's a
20   good checklist.  And it's something the Fifth Circuits
21   use, others have used.  It's gotten used sometimes
22   today.
23          And we'll talk for just a second about
24   Bridas 1.  But if you can look at these factors, I urge
25   the panel to say in your opinion that you are

1646

1    determining to use what is considered the federal common

2    law with respect to alter ego issues.

3                But we've said in our brief that whether

4    you use federal common law, Texas law, Delaware law or

5    California law, it's the same thing.  The question is,

6    is it -- have the corporate formalities been observed or

7    not; and, with respect to number two, is it unfair to

8    insist on those corporate formalities here.  That's what

9    that's all about.

10               In that regard, I would set aside the

11   California case that's been cited to that said --

12   remember all that questioning about now, is there any

13   evidence that AVIC USA owns stock in Ascendant; the

14   answer's no.  Is there any evidence that Ascendant owns

15   stock in AVIC USA; the answer's no.  That's because they

16   were citing to you a California case that says if you

17   don't have stock ownership between the two, there can be

18   no alter ego.

19               And when I read that, I thought I never

20   thought California was going to be that strict about

21   much of anything.  And so I went and looked it up.  And

22   what that case says is, and it's cited -- there's a case

23   we cite call Politte, with comes out of the Northern

24   District also.  And Politte says, contrary to their

25   statement, when -- this is a quote.  "When one

1647

1  corporation is asserted to be the alter ego of another,

2  California law does not require one corporation to have

3  an ownership interest in the other.  Instead, Courts can

4  look to the ownership interest or a substantial unity of

5  ownership and interest."

6             And when you look up there on that board

7  and you look at AVIC HQ and all those other AVIC

8  entities, that's what we're alleging here.  That's what

9  we've got.  Politte goes on to criticize the case they

10  talked about, which is called the Hickey case.  And it

11  says, "Oh, yeah.  We know what Hickey says, but Hickey

12  involved an individual with no corporate ownership

13  interest rather than a two corporate situation like we

14  have here."  That case has been blown out by the

15  California Northern District.  That case was affirmed by

16  the very Ninth Circuit that wrote Hickey.  Politte has

17  been affirmed by the same circuit, and now I want to

18  cite to you, use the federal common law standards and

19  back that up with suspenders by saying it's the same law

20  in Delaware or Texas or California, and we got cases in

21  the brief to say that.  That's how Bridas works here.

22             Now, let's talk about damages for -- I

23  want to talk about one more thing about Bridas.  I'm

24  going to get up for this part.  You thought we left this

25  up here by mistake.  This is the Bridas board that

1648

1    Mr. McNeil prepared for you quoting Bridas 1, said this

2    is good law, I want you to follow it, put it up here,

3    puts all these things in here and says that that is what

4    kills our alter ego case.

5              The problem is this isn't from the alter

6    ego discussion with Bridas 1.  It's from the agency

7    discussion in Bridas 1.  In Bridas 1 there were several

8    different theories presented as to piercing the veil,

9    one of which was agency, and the Court said agency won't

10   cut it.  This is a agency quote.  If you print that out

11   on Westlaw, that's at the top of page 10, and alter ego

12   starts at the bottom of page 10.

13             Why am I bringing that up?

14             MR. MCNEIL:  I don't want to object but

15   that's a misstatement.  I specifically said that's

16   related to --

17             CHAIRMAN ALDOUS:  We'll read the cases.

18             JUDGE MOSELEY:  I think he said agency.

19   I think he said it in the middle of his alter ego

20   discussion.

21             Now, with respect to the damage question.

22   Everybody's talking about whether these damages are

23   barred by the agreement, and I want to give you the case

24   that we urge you to follow.  It's in a brief, eCommerce

25   Industries, this is a Delaware Chancery Court opinion,

1649

1    that talks about what's a direct and what's a

2    consequential damage.

3              And in this case it says if lost -- that

4    profits are direct and not consequential damages, quote,

5    when profits are precisely what the nonbreaching party

6    bargained for and only an award of damages equal to lost

7    profits will put the nonbreaching party in the same

8    position he would have occupied had the contract been

9    performed.

10             That's from the Delaware Chancery Court.

11   And it cites the Tractebel case, which is a Second

12   Circuit case I'll mention something about in a minute.

13   I want to give you one more comment from that case, from

14   the eCommerce case.

15             In this particular case, the Court was

16   looking at -- in the eCommerce case, the Court goes on

17   to say, "With respect to a noncompete provision or

18   agreement," and what we have here in Soaring Wind

19   agreement between Tang and AVIC is an agreement not to

20   compete with each other.  It's a stipulation that we're

21   only going to do business in the defined term of

22   business together through Soaring Wind.

23             And here's what eCommerce says:  "In

24   respect to a noncompete provision or agreement, I

25   conclude the profits of the product line or business

1650

1  that is being protected from competition constitute the

2  benefits for which the protected parties bargained.

3  Furthermore, lost profits on the part of the

4  nonbreaching party are the direct and natural

5  consequence of breaching a noncompetition provision.

6  The language of limitation of liability in question here

7  suggests that the parties didn't intend to preclude

8  direct damages."  And our agreement's the same thing.

9  It doesn't preclude direct damages.

10            Last quote.  "Because lost profits are

11  the type of damages most likely to result from a breach

12  of a noncompetition provision, I consider lost profits

13  to be in the nature of direct damages in this case."

14  That's what we have here.  These are direct damages for

15  breach of the noncompetition.

16            How did they breach it?  It's not that

17  they -- it's not the deals that we could have made with

18  them; it's the deals that they went off and made.  We're

19  not speculating about deals.  There's been question

20  about what is the evidence with respect to what deal got

21  done, but our claims here are based on the fact that

22  they did these deals without us and therefore cut us out

23  of our percentage interest from the profits.  And that's

24  what Ms. Bramer goes into.

25            Now, well, gee, can that disgorge?  Yeah,

1651

1  you can.  Remember there was a comment a moment ago that

2  there is an effective disclaimer of -- a question of --

3  I'm sorry.  Let me pull it up here.  Of fiduciary duty.

4  And that is correct.  With respect to these parties,

5  there's a general fiduciary obligation to each other.

6              However, in the very next paragraph there

7  is -- it's paragraph 6.10 of the agreement, there's an

8  exclusive arrangement.  "Each party agrees during the

9  term of this agreement each shall only conduct

10 activities constituting the business in and through the

11 company."  That's it.

12             And breach of that, whether you call it a

13 fiduciary duty or not, gives rise to the same types of

14 damage that we just talked about as direct damages.

15 This also fits into the category of damages that are

16 subject to disgorgement.

17             When you have a breach of a duty, a

18 fiduciary duty, or in this case a limited fiduciary

19 obligation to not do business competing against your own

20 deal, case out of Delaware saying "When the defendant

21 breaches the duty of loyalty, the infringing party must

22 disgorge all profits and equity from the usurpation.

23 Plaintiff may elect to claim the results of those

24 transactions for himself.  The rule is based on wise

25 public policy to take away the temptation of breach of

 1    that relationship."  That's also from our Claimants'

 2    brief regarding damages, Mobilactive case.

 3              Lastly, are these speculative damages or

 4    not.  I want to talk about this for just a little bit

 5    longer than the other cases.  Remember I said while ago

 6    that Delaware case cited Tractebel, which is a Second

 7    Circuit case.  Tractebel was a long-term electrical

 8    sales contract dispute.  And in Tractebel, the district

 9    court said, "Oh, these damages are speculative.  These

10    are too far out there and we can't award them."

11              In fact, here's what the district court

12    said.  See if this sounds like an expert witness in this

13    case.  "In order to know what the revenues would be over

14    the next 20 years, one would have to be able to presage

15    a vast and buried body of facts, projections of lost

16    profit, include assumptions regarding the price of

17    electricity, cost of operating over 20 years.  One would

18    need to surmise what competing forms of energy might

19    cost over the same period of time, factoring in the

20    calculations of political and regulatory developments

21    over 20 years, population growth by energy, by region,

22    technological advances."  And the district court sums up

23    by saying, "These experts might have done as well had

24    they consulted tea leaves or a crystal ball."

25              Unfortunately for the defendant in this

1653

1   case, unfortunately for AVIC, unfortunately for

2   Dr. Safir, the Second Circuit reversed that case and

3   said those damages aren't speculative.  What they said

4   is, here's the quote, "Not a single product or service

5   exists for which a company's profit margin over time is

6   unaffected by fluctuating supply and demand, changes in

7   operating costs, increased competition from

8   alternatives."  He goes on to some more.

9             And then it says, "The variables

10  identified by the district court exist in every

11  long-term contract.  It is in -- this is not the case

12  that all such contracts may be breached with impunity

13  because of the difficulty of accurately calculating

14  damages."

15            This was damages over a 20-year deal.

16  We've given you a range of numbers.  Dr. Safir, in his

17  nonlawyerly wisdom, says, "Well, five years max, maybe

18  no more than that because it's too speculative."  He's

19  wrong in the Second Circuit.  I think he's wrong here.

20  These are not speculative damages.  We gave you the best

21  numbers we could get.

22            And I will echo something that Bob said.

23  We're asking you to make a negative inference.  The

24  inference is that when they're casual, when they're

25  unguarded, when they're not worried about lawsuits, the

1654

1    inference is that AVIC's website's telling the truth.

2    The inference is that AVIC's employee, Sherman, was

3    telling the truth when he was unguarded and relaxed.

4            And the same is true with respect to

5    Mr. Thompson.  Mr. Thompson stood up here, I don't know

6    if you saw -- or heard the little comment he made near

7    the end of one of his points, he said, "Yeah, that

8    wasn't true and I'm sorry."  But when he responded back

9    to the e-mail that was sent to him, he didn't say,

10   "What I said wasn't true."  He said, "Well, I can't

11   prove it."  Then he said, "Well, I've got a conflict of

12   interest.  I don't want to be involved."  That's what he

13   said.

14            I would urge you to take them at their

15   word.  And, yeah, we taped them.  If you had just gotten

16   an e-mail saying, "Oh, yeah, we're waiting on our 50

17   million.  When are you going to start doing deals with

18   us," and your partner comes back and says, "What do you

19   mean?  We've already done 50 million," well, they didn't

20   do them with us.  You'd start taping people, too.  You'd

21   start wondering what is going on here, and that's what

22   happened here.

23            Now, last comment -- well, next to last.

24   I'm a lawyer.  Who is here?  Who's before this Court,

25   before this tribunal.  We told you back in December when

1655

1   we had the first hearing, we said the very way that this

2   case is being prosecuted and presented to you is itself

3   evidence of alter ego.

4           I'm not going to lay them out in detail,

5   but at the beginning of our original draft proposed

6   award, there's about two pages of what we say is

7   evidence based on the actions of the people who are here

8   that indicates that Ascendant is here, that AVIC IHC is

9   here.  We've now seen a report that maybe AVIC IRE is

10  here.

11          What we got today for the first time

12  ever, we've been asking for this, is a reimbursement

13  agreement.  This is between an entity that's not here,

14  Ascendant and AVIC International Renewable Energy, AVIC

15  IRE, another entity not here, on figuring out how they

16  going to cover the costs for Mr. Steve DeWolf in the

17  lawsuit case.  That's what this is all about.  This is

18  what we've been trying to get.

19          Based on what we've seen and our look

20  at -- looking at this record, once we get it all put

21  together, we're going to ask this panel to make findings

22  that include findings that AVIC TED -- let me back up

23  for a minute.  AVIC IRE, AVIC IHC and Ascendant, in

24  fact, are here and have participated in this

25  arbitration.

1656

1                    The reason I backed up on AVIC TED, I

2    want to go back and look at the record.  I'm not sure I

3    can represent to you right now that I got a basis for

4    saying that.  If I do, I'm going to put it in the

5    motion, going to put it in our proposal.  I can't tell

6    you that right now.  But that's what we're proposing to

7    do.

8                    Now, we are respectful of Judge

9    Kinkeade's order.  You know we're respectful of Judge

10   Kinkeade's order, and I'm not going to ask you to do

11   anything to it, but when we file -- we don't think it's

12   necessarily right.  And we're going to be filing some

13   motions to try to set it aside or get it reconsidered or

14   reheard.

15                   At the very least we're going to ask

16   Judge Kinkeade to clarify that this panel has the

17   authority based on what it has seen in the presentation

18   of this arbitration, some of which may have taken place

19   before Kinkeade's order, but certainly a lot of it that

20   took place after last Friday.  We're going to want to

21   ask Judge Kinkeade to make it clear that this panel has

22   the authority to say as a matter of fact Ascendant

23   showed up and Ascendant participated in this

24   arbitration.

25                   And that's one of the things we're going

1657

1    to be asking you to do.  And we think we've got the

2    evidence to support that, and we ask that you make those

3    determinations.

4                    Now, last couple of comments.

5    Mr. McNeil, who I like personally, by the way, doubled

6    down today -- tripled down, from my count, talked about

7    innuendo and deceive, inveigle and obfuscate.  That was

8    a phrase used twice.

9                    I confess, I've been on the bench 18

10   years.  I'm kind of not used to seeing some of this

11   stuff as up close and personal as I get to see it here,

12   but here I sit.  I heard him say that and I was feeling

13   kind of thin-skinned about it, not very happy, and then

14   I started listening to what else he had to say.

15                   He talked about Tang as being some name

16   that was ginned up to try to get investors in China.

17   And y'all know they did an investment deal in China.

18   You heard about that, didn't ya?  Oh, but that wasn't

19   Tang.  That was HT Blade.  There's no innuendo about the

20   use of the name Tang to try to mislead investors.

21                   Here's a statement --

22                   CHAIRMAN ALDOUS:  I've been waiting to

23   say this for 28 years:  Justice Moseley, you are now on

24   the yellow light.

25                   MR. MOSELEY:  I'm going to try to kick it

1658

1    up to McNeil speed, Your Honor.  83 instances when he

2    was deposing Patrick where he found evasion.  How are

3    you supposed to count that?  How are y'all supposed to

4    determine that?

5                    And then his very next statement was

6    accusing us of crafting evidence that cannot be verified

7    by a source.  What on earth is Lili's document that was

8    presented up here to you that came in response to

9    Mr. DeWolf's e-mail?

10                   Or what about Xu Hang, who testified by

11   deposition, not as a corporate representative of IRE.

12   He disclaimed that.  "I'm not a representative of the

13   company, I don't know who might be a representative of

14   the company, I don't know what they might say, but

15   here's my testimony."

16                   And, no, you don't get any discovery

17   against my company so I can determine the weight or

18   merit of what you're saying.  Neither can we with Lili.

19   This isn't the late production of business records.

20   This is handcrafted, on demand, custom-designed trial

21   exhibits made for your consideration without our ability

22   to test or weigh those in the process that we're

23   supposed to be doing here.  That's what that is.

24                   And so when I hear people talk about

25   deceiving, inveigle and obfuscating, I confess, I got

1659

1   about four more pages, I'm going to cut that off, but

2   champerty.  Good Lord.  Is that where we're going?

3   That's about all I'm going to -- last comment.  He said

4   this is a case about xenophobia.  Xenophobia is the

5   innuendo that my client and Fulbright & Jaworski got

6   together to trick this poor person that can't speak

7   English, or that Xu Hang, who drafted the Chicago

8   agreement in English -- y'all saw his deposition.  He

9   was being questioned about the document he drafted in

10  English.  He was asked a question in English, which was

11  translated in Mandarin, so he could respond to it in

12  Mandarin about the document he drafted in English so

13  that it could be translated back by the translator into

14  English for the deposition.  Xu Hang drafted that

15  document, and to say that we took advantage of Xu.  "Oh,

16  they should have taken that to a lawyer."  Xu Hang said,

17  and here's the testimony, "This is how you get money out

18  of China.  You got to have one of these signed."

19  Patrick did.

20              I'm going to let this man close here.  I

21  think we're about done.  I want to thank you for your

22  time and we're going to try to help you avoid those

23  rabbit trails down the road.

24              MR. JENEVEIN:  We don't have anything

25  further, Mr. Chairman.

1660

1        CHAIRMAN ALDOUS:  All right.  Thank you

2   very much.  I would like to compliment all the lawyers

3   on a job well done and to tell you I appreciate the fact

4   that y'all didn't engage in any fisticuffs and things

5   like that.

6        And so everybody has the schedule and

7   that will bring the oral -- Ms. McKay?

8        MS. MCKAY:  Your Honor, there's been

9   evidence we've put in the expert reports of the

10  handwriting experts.  You have two experts on our side

11  and one on their side.  And I know that many of the

12  documents that are included with those reports are

13  second and third generation of the signature at issue.

14       I just want to make an offer of evidence.

15  We have the original signatures if the panel wants to

16  view them or see them at any time, it can be provided to

17  the panel.

18       CHAIRMAN ALDOUS:  All right.  So

19  Ms. McKay is the repository of the original signatures,

20  and if anybody wants to take a look at them, that's

21  great.

22       And I feel like I love y'all so much, if

23  I don't leave now, I may never leave.

24

25       (Proceedings concluded at 4:58 p.m.)

1661

1   STATE OF TEXAS     *

2   COUNTY OF DALLAS   *

3

4        I, Christy Fagan, CSR, CRR, RMR, TMR, RPR, CLR,

5   Certified Shorthand Reporter in and for the State of

6   Texas, hereby certify to the following:

7        That this transcript is a true record of the

8   proceedings held and the parties present, named herein

9   August 14, 2015.

10       Certified to by me on this 2nd day of September,

11  2015.

12

13

14

15

16

17

18  _____
    Christy Fagan, CSR, CRR, RMR, TMR, RPR, CLR
19  Texas CSR 5459
    Expiration:  12/31/16
20  LEGAL SOLUTIONS COURT REPORTING
    Firm Registration No. 424
21  3102 Maple Avenue
    Suite 450
22  Dallas, Texas 75201
    (866) 830-1717
23  (866) 651-4292 Fax
    www.LegalSolutionsCourtReporting.com
24

25